## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF ILLINOIS; STATE OF CALIFORNIA; STATE OF NEW JERSEY; STATE OF RHODE ISLAND; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF MINNESOTA; STATE OF NEW YORK; STATE OF VERMONT; STATE OF WASHINGTON, | |
| *Plaintiffs*, | |
| v. | No. __ |
| KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; FEDERAL EMERGENCY MANAGEMENT AGENCY, | |
| *Defendants*. | |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      For decades, state and local governments have relied on federal funding—totaling billions of dollars annually—to prepare for, protect against, respond to, and recover from catastrophic disasters. These grants fund first responders' salaries and pay for the training they receive. They fund computer network testing to identify cyberattack vulnerabilities. They fund the mutual aid networks that allow first responders to mobilize from outside the immediate jurisdiction when tragedy strikes. Congress created these federal grant programs and appropriated billions of

dollars each year to ensure they are fully funded to meet the Nation's needs. Many were authorized by legislation passed in the wake of national emergencies, such as the September 11 terrorist attacks and Hurricane Katrina, to strengthen the nation's preparedness for and response to emergencies and major disasters.

2.    And for decades, across presidential administrations of both parties, the U.S. Department of Homeland Security ("DHS") and its sub-agency, the Federal Emergency Management Agency ("FEMA"), have operated these programs evenhandedly, supporting all fifty States in their efforts to prepare for and respond to emergencies and threats, understanding that the Nation is at its strongest when all Americans are protected from catastrophe.

3.    But the current Administration has taken a different approach to administering the Nation's emergency management funds. On January 20, 2025, his first day in office, President Trump expressly directed DHS to "ensure that so-called 'sanctuary' jurisdictions do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). The President has deemed that certain States and jurisdictions are in "lawless insurrection," Exec. Order No. 14287, § 1, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025), because he disagrees with how they allocate their own local law enforcement resources. As recently as September 24, DHS proclaimed that "[c]ities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding." "No lawsuit, not this one or any other, is going to stop us from doing that." Anna Griffin, *Federal Judge Rejects Administration Efforts to Tie State Disaster Funds to Immigration Cooperation*, N.Y. Times, Sept. 24, 2025.[1]

4.    DHS was referring to the injunction entered against it just five days ago in *Illinois v. Fed. Emergency Mgmt. Agency*, _ F. Supp. 3d _, 2025 WL 2716277 (D.R.I. Sept. 24, 2025). In

---

[1] https://www.nytimes.com/2025/09/24/us/politics/trump-disaster-aid-immigration.html.

that case, DHS and FEMA had sought to upend the Nation's emergency management system, holding critical emergency preparedness and response funding hostage unless States agreed to devote their scarce law-enforcement resources to assisting the federal government in enforcing federal immigration law. DHS did so by adding terms to its "Standard Terms and Conditions"— applicable to all grant awards—that required States to divert their law enforcement resources away from core public safety missions to federal civil immigration enforcement as a condition of receiving *any* federal funds. Plaintiffs here are 12 States that were among those that brought suit to challenge the legality of these terms, contending that they were arbitrary and capricious, exceeded DHS's legal authority, and violated the Spending Clause. *See Illinois v. FEMA*, No. 25-cv-206 (D.R.I.). Just last week, the U.S. District Court for the District of Rhode Island agreed, issuing an opinion granting the States' motion for summary judgment and permanently enjoining DHS and FEMA from enforcing the conditions on the grants that they administer.

5.      But DHS and FEMA are undeterred. Two days ago, frustrated in its first attempt to coerce Plaintiff States into enforcing federal civil immigration law, DHS took yet another lawless action. It simply cut many Plaintiff States' awards dramatically, without explanation, re-allocating their funds to more favored jurisdictions.

6.      On Saturday, September 27, FEMA issued the award notifications for FEMA's single largest grant program—the Homeland Security Grant Program ("HSGP"), which totals approximately $1 billion in funds annually for state and municipal efforts to "prevent, prepare for, protect against, and respond to acts of terrorism." 6 U.S.C § 608(2). Consistent with federal law, FEMA had previously issued notices of funding opportunity ("NOFOs") preliminarily allocating the funding among state recipients based on each jurisdiction's "relative threat, vulnerability, and consequences from acts of terrorism." 6 U.S.C § 608; *see also* U.S. Dep't of Homeland Sec.,

*Notice of Funding Opportunity (NOFO): Fiscal Year 2025 Homeland Security Grant Program* ("*HSGP NOFO*") (Ex. 1). That NOFO allocated nearly $460 million to Plaintiff States under the two main components of HSGP: the State Homeland Security Program ("SHSP") and the Urban Area Security Initiative ("UASI").

7.     On Saturday, however, FEMA issued its formal HSGP award notifications. Those award notifications allocated only $226 million to Plaintiff States under the SHSP and UASI subcomponents—an over $233 million reduction from the NOFOs, totaling over 50 percent of the amount that FEMA had previously stated it would provide to Plaintiff States. Some States saw even sharper cuts: Illinois received a 69% reduction in HSGP funds, totaling over $30 million, and New York received a 79% reduction in funds, totaling over *$100 million*. The notifications provide no explanation for the reductions, except that each was "[a]djusted per DHS directive."

8.     But FEMA did not treat all States evenhandedly—for instance, reducing *all* States' allocation of funds by the same amount. Instead, on information and belief, FEMA reduced the allocation only of certain States that it views as "sanctuary" jurisdictions. Indeed, at the same time as it reduced many Plaintiff States' HSGP allocations, FEMA made sizable increases to other States' allocations—with some States' allocations increasing by over 100 percent. Again, FEMA provided no explanation for the increases, except that each was "[a]djusted per DHS directive."

9.     The explanation for DHS and FEMA's last-minute decision to reallocate $233 million in homeland security funds—the Reallocation Decision—is apparent. Although DHS has for decades administered federal grant programs in a fair and evenhanded manner, the current Administration is taking money from its enemies. Or, as defendant Secretary Noem put it succinctly in a February 19 internal memorandum, States whose policies she dislikes "should not receive a single dollar of the Department's money." Ex. 4 at 2. And, yet again, on September 24,

2025, a DHS spokesperson proclaimed that "Cities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding." Griffin, *supra*.[2] "No lawsuit, not this one or any other, is going to stop us from doing that." *Id.*

10. The Reallocation Decision is unlawful in multiple respects, and it should be vacated and set aside. First, it violates federal law: The Homeland Security Act requires DHS and FEMA to allocate HSGP funds using objective, risk-based criteria, but the Reallocation Decision rests on a factor not enumerated in the Act: their domestic policies about how to best utilize their domestic law-enforcement resources. Second, the Decision is arbitrary and capricious for multiple independent reasons, including that it withdraws hundreds of millions of dollars from Plaintiff States with no more than a word of explanation and that it rests on factors Congress did not intend DHS to consider. Finally, it violates the Constitution, in that, among other things, it represents a derogation of the principle of equal sovereignty.

11. Finally, at the same time, and likewise without any explanation, DHS reduced the period of performance for the HSGP grant from three years at the NOFO stage to just one year in the awards. DHS did the same to the important Emergency Management Performance Grant, also issued on Saturday, September 27. The Performance Period Decision, while apparently taken across the board, is independently unlawful under the APA for distinct though overlapping reasons.

12. Plaintiff States seek declaratory and injunctive relief setting aside the Reallocation Decision and Performance Period Decision and requiring DHS and FEMA to adhere to their statutory responsibilities in allocating homeland-security funds.

