# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF ILLINOIS, *et al.*,

                *Plaintiffs*,

    v.

KRISTI NOEM, in her official capacity as
Secretary of the Department of Homeland
Security, *et al.*,

                *Defendants.*

No. 1:25-cv-00495


## PLAINTIFF STATES' EMERGENCY
## MOTION FOR A TEMPORARY RESTRAINING ORDER

## RELIEF SOUGHT BY SEPTEMBER 30, 2025

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................. 3

    A.    Congress's Longstanding Support For State Emergency Preparation And Response. ................................................................................................................... 3

    B.    The Department's Enjoined Attempt To Conscript States In Immigration Enforcement. ................................................................................................................ 5

    C.    The Reallocation Decision. .................................................................................... 7

ARGUMENT ...................................................................................................................... 10

I.    Plaintiffs Are Likely To Succeed On The Merits. ............................................................ 11

    A.    The Reallocation Decision Exceeds Statutory Authority and Disregards Procedure Required by Law. ................................................................................... 11

    B.    The Reallocation Decision Is Arbitrary and Capricious. ..................................... 13

        1.    The Department relied on factors which Congress has not intended it to consider in making allocation decisions. .................................................... 14

        2.    The Department abandoned its position in the HSGP notice of funding opportunity without acknowledgement or explanation. ............................... 16

        3.    The Department failed to consider the States' reliance interests in billions of dollars in federal funding. ........................................................... 18

II.    The Equities Compel Emergency Relief. ......................................................................... 19

    A.    Emergency Relief Is Needed To Avert Irreparable Harm, and the Court has the Authority to Preserve the Status Quo. ........................................................... 19

    B.    The Balance of Equities And Public Interest Favor Emergency Relief. ............... 21

CONCLUSION ................................................................................................................... 22

# INTRODUCTION

Five days ago, a federal district court held that the Department of Homeland Security ("DHS") could not lawfully condition the award of federal funds to Plaintiff States on "requiring state and local recipients to certify that they will assist in enforcing federal immigration law." *Illinois v. Fed. Emergency Mgmt. Agency*, _ F. Supp. 3d _, 2025 WL 2716277, at *2 (D.R.I. Sept. 24, 2025). The court held that DHS's decision to impose such immigration conditions was "both arbitrary and capricious and unconstitutional." *Id.* at *16.

Two days ago, frustrated in its first attempt to coerce the States into enforcing federal civil immigration law, DHS took yet another lawless action. It simply cut by over $233 million awards that go to States and municipalities viewed as "sanctuary" jurisdictions (that is, States and localities that as a policy matter do not commit their limited law enforcement resources to assisting the federal government in enforcing federal immigration laws)—and it did so dramatically, without explanation, while re-allocating their funds elsewhere (the "Reallocation Decision"). In particular, DHS dramatically reduced Plaintiff States' awards under the Homeland Security Grant Program ("HSGP"), a critical program administered by the Federal Emergency Management Agency ("FEMA"), that helps States to prevent, prepare for, protect against, and respond to acts of terrorism and other sudden emergencies. As to the two HSGP subprograms that constitute the large majority of HSGP funding to the States, and as compared to the notice of funding opportunity ("NOFO") for HSGP that issued just two months ago, the allocation to Illinois was cut by 69%, to New York by 79%, to the District of Columbia by 70%, to New Jersey by 49%, and to California by 33%. Meanwhile, Missouri saw a gain of 68% and Texas a gain of 31%. The difference is that DHS views the first group of States as opposed to its policy priorities, and the second group of States as aligned with those priorities.

The only explanation FEMA has given for the devastating cuts was a four-word phrase: "Adjusted per DHS directive." The award documents repeatedly intone these words, in line item after line item, as the sole reason for the dramatic funding cuts. Yet "[r]easoned decisionmaking under the Administrative Procedure Act calls for an explanation for agency action." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). DHS gave no reason at all for what it did here. Moreover, Congress has directed that the administrator of FEMA—not DHS Secretary Noem—allocate these funds based on the States' "relative threat, vulnerability, and consequences from acts of terrorism." 6 U.S.C. § 608(a)(1). No such risk-based allocation happened here. Instead, in a clearly pretextual rearguard attack on disfavored jurisdictions, DHS retroactively slashed awards to States whose domestic law-enforcement policies DHS dislikes. That violates the "fundamental principle of *equal* sovereignty among the States." *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013).

Tomorrow is the last day of the federal fiscal year. After that date, the appropriation that funds the HSGP will expire, and DHS will be unable to incur new obligations based on it. *See* 31 U.S.C. § 1502(a). In the unique posture of this case, where DHS has chosen to obligate the balance of the HSGP funds at the very end of the fiscal year, there is a significant risk that, absent immediate relief freezing the status quo, the funds at issue will be irretrievably disbursed to other States after the original appropriation has expired. *See City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1427 (D.C. Cir. 1994). This Court has the authority to direct DHS to record the contested funds as an obligation of the United States and otherwise simply preserve matters as they stand while litigation unfolds. *See* 31 U.S.C. §§ 1501(a)(6), 1502(b). Plaintiff States do not now seek *disbursement* of any funds but merely sufficient relief to "preserve the status quo during the pendency of trial-court proceedings." *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 37 n.6 (1st Cir. 2024).

The federal government cannot coerce the States into enacting its preferred policy goals using the Spending Clause. Having failed to do so, DHS has now set out to punish Plaintiff States for their sovereign choices about how to allocate their scarce law-enforcement resources. The Court should issue temporary relief to ensure that Plaintiff States have the opportunity to challenge this profound affront to the constitutional order.

## BACKGROUND

### A. Congress's Longstanding Support For State Emergency Preparation And Response.

For over 70 years, Congress has addressed the threat of unpredictable disasters and emergencies by providing robust and unflagging financial support—today totaling tens of billions of dollars annually—for a complex infrastructure of emergency preparedness and response, anchored by FEMA but administered in the first instance by the States. After the September 11, 2001 terrorist attacks, Congress added funding programs to support States and localities in counterterrorism measures, with the goal of ensuring that a disaster of that sort never happens again. In October 2001, Congress passed the USA PATRIOT Act, establishing grant programs to States "to prepare for and respond to terrorist acts." Pub. L. No. 107-56, § 1014, 115 Stat. 272, 399. Congress went on to pass the Homeland Security Act of 2002, Pub. L. No. 107-296, § 430, 116 Stat. 2135, 2191, which increased support for state preparedness measures. A companion preparedness program, the Emergency Management Performance Grant Program ("EMPG"), was established by Congress around the same time. Pub. L. No. 108-7, 117 Stat. 11, 515–16. The Homeland Security Grant Program was codified in its current form five years later by the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, § 101, 121 Stat. 266, 273–85 (codified as amended at 6 U.S.C. § 603 *et seq.*).

Through the Homeland Security Grant Program, FEMA annually distributes over $1 billion to States. The overarching Homeland Security Grant Program has two statutory sub-components relevant here: the State Homeland Security Grant Program ("SHSP"), which focuses on the state level, 6 U.S.C. § 605, and the Urban Area Security Initiative ("UASI"), which "provide[s] grants to assist high-risk urban areas," though again through grants to the States, *id.* § 604(a), (c)(4).[1] Each State is entitled to a minimum amount of funding under SHSP. *See id.* § 605(e)(1) (FEMA Administrator "shall ensure that . . . each State receives . . . not less than an amount equal to" .35 percent of total appropriated funds). The balance of SHSP and UASI funds are allocated among the States and their high-risk urban areas by way of a risk-based formula that enumerates certain factors the FEMA administrator "shall consider." *Id.* § 608(a). They include things like population density, degree of threat, and the "anticipated effectiveness of the proposed use of the grant by the State." *Id.* § 608(a)(1)(B), (a)(1)(D), (a)(2). The FEMA administrator may consider other factors, within constitutional limits, but any additional factors must be "specified in writing." *Id.* § 608(a)(1)(K).

HSGP, with its sub-components SHSP and UASI, forms an indispensable part of Plaintiff States' public safety budgets. SHSP funds provide the near-exclusive source of money for the "mutual aid" networks of police departments, fire departments, emergency services, and public works departments across the country. Ex. 1 (Evans Decl.), ¶ 13. In a major emergency, these networks mobilize first responders from outside the immediate jurisdiction where the disaster took place. Without them, local first responder capabilities would quickly be overwhelmed. *Id.* Similarly, in Illinois, UASI funds the Urban Area Working Group, which coordinates response

---

[1] The third HSGP sub-component, known as "Operation Stonegarden," which supports state efforts to enhance border security, was not affected by the Reallocation Decision.

from Chicago, Cook County, and its municipalities during a disaster, terrorist attack, or other mass-casualty event. This coordinated effort relies entirely on FEMA funds, so their termination could leave one of the most populous areas of the country without a coordinated response to the next disaster. *Id.* ¶ 58; *see also* Ex. 11 (Bray Decl.), ¶ 31. States do not have the budgetary resources or flexibility to make up for the lost funding without drawing funding away from other important public safety and law enforcement operations. *Id.* ¶ 75; Ex. 1 (Evans Decl.), ¶ 60.

**B.    The Department's Enjoined Attempt To Conscript States In Immigration Enforcement.**

In the seven decades in which the federal government has supported the States in protecting their residents against catastrophic disasters, to Plaintiffs' knowledge, no presidential administration has threatened to withhold emergency and disaster funds to conscript the States into adhering to its policy preferences. But the current administration took that step. On January 20, 2025, his first day in office, President Trump expressly directed DHS to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). Another order on February 19, 2025, directed not only DHS but all executive departments to "ensure, consistent with applicable law, that Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies." Exec. Order No. 14218, § 2(a)(ii), 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025). That same day, the DHS Secretary issued a memorandum to all DHS agencies and offices titled "Restricting Grant Funding for Sanctuary Jurisdictions," directing DHS agencies to review all federal financial assistance and cease federal funding to sanctuary jurisdictions. *See* Ex. 2.

Then, "[o]n March 27, DHS revised the standard terms and conditions governing <u>all</u> federal grants it oversees, adding provisions requiring state and local recipients to certify that they will assist in enforcing federal immigration law." *Illinois v. FEMA*, 2025 WL 2716277, at *2. The States

of Illinois, California, New Jersey, Rhode Island, Colorado, Connecticut, Delaware, Hawai'i, Maine, Maryland, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, and Wisconsin, and the District of Columbia brought suit, claiming that the immigration conditions imposed on all DHS funds were unlawful. *See* Complaint, *Illinois v. FEMA*, ECF 1 (D.R.I. May 13, 2025).[2]

Even as the litigation unfolded, defendants continued to make clear that they would press forward with punishing disfavored jurisdictions whenever and however they could. On April 28, 2025, the President issued yet another executive order denouncing "State and local officials" who "use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws," calling States' sovereign choice about how to employ their own law enforcement "a lawless insurrection." Exec. Order No. 14287, § 1, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025). This executive order also directed DHS to "publish a list of" so-called "sanctuary jurisdictions" by May 28, 2025. *Id.* § 2(a). DHS did so, though the list was later taken down. *See* Exs. 3–5. Defendant Noem has publicly stated in a television interview that the sanctuary list "is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice." Ex. 6.

The parties cross-moved for summary judgment, and the court ruled for the plaintiffs, finding that DHS's attempt to impose the immigration conditions was both arbitrary and capricious and unconstitutional. To begin, "DHS made no attempt to claim that it examined the relevant data or articulated a fact-based reason for its actions." *Illinois v. FEMA*, 2025 WL 2716277, at \*12. The Court concluded that DHS "engaged in a wholly under-reasoned and arbitrary process," "did not meaningfully evaluate the States' reliance interests," and compounded these failures by using

---

[2] The District of Columbia was joined with the first amended complaint on July 2, 2025.

"vague and confusing language" that "ma[de] vague compliance a nearly impossible-to-achieve moving target." *Id.* To the extent DHS had any reasons at all, "the string of memoranda on which the Defendants rely were drafted in direct response to the Executive Order calling upon the agencies to terminate funding to 'sanctuary jurisdiction[s].'" *Id.* (alteration in original). "With these conditions, states are left to guess at what conduct satisfies the requirements under threat of losing billions in essential funding." *Id.* For similar reasons, the court held that, where "states rely on these grants for billions of dollars annually in disaster relief and public safety funds that cannot be replaced by state revenues," the immigration conditions were unconstitutionally coercive under the Spending Clause. *Id.* at *14.

Accordingly, by judgment entered September 24, 2025, the district court vacated the immigration conditions as to all DHS awards and all recipients. *Id.* at *15. The court also issued a permanent injunction because "Plaintiff States stand to suffer irreparable harm; the effect of the loss of emergency and disaster funds cannot be recovered later, and the downstream effect on disaster response and public safety are real and not compensable." *Id.* at *16. The court therefore "permanently enjoin[ed] Defendants from enforcing the contested conditions against Plaintiff States." *Id.*

### C. The Reallocation Decision.

When asked about the court's opinion, DHS's spokesperson said: "Cities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding." She added: "No lawsuit, not this one or any other, is going to stop us from doing that." Anna Griffin, *Federal Judge Rejects Administration Efforts to Tie State Disaster Funds to Immigration Cooperation*, N.Y. Times, Sept. 24, 2025.[3]

---

[3] https://www.nytimes.com/2025/09/24/us/politics/trump-disaster-aid-immigration.html.

Three days later, DHS slashed over $233 million in Homeland Security Grant Program funding to many States protected by the *Illinois v. FEMA* injunction, redistributing their funding to other States. The fiscal year 2025 notice of funding opportunity had established "target allocations" for both SHSP and UASI. These target allocations were, by FEMA's own account, grounded in the statutory process: "For FY 2025, DHS/FEMA will distribute SHSP funds based on their risk assessment methodology and legal minimums outlined in the *Homeland Security Act of 2002*, as amended." Ex. 1-A at 53. Likewise, FEMA determined fiscal year 2025 "UASI allocations for each high-risk urban area based on DHS/FEMA's risk-informed assessment in accordance with the *Homeland Security Act of 2002*, as amended." *Id.* at 55.

The notice of funding opportunity announced that these were "target allocations," with the caveat that "final allocations may be different in the award letter." *Id.* at 53, 55. But, as FEMA itself publicly declared on September 12, 2025: "*Final* allocations are published in the FY 2025 HSGP NOFO." Fed. Emergency Mgmt. Agcy., *FY 2025 Homeland Security Grant Program Fact Sheet*, at 3 (Sept. 12, 2025) (Ex. 10) (emphasis added). In practice, in past years, final allocations have never meaningfully differed from target allocations by more than fractions of percentages. The Illinois Emergency Management Agency – Office of Homeland Security ("IEMA-OHS"), for instance, has *never* experienced a substantial reduction between the NOFO allocations and the final award under the SHSP and UASI programs. Ex. 1 (Evans Decl.), ¶ 34. IEMA-OHS's chief preparedness officer attests that in 22 years of experience in the emergency-management field, he cannot recall *any* difference between the NOFO allocation and the final award. *Id.* This year, DHS cut the SHSP award to Illinois by 58 percent and the UASI award to Illinois, corresponding to the Chicago metropolitan area, by 72 percent. The total combined drop was 69 percent, or $30 million. *See id.* ¶ 35; *see also* Ex. 1-E.

In total, at least eight States (and their municipalities, via the UASI component) received awards reduced substantially relative to the NOFO allocations, as shown by the below chart:

| State | Notice of Funding Opportunity | | | Final Award | | | Total Percentage Reduction |
| | SHSP | UASI | Total | SHSP | UASI | Total | |
|---|---|---|---|---|---|---|---|
| Cal. | $55,863,486 | $109,325,268 | $165,188,754 | $17,156,754 | $93,473,801 | $110,630,555 | **-33%** |
| D.C. | $4,362,750 | $25,270,521 | $29,633,271 | $4,362,750 | $4,400,000 | $8,762,750 | **-70%** |
| Ill. | $10,419,556 | $33,479,819 | $43,899,375 | $4,362,750 | $9,395,829 | $13,758,579 | **-69%** |
| Mass. | $5,390,887 | $16,838,838 | $22,229,725 | $6,000,629 | $9,301,839 | $15,302,468 | **-31%** |
| Minn. | $4,362,750 | $9,526,217 | $13,888,967 | $4,362,750 | $2,973,810 | $7,336,560 | **-47%** |
| N.J. | $5,065,776 | $13,928,247 | $18,994,023 | $3,768,628 | $6,000,629 | $9,769,257 | **-49%** |
| N.Y. | $38,200,874 | $92,180,364 | $130,381,238 | $5,624,924 | $22,069,395 | $27,694,319 | **-79%** |
| Wash. | $5,483,241 | $12,713,580 | $18,196,821 | $4,362,750 | $11,782,120 | $16,144,870 | **-11%** |

Each of these States is listed on DHS's now-removed list of "sanctuary" jurisdictions and has impacted UASI municipalities that are. *See* Ex. 4.[4]

DHS redistributed the funds that it cut from these jurisdictions to jurisdictions that it views as aligned with its policy preferences. Although information is necessarily incomplete at this stage, Plaintiff States are aware that:

- Texas was preliminarily allocated $79 million in HSGP-SHSP and -UASI funds by the NOFO but ultimately received $104 million—a 31 percent increase;

- Missouri was preliminarily allocated $15 million in HSGP-SHSP and -UASI funds by the NOFO but ultimately received $25 million—a 68 percent increase; and

- North Carolina was preliminarily allocated $9 million in HSGP-SHSP and -UASI funds by the NOFO but ultimately received $21 million—a 136 percent increase.

---

[4] Indeed, many more States that DHS views as "sanctuary" jurisdictions might have also received dramatic funding cuts, but are sufficiently small that they receive the statutory minimum of "0.35 percent of the total funds appropriated," 6 U.S.C. § 605(e)(1)(A)(v), meaning $4,362,750 in fiscal year 2025. *See* Ex. 1-A at 54.

Compl., ¶¶ 114–116. Indiana, Iowa, North Dakota, and Tennessee also saw substantial increases. *Id.* ¶ 117. None of these jurisdictions is identified by DHS as a "sanctuary" jurisdiction.

FEMA made other last-minute changes to the scope of the HSGP program (and also to the EMPG program, for which award notifications were likewise issued on Saturday, September 27). Most significantly, although FEMA has traditionally issued preparedness awards with three-year performance periods, and stated in the HSGP and EMPG NOFOs that these programs would once more operate on a three-year performance period, Ex. 1-A at 4; Ex. 1-D at 4, it reduced the period of performance on all HSGP and EMPG awards to one year without explanation or justification, Ex. 1 (Evans Decl.), ¶ 54. FEMA likewise placed an indefinite hold on all States' awards, again without explanation or justification, meaning that the States cannot use awarded funds. *E.g.*, Ex. 1-E at 81.

As to the redistributions away from Plaintiff States and toward jurisdictions that DHS and FEMA view as aligned with their policy preferences, the entire explanation is a four-word phrase placed on various budget lines: "Adjusted per DHS directive." *Id.* at 9–53; *see also, e.g.,* Ex. 12 at 4–12 (California award "Adjustment per DHS directive"); Ex. 13 at 15–20 (Minnesota award "Adjusted per DHS directive"); Ex. 14 at 4–16 (New York "Adjusted per DHS directive"). The directive in question is not specified.

## ARGUMENT

"When assessing a request for a preliminary injunction, a district court must consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020) (internal quotation marks omitted). All four factors overwhelmingly support granting a temporary restraining order to freeze matters in place before the end of the 2025 federal fiscal year.

**I.      Plaintiffs Are Likely To Succeed On The Merits.**

Plaintiffs are highly likely to succeed in establishing that DHS's re-allocation of funds to punish States' sovereign choices is unlawful. Indeed, the Reallocation Decision is unlawful in at least two separate respects: The agency's decision to re-allocate the funds at the last minute was (a) contrary to HSGP's authorizing statute, and (b) arbitrary and capricious, violating the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). And its decision to truncate the period of performance from three years to one is arbitrary and capricious for many of the same reasons.

**A.      The Reallocation Decision Exceeds Statutory Authority and Disregards Procedure Required by Law.**

DHS and its sub-agencies are "charged with administering congressional statutes," which means that "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Indeed, "an agency literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986), especially in the area of federal funding, *see Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022) (emphasizing that it is Congress that "has broad power" to "set the terms on which it disburses federal funds"). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the [APA]." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020); 5 U.S.C. § 706(2)(C). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

The HSGP statute establishes a prescriptive list of factors that "the Administrator shall consider" "[i]n allocating funds among States and high-risk urban areas." 6 U.S.C. § 608(a). "The Administrator" is the FEMA administrator, not defendant Secretary Noem. *Id.* § 113(a)(1)(D). The overall factors are the States' "relative threat, vulnerability, and consequences from acts of

terrorism" alongside "the anticipated effectiveness of the proposed use of the grant." *Id.* § 608(a)(1), (2). The HSGP notice of funding opportunity reflects the statutory factors when it states: "The equation for relative risk is comprised of three components: Threat x Vulnerability x Consequence." Ex. 1-A at 37. The statute then enumerates ten more "consideration[s]" for the FEMA administrator in making that risk assessment, including things like population, population density, history of threats, and needs of neighboring jurisdictions. *Id.* § 608(a)(1)(A), (B), (C), (H). The proximity of international borders is a factor, *id.* § 608(a)(1)(F), but state policies concerning cooperation with federal immigration officials are not.

Up until two days ago, defendant FEMA was in full agreement with Plaintiff States that the HSGP statute requires allocations based on risk. On FEMA's own account, the target allocations that it calculated for each State for fiscal year 2025 were based on a "risk assessment methodology" reflecting the relevant statutory factors. Ex. 1-A at 53, 55. As late as September 12, 2025, FEMA publicly called those allocations "[f]inal." Ex. 10 at 3. FEMA boasted that "[u]nlike previous years, where allocations were based on a combination of risk and policy considerations, FY 2025 SHSP and UASI allocations were based solely on FEMA's relative risk methodology." Fed. Emergency Mgmt. Agcy., *FY 2025 Homeland Security Grant Program Key Changes*, at 2 (Sept. 12, 2025) (Ex. 9). FEMA proclaimed that its ostensibly apolitical allocation process was "required by the Homeland Security Act." *Id.*

At the last minute, however, a nameless and unexplained "DHS directive" was implemented to "[a]djust" dramatically the "final" allocations. *See supra* p. 10. Nothing in § 608 or any other statute authorized the DHS secretary to reverse FEMA's risk-based allocation based purely on an edict from above. Instead, the statute makes clear that its factors are exclusive: "The allocation of grants authorized under section 604 [meaning UASI] or 605 [meaning SHSP] of this

title shall be governed by the terms of this part and not by any other provision of law." 6 U.S.C. § 603(c)(2). So Congress has barred DHS from asserting some free-standing DHS directive, outside the confines of the Homeland Security Grant Program statute, as a basis for tinkering with the allocations among the States. Again, defendant FEMA apparently agrees. *See* Ex. 9 at 2.

Finally, the residual clause closing the list of potential considerations reinforces the exclusive nature of the listed factors. The FEMA administrator may, unless otherwise prohibited by law, consider "such other factors as are specified in writing by the Administrator." 6 U.S.C. § 608(a)(1)(K). But the administrator has specified nothing here. The directive to alter the allocations came straight from DHS, not "the Administrator." And the administrator has specified nothing in writing—the directive remains a total mystery—such that whatever decision defendant Secretary Noem made was also "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

### B.     The Reallocation Decision Is Arbitrary and Capricious.

Defendants further violated the APA in making sudden and drastic funding cuts to Plaintiff States, totaling in the hundreds of millions of dollars, without a word of explanation. *See* 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or [that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When changing positions, an agency must also consider both the "alternatives that are within the ambit of the existing policy" and the "serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (brackets and internal quotation marks omitted).

To start, the Court must consider the explanation (or lack thereof) that DHS gave this week in cutting Plaintiff States' allocations, not any explanation provided in litigation. *Id.* at 20 ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'") (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)). There was no accompanying material, of any kind, that gave any reasons at all for their precipitous funding cuts. The invoked reasons must not be secret, internal reasons but rather "reasons that can be scrutinized by courts and the interested public." *New York*, 588 U.S. at 785. DHS has publicly invoked *no grounds* for what it did on September 27. That alone requires judgment on the APA claim in Plaintiff States' favor. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (it is "a fundamental requirement of administrative law . . . that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action").

In any event, DHS's gutting of state terrorism budgets bears all the hallmarks of unreasoned decisionmaking. DHS (1) relied on extra-statutory considerations; (2) ignored the States' profound reliance interests on federal funding, with the attendant impacts on public safety; and (3) relied on factors not set forth in the notice of funding opportunity, without explaining its change in position.

### 1. The Department relied on factors which Congress has not intended it to consider in making allocation decisions.

First, whether the agency "entirely failed to consider an important aspect of the problem" or "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, necessarily "turns on what a relevant substantive statute makes important," *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) (internal quotation marks omitted); *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1039 (9th Cir. 2023). Put differently, the universe of information an agency must (and must not) consider depends on "the

scope of the duty imposed on the agency by Congress in the relevant substantive statute." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 78 (D.D.C. 2016), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018). It is thus arbitrary and capricious for the agency to "rel[y] on factors which Congress has not intended it to consider" in making its decision, *State Farm*, 463 U.S. at 43; *see Ctr. for Biological Diversity*, 67 F.4th at 1039.

These principles are even more pressing in the grant context. "*Congress* may fix the terms on which it shall disburse federal money to the States," meaning that any "federally imposed conditions" on States must square with the relevant "legislation enacted pursuant to the spending power." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added). The statutory authorization for a grant program, by definition, sets forth the factors that Congress requires—and permits—an agency to consider in issuing funds. As the First Circuit has explained, the agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities." *Providence*, 954 F.3d at 39; *see also, e.g.*, *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973) (agency cannot set spending requirements "remote and unrelated" to the underlying statute).

But DHS has transparently relied on a factor that "Congress ha[d] not intended it to consider," *State Farm*, 463 U.S. at 43—namely, whether state and local grant recipients assist the federal government in enforcing immigration law or instead choose to exercise control over the use of their law-enforcement resources. As discussed, *supra* pp. 11–12, Congress set out a list of factors that the Administrator "shall consider" in allocating HSGP funds, 6 U.S.C. § 608(a), and a jurisdiction's willingness to enforce federal immigration law is not among them. FEMA, as recently as September 12, 2025, acknowledged that "policy considerations" form no part of the "risk methodology." Ex. 9 at 2. But *every* State that saw its allocation reduced was on DHS's list

of "sanctuary" jurisdictions. *Supra* p. 9; *see* Ex. 4. DHS thus plainly based its decision not on those factors that Congress instructed it to consider—factors FEMA had considered in developing the NOFO's target allocations—but on an impermissible extra-statutory factor, namely the punishment of States with domestic policies that DHS dislikes. Doing so was arbitrary and capricious.

### 2. The Department abandoned its position in the HSGP notice of funding opportunity without acknowledgement or explanation.

The HSGP notice of funding opportunity announced DHS's view, at the time, on what the appropriate risk allocation was and what factors could be considered in deriving target allocations. Ex. 1-A at 53–55. The notice of funding opportunity is no mere formality: Office of Management and Budget administrative requirements, which DHS has adopted as its own binding regulations, require DHS to disclose "the expected dollar values of individual awards" up front. 2 C.F.R. §§ 200.204(a)(6), 3002.10. On September 12, 2025, FEMA called these allocations "[f]inal." Ex. 10 at 3.

Yet, two months later, DHS evidently identified some new factor that indicated a dramatically different result, and a huge departure from the originally published expected value of awards. When changing policy, "the agency must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Changes in agency policy, just as much as factfinding or any other regulatory pronouncement, require that the agency "'examine the relevant data and articulate a satisfactory explanation for its action,'" *id.* at 513 (quoting *State Farm*, 463 U.S. at 43). So when, as here, an agency makes a "policy change," it "must consider the 'alternatives' that are 'within the ambit of the existing policy'" and assess "whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33 (alterations omitted) (quoting *State Farm*, 463 U.S. at 51).

DHS did none of this. In the grant context, just as in any other, if an agency has "determined that the grant was the best way to fulfill the purposes of" a program, then "[i]n rescinding that determination, the [agency is] clearly compelled to give adequate reasoning for the dramatic change of course." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985). Once again, the full explanation that DHS has given is: "Adjusted per DHS directive." Those four words are manifestly inadequate to justify reallocating hundreds of millions of dollars away from Plaintiff States and toward other jurisdictions. Indeed, the unreasoned nature of the Reallocation Decision—and its deviation from the NOFO—is particularly stark when placed in historical context: The preparedness director of Illinois emergency-management agency cannot remember *any* federal fiscal year in which there was *any* change between the NOFO allocation and the final award amount, much less a reduction of 70% of the funds allocated to the State. Ex. 1 (Evans Decl.), ¶¶ 34–35; *see also* Ex. 11 (Bray Decl.), ¶¶ 57–58 (New York, same).

The same is true of the award notifications' reduction in the performance period associated with both the HSGP and EMPG grants from three years to one. *Supra* p. 10. Again, FEMA has traditionally issued preparedness awards with three-year performance periods, and announced in the HSGP and EMPG NOFOs that there would be a three-year period of performance for both programs. Ex. 1 (Evans Decl.), ¶¶ 46, 51. Indeed, the agency expressly instructed applicants to frame their budgetary needs by reference to the anticipated three-year period of performance: The HSGP NOFO stated that projects must be "able to be fully completed within the three-year period of performance," Ex. 1-A at 38, and the EMPG NOFO stated that "[e]ach goal must be specific, measurable, and achievable within the period of performance," Ex. 1-D at 50. Plaintiff States proposed projects for both NOFOs on that understanding. *E.g.*, Ex. 1 (Evans Decl.), ¶ 53. Those Plaintiffs that received dramatically reduced awards must now, apparently, revise those projects,

burning further limited time. Compl., ¶ 141. But—and again without explanation—when the awards issued, Defendants curtailed the period of performance to one year on both awards, running from October 1, 2025, to September 30, 2026. Ex. 1 (Evans Decl.), ¶ 54; Ex. 1-E at 75. This decision, too, marks a significant and unexplained deviation from past practice; again, Illinois's emergency management preparedness director attests that he has never seen a reduction in performance period of this sort in 22 years in the industry. Ex. 1 (Evans Decl.), ¶ 56; *see also* Ex. 11 (Bray Decl.), ¶ 74.

### 3. The Department failed to consider the States' reliance interests in billions of dollars in federal funding.

The Reallocation Decision is finally arbitrary and capricious because DHS "failed to address whether there was legitimate reliance on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30 (internal quotation marks omitted). As the Supreme Court has explained, "[w]hen an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 30, 33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id.* at 30 (quotation marks omitted).

Again, that is exactly what DHS did here. The States rely heavily on the annual receipt of funds to protect their residents from terrorist threats. For one, Plaintiff States rely on billions of dollars in federal funding annually to support critical preparedness programs—programs that help prepare for the possibility of catastrophic events that range from floods to tornadoes to acts of extremist violence. For instance, as DHS itself has explained, the National Network of Fusion Centers—which FEMA funding supports in many States through the Homeland Security Grant Program—helps share threat-related information among different levels of government. U.S. Dep't of Homeland Sec., *Fusion Centers* (captured Sept. 28, 2025) (Ex. 7). DHS admits "that no

other federal or local organization can replicate" that "unique perspective on threats to" states and localities. *Id.* But DHS's decision to reallocate hundreds of millions of dollars from Plaintiff States to others will imperil the continued vitality of this critical support structure in many or all Plaintiff States—a cost DHS made no attempt to justify.

As the court found based on the uncontested record in *Illinois v. FEMA*, Plaintiff States' "budgets are structured in reliance on billions in DHS-administered grants, and they cannot replace those funds from other sources." 2025 WL 2716277, at *9. In imposing the Civil Immigration Conditions, DHS not only failed to "weigh" these longstanding, substantial reliance interests "against competing policy concerns"; it "ignore[d]" them altogether. *Regents*, 591 U.S. at 30, 33 (internal quotation marks omitted). Because the Conditions were adopted "with no regard for the [States'] reliance interests," and DHS "did not acknowledge—much less justify—its adoption" of the new requirements, they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 179–80 (D.C. Cir. 2023).

## II.     The Equities Compel Emergency Relief.

### A.     Emergency Relief Is Needed To Avert Irreparable Harm, and the Court has the Authority to Preserve the Status Quo.

Absent emergency relief from this Court, Plaintiff States will be severely and irreparably harmed by the Reallocation Decision. Congress funded the Homeland Security Grant Program using a single-year appropriation that will expire after tomorrow, September 30, the end of the 2025 federal fiscal year. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 607, (1)–(2) (fiscal year 2024 appropriation); Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, § 1101(a)(6), 139 Stat. 9, 11 (continued fiscal year 2025 appropriation under the same terms); 31 U.S.C. § 1301(c)(2) (default rule that appropriations expire after one year unless otherwise specified). Agency obligations

against the appropriation must be made on or before September 30. *See id.* § 1502(a). Moreover, where an agency is actively obligating funds to other potential recipients, some courts have held that "to avoid having its case mooted, a plaintiff must both file its suit before the relevant appropriation lapses *and* seek a preliminary injunction preventing the agency from disbursing those funds." *City of Houston*, 24 F.3d at 1427; *see also Cnty. of Suffolk v. Sebelius*, 605 F.3d 135, 138 (2d Cir. 2010) ("Where, as here, the congressional appropriations relating to the funds sought … have been lawfully distributed—and therefore exhausted—by a federal agency, courts lack authority to grant effectual relief . . . ."); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) ("[I]f the government in the instant case is permitted to *distribute* the $10 million to other organizations, the appeal will become moot.").

There is accordingly risk that, if this fiscal year ends with the only HSGP obligations being those made under the Reallocation Decision, the disputed funds will be irretrievably lost, and there will be no effective relief for a court to grant. The Court can prevent this "harsh result," *Cnty. of Suffolk*, 605 F.3d at 138, by simply freezing the status quo and leaving all options for future obligations open to DHS. *See Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009) ("[T]he purpose of a preliminary injunction is to preserve the status quo *before* the merits have been resolved."). Plaintiff States seek no immediate disbursement of any funds; they seek only relief tailored to ensure that this case will not become moot on October 1.[5]

The Court has the power to grant the requested relief. First, 31 U.S.C. § 1501 permits recording of "an obligation of the United States Government" based on "a liability that may result from pending litigation" or "other legal liability of the Government against an available

---

[5] Plaintiff States do not concede that they could not claim a right to undistributed balances after the end of this fiscal year. Nevertheless, in the emergency circumstances at issue, a restraining order is warranted to avoid the potential loss of this Court's jurisdiction.

appropriation or fund." 31 U.S.C. § 1501(a)(6), (a)(9). The Comptroller General has held that district courts may use these provisions to "establish[] a valid obligation against the unexpended balance" of an appropriation. *In re Impounded Food Stamp Program Appropriations*, 54 Comp. Gen. 962, 966 (1975); *see also* Ex. 8 (preliminary injunction entered in *Bennett v. Butz*, No. 4-73 Civil 284 (D. Minn. June 25, 1973), and cited in the Comptroller General's ruling). Second, both statute and equity provide this Court with general authority to prevent the lapse of otherwise-expiring funds that are subject to litigation. *See* 31 U.S.C. § 1502(b); *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 98–99 (D.C. Cir. 2021). Exercising these powers, this Court recently ordered "that the statutory lapse of the funds at issue in [a] Funding Opportunity" be "suspended pending further order of the Court." *Nat'l All. to End Homelessness v. Turner*, No. 25-CV-00447, 2025 WL 2638377, at *1 (D.R.I. Sept. 14, 2025) (McElroy, J.).

**B.    The Balance of Equities And Public Interest Favor Emergency Relief.**

Last, "the balance of equities tips in [Plaintiff States'] favor," and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Through the Reallocation Decision, DHS aims to punish state and local officials for exercising their reserved sovereign rights to choose how to allocate scarce law enforcement resources. There is no public interest in allowing such gangsterism to continue.

In any event, as explained above, Plaintiff States do not seek the relief of disbursing any funds from the federal Treasury; rather, they seek only to prevent the mootness of their claim by operation of the obligations to other States combined with the end of the federal fiscal year. They seek only a pause. Therefore, "the hardship to the nonmovant if enjoined" pales in comparison to "the hardship to the movant if no injunction issues." *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020). Plaintiff States are thus entitled to a temporary restraining order (a) requiring DHS and FEMA to rescind the fiscal year 2025 award notifications and de-obligate the associated funds

(or, at minimum, the funds reallocated from Plaintiff States to other jurisdictions), (b) enjoining DHS and FEMA from disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable by any means all fiscal year 2025 Homeland Security Grant Program funds; and (c) suspending the September 30, 2025, statutory lapse of HSGP funds to the full extent necessary to permit obligation of revised Homeland Security Grant Program awards to Plaintiff States at the levels of the target allocations specified in the fiscal year 2025 Homeland Security Grant Program notice of funding opportunity, including, if necessary, by recording as an obligation of the United States the full appropriation for the Homeland Security Grant Program for federal fiscal year 2025 pursuant to 31 U.S.C. § 1501(a)(6).

## CONCLUSION

Plaintiff States respectfully request that the Court:

1. Grant Plaintiff States' motion for a temporary restraining order;

2. Direct defendants to rescind the fiscal year 2025 award notifications and de-obligate the associated funds (or, at minimum, the funds reallocated from Plaintiff States to other jurisdictions);

3. Enjoin defendants from disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable by any means all fiscal year 2025 Homeland Security Grant Program funds; and

4. Suspend the statutory lapse of funds to the full extent necessary to permit obligation of revised Homeland Security Grant Program awards to Plaintiff States at the levels of the target allocations specified in the fiscal year 2025 Homeland Security Grant Program notice of funding opportunity, including, if necessary, by recording as an obligation of the United States the full appropriation for the Homeland Security Grant Program for federal fiscal year 2025 pursuant to 31 U.S.C. § 1501(a)(6).

September 29, 2025

Respectfully submitted,

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
James E. Stanley
  *Supervising Deputy Attorneys General*
Deylin Thrift-Viveros
  *Deputy Attorney General*

/s/ Lee I. Sherman
Lee I. Sherman
  *Deputy Attorney General*
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6000
lee.sherman@doj.ca.gov

*Attorneys for the State of California*

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Christopher G. Wells
  *Chief of the Public Interest Division*
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
  *Deputy Solicitor General*
Mayur P. Saxena
  *Assistant Attorney General*
Daniel Resler
  *Deputy Attorney General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (R.I. Bar No. 8486)
  *Chief, Civil Division*
  *Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Ashley Meskill
Ashley Meskill
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorneys for the State of Connecticut*


**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

/s/ Mitchell P. Reich
Mitchell P. Reich
  *Senior Counsel to the Attorney General*
Office of the Attorney General for the District
  of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*


**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Rose Gibson
  *Assistant Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*


**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Stephen Thompson
Rabia Muqaddam
  *Chief Counsel for Federal Initiatives*
Stephen C. Thompson
  *Special Counsel*
Julie Dona
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Jonathan T. Rose
  *Solicitor General*
Julio A. Thompson
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
  ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts
  *Assistant Attorney General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov

*Attorneys for the State of Washington*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2025, I caused a copy of the foregoing motion for a temporary restraining order and its exhibits to be sent to individuals at the U.S. Department of Justice by electronic mail:

Sara Miron Bloom
Acting U.S. Attorney
United States Attorney's Office, District of Rhode Island
sara.bloom@usdoj.gov

Bethany Wong
Assistant U.S. Attorney
United States Attorney's Office, District of Rhode Island
bethany.wong@usdoj.gov

/s/ Alex Hemmer
Alex Hemmer