# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF ILLINOIS, *et al.*,

    *Plaintiffs*,

v.

KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, *et al.*,

    *Defendants*.

No. 1:25-cv-00495

## PLAINTIFF STATES' OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION OF TEMPORARY RESTRAINING ORDER

At some point between September 12, 2025, when they publicly called the allocations for the Homeland Security Grant Program ("HSGP") "final," ECF 3-16 at 3, and September 27, when they awarded dramatically altered allocations, defendants decided to move $245,565,440 away from disfavored jurisdictions toward more favored jurisdictions (the "Reallocation Decision"). On September 30, the Court entered a limited temporary restraining order ("TRO") that does no more than preserve the status quo while Plaintiff States' claims against the Reallocation Decision are litigated on the merits. Although Plaintiff States do not oppose defendants' request to narrow the TRO to immediately contested funds—to be precise, $245,565,440—Plaintiff States do oppose defendants' request to narrow the TRO so that it merely enjoins defendants from *disbursing funds*, rather than requiring them to restore the status quo by de-obligating those funds and making them available for re-obligation at the case's conclusion. As Plaintiff States explained in their motion— and at the TRO hearing—any lesser remedy would permit defendants to advance mootness arguments that could, if accepted, impair Plaintiff States' ability to recover the funds that defendants have unlawfully reallocated.

Plaintiff States have repeatedly explained these mechanics to defendants, but defendants have repeatedly—including in the motion to modify the TRO—declined to explain why their proposed modification would not give rise to a mootness argument. Indeed, just four days ago, in related litigation, defendants argued that claims similar to Plaintiff States' *are* moot due to third-party obligations and the end of the federal fiscal year. *See New York v. Noem*, No. 25-cv-08106 (S.D.N.Y) ("*New York*"), ECF No. 25, at 4–6. The Court should not modify the TRO in a manner that would permit defendants to later contend that Plaintiff States' claims are moot; it should instead modify the TRO so that it governs only contested funds, but otherwise deny defendants' motion. A proposed modified temporary restraining order is attached as Exhibit 1.

## BACKGROUND

Plaintiff States' motion described the events that gave rise to this case as they were known to Plaintiff States at that time. ECF 3 at 3–10. Plaintiff States supplement that discussion here with facts not known at the time of filing or that postdate the motion.

### A. All But Four States Saw Large Changes To Their Allocations At The Award Stage.

This case concerns the reallocation of hundreds of millions of dollars in homeland-security grant funding from disfavored jurisdictions to favored jurisdictions. Defendants' request to modify the TRO turns in part on their suggestion that "the majority of states and municipalities received final funding allocations similar to their target allocations stated in the HSGP NOFO." ECF 27 at 5. That is not correct. Instead, **46 of 50** States saw large changes to their allocations.

When Plaintiff States filed suit, the full details of what defendants had done were unclear, though Plaintiff States had already learned much of the truth. *See* ECF 1 ¶¶ 107–117. But the final allocations are now a matter of public record. On September 29, 2025, defendant FEMA presented to congressional staff a PowerPoint presentation with comprehensive information on the award-

stage allocations to all States and territories. *See* Fed. Emergency Mgmt. Agency, *Fiscal Year 2025 Preparedness Grant Final Allocations* (Sept. 29, 2025) (Ex. 3). The presentation provides the "final allocations" for all recipients under the State Homeland Security Program ("SHSP") and the Urban Area Security Initiative ("UASI"). *See id.* at 14–19. On September 30, this presentation was filed on the docket in *New York v. Noem*, 25-cv-08106 (S.D.N.Y), ECF No. 3-3; so defendants have been aware of its existence and its disclosure. Indeed, defendants wrote it.

Rather than setting out the funding reallocation in full, defendants' motion minimizes its extent in a pair of footnotes that omit many States entirely. ECF 27 at 5 n.1, 6 n.2. (Wyoming, for instance, is not mentioned, nor are the territories.) In fact, only **four** States saw no change to their Homeland Security Grant Program allocation between the NOFO and award stages. All others saw swings in the millions of dollars:

| State or Territory | August 1 Notice of Funding Opportunity | | | Final Award | | | Total Change |
|---|---|---|---|---|---|---|---|
| | SHSP | UASI | Total | SHSP | UASI | Total | |
| AK | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,628 | $1,637,878 |
| AL | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| AR | $4,362,750 | $0 | $4,362,750 | $6,000,628 | $0 | $6,000,629 | $1,637,879 |
| AS | $997,200 | $0 | $997,200 | $2,635,078 | $0 | $2,635,078 | $1,637,878 |
| AZ | $5,023,205 | $12,910,357 | $17,933,562 | $7,362,750 | $21,938,710 | $29,301,460 | $11,367,898 |
| CA | $55,863,486 | $109,325,268 | $165,188,754 | $17,156,754 | $93,473,801 | $110,630,555 | -$54,558,199 |
| CO | $4,362,750 | $9,836,656 | $14,199,406 | $4,362,750 | $18,726,869 | $23,089,619 | $8,890,213 |
| CT | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| DC | $4,362,750 | $25,270,521 | $29,633,271 | $4,362,750 | $4,416,737 | $8,779,487 | -$20,853,784 |
| DE | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| FL | $15,745,665 | $34,181,770 | $49,927,435 | $18,395,245 | $71,849,604 | $90,244,849 | $40,317,414 |
| GA | $7,272,801 | $14,564,394 | $21,837,195 | $9,362,750 | $9,372,418 | $18,735,168 | -$3,102,027 |
| GU | $1,110,150 | $0 | $1,110,150 | $2,748,028 | $0 | $2,748,028 | $1,637,878 |
| HI | $4,362,750 | $6,338,443 | $10,701,193 | $6,000,629 | $16,694,331 | $22,694,960 | $11,993,767 |
| IA | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| ID | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| IL | $10,419,556 | $33,479,819 | $43,899,375 | $4,362,750 | $9,395,829 | $13,758,579 | -$30,140,796 |
| IN | $4,362,750 | $3,367,289 | $7,730,039 | $6,000,629 | $10,111,002 | $16,111,631 | $8,381,592 |
| KS | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| KY | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| LA | $4,362,750 | $4,546,754 | $8,909,504 | $8,362,750 | $0 | $8,362,750 | -$546,754 |
| MA | $5,390,887 | $16,838,838 | $22,229,725 | $6,000,629 | $9,301,839 | $15,302,468 | -$6,927,257 |
| MD | $4,990,556 | $7,709,724 | $12,700,280 | $6,000,629 | $9,328,784 | $15,329,413 | $2,629,133 |

| State or Territory | August 1 Notice of Funding Opportunity | | | Final Award | | | Total Change |
|---|---|---|---|---|---|---|---|
| | SHSP | UASI | Total | SHSP | UASI | Total | |
| ME | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| MI | $4,362,750 | $8,123,989 | $12,486,739 | $6,000,629 | $14,114,393 | $20,115,022 | $7,628,283 |
| MN | $4,362,750 | $9,526,217 | $13,888,967 | $4,362,750 | $2,973,810 | $7,336,560 | -$6,552,407 |
| MO | $4,362,750 | $10,473,154 | $14,835,904 | $6,000,629 | $18,986,236 | $24,986,865 | $10,150,961 |
| MP | $997,200 | $0 | $997,200 | $2,635,078 | $0 | $2,635,078 | $1,637,878 |
| MS | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| MT | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| NC | $4,631,809 | $4,285,035 | $8,916,844 | $6,862,750 | $14,200,846 | $21,063,596 | $12,146,752 |
| ND | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| NE | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| NH | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| NJ | $5,065,776 | $13,928,247 | $18,994,023 | $6,000,629 | $3,768,628 | $9,769,257 | -$9,224,766 |
| NM | $4,362,750 | $0 | $4,362,750 | $8,362,750 | $0 | $8,362,750 | $4,000,000 |
| NV | $4,362,750 | $8,958,896 | $13,321,646 | $4,362,750 | $10,954,761 | $15,317,511 | $1,995,865 |
| NY | $38,200,874 | $92,180,364 | $130,381,238 | $5,624,924 | $22,069,395 | $27,694,319 | -$102,686,919 |
| OH | $5,643,542 | $12,538,962 | $18,182,504 | $7,862,750 | $32,893,878 | $40,756,628 | $22,574,124 |
| OK | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| OR | $4,362,750 | $6,703,242 | $11,065,992 | $4,362,750 | $8,841,357 | $13,204,107 | $2,138,115 |
| PA | $9,407,455 | $23,181,198 | $32,588,653 | $11,362,750 | $12,305,323 | $23,668,073 | -$8,920,580 |
| PR | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| RI | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| SC | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| SD | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| TN | $4,362,750 | $4,150,624 | $8,513,374 | $6,000,629 | $12,131,222 | $18,131,851 | $9,618,477 |
| TX | $26,066,797 | $53,412,309 | $79,479,106 | $28,759,327 | $77,028,653 | $105,787,980 | $26,308,874 |
| UT | $4,362,750 | $0 | $4,362,750 | $6,000,628 | $0 | $6,000,628 | $1,637,878 |
| VA | $8,770,850 | $11,867,416 | $20,638,266 | $11,362,750 | $23,485,484 | $34,848,234 | $14,209,968 |
| VI | $997,200 | $0 | $997,200 | $2,635,078 | $0 | $2,635,078 | $1,637,878 |
| VT | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| WA | $5,483,241 | $12,713,580 | $18,196,821 | $4,362,750 | $11,782,120 | $16,144,870 | -$2,051,951 |
| WI | $4,362,750 | $3,086,934 | $7,449,684 | $6,000,629 | $13,353,970 | $19,354,599 | $11,904,915 |
| WV | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| WY | $4,362,750 | $0 | $4,362,750 | $6,000,628 | $0 | $6,000,628 | $1,637,878 |

The losing Plaintiff States were listed on DHS's now-removed list of "sanctuary" jurisdictions. *See* Ex. 4. The three other losing States were not themselves listed, but the UASI cuts that they suffered were directed at listed "sanctuary" cities: Philadelphia, Atlanta, and New Orleans. *See id.* at 6, 9, 15. The sum gained by the gaining jurisdictions is $245,565,440, the reallocated amount.

The four jurisdictions with no net change were Connecticut, Delaware, Rhode Island, and Vermont. These four, who are Plaintiff States here, received the statutory minimum of "0.35

4

percent of the total funds appropriated," 6 U.S.C. § 605(e)(1)(A)(v), meaning $4,362,750 in fiscal year 2025. *See* ECF 3-3 at 53–54. But the Reallocation Decision has harmed their *relative* standing to other States. Nearly all *other* States benefited from an elevated floor funding level that defendants apparently set at $6,000,629 (instead of the statutory minimum).[1] But Connecticut, Delaware, Rhode Island, and Vermont were excluded from that elevated floor. These four States were also listed on DHS's now-removed list of "sanctuary" jurisdictions. *See* Ex. 4 at 5, 16.

In short, information readily accessible to defendants easily disproves their suggestion that "the majority of States" received final allocations "similar" to their target allocations. ECF 27 at 5. To the contrary, most of the States listed in footnote 1 received millions of extra dollars in HSGP funding (funding taken from Plaintiff States). *Id.* at 5 n.1. Strangely, footnote 1 also lists Washington, a plaintiff here, even though Washington was cut by over $2 million. Footnote 2, which purports to list the States that received "substantially increased" awards, *id.* at 6 n.2, is inaccurate for substantially the same reason: Many States not identified in this footnote received increases of millions of dollars, an amount that cannot be reckoned insubstantial.

B.   *New York v. Noem*.

This case concerns defendants' decision to reallocate over $200 million in funds associated with the Homeland Security Grant Program, which funds public-safety efforts in the States and their political subdivisions. ECF 1 ¶¶ 34–57. At the same time that defendants reallocated HSGP funds away from States and subdivisions that they disfavor, defendants did substantially the same thing to New York State's Metropolitan Transit Association ("MTA")—taking $34 million in funds that had been preliminarily allocated to the MTA under the Transit Security Grant Program

---

[1] For Arkansas, Utah, and Wyoming, the floor was one dollar lower, $6,000,628. The States that received final SHSP allocations lower than Wyoming, the least populous State in the union with less than 600,000 residents, are: Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Minnesota, Nevada, New York, Oregon, Rhode Island, Vermont, and Washington.

5

("TSGP") and providing those funds to other public-transit agencies across the United States. *See New York* ECF No. 11, ¶¶ 1–5. FEMA did not even inform New York of its decision; instead, the State learned on September 30, 2025, the last day of the federal fiscal year, through public reporting. *Id.* ¶ 4.

That same day, New York sued defendants in the Southern District of New York, raising substantially similar claims as here—namely, that the reallocation of $34 million in public-safety funds from New York at the last minute, with no notice or explanation, was contrary to law and arbitrary and capricious. *Id.* ¶¶ 50–77. New York also sought a temporary restraining order, which was granted on October 1. *New York* ECF Nos. 2, 12. That order enjoins defendants from "[o]bligating, . . . [d]isbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable to plaintiff by any means" any more than $49,801,500. *New York* ECF No. 12 (Ex. 5), at 1–2. The $49 million figure is the total amount of funds appropriated for the TSGP program less the $34 million that the MTA had preliminarily been allocated—in other words, the uncontested funds in the *New York* case. So, again, the *New York* court prohibited *obligation*, not just *disbursement*, of any funds allegedly owed to New York to preserve the status quo. *Id.* at 1 ¶ 1. The court ordered a briefing schedule on New York's motion—construed as a motion for preliminary injunction—with briefing to conclude by October 8.

On October 6, defendants opposed New York's preliminary-injunction motion. *New York* ECF No. 25 (Ex. 6). In a sworn declaration, defendants admitted that they eliminated MTA's funding allocation because it is "based in New York City, a designated Sanctuary Jurisdiction city," and "redistributed" those funds to other applicants. *New York*, ECF No. 24 ¶ 5 (Ex. 7). Defendants contended that New York's claims were nevertheless "moot," because the relevant appropriation "lapsed on September 30, 2025, the end [of] FY 2025, and the funds Plaintiff demands have already

6

been obligated to other recipients." Ex. 6 at 4, 6. The fact that the TSGP funds were "not yet disbursed," defendants argued there, "d[id] not compel a different result," because—again—the funds "ha[d] been awarded to other grant recipients, thereby exhausting the relevant FY 2025 appropriation," and that appropriation "expired and therefore lapsed." *Id.* at 8–9.

### C. Negotiations Between The Parties.

Since issuance of the TRO on Tuesday, September 30, and as directed by the Court, the parties have engaged in a meet-and-confer process to agree upon next steps in this case. In those discussions, defendants have repeatedly expressed concerns about the scope of the Court's TRO, and Plaintiff States have made good-faith attempts to resolve those concerns while protecting their claims from mootness. Plaintiff States have now twice agreed to defer defendants' deadline to de-obligate the HSGP funds and rescind the HSGP award notices pending those discussions, ECF 21 at 2; ECF 27 at 1; and, as discussed below, would agree to a modification of the TRO to govern only the amount immediately contested. But Plaintiff States have explained that they cannot agree to the proposed modified TRO (which would prohibit only the *disbursement* of HSGP funds, rather than requiring the *de-obligation* of those funds) unless—at minimum—defendants were able to represent that such relief will not, in defendants' view, moot Plaintiff States' claims. On October 7, Plaintiff States informed defendants of their willingness to agree to a modified TRO that would govern only "contested" funds, but defendants declined to accept such relief.

## ARGUMENT

### I. Plaintiff States Do Not Oppose Modifying The TRO To Govern Only "Contested" Funds, But The Court Should Do So With Precision.

Plaintiff States would not oppose modifying the TRO to apply only to funds that were subject to the Reallocation Decision—funds that changed hands between the final August 1, 2025 version of the HSGP NOFO and the final awards. But the Court should do so with precision,

7

specifying the amount at issue, rather than simply stating that the TRO applies only to States that "received final awards substantially increased or decreased relative to their NOFO target allocations," ECF 27 at 6, as defendants suggest.

The relevant sums can be determined through straightforward arithmetic. The initial allocation of the HSGP funds is set out at pages 53 to 56 of the 2025 NOFO, ECF 3-3, and FEMA subsequently informed Congress of the final award amounts. Ex. 3. The total amount of funding that defendants reallocated between the NOFO stage and the award stage is $245,565,440. Plaintiff States thus agree with defendants that their claims challenging the Reallocation Decision concern the reallocation of "a specific pool of money," ECF 27 at 6, and do not object to an order narrowing the TRO to protect that pool of money. Limiting the TRO to only these funds would allow the parties to litigate this dispute while ensuring that funds unaffected by the Reallocation Decision can be obligated and disbursed to other States.

The Court should decline defendants' proposal, under which the Court would narrow the TRO to apply only to States that saw what defendants call "substantial" changes from the NOFO. *See id.*; ECF 27-3 at 1 (proposed modified TRO). Defendants do not define that term, but to the extent it refers only to those States referenced on page 6 and footnote 2 of their motion (and excludes all other States), it would exclude at least 28 States and territories that received unexplained increases of between $1.6 and $12 million, increases that taken together total almost $80 million. *Supra* pp. 3–4. An order so limited would not provide "complete relief" to Plaintiff States, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994), because it would mean Plaintiff States would be unable to recover the funds that were taken from them. The Court should instead modify the TRO to govern only the total amount of funding that defendants reallocated between the NOFO stage and the award stage, which is $245,565,440.

8

**II.  Striking Paragraph 2 from the TRO Would Subject Plaintiff States to the Precise Risk They Sought to Avoid in Seeking Emergency Relief.**

Defendants also ask the Court to strike paragraph 2 in the TRO, which requires defendants to rescind the fiscal year 2025 HSGP award notifications and de-obligate the associated funds. Plaintiff States oppose this request as posed. Plaintiff States would not oppose a more limited revision, consistent with de-obligating at least $245,565,440, which would still require re-issuing amended awards to many States. But defendants' blanket request to halt all de-obligations should be rejected.

Plaintiff States sought rescission and de-obligation on an emergency basis to address the risk that they would face an argument at some point that their claims were mooted out by the September 30, 2025, lapse in appropriated funds. Plaintiff States recognized the risk that the government would argue that funds obligated to other parties could not be re-obligated once the September 30 deadline passed. *See* ECF 3 at 19–21. The Supreme Court has held that even the chance that "the Government *may have argued*" later "that no U.S. court had jurisdiction to order relief" suffices to grant an "injunction pending further proceedings." *A.A.R.P. v. Trump*, 605 U.S. 91, 93–94 (2025) (emphasis added). The TRO removes this risk by requiring defendants to de-obligate the funds at issue while the lapse deadline is suspended, thus effectively freezing the status quo in place. Some degree of de-obligation, either entire or in the amount of $245,565,440, is thus required to permit the parties to litigate the merits of defendants' Reallocation Decision, without the risk that defendants could evade judicial review through a jurisdictional argument. Plaintiff States have repeatedly emphasized to defendants their interest in preserving their claims to the contested funds, *supra* p. 7, and asked defendants to explain why a narrower TRO would permit those claims to proceed in light of defendants' understanding of appropriations law.

Defendants' motion offers no answer. Indeed, defendants expressly *preserve* the mootness argument that the TRO is intended to forestall, suggesting that their authority to obligate the funds in question lapsed on September 30 and that it is "far from clear" the Court retains power to order the obligation of those funds post-lapse. ECF 27 at 8. Indeed, in the *New York* litigation, defendants have gone further, affirmatively contending that New York's challenge to a similar last-minute reallocation of funds is moot in light of (a) the obligation of funds to third parties and (b) the lapse of the relevant appropriations. *Supra* pp. 6–7; Ex. 6 at 4 ("The State's claims are moot, as appropriations lapsed on September 30, 2025, and the funds it now asks this Court to de-obligate are no longer available."). And despite Plaintiff States' repeated efforts to ascertain their position on mootness, defendants advance no explanation at all as to why their more limited TRO would *not* permit them to argue mootness at a subsequent stage of litigation, as they now have in *New York*. Absent any explanation of this sort, defendants' request to modify the TRO to remove the de-obligation requirement should be rejected, since it would expose Plaintiff States to exactly the mootness argument the TRO sought to forestall.[2]

Defendants offer no justification for seeking such relief that could outweigh leaving the door open to this mootness argument. Defendants state that they are "concerned" that de-obligation might bar them from "re-obligat[ing] the money again in the future to anyone, including Plaintiffs." ECF 27 at 8. But their only basis for this "concern[]" is that it is (allegedly) not possible to newly obligate funds after a lapse in appropriations, coupled with an asserted lack of "clarity" as to this

---

[2] To be sure, as Plaintiff States explained in the TRO motion, ECF 3 at 20 n.5, they do not concede that their claims *would* be moot under a disbursement-only TRO, as New York has explained in a recent filing in *New York*. *See New York* ECF No. 28 at 1–5; *Population Inst. v. McPherson*, 797 F.3d 1062, 1081 (D.C. Cir. 1986) (mootness does not arise until the government "distribute[s]" funds to other grantees); *Rodriguez v. Carson*, 401 F. Supp. 3d 465, 470 (S.D.N.Y. 2019) (same rule). But as long as defendants take a contrary position on mootness—or insist on preserving the option of doing so—Plaintiff States cannot agree to narrower relief.

Court's authority to "prevent appropriations from lapsing." *Id.* Defendants' concern that the Court lacked authority to suspend the lapse in HSGP appropriations, if taken seriously, would appear to mean that *no* re-obligation of the contested funds would *ever* be possible in this case, whether de-obligation is ordered or not. Whatever the merits of defendants' view, it is not an argument against de-obligation, because under their view it is irrelevant whether funds are de-obligated or not; all that matters is that the appropriations have lapsed, at which point no one—neither the Court nor the agency—allegedly has the power to re-obligate them. In other words, defendants ask this Court to remove one part of its order—requiring de-obligation of funds—based solely on the *possibility* that the Court lacked authority to issue another part of its order—suspension of the lapse in HSGP appropriations.

Regardless, defendants' "concern" is misplaced. As Plaintiff States explained, ECF 3 at 20–21, courts have the equitable power to toll a statutory lapse of funding. *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 98–99 (D.C. Cir. 2021). Congress has likewise conferred on courts the tools needed to prevent mootness in circumstances like this one, including by (a) providing that a lawsuit premised on an entitlement to appropriated funds can itself toll a lapse provision, 31 U.S.C. § 1502(b); and (b) allowing recording of obligations that "may result from pending litigation," like this suit, *id.* § 1501(a)(6).[3] If defendants believe they must fully obligate the HSGP funds or else

---

[3] Defendants argue that § 1502(b) does not apply here because the funds in question will not "return[] to the general fund of the Treasury" until 2030. ECF 27 at 9. But as the D.C. Circuit has explained, § 1502(b) "expressly authorize[s] courts to suspend the lapse of budget authority while lawsuits play out." *Goodluck v. Biden*, 104 F.4th 920, 928 (D.C. Cir. 2024) (Katsas, J.). Defendants' contrary reading would render § 1502(b) without force not only in this case but in *every* case, because, as defendants themselves admit, *no* appropriation returns to the Treasury immediately upon lapse; rather, an appropriation remains in an expired fund for a five-year period in order to satisfy earlier obligations. *See* 31 U.S.C. § 1553. The Comptroller General has held, contrary to defendants' position, that § 1502(b) broadly prevents mootness due to any "expiration of an appropriation due to the passage of time." *Availability of Expired Funds for Non-Monetary Jud. Awards*, 70 Comp. Gen. 225, 229 (Feb. 4, 1991).

11

lose them, Plaintiff States have already stated (ECF 3 at 22) that they would agree to a TRO directing defendants to record a litigation-related obligation in the amount of the contested funds, namely $245,565,440. If defendants genuinely seek only to avoid supposed risks associated with de-obligation, Plaintiff States would accept that modification of the TRO here.

Defendants' remaining arguments in favor of modification lack merit. Defendants protest that the TRO "altered the status quo" rather than "simply 'freezing' the funding as it existed at the time of the lawsuit." ECF 27 at 7. That is incorrect. As the First Circuit has explained, for purposes of a preliminary injunction or TRO, the status quo is "the last *uncontested* status which preceded the pending controversy," *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 893 (1st Cir. 1988) (emphasis in original)—here, the pre-award status, in which HSGP funds remained available for obligation, and defendants had not yet reallocated them away from certain jurisdictions and toward others. That is the status quo the TRO "froze" in place. Defendants also say that modification would align the TRO with the TRO entered in *New York*. ECF 27 at 10. That is also incorrect. The TRO entered there prohibited defendants from *obligating* funds, not merely from *disbursing* them, as defendants suggest is appropriate here. *See* Ex. 5 at 1 (defendants are "enjoined and restrained" from "*obligating*" funds in a manner that would encroach upon contested funds (emphasis added)). In that respect, it is the current TRO, not defendants' proposed modification, that aligns with the TRO entered in that case. And although the *New York* TRO was limited to the funds in immediate dispute, *see id.*, Plaintiff States have agreed to a modification of the TRO in that respect, *see supra* pp. 6–8. There is no basis for any further modification.

The Court should not unwind its remedy and should decline to strike Paragraph 2. Plaintiff States would agree to a more limited modification to require de-obligation in part, but defendants have rejected that offer.

12

## CONCLUSION

The Court should modify the TRO to require de-obligation of only "contested" funds, namely $245,565,440, and to direct the recording of that balance as a litigation obligation, but defendants' motion should otherwise be denied. Plaintiff States confirm that they agree with defendants' proposal to extend both the status report deadline and the TRO until three days after the Court rules on defendants' pending motion for reconsideration. *See* ECF 27 at 3; ECF 27-2; *see also* Fed. R. Civ. P. 65(b)(2) (allowing for TRO extension with the consent of the adverse party). Plaintiff States' proposed modified temporary restraining order is attached as Exhibit 1.

October 10, 2025                                             Respectfully submitted,

**ROB BONTA**                                                **KWAME RAOUL**
  ATTORNEY GENERAL OF CALIFORNIA                               ATTORNEY GENERAL OF ILLINOIS

Michael L. Newman                                            /s/ Alex Hemmer
  *Senior Assistant Attorney General*                        Alex Hemmer
Joel Marrero                                                   *Deputy Solicitor General*
James E. Stanley                                             Christopher G. Wells
  *Supervising Deputy Attorneys General*                       *Chief of the Public Interest Division*
Deylin Thrift-Viveros                                        R. Sam Horan
  *Deputy Attorney General*                                  Michael M. Tresnowski
                                                             R. Henry Weaver
/s/ Lee I. Sherman                                             *Assistant Attorneys General*
Lee I. Sherman                                               Office of the Illinois Attorney General
  *Deputy Attorney General*                                  115 LaSalle Street
California Department of Justice                             Chicago, IL 60603
300 South Spring Street, Suite 1702                          (773) 590-7932
Los Angeles, CA 90013                                        alex.hemmer@ilag.gov
(213) 269-6000
lee.sherman@doj.ca.gov                                       *Attorneys for the State of Illinois*

*Attorneys for the State of California*

| | |
|---|---|
| **MATTHEW J. PLATKIN**<br>  ATTORNEY GENERAL OF NEW JERSEY<br><br>/s/ Shankar Duraiswamy<br>Shankar Duraiswamy<br>  *Deputy Solicitor General*<br>Mayur P. Saxena<br>  *Assistant Attorney General*<br>Daniel Resler<br>  *Deputy Attorney General*<br>New Jersey Office of Attorney General<br>25 Market Street, PO Box 093<br>Trenton, NJ 08625-0093<br>(609) 376-2745<br>shankar.duraiswamy@law.njoag.gov<br><br>*Attorneys for the State of New Jersey* | **PETER F. NERONHA**<br>  ATTORNEY GENERAL OF RHODE ISLAND<br><br>/s/ Kathryn M. Sabatini<br>Kathryn M. Sabatini (R.I. Bar No. 8486)<br>  *Chief, Civil Division*<br>  *Special Assistant Attorney General*<br>Paul Meosky (RI Bar No. 10742)<br>  *Special Assistant Attorney General*<br>Rhode Island Attorney General's Office<br>150 South Main Street<br>Providence, RI 02903<br>(401) 274-4400, Ext. 1882<br>ksabatini@riag.ri.gov<br><br>*Attorneys for the State of Rhode Island* |
| **WILLIAM TONG**<br>  ATTORNEY GENERAL OF CONNECTICUT<br><br>/s/ Ashley Meskill<br>Ashley Meskill<br>  *Assistant Attorney General*<br>Connecticut Office of the Attorney General<br>165 Capitol Avenue<br>Hartford, CT 06106<br>(860) 808-5270<br>ashley.meskill@ct.gov<br><br>*Attorneys for the State of Connecticut* | **KATHLEEN JENNINGS**<br>  ATTORNEY GENERAL OF DELAWARE<br><br>/s/ Ian R. Liston<br>Ian R. Liston<br>  *Director of Impact Litigation*<br>Vanessa L. Kassab<br>  *Deputy Attorney General*<br>Rose Gibson<br>  *Assistant Attorney General*<br>Delaware Department of Justice<br>820 North French Street<br>Wilmington, DE 19801<br>(302) 683-8899<br>ian.liston@delaware.gov<br><br>*Attorneys for the State of Delaware* |

**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

/s/ Mitchell P. Reich
Mitchell P. Reich
  *Senior Counsel to the Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Stephen Thompson
Rabia Muqaddam
  *Chief Counsel for Federal Initiatives*
Stephen C. Thompson
  *Special Counsel*
Julie Dona
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*

| | |
|---|---|
| **CHARITY R. CLARK**<br>ATTORNEY GENERAL OF VERMONT | **NICHOLAS W. BROWN**<br>ATTORNEY GENERAL OF WASHINGTON |
| /s/ Julio A. Thompson<br>Jonathan T. Rose<br>  *Solicitor General*<br>Julio A. Thompson<br>  *Co-Director, Civil Rights Unit*<br>Officer of the Vermont Attorney General<br>109 State Street<br>Montpelier, VT 05609<br>(802) 828-5519<br>julio.thompson@vermont.gov<br><br>*Attorneys for the State of Vermont* | /s/ Tyler Roberts<br>Tyler Roberts<br>  *Assistant Attorney General*<br>Washington State Office of the Attorney<br>  General<br>800 Fifth Avenue<br>Suite 2000<br>Seattle, WA 98104-3188<br>(206) 464-7744<br>Tyler.Roberts@atg.wa.gov<br><br>*Attorneys for the State of Washington* |