13. In the interim, however, Plaintiff States seek an emergency temporary restraining order ("TRO") (a) requiring DHS and FEMA to rescind the fiscal year 2025 award notifications

---

[2] https://www.nytimes.com/2025/09/24/us/politics/trump-disaster-aid-immigration.html.

and de-obligate the associated funds (or, at minimum, the funds reallocated from Plaintiff States to other jurisdictions), (b) enjoining DHS and FEMA from disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable by any means all fiscal year 2025 Homeland Security Grant Program funds; and (c) suspending the September 30, 2025, statutory lapse of HSGP funds to the full extent necessary to permit obligation of revised Homeland Security Grant Program awards to Plaintiff States at the levels of the target allocations specified in the fiscal year 2025 Homeland Security Grant Program notice of funding opportunity, including by recording as an obligation of the United States the full appropriation for the Homeland Security Grant Program pursuant to 31 U.S.C. § 1501(a)(6). Such an order is necessary to ensure that there is no question about the availability of the HSGP funds for obligation according to the procedures set out by Congress and consistent with the APA's requirement of reasoned decisionmaking.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 705, and 706.

15.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in her official capacity. Plaintiff the State of Rhode Island is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Rhode Island.

## PARTIES

**A.      Plaintiffs**

16.     Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

17.    Plaintiff the State of California, represented by and through its Attorney General, Rob Bonta, is a sovereign state in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

18.    Plaintiff the State of New Jersey, represented by and through its Attorney General, Matthew J. Platkin, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter. The Attorney General is also head of the New Jersey Department of Law and Public Safety, which is the agency responsible for applying for, obtaining, and disbursing several of the federal grant awards that are the subject of this litigation. See N.J. Stat. Ann. § 52:17B-2.

19.    Plaintiff the State of Rhode Island, represented by and through its Attorney General Peter Neronha, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

20.    Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

21.    Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

22.    Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government

for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

23.    Plaintiff the Commonwealth of Massachusetts, represented by and through its Attorney General Andrea Joy Campbell, is a sovereign state of the United States of America. Attorney General Campbell is authorized to pursue this action under Mass. Gen. Laws ch. 12, §§ 3, 10.

24.    Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

25.    Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter

26.    Plaintiff the State of Vermont is a sovereign State of the United States of America. Vermont is represented by Attorney General Charity Clark, who is the chief law enforcement officer and is authorized by law to initiate litigation on behalf of the State.

27.    Plaintiff the State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign state of the United States of America. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 RCW.

**B.    Defendants**

28.    Defendant Kristi Noem (the "DHS Secretary") is the United States Secretary of Homeland Security and the federal official in charge of DHS. The DHS Secretary is sued in her official capacity.

29.    Defendant DHS is an agency and executive department of the United States government and has responsibility for implementing the federal grant programs at issue in this action, including through FEMA and other subagencies.

30.    Defendant David Richardson is the Senior Official Performing the Duties of the Administrator of FEMA (the "Interim FEMA Head"). The Interim FEMA Head is sued in his official capacity.

31.    Defendant Federal Emergency Management Agency ("FEMA") is a federal agency within DHS that coordinates operational and logistical disaster response and oversees the administration of many of the federal grant programs at issue in this action.

## ALLEGATIONS

**A.    Congress Has For Decades Supported State Emergency Preparedness, Response, and Recovery, Including By Enacting the Homeland Security Grant Program and the Emergency Management Performance Grant.**

32.    FEMA is a distinct entity within DHS. *See* 6 U.S.C. §§ 313(a); 316(a). By law, the DHS Secretary "may not substantially or significantly reduce . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform those missions, authorities, responsibilities, except as otherwise specifically provided in an Act enacted after October 4, 2006." *Id.* § 316(c)(1); *see also id.* § 591h(c).

33.    Consistent with the structure created by Congress over the course of many decades, Plaintiff States today rely on federal grants as a critical tool to support their efforts to mitigate, prepare for, respond to, and recover from catastrophic events like natural disasters and malicious

attacks. State emergency management budgets are largely committed to preexisting priorities—including, for example, emergency management staff. Indeed, many federal grants may be used only to support activities that are not already directly funded by the State. Federal grants therefore typically support disaster management initiatives that would not exist but for the federal grant funds and would disappear without them.

34.    At issue in this case is FEMA's single largest federal grant program, the Homeland Security Grant Program ("HSGP"), as well as the almost equally important Emergency Management Performance Grant ("EMPG"). Both are "preparedness grant programs"—two of a handful of programs that annually provide "more than two billion dollars in funding to state, local, tribal Nations, and territorial governments, as well as transportation authorities, nonprofit organizations, and other eligible entities." *Simplifying FEMA Preparedness Grants*, 88 Fed. Reg. 62098, 62099 (2023). "For decades, FEMA has provided federal assistance to aid states in building and sustaining capabilities to measurably improve the nation's readiness in preventing, preparing for, protecting against, and responding to terrorist attacks and other hazards." *Id.* at 62098-99. HSGP and EMPG constitute over half of that funding, with appropriations of over $1.3 billion annually.

35.    Congress established HSGP in direct response to the horrific events of September 11, 2001. The USA PATRIOT Act, enacted on October 26, 2001, established a grant program to allow States "to prepare for and respond to terrorist acts," Pub. L. 107-56, § 1014, 115 Stat. 272, 399—a program that became HSGP. When Congress expanded the preparedness programs in 2007 with comprehensive legislation "[t]o provide for the implementation of the recommendations of the" 9/11 Commission, Pub. L. 110-53, 121 Stat. 266, it made HSGP permanent. Today, Plaintiff

States rely on hundreds of millions in HSGP funds annually. Two HSGP sub-programs, as well as the EMPG program, are primarily relevant here.[3]

### a. The Homeland Security Grant Program – State Homeland Security Program ("SHSP")

36.    Homeland Security Grant Program – State Homeland Security Program ("SHSP") grants exist to provide federal funding to States to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

37.    SHSP funds have been available to States since the first version of the program was created by the USA PATRIOT Act in 2001. The program is codified at 6 U.S.C. §§ 603, 605-09.

38.    FEMA is required to allocate SHSP funds pursuant to a risk assessment, which determines each State's relative threat, vulnerability, and consequences from acts of terrorism, considering objective factors such as population density and history of threats. *Id*. § 608(a)(1). Recipients may then use SHSP funds for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id*. § 609(a).

39.    Because SHSP grants are based on a statutory risk formula, not an exercise of the agency's discretion, each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted.

40.    The FEMA Administrator "shall ensure" that each State receives no less than an amount equal to 0.35 percent of the total funds Congress appropriated for SHSP grants. *Id*. § 605(e)(1)(A)(v).

41.    States collectively receive hundreds of millions of dollars per year in SHSP grants. They use these funds for myriad counterterrorism and emergency preparedness purposes,

---

[3] A third HSGP sub-component, known as "Operation Stonegarden," which supports state efforts to enhance border security, was not affected by the Reallocation Decision.

including, but not limited to, funding State special operations command teams (including SWAT teams and bomb squads) and funding mutual aid networks of police departments, fire departments, emergency services, and public works departments to mobilize first responders from outside an immediate jurisdiction in the event of a disaster.

42.    SHSP funds allow States to advance counterterrorism and emergency preparedness purposes in ways they otherwise could not. The multijurisdictional emergency response organizations funded by SHSP would be forced to shut down absent federal funding.

43.    Because—until this year—each SHSP grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter, many Plaintiff States are currently relying on funding from the SHSP awards for Federal Fiscal Years ("FY") 2021-2024.

44.    As an example of how States use SHSP funding, Illinois has used its SHSP funding for a wide range of initiatives that prevent, prepare for, protect against, and respond to acts of terrorism. Those efforts include first responder mutual aid networks, which coordinate terrorism responses from outside an immediate jurisdiction. SHSP funds also support the Illinois Statewide Terrorism and Intelligence Center, which facilitates communication across jurisdictions between public safety officials regarding national terrorism trends. SHSP funds also pay for the Illinois State Police's SWAT and Statewide Weapons of Mass Destruction Team.

45.    New Jersey has used its SHSP funding to fund the salaries of state agency staff who provide cybersecurity training, plan risk mitigation efforts, and combat domestic violent extremism. SHSP funds have also enabled the development and maintenance of several technological systems, including automated license plate recognition, unmanned aircraft detection,

and the New Jersey Interoperability Communications System, which is a statewide radio system designed to strengthen communication among local, county, state, and federal first responders.

46.    Furthermore, New York has used SHSP funds to administer and manage terrorism and targeted violence prevention grants and 12 local FBI-certified bomb squads to detect and respond to explosive incidents throughout the State.  SHSP funding has also been critical in New York's establishment of local specialty teams, including explosive detection canine teams, tactical teams, and HazMat teams.  SHSP funding supports the operations of the State's only fusion center, the New York State Intelligence Center (NYSIC).  This funding is critical to supporting incident command operations, radiation interdiction efforts, cybersecurity activities, and weapons of mass destruction programs and staffing for intelligence analysts. In addition, SHSP funding supports citizen preparedness initiatives across the State, and New York has used SHSP funds to reduce vulnerabilities in crowded open spaces.

**b.    Homeland Security Grant Program – Urban Area Security Initiative ("UASI")**

47.    Homeland Security Grant Program – Urban Area Security Initiative ("UASI") grants serve the same overall purposes as SHSP grants. These funds are used to build necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism but with a focus on high-threat, high-density urban areas.

48.    UASI funds have been available to States since the first version of the program was created by appropriations statute in 2003. *See* Pub. L. 108-90, 117 Stat. 1137, 1146. The program is codified at 6 U.S.C. §§ 603-04, 606-09.

49.    FEMA is required to follow considerations set in statute to determine the relative threat, vulnerability, and consequences from acts of terrorism faced by metropolitan areas to designate high-risk urban areas that may submit applications for UASI grants. *Id*. §§ 604(b)(3).

FEMA is required to allocate UASI funds pursuant to a risk assessment, which determines each high-risk urban area's relative threat, vulnerability, and consequences from acts of terrorism, considering factors such as population density and history of threats. *Id*. § 608(a)(1).

50.     Because UASI grants are based on a statutory risk formula, not an exercise of the agency's discretion, each eligible State is entitled to a specific allocation based on the risk assessment whenever a notice of funding opportunity is posted, tied to the FEMA-designated eligible urban area or areas in that State.

51.     Recipients must use UASI funds for permitted uses, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id*. § 609(a). None of the permitted uses include civil immigration enforcement.

52.     States that receive UASI funds must provide the high-risk urban area with at least 80% of the grant funds. *Id*. § 604(d)(2)(A). Any funds retained by the State shall be expended on items, services, or activities that benefit the high-risk urban area. *Id*.

53.     States collectively receive hundreds of millions of dollars per year in UASI grants, passing most of these funds along to the high-risk urban areas. States and the local government entities they pass these funds to use UASI funds for myriad counterterrorism and emergency preparedness purposes, including support for urban fusion centers, SWAT teams, canine units, and bomb squads.

54.     UASI funds allow States and local government entities to advance counterterrorism and emergency preparedness purposes in ways they otherwise could not.

55.     Because—until this year—each UASI grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter.

56.    As an example of how States use UASI funding, Illinois has one eligible high-threat, high-density urban area, the Chicago metropolitan statistical area. Illinois passes approximately 90% of UASI funds on to fire departments, law enforcement, other first responders, and emergency preparedness offices in the greater Chicago area. These funds provide critical funding for the Chicago Office of Emergency Management, the Chicago Crime Prevention and Intelligence Center, and the Cook County Department of Emergency Management and Regional Security. Chicago uses UASI funds for preparedness purposes including, but not limited to, replacing and sustaining its stock of respirators necessary for mass casualty incidents, maintaining training for fire department special operations teams, and developing policy and training regarding active shooters and coordinated terrorist attack scenarios.

57.    Similarly, New Jersey passes UASI funds through to seven contiguous counties in the New York City metropolitan area, including the major cities of Newark and Jersey City, eight medical centers in urban areas throughout the state, and six State-level agencies that perform preparedness work in service of those geographic areas. New Jersey has used UASI funds to enhance urban search and rescue, including training and equipment and gear upgrades and replacements.

**c.    Emergency Management Performance Grant Program ("EMPG")**

58.    The Emergency Management Performance Grant Program ("EMPG") provides federal funding to States to assist state, local, tribal, and territorial emergency management agencies in implementing FEMA's National Preparedness System, including by building continuity-of-government capabilities to ensure essential functions in a catastrophic disaster.

59.    EMPG funds have been available to States since an initial appropriation for the program in 2003. *See* Pub. L. 108-7, 117 Stat. 11, 516. The program is now codified at 6 U.S.C.

§ 762 after being made permanent by the Post-Katrina Emergency Management Reform Act of 2006.

60.    FEMA's allocation of EMPG funds is set by statutory formula. For each year's apportioned amount of EMPG, FEMA must allocate to certain territories a baseline amount of 0.25 percent of the appropriated funds and to the States a baseline amount of 0.75 percent of the appropriated funds. *Id*. § 762(d)(1). FEMA must apportion the remaining amount among the States on a population-share basis. *Id*. § 762(d)(2).

61.    Because EMPG grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

62.    States collectively receive hundreds of millions of dollars per year in EMPG grants. They use these funds for emergency preparedness purposes, including funding the salaries of operations personnel who coordinate disaster response efforts and funding communications, facilities, and vehicles used for disaster response.

63.    EMPG funds allow States to advance emergency preparedness purposes in ways they otherwise could not. States would otherwise not be able to employ the emergency management staff funded by EMPG funds, severely diminishing States' ability to coordinate a disaster response.

64.    Because—until this year—each EMPG grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter.

65.    States use EMPG funding for a wide range of emergency response programming. For instance, EMPG dollars fund the salaries of state agency personnel who lead statewide coordination efforts in response to a natural disaster or mass casualty event, such as state

emergency operations plans, hurricane response plans, severe weather plans and procedures. The EMPG program also funds communications, facilities, and vehicles for disaster response in State-level agencies. EMPG monies also fund the ongoing costs of the software program used at the state emergency operations centers, which are the physical location where a state emergency manager directs all strategic and operational activities in the event of a disaster or public health emergency. For example, Rhode Island uses EMPG funds to lead statewide coordination efforts in response to disasters or mass casualty events. EMPG funds pay for communications, facilities, vehicles and equipment for disaster response.

66.    States also pass through EMPG funds to localities who likewise fund the salaries of local emergency managers and local support staff statewide as well as software and communications to support local emergency response. For instance, California distributes EMPG funding to 59 local government entities and tribes to improve and fill critical gaps for existing emergency management systems.

**B.    States Have Exercised Their Sovereign Prerogative To Choose How To Deploy Law Enforcement Resources Within Their Jurisdictions.**

67.    Plaintiff States are responsible for maintaining the day-to-day safety of all residents of their communities. Plaintiff States enact statutes and establish policies to effectively enforce state and local laws, keep public order, and provide public safety services. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

68.    One critical choice that Plaintiff States can make in doing so is whether to devote their scarce law enforcement and other agency resources to assisting the federal government in enforcing federal civil immigration law.

69.     Many Plaintiff States and their political subdivisions, for decades, have chosen to limit their entanglement in the enforcement of federal immigration law. *See, e.g.*, 5 Ill. Comp. Stat. 805/1 to /20; 5 Cal. Gov. Code §§ 7282, 7282.5, 7283-7283.2, 7284-7284.12; N.J. Att'y Gen. Directive 2018-6; Wash. Rev. Code Ann. §§ 10.93.160, 43.10.315; Conn. Gen. Stat. Ann. § 54-192h; Vt. Stat. Ann. tit. 20, § 4651; N.Y. Exec. Orders 170 and 170.1. Many of these States have determined that public safety and law enforcement benefit from a relationship of trust between immigrant communities and state and local law enforcement. Their laws and policies uniformly authorize state and local authorities to comply with all applicable federal laws but impose limitations on the circumstances under which state and local officers can devote their own resources to assisting the federal government in enforcing federal immigration law.

70.     These laws and policies are based on the considered experience of law enforcement agencies, which demonstrates that persons who lack lawful immigration status or have family members or friends who lack lawful immigration status are less likely to report a crime as victims or witnesses if they fear that the responding officer will turn them over to civil immigration authorities. This reluctance makes it increasingly difficult for officers to solve crimes and bring suspects to justice, putting all residents at risk. *See, e.g.*, Directive 2018-6, at 1; Cal. Gov. Code § 7284.2.

71.     These States' determination is also well-supported by analyses of empirical data. Numerous studies have confirmed that immigration-related fears prevent witnesses, victims, and others from reporting crimes. Surveys of law enforcement officers and analyses of victim reporting data conclude that fear of immigration enforcement decreased immigrant victims' likelihood of making police reports and reporting domestic violence, participating in investigations, and working with prosecutors. *See* Rafaela Rodrigues et al., *Promoting Access to Justice for Immigrant*

*and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* at 72-73, National Immigrant Women's Advocacy Project (May 3, 2018).[4] One study estimated that policies designed to foster greater trust between immigrant communities and police could cause an additional 90,000 violent incidents per year to be reported to law enforcement nationwide. *See* Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Sociological Rev. 154, 170 (2021).

72.    Some States have likewise determined that it will interfere with important public welfare functions if state employees divert non-law enforcement resources to engage in unnecessary inquiries into individuals' immigration status, fulfill information requests by federal immigration officials not required by law, or facilitate civil immigration arrests in state buildings. *E.g.*, New York Exec. Order 170 (Sept. 15, 2017); New York Exec. Order 170.1 (Apr. 25, 2018).

73.    Other Plaintiff States have made different decisions or are subject to different rules in this context. For instance, some Plaintiff States must comply with state court rulings that prevent them from cooperating with civil immigration detainer requests. *See Lunn v. Commonwealth*, 477 Mass. 517, 518-19 (2017).

74.    Still other Plaintiff States without codified directives of the kind described above have not imposed categorical limitations on the use of law-enforcement or state agency resources to assist in the enforcement of federal immigration law. However, they do not impose categorical *requirements* of this kind on their law enforcement officers and state agency employees.

---

[4] http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf.

75.    Some of these States have concluded that participating in federal immigration enforcement efforts imposes substantial costs on local jurisdictions, not only in the form of personnel and resources but also in the form of potential civil liability. And some such States have reasoned that even where law-enforcement resources are dedicated to assisting with enforcement of federal immigration law, it is preferable to retain critical decisionmaking authority regarding when to offer those resources and how many resources to offer.

76.    Thus, although Plaintiff States have made different decisions regarding the use of their law enforcement and agency resources, all Plaintiff States' decisions in this area are consistent with the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz*, 521 U.S. at 928—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

**C.    Defendants Announce Their Opposition To Plaintiff States' Policies.**

77.    Since January 2025, Defendants have engaged in a concerted campaign to pressure States to serve as enforcers of federal immigration law, subverting the design of DHS grant programs.

78.    On January 20, 2025, his first day in office, President Trump issued an executive order directing the Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions do not receive access to Federal funds," and to take "any other lawful actions, criminal or civil" that the Secretary of Homeland Security deem warranted. Exec. Order No. 14159, 90 Fed. Reg. 8443 (2025).

79.    This was not President Trump's first time announcing an intent to use conditions on federal funding to coerce states into adopting his preferred set of policies. The first Trump Administration imposed immigration-enforcement conditions on funding Plaintiff States received from the Byrne Justice Access Grants Program. These immigration-enforcement conditions

prompted extensive litigation, in which courts repeatedly held the immigration-enforcement conditions to exceed the Department's statutory authority. *City of Providence v. Barr*, 954 F.3d 23, 42 (1st Cir. 2020); *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 290 (3d Cir. 2019); *City of Chicago v. Barr*, 961 F.3d 882, 894 (7th Cir. 2020); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 761 (9th Cir. 2020); *City of Los Angeles v. Barr*, 941 F.3d 931, 944 (9th Cir. 2019); *Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 1034 (D. Colo. 2020); *City of Evanston v. Sessions*, 2018 WL 10228461 (N.D. Ill. 2018); *see also City of Albuquerque v. Barr*, 515 F. Supp. 3d 1163 (D. N.M. 2021) (granting preliminary injunction); *but see New York v. Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020).

80.    On February 19, 2025, the DHS Secretary issued a memorandum to all USDHS agencies and offices titled "Restricting Grant Funding for Sanctuary Jurisdictions" (the "Directives Memorandum"), attached as Exhibit 4. The Directives Memorandum directed all DHS agencies and offices to review all federal financial assistance and, consistent with DHS' immigration initiatives, cease federal funding to what DHS deems "sanctuary" jurisdictions. The DHS Secretary also directed components to make criminal referrals to the Department of Justice for any resistance or non-compliance with lawful immigration-related commands.

81.    On March 20, 2025, then-interim FEMA Administrator Cameron Hamilton sent a memorandum to the DHS Secretary titled "Approval of FEMA-Administered Grant Disbursements," attached as Exhibit 5. Hamilton's memorandum listed FEMA's grant programs and identified twelve specific grant programs that, in his view, might lawfully be limited to non-"sanctuary" jurisdictions. Hamilton recommended applying targeted terms that would limit funding under these twelve programs to States that helped assist in enforcing federal immigration law—but only those twelve programs. Hamilton's recommendation regarding these twelve

programs was not supported by any statutory authority or any analysis of the basis for DHS's authority to impose conditions on grant programs.

82.     On April 28, 2025, President Trump issued another Executive Order relating to jurisdictions with policies designed to improve relations between law enforcement and communities. *See* Exec. Order No. 14287, 90 Fed. Reg. 18761 (2025). The EO requires "the Attorney General, in coordination with [DHS]" to publish a "list" of "sanctuary jurisdictions" and to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.* § 2(a). The Attorney General and DHS were to publish this list within 30 days, meaning May 28, 2025. *Id.*

83.     Section 3(a) of the April 28 Executive Order then directs agencies to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate," *id.* § 3(a), 90 Fed. Reg. at 18761-62, expanding to all federal agencies a similar directive in the January 20 Executive Order that applied only to the Attorney General and DHS, 90 Fed. Reg. at 8446, § 17.

84.     On May 29, 2025, DHS published a list of so-called "sanctuary jurisdictions," which included all Plaintiff States here. The list was taken down two days later after 9:19 PM on Saturday, May 31. *See* Dep't of Homeland Sec., *Sanctuary Jurisdictions Defying Federal Immigration Law* (captured June 1, 2025 1:19 AM GMT) (Exhibit 6).

85.     In an interview with Fox News on June 1, 2025, however, Defendant Noem stated that the "list is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice."

**D.    Defendants Try But Fail To Condition All DHS Federal Funds On Their Views About Plaintiff States' Policies.**

86.    *Illinois v. FEMA*, No. 25-cv-206 (D.R.I.), successfully countered DHS's first attempt to act on its animus toward certain States by depriving them of federal funds unrelated to civil immigration enforcement. In March and April 2025, DHS posted on its website revised versions of the DHS Standard Terms and Conditions (the "Terms and Conditions").[5] These Terms and Conditions govern "all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025." The revised versions included "provisions requiring state and local recipients to certify that they will assist in enforcing federal immigration law." *Illinois v. FEMA*, 2025 WL 2716277, at *2.

87.    The States of Illinois, California, New Jersey, Rhode Island, Colorado, Connecticut, Delaware, Hawaiʻi, Maine, Maryland, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, and Wisconsin, and the District of Columbia brought suit, claiming that the civil immigration conditions imposed on all DHS funds were unlawful. *See* Complaint, *Illinois v. FEMA*, ECF 1 (D.R.I. May 13, 2025).[6]

88.    The parties cross-moved for summary judgment, and, last week, the district court issued an opinion granting the *FEMA* Plaintiff States' motion for summary judgment and holding that the promulgation of the immigration conditions violated the APA and the Constitution. *Illinois v. FEMA*, 2025 WL 2716277 (D.R.I. Sept. 24, 2025).

89.    The court explained that the decision to promulgate the conditions was arbitrary and capricious because DHS had failed to "examine[] the relevant data or articulate[] a fact-based

---

[5] Available at https://www.dhs.gov/publication/dhs-standard-terms-and-conditions.
[6] The District of Columbia was joined with the first amended complaint on July 2, 2025.

reason" for doing so, instead relying principally on the President's executive order "calling upon agencies to terminate funding to 'sanctuary jurisdiction[s].'" *Id.* at *12. DHS, the court explained, had provided no "actual explanation of why it is necessary to attach sweeping immigration conditions to all the grants at issue here, regardless of their statutory purpose or programmatic objectives." *Id.* Moreover, the Court concluded that DHS "engaged in a wholly under-reasoned and arbitrary process," "did not meaningfully evaluate the States' reliance interests," and compounded these failures by using "vague and confusing language" that "ma[de] vague compliance a nearly impossible-to-achieve moving target." *Id.*

90.    The court also explained that the conditions violated the Spending Clause because they were "not reasonably related to the purposes of the grants to which they attach" and were coercive, amounting to "'economic dragooning' of the sort condemned in" *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519 (2012).  *FEMA*, 2025 WL 2716277, at *14.

91.    Accordingly, by judgment entered September 24, 2025, the district court vacated the immigration conditions as to all DHS awards and all recipients. *Id.* at *15. The court also issued a permanent injunction because "Plaintiff States stand to suffer irreparable harm; the effect of the loss of emergency and disaster funds cannot be recovered later, and the downstream effect on disaster response and public safety are real and not compensable." *Id.* at *16. The court therefore "permanently enjoin[ed] Defendants from enforcing the contested conditions against Plaintiff States." *Id.*

92.    When asked about the court's opinion, DHS's spokesperson said: "Cities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal

funding." She added: "No lawsuit, not this one or any other, is going to stop us from doing that." Griffin, *supra*.[7]

### E.    Defendants Preliminarily Allocate HSGP Funds In The August NOFO, But Then Reallocate Them Away From Disfavored States.

93.    The DHS's spokesperson's explicit threat bore fruit just three days later when DHS slashed Homeland Security Grant Program funding to many States protected by the *Illinois v. FEMA* injunction, redistributing their funding to other States.

94.    On August 1, 2025, DHS had finalized and posted the Notice of Funding Opportunity ("NOFO") for the Homeland Security Grant Program. *HSGP NOFO*, *supra*. That NOFO stated DHS's intention of awarding to the States the $1.008 billion that Congress appropriated for the HSGP program in federal fiscal year 2025. *Id.* at 4; *see* Further Consolidated Appropriations Act of 2024, Pub. L. 118-47, 138 Stat. 460, 607, (1)–(2) (fiscal year 2024 appropriation); Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. 119-4, § 1101(a)(6), 139 Stat. 9, 11 (continued fiscal year 2025 appropriation under the same terms).

95.    The $1.008 billion that Congress appropriated expires on October 1, 2025, the first day of the federal government's fiscal year 2026. *See id*.; *see also* 31 U.S.C. § 1502(a).

96.    Office of Management and Budget administrative requirements, which DHS has adopted as its own binding regulation, require DHS to disclose "the expected dollar values of individual awards." 2 C.F.R. §§ 200.204(a)(6), 3002.10. Consistent with that requirement, the HSGP NOFO included "target allocations" for grantees totaling $1.008 billion. *Id.* at 53-57.

97.    The NOFO explained that for the HSGP-SHSP subprogram, "DHS/FEMA [would] distribute SHSP funds based on their risk assessment methodology and legal minimums outlined

---

[7] https://www.nytimes.com/2025/09/24/us/politics/trump-disaster-aid-immigration.html.

in the Homeland Security Act of 2002, as amended." *Id.* at 53. And the NOFO accordingly set out the allocations that resulted from that "risk assessment methodology." *Id.* at 54.

98.    As FEMA itself publicly declared on September 12, 2025: "*Final* allocations are published in the FY 2025 HSGP NOFO." Fed. Emergency Mgmt. Agcy., *FY 2025 Homeland Security Grant Program Fact Sheet*, at 3 (Sept. 12, 2025) (Ex. 7) (emphasis added).

99.    Under those allocations, Plaintiff States were slated to receive over $146 million in HSGP-SHSP funds, including over $55 million for California, $38 million for New York, $10 million for Illinois, and $5 million for New Jersey. *Id.* at 54.

100.    The NOFO likewise explained that for the HSGP-UASI subprogram, defendants had determined program eligibility "through an analysis of relative risk of terrorism faced by the 100 most populous Metropolitan Statistical Areas (MSA) in the United States," as required by the Homeland Security Act. *Id.* at 54. And it set out the allocations for designated urban areas "based on DHS/FEMA's risk-informed assessment." *Id.* at 55.

101.    Under those allocations, Plaintiff States were slated to receive over $313 million in HSGP-UASI funds, including over $109 million for California, $92 million for New York, $33 million for Illinois, and $13 million for New Jersey. *Id.* at 55-56.

102.    All in, Plaintiff States were allocated over $477 million in funds under the NOFO associated with HSGP-SHSP and -UASI, including $146 million under HSGP-SHSP and $313 million under HSGP-UASI.[8]

103.    Plaintiff States each applied for funding under the HSGP program.

---

[8] Plaintiff States also were allocated about $17 million under HSGP's third subprogram, Operation Stonegarden. *Id.* at 57. The Reallocation Decision does not, as of this writing, appear to have affected these funds.

104. On Saturday, September 27—four days before the funds were set to expire—DHS issued award notifications under the HSGP program, with the award letters dated September 26.

105. Plaintiff States have not yet ratified their awards by counter-signature through the FEMAGo system.

106. The award notifications contained significant—indeed, extraordinary—deviations from the NOFO allocations.

107. Although New York had been preliminarily allocated $130 million in HSGP-SHSP and -UASI funds by the NOFO, it received only $28 million in funding—a 79% decrease.

108. Although the District of Columbia had been preliminarily allocated $30 million in HSGP-SHSP and -UASI funds by the NOFO, it received only $9 million in funding—a 70% decrease.

109. Although Illinois had been preliminarily allocated $44 million in HSGP-SHSP and -UASI funds by the NOFO, it received only $14 million in funding—a 69% decrease.

110. And although California had been preliminarily allocated $165 million in HSGP-SHSP and -UASI funds by the NOFO, it received only $110 million in funding—a 33% decrease.

111. In total, at least eight States (and their municipalities, via the UASI subcomponent) received awards reduced substantially relative to the NOFO allocations, as shown by the below chart:

| State | Notice of Funding Opportunity | | | Final Award | | | Total Percentage Reduction |
|---|---|---|---|---|---|---|---|
| | **SHSP** | **UASI** | **Total** | **SHSP** | **UASI** | **Total** | |
| Cal. | $55,863,486 | $109,325,268 | $165,188,754 | $17,156,754 | $93,473,801 | $110,630,555 | **-33%** |
| D.C. | $4,362,750 | $25,270,521 | $29,633,271 | $4,362,750 | $4,400,000 | $8,762,750 | **-70%** |
| Ill. | $10,419,556 | $33,479,819 | $43,899,375 | $4,362,750 | $9,395,829 | $13,758,579 | **-69%** |
| Mass. | $5,390,887 | $16,838,838 | $22,229,725 | $6,000,629 | $9,301,839 | $15,302,468 | **-31%** |
| Minn. | $4,362,750 | $9,526,217 | $13,888,967 | $4,362,750 | $2,973,810 | $7,336,560 | **-47%** |
| N.J. | $5,065,776 | $13,928,247 | $18,994,023 | $3,768,628 | $6,000,629 | $9,769,257 | **-49%** |

| State | Notice of Funding Opportunity | | | Final Award | | | Total Percentage Reduction |
|---|---|---|---|---|---|---|---|
| | **SHSP** | **UASI** | **Total** | **SHSP** | **UASI** | **Total** | |
| N.Y. | $38,200,874 | $92,180,364 | $130,381,238 | $5,624,924 | $22,069,395 | $27,694,319 | **-79%** |
| Wash. | $5,483,241 | $12,713,580 | $18,196,821 | $4,362,750 | $11,782,120 | $16,144,870 | **-11%** |

112.    Each of these States is listed on DHS's now-removed list of "sanctuary" jurisdictions and has impacted UASI municipalities that are. *See* Ex. 6.

113.    On information and belief, States *not* on DHS's "sanctuary" jurisdiction list did not experience decreases in funding. Quite the opposite: Many other States received substantial *increases* in HSGP funding.

114.    Texas, for instance, was preliminarily allocated $113 million in HSGP funds by the NOFO, but on information and belief, ultimately received $138 million—a 22 percent increase

115.    Missouri, for its part, was preliminarily allocated $15 million in HSGP funds by the NOFO, but on information and belief, ultimately received $25 million—a 68 percent increase.

116.    North Carolina was preliminarily allocated $9 million in HSGP funds by the NOFO, but on information and belief, ultimately received $21 million—a *136 percent* increase.

117.    And, on information and belief, Indiana, Iowa, North Dakota, and Tennessee also saw substantial increases in their final awards as compared to the NOFO.

118.    No award notification provided any substantive explanation for the reallocation of HSGP funds. Instead, almost all reduced fields state only that the field has been "[a]djusted per DHS directive." The Illinois award letter contained this phrase, with no elaboration, 26 times. *See* Illinois HSGP Award (Ex. 3), at 9–53.

119.    Plaintiff States have applied for funding under the HSGP program every year since its enactment during the Bush Administration. In that time, Plaintiff States have never seen a last-minute reallocation of this sort—one that deviates from the NOFO allocations for the transparent

purpose of rewarding States that align with the Administration's policy priorities and punish those States that deviate from those priorities.

120.    Indeed, in that time, Illinois has *never* seen a deviation from the NOFO that exceeds a nominal sum. In the eight prior years dating to 2017, including all of the previous administration of President Trump, Illinois has seen a total of $0 in adjustments between the NOFO and the award for its SHSP and UASI funding lines, across all grants and across all years.

121.    On information and belief, the drastic and unexplained re-allocations of funds between the NOFO stage and the award stage under the Homeland Security Grant Program is unprecedented in the history of post-September 11 emergency preparedness funding.

122.    Defendants' last-minute decision to reallocate funds from States that disagree with it and award those funds to other States—the Reallocation Decision—will cost Plaintiff States over $233 million in critical homeland-security funds if not vacated.

**F.    The Reallocation Decision Is Unlawful And Should Be Vacated.**

123.    The Reallocation Decision is unlawful in multiple respects.

124.    First, it exceeds defendants' statutory authority. DHS and its sub-agencies are "charged with administering congressional statutes," which means that "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the [APA]." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020); 5 U.S.C. § 706(2)(C). The HSGP statute establishes a prescriptive list of factors that "the Administrator shall consider" "[i]n allocating funds among States and high-risk urban areas." 6 U.S.C. § 608(a). An unexplained "DHS directive" is not among them. Congress has specifically barred DHS from asserting some free-floating and, in any event, completely unspecified DHS

directive, outside the confines of the Homeland Security Grant Program statute, as a basis for tinkering with the allocations among the States.

125.    Second, the Reallocation Decision was arbitrary and capricious. DHS effected drastic funding cuts without a word of explanation. The APA requires exactly the opposite. When changing positions, an agency must consider both the "alternatives that are within the ambit of the existing policy" and the "serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (brackets and internal quotation marks omitted). The agency must not "entirely fail[] to consider an important aspect of the problem" or "rel[y] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

126.    DHS has done both. The explanation that can be gleaned from circumstantial evidence is that DHS set out to punish States with policies concerning law-enforcement cooperation with federal immigration enforcement that DHS opposes. That is an impermissible factor under the statute at issue. 6 U.S.C. § 608(a). In any event, DHS also just did not explain its decision in any transparent way. Again, it simply said, over and over: "Adjusted per DHS directive." The APA requires far more when an agency proposes to so drastically disrupt existing reliance interests measured the hundreds of millions of dollars.

127.    Finally, the Reallocation Decision violates bedrock constitutional rules, including the guarantee of "*equal* sovereignty," *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013), among the States.

128.    The Reallocation Decision, if not vacated, will also irreparably harm the Plaintiff States. For one, there is the simple loss of funds from a fixed-sum appropriation, which will be likely irrecoverable once disbursed to other grantees. More broadly, defendants' actions in this case derogate the fundamental principle that, under our "system of dual sovereignty between the

States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), the States also enjoy "equal sovereignty," *Shelby Cnty.*, 570 U.S. at 544 (emphasis omitted). The impact of an invasion of state sovereignty "cannot be economically quantified" and thus constitutes irreparable harm. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (alterations omitted) (quoting *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022)). States suffer an "irreparable" injury when forced to abandon their "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

129.    For these reasons, Plaintiff States seek declaratory and injunctive relief setting aside the Reallocation Decision and requiring DHS and FEMA to adhere to their responsibilities in allocating homeland-security funds.

130.    In the interim, however, Plaintiff States seek an emergency temporary restraining order ("TRO") (a) requiring DHS and FEMA to rescind the September 26 award notifications and de-obligate the associated funds (or, at minimum, the funds reallocated from Plaintiff States to other jurisdictions), (b) enjoining DHS and FEMA from disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable by any means all fiscal year 2025 Homeland Security Grant Program funds; and (c) suspending the September 30, 2025, statutory lapse of HSGP funds to the full extent necessary to permit obligation of revised Homeland Security Grant Program awards to Plaintiff States at the levels of the target allocations specified in the fiscal year 2025 Homeland Security Grant Program notice of funding opportunity, including by recording as an obligation of the United States the full appropriation for the Homeland Security Grant Program pursuant to 31 U.S.C. § 1501(a)(6).

131.    Such an order is necessary to ensure that there is no question about the availability of the HSGP funds for obligation according to the procedures set out by Congress and consistent with the APA's requirement of reasoned decisionmaking.

**G.    Defendants Unlawfully Reduce The Period Of Performance On HSGP And EMPG Awards From Three Years To One Year.**

132.    Another dramatic change that DHS effected between the NOFO stage and the award stage for preparedness grants is a sudden and unexplained reduction in the period of performance from three years to one year. This change, effected without any explanation, will debilitate the ability of state agencies to implement the purposes of the HSGP and EMPG grants.

133.    The term of FEMA preparedness awards has generally been three years, meaning that the award remains open for a three-year period for completing reimbursable activities. Any program activities supported by the awarded funds must be completed within the time the award remains open.

134.    It is typical for FEMA preparedness awards to take several years to fully disburse. The HSGP and EMPG programs have used multi-year periods of performance, sometimes even longer than three years, for almost every year of their existence. Moreover, these programs fund essential ongoing operational needs of state and local public safety agencies. As a result, States have structured their budgeting systems for HSGP and EMPG grants around multi-year sub-obligation periods.

135.    Consistent with that past practice, the fiscal year 2025 HSGP and EMPG NOFOs announced that there would be a three-year period of performance for both programs. *HSGP NOFO*, *supra*, at 4; U.S. Dep't of Homeland Sec., *Fiscal Year 2025 Emergency Management Performance Grant* ("*EMPG NOFO*") (Ex. 2), at 4.

136.    Both NOFOs explained that applications should frame their budget needs by reference to the anticipated three-year period of performance. HSGP stated that projects must be "able to be fully completed within the three-year period of performance." Ex. 1 at 38. EMPG stated that "[e]ach goal must be specific, measurable, and achievable within the period of performance." Ex. 2 at 50.

137.    Yet, without explanation, when the awards issued, the period of performance was reduced to one year on both awards, running from October 1, 2025, to September 30, 2026.

138.    On information and belief, Defendants reduced the period of performance in this manner as to all States, not just disfavored "sanctuary" jurisdictions.

139.    That unreasoned decision to shorten the period of performance was perhaps less malicious than the Reallocation Decision, but it was no less arbitrary. All States submitted applications in reliance on the specific statements in the NOFOs, *supra* ¶ 136, calling for three years of project planning. In addition, all States have substantial outstanding funds from prior grant years that must also be obligated in this upcoming fiscal year, creating a direct collision between prior-year funds and new funds.

140.    As to EMPG in particular, its awards have historically been back-dated to the start of the federal fiscal year, meaning October 1, 2024, for federal fiscal year 2025. DHS's decision to instead start the performance period on October 1, 2025—the first day of federal fiscal year 2026—without any explanation and in departure from past years, has effectively skipped an entire year of program funding.

141.    The reduced performance period also exacerbates the injury to the Plaintiff States that received a reduced allocation. Plaintiff States constructed their projects based on the expectation that they would receive the full amount set forth in the NOFO. Now Plaintiff States

would have to redo those projects and ask their subrecipients to redo their budgets to align with the significantly reduced amounts. Only then would Plaintiff States be able to seek approval from FEMA to remove a hold on funds. This process could take several months, thus curtailing the Plaintiff States' ability to draw down the funds within the reduced one-year performance period.

142.     An agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). DHS did not do so here, or even attempt to.

## FIRST CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action (Reallocation Decision)

143.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

144.     Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).

145.    Defendants failed to comply with these bedrock requirements in making the Reallocation Decision in multiple respects.

146.    First, Defendants provided no explanation for why it reallocated funding away from many Plaintiff States. Agencies may not keep the reasons for their decisions secret. *New York*, 588 U.S. at 785.

147.    Second, Defendants relied on an extra-statutory factor when making the Reallocation Decision. Congress provided a list of factors FEMA "shall consider" when allocating SHSP funds. 6 U.S.C. § 608(a). A state or local government's willingness to enforce federal immigration law was not one of those statutory factors. *Id*. Yet, DHS ordered the reallocation of SHSP funds based on whether the recipient has policies DHS dislikes. An agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities." *Providence*, 954 F.3d at 39; *see also, e.g., State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973) (agency cannot set spending requirements "remote and unrelated" to the underlying statute).

148.    Third, Defendants abandoned the risk allocation set out in the NOFO without explanation. DHS's own regulations require the NOFO to disclose "the expected dollar values of individual awards" up front. 2 C.F.R. §§ 200.204(a)(6), 3002.10. Despite this requirement, the SHSP awards differ drastically from the NOFO's dollar values. In making such a drastic policy change, an agency must "articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Defendants have provided no such explanation.

149.    Fourth, Defendants entirely failed to consider the legitimate reliance Plaintiff States had on the NOFO's expected dollar values of the awards. Before an agency adopts a new policy, it must "assess whether there were reliance interests, determine whether they were significant, and

weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33. Here, States have structured budgets in reliance on the money they expect to receive from DHS-administered grants, including SHSP. To reallocate those funding levels, without notice of explanation, disrupts the operation of crucial emergency preparedness programs in the Plaintiff States.

150.     The Reallocation Decision will cause harm to Plaintiffs and their residents.

### SECOND CAUSE OF ACTION

*Ultra Vires* **Agency Action Not Authorized by Congress (Reallocation Decision)**

151.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

152.     An executive agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986).

153.     Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

154.     Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

155.     Defendants lack the statutory authority to make the Reallocation Decision. The HSGP statute establishes a prescriptive list of factors that the FEMA administrator must consider

in allocating funds among States and high-risk urban areas. None of those factors include state policies concerning cooperation with federal immigration officials.

156.    Defendants did not make the Reallocation Decision pursuant to the statutory factors, but instead they acted pursuant to a free-standing DHS directive.

157.    Defendants also acted contrary to the residual clause of the HSGP statue, which permits allocation decisions pursuant to "such other factors as are specified in writing by the Administrator." 6 U.S.C. § 608(a)(1)(K).  Defendants specified nothing in writing regarding the Reallocation Decision and acted pursuant to a directive from DHS, rather than from the FEMA administrator.

158.    In making the Reallocation Decision, Defendants exceeded the statutory authority granted to DHS by Congress. The Reallocation Decision is therefore an ultra vires executive agency action.

159.    The Reallocation Decision will cause harm to Plaintiffs and their residents.

### THIRD CAUSE OF ACTION

**Violation of Administrative Procedure Act**
**Agency Action in Excess of Statutory Authority (Reallocation Decision)**

160.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

161.    The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

162.    Defendants lack the statutory authority to make the Reallocation Decision. The SHSP statute does not permit DHS to reallocate funds based on secret "DHS directive" nor does it permit allocation of funds pursuant to State and local cooperation with federal immigration enforcement.

163.     In making the Reallocation Decision, Defendants exceeded the statutory authority granted to DHS and FEMA by Congress. The Reallocation Decision therefore must be set aside under the APA.

164.     The Reallocation Decision will cause harm to Plaintiffs and their residents.

## FOURTH CAUSE OF ACTION

### Violation of Administrative Procedure Act
### Agency Action Without Observance of Required Procedure (Reallocation Decision)

165.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

166.     The APA requires that a court set aside agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

167.     Defendants made the Reallocation Decision pursuant to a secret "DHS Directive," issued after the SHSP NOFOs were posted to States.

168.     The SHSP statute does not permit DHS to relocate funds pursuant to a secret directive. Instead, funds must be allocated pursuant to statutory formula. When FEMA considers an additional factor in making an allocation decision, it must specify that factor in writing by the FEMA administrator. 6 U.S.C. § 608(a)(1)(K). The FEMA administrator has specified no such additional factor in writing.

169.     In making the Reallocation Decision, Defendants did not observe the procedure required by Congress.  The Reallocation Decision therefore must be set aside under the APA.

170.     The Reallocation Decision will cause harm to Plaintiffs and their residents.

## FIFTH CAUSE OF ACTION

### Violation of the U.S. Constitution
### Spending Clause (Reallocation Decision)

171.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

172.    The Constitution vests the spending power in Congress, not the President or any executive agency. U.S. Const. art. I § 8, cl. 1.

173.    "*Congress* may fix the terms on which it shall disburse federal money to the States," meaning that any "federally imposed conditions" on States must square with the relevant "legislation enacted pursuant to the spending power." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added).

174.    Congress has fixed the terms by which DHS and FEMA may allocate SHSP funds, by identifying a set of risk factors in the SHSP statute and a procedure for identifying additional factors for the FEMA administrator to consider. Defendants have disregarded the relevant statutory terms, instead allocating funds pursuant to an unspecified additional factor, contained solely in a secret DHS directive. The Constitution does not authorize Defendants to spend funds pursuant to unrelated extra-statutory factors, imposed on the States without explanation.

175.    In addition, the federal government cannot use federal funds to "coerce[] a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012). That is exactly what defendants are attempting to do: By unilaterally reducing many Plaintiff States' awards on the sole basis of their refusal to assist the federal government in enforcing federal law, defendants are impermissibly attempting to "coerce" these Plaintiff States into compliance.

176.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327. "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). Plaintiff States are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

177.    The Reallocation Decision will cause harm to Plaintiffs and their residents.

### SIXTH CAUSE OF ACTION

### Violation of the U.S. Constitution
### Equal Sovereignty Principle (Reallocation Decision)

178.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

179.    States retain sovereignty under the Constitution and there is also a "fundamental principle of *equal* sovereignty" among the States. *Shelby Cnty.*, 570 U.S. at 544. Pursuant to this principle, if the federal government is to divide the States, it "must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions." *Id*. at 553.

180.    Here, Defendants have treated the States differently, subjecting only some States to substantial reductions in their SHSP allocations without explanation. Defendants have identified no basis imposing such reductions. Nor could they provide any such basis that accords with the statutory text or purpose of the SHSP program. Instead, Defendants have treated certain States differently based solely on whether the administration approves of the State and local policies within those States. Such disparate treatment without any basis violates the principle of equal sovereignty.

181.    The Reallocation Decision will cause harm to Plaintiffs and their residents.

## SEVENTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action (Performance Period Decision)

182.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

183.    Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co*., 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made"); *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).

184.    Defendants failed to comply with these bedrock requirements in making the Performance Period Decision.

185.    First, Defendants provided no explanation for why it truncated the performance period for HSGP and EMPG grants from three years to one year, after announcing a three-year period of performance in the NOFOs. Agencies may not keep the reasons for their decisions secret. *Dep't of Com. v. New York,* 588 U.S. 752, 785 (2019).

186.    Second, Defendants entirely failed to consider the legitimate reliance Plaintiff States had on the period of performance announced in the NOFO. Before an agency adopts a new policy, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S.

at 30, 33. Here, States proposed projects for spending SHSP and EMPG funds in reliance on the announcement that there would be a three-year period of performance. Such reliance was reasonable, as States had never seen a post-NOFO reduction in performance period on either of these grants. Yet, Defendants never considered such reliance when making the Performance Period Decision.

187.    The Performance Period Decision will cause harm to Plaintiffs and their residents.


## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a.    Declare that the Reallocation Decision is unconstitutional and/or unlawful because it: (a) violates the APA; (b) is *ultra vires;* and (c) is contrary to the Constitution of the United States;

b.    Set aside the Reallocation Decision;

c.    Direct Defendants to obligate fiscal year 2025 HSGP funds consistent with the statutory criteria or, in the alternative, the target allocations set forth in the fiscal year 2025 notice of funding opportunity;

d.    Require defendants to rescind the fiscal year 2025 award notifications and de-obligate the associated funds (or, at minimum, the funds reallocated from Plaintiff States to other jurisdictions);

e.    Enjoin DHS and FEMA from disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable by any means all fiscal year 2025 Homeland Security Grant Program funds;

f.    Suspend the September 30, 2025, statutory lapse of HSGP funds to the full extent necessary to permit obligation of revised Homeland Security Grant Program awards to

Plaintiff States at the levels of the target allocations specified in the fiscal year 2025 Homeland Security Grant Program notice of funding opportunity, including by recording as an obligation of the United States the full appropriation for the Homeland Security Grant Program for fiscal year 2025 pursuant to 31 U.S.C. § 1501(a)(6);

g. Set aside the Performance Period Decision and direct defendants to re-issue award notifications that reflect a three-year performance period, or are otherwise compliant with federal law;

h. Retain jurisdiction to monitor defendants' compliance with this Court's judgment;

i. Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

j. Award such additional relief as this Court may deem just and proper.

September 29, 2025

Respectfully submitted,

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
James E. Stanley
  *Supervising Deputy Attorneys General*
Deylin Thrift-Viveros
  *Deputy Attorney General*

/s/ Lee I. Sherman
Lee I. Sherman
  *Deputy Attorney General*
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6000
lee.sherman@doj.ca.gov

*Attorneys for the State of California*

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Christopher G. Wells
  *Chief of the Public Interest Division*
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy*
  *Deputy Solicitor General*
Mayur P. Saxena*
  *Assistant Attorney General*
Daniel Resler*
  *Deputy Attorney General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (R.I. Bar No. 8486)
  *Chief, Civil Division*
  *Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Ashley Meskill
Ashley Meskill
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorneys for the State of Connecticut*

**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

/s/ Mitchell P. Reich
Mitchell P. Reich
  *Senior Counsel to the Attorney General*
Office of the Attorney General for the District
  of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Rose Gibson
  *Assistant Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*

45

KEITH ELLISON
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*

LETITIA JAMES
  ATTORNEY GENERAL OF NEW YORK

/s/ Stephen Thompson
Rabia Muqaddam
  *Chief Counsel for Federal Initiatives*
Stephen C. Thompson
  *Special Counsel*
Julie Dona
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*

CHARITY R. CLARK
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Jonathan T. Rose
  *Solicitor General*
Julio A. Thompson
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

NICHOLAS W. BROWN
  ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts
  *Assistant Attorney General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov

*Attorneys for the State of Washington*