**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF ILLINOIS; STATE OF
CALIFORNIA; STATE OF NEW JERSEY;
STATE OF RHODE ISLAND; STATE OF
CONNECTICUT; STATE OF DELAWARE;
DISTRICT OF COLUMBIA;
COMMONWEALTH OF
MASSACHUSETTS; STATE OF
MINNESOTA; STATE OF NEW YORK;
JOSH SHAPIRO, in his official capacity as
Governor of the Commonwealth of
Pennsylvania; STATE OF VERMONT;
STATE OF WASHINGTON,

               *Plaintiffs*,

    v.

KRISTI NOEM, in her official capacity as
Secretary of the Department of Homeland
Security; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; DAVID RICHARDSON, in his
official capacity as Senior Official
Performing the Duties of the Administrator
of the Federal Emergency Management
Agency; FEDERAL EMERGENCY
MANAGEMENT AGENCY,

               *Defendants*.

No. 1:25-cv-00495

---

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

    1.    For decades, state and local governments have relied on federal funding—totaling

billions of dollars annually—to prepare for, protect against, respond to, and recover from

catastrophic disasters. These grants fund first responders' salaries and pay for the training they

receive. They fund computer network testing to identify cyberattack vulnerabilities. They fund the

mutual aid networks that allow first responders to mobilize from outside the immediate jurisdiction

when tragedy strikes. Congress created these federal grant programs and appropriates billions of dollars each year to ensure they are fully funded to meet the Nation's needs. Many were authorized by legislation passed in the wake of national emergencies, such as the September 11 terrorist attacks and Hurricane Katrina, to strengthen the Nation's preparedness for and response to emergencies and major disasters.

2.     And for decades, across presidential administrations of both parties, the U.S. Department of Homeland Security ("DHS") and its sub-agency, the Federal Emergency Management Agency ("FEMA"), have operated these programs evenhandedly, supporting all fifty States in their efforts to prepare for and respond to emergencies and threats, understanding that the Nation is at its strongest when all Americans are protected from catastrophe.

3.     But the current Administration has taken a different approach to administering the Nation's emergency management funds. Rather than follow the objective, risk-based criteria that Congress created to govern distribution of emergency funding, the Administration has followed a different path to determine how to award emergency funding to states and political subdivisions across the country.

4.     Based on available information, DHS has put in place a "directive" under which it will not award funding to any State it considers a "sanctuary" jurisdiction (or to include within it a "sanctuary" jurisdiction)—even though DHS has neither defined that phrase nor explained why it considers some places to qualify as "sanctuary" jurisdictions.

5.     On January 20, 2025, his first day in office, President Trump expressly directed DHS to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). The President has deemed that certain States and local jurisdictions are in "lawless insurrection," Exec. Order No. 14287, § 1,

90 Fed. Reg. 18761, 18761 (Apr. 28, 2025), because he disagrees with how they allocate their own local law enforcement resources. As recently as September 24, DHS proclaimed that "[c]ities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding[.] . . . No lawsuit, not this one or any other, is going to stop us from doing that." Anna Griffin, *Federal Judge Rejects Administration Efforts to Tie State Disaster Funds to Immigration Cooperation*, N.Y. Times (Sept. 24, 2025).[1]

6.     DHS was referring to the injunction entered against it that same day in *Illinois v. Fed. Emergency Mgmt. Agency*, __ F. Supp. 3d __, 2025 WL 2716277 (D.R.I. Sept. 24, 2025). In that case, DHS and FEMA had sought to upend the Nation's emergency management system, holding critical emergency preparedness and response funding hostage unless States agreed to devote their scarce law enforcement resources to assisting the federal government in enforcing federal civil immigration law. DHS did so by adding terms to its "Standard Terms and Conditions"—applicable to all grant awards—that required States to divert their law enforcement resources away from core public safety missions to federal civil immigration enforcement as a condition of receiving ***any*** federal funds. Plaintiffs here are 12 States that were among those that brought suit to challenge the legality of these terms (and one Governor representing a State that was not), contending that the terms were arbitrary and capricious, exceeded DHS's legal authority, and violated the Spending Clause. *See Illinois v. FEMA*, No. 25-cv-206 (D.R.I.). On September 24, 2025, the U.S. District Court for the District of Rhode Island agreed, issuing an opinion granting the States' motion for summary judgment and permanently enjoining DHS and FEMA from enforcing the conditions on the grants that they administer.

---

[1] https://www.nytimes.com/2025/09/24/us/politics/trump-disaster-aid-immigration.html.

7.     But DHS and FEMA were undeterred. Frustrated in its first attempt to coerce Plaintiff States into enforcing federal civil immigration law, DHS took yet another lawless action. It simply cut many Plaintiff States' awards dramatically, without explanation, reallocating their funds to more favored jurisdictions.

8.     On Saturday, September 27, FEMA issued the award notifications for FEMA's single largest grant program—the Homeland Security Grant Program ("HSGP"), which totals approximately $1 billion in funds annually for state and municipal efforts to "prevent, prepare for, protect against, and respond to acts of terrorism." 6 U.S.C § 608(a)(2). Consistent with federal law, FEMA had previously issued notices of funding opportunity ("NOFOs") preliminarily allocating the funding among state recipients based on each jurisdiction's "relative threat, vulnerability, and consequences from acts of terrorism." 6 U.S.C § 608(a)(1); *see also* U.S. Dep't of Homeland Sec., *Notice of Funding Opportunity (NOFO): Fiscal Year 2025 Homeland Security Grant Program* (Aug. 1, 2025 Version) (Ex. 1). The August 1, 2025 NOFO allocated over $490 million to Plaintiff States under the two main components of HSGP: the State Homeland Security Program ("SHSP") and the Urban Area Security Initiative ("UASI"). Notably, the federal fiscal year ("FY") 2025 NOFO already represented a substantial downward departure from past years for many Plaintiff States. The FY 2024 NOFO had allocated, on net, $120 million more to Plaintiff States here. *See infra* ¶¶ 107–110.

9.     On September 27, however, FEMA issued its formal HSGP award notifications. Those award notifications allocated only $250 million to Plaintiff States under the SHSP and UASI subcomponents—an over $240 million reduction from the NOFOs, totaling nearly half of the amount that FEMA had previously stated it would provide to Plaintiff States. Some States saw even sharper cuts: Illinois received a 69% reduction in HSGP funds, totaling over $30 million, and

New York received a 79% reduction in funds, totaling over *$100 million*. The notifications provide no explanation for the reductions, except that each was "[a]djusted per DHS directive."

10.     But FEMA did not treat all States evenhandedly—for instance, reducing *all* States' allocation of funds by the same amount. Instead, on information and belief, FEMA reduced the allocations only of certain States that it views as "sanctuary" jurisdictions. FEMA even cut funding to States—such as Pennsylvania—that have never been identified as "sanctuary" jurisdictions but have municipalities that FEMA views as "sanctuary" jurisdictions.

11.     At the same time as it reduced many Plaintiff States' HSGP allocations, FEMA made sizable increases to other States' allocations—with some States' allocations increasing by over 100%. Again, FEMA provided no explanation for the increases, except that each was "[a]djusted per DHS directive."

12.     The explanation for DHS and FEMA's last-minute decision to reallocate $240 million in homeland security funds—the Reallocation Decision—is apparent. Although DHS has for decades administered federal grant programs in a fair and evenhanded manner, the current Administration is taking money from jurisdictions it believes are its enemies. Or, as Defendant Secretary Noem put it succinctly in a February 19 internal memorandum, States whose policies she dislikes "should not receive a single dollar of the Department's money." Ex. 6 at 2. And, yet again, on September 24, 2025, a DHS spokesperson proclaimed that "[c]ities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding." Griffin, *supra*. "No lawsuit . . . is going to stop us from doing that." *Id.*

13.     The Reallocation Decision is unlawful in multiple respects, and it should be vacated and set aside. First, it violates federal law. The Homeland Security Act requires DHS and FEMA to allocate HSGP funds using objective, risk-based criteria, but the Reallocation Decision rests on

a factor not enumerated in the Act: FEMA's view of States' or local jurisdictions' domestic policies about how to best utilize their domestic law enforcement resources. Second, the Decision is arbitrary and capricious for multiple independent reasons, including that it withdraws hundreds of millions of dollars from Plaintiff States with no more than a word of explanation and that it rests on factors Congress did not intend DHS to consider.

14.     At the same time, and likewise without any explanation, DHS reduced the period of performance for the HSGP grant from three years at the NOFO stage to just one year in the awards. DHS did the same to the important Emergency Management Performance Grant ("EMPG"), also issued on Saturday, September 27, and likewise unilaterally changed the start date of the performance period. This Performance Period Decision, although apparently applied across the board, is independently unlawful under the Administrative Procedure Act ("APA") for distinct though overlapping reasons.

15.     Finally, three days later, on September 30, 2025, DHS issued amended EMPG awards that imposed a brand-new condition titled "Funding Hold: Verification of State's Population." This Population Certification Requirement requires States, for the first time in the history of the EMPG program, to certify their own populations—rather than DHS simply using federal census data to make that determination. And it requires States to do so "as of September 30, 2025," and to identify a methodology to exclude "individuals that have been removed from the State pursuant to the immigration laws of the United States." DHS and FEMA placed a complete funding hold on EMPG awards that will not be released until FEMA approves a State's requested population certification.

16.     Real-time population figures are simply impossible to provide, and they are made doubly impossible by the demand to incorporate information about deportations that DHS alone

holds. Defendants' decision to impose this requirement is also arbitrary and capricious, and unlawful, because defendants themselves have—and are legally obligated to use—data produced by the U.S. Census Bureau about state populations. The Population Certification Requirement is, yet again, unlawful under the APA.

17.    Plaintiff States seek declaratory and injunctive relief setting aside the Reallocation Decision, Performance Period Decision, and Population Certification Requirement and requiring DHS and FEMA to adhere to their statutory responsibilities in allocating homeland-security funds.

## JURISDICTION AND VENUE

18.    The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 702, 705, and 706.

19.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in her official capacity. Plaintiff the State of Rhode Island is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Rhode Island.

## PARTIES

A.    **Plaintiffs**

20.    Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

21.    Plaintiff the State of California, represented by and through its Attorney General, Rob Bonta, is a sovereign state in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

22.    Plaintiff the State of New Jersey, represented by and through its Attorney General, Matthew J. Platkin, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter. The Attorney General is also head of the New Jersey Department of Law and Public Safety, which is the agency responsible for applying for, obtaining, and disbursing several of the federal grant awards that are the subject of this litigation. See N.J. Stat. Ann. § 52:17B-2.

23.    Plaintiff the State of Rhode Island, represented by and through its Attorney General Peter Neronha, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

24.    Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

25.    Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

26.    Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits

initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

27.    Plaintiff the Commonwealth of Massachusetts, represented by and through its Attorney General Andrea Joy Campbell, is a sovereign state of the United States of America. Attorney General Campbell is authorized to pursue this action under Mass. Gen. Laws ch. 12, §§ 3, 10.

28.    Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of state concern. Minn. Stat. § 8.01.

29.    Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

30.    Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

31.    Plaintiff the State of Vermont is a sovereign State of the United States of America. Vermont is represented by Attorney General Charity Clark, who is the chief law enforcement officer and is authorized by law to initiate litigation on behalf of the State.

32.    Plaintiff the State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign state of the United States of America. The Attorney General of

Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 RCW.

**B.  Defendants**

33.  Defendant Kristi Noem (the "DHS Secretary") is the United States Secretary of Homeland Security and the federal official in charge of DHS. The DHS Secretary is sued in her official capacity.

34.  Defendant DHS is an agency and executive department of the United States government and has responsibility for implementing the federal grant programs at issue in this action, including through FEMA and other subagencies.

35.  Defendant David Richardson is the Senior Official Performing the Duties of the Administrator of FEMA (the "Interim FEMA Head"). The Interim FEMA Head is sued in his official capacity.

36.  Defendant FEMA is a federal agency within DHS that coordinates operational and logistical disaster response and oversees the administration of many of the federal grant programs at issue in this action.

## ALLEGATIONS

**A.  Congress Has For Decades Supported State Emergency Preparedness, Response, and Recovery, Including By Enacting the Homeland Security Grant Program and the Emergency Management Performance Grant.**

37.  FEMA is a distinct entity within DHS. *See* 6 U.S.C. §§ 313(a); 316(a). By law, the DHS Secretary "may not substantially or significantly reduce . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform those missions, authorities, [and] responsibilities, except as otherwise specifically provided in an Act enacted after October 4, 2006." *Id*. § 316(c)(1); *see also id.* § 591h(c).

38.     Consistent with the structure created by Congress over the course of many decades, Plaintiff States today rely on federal grants as a critical tool to support their efforts to mitigate, prepare for, respond to, and recover from catastrophic events like natural disasters and malicious attacks. State emergency management budgets are largely committed to preexisting priorities—including, for example, emergency management staff. Indeed, many federal grants may be used only to support activities that are not already directly funded by the State. Federal grants therefore typically support disaster management initiatives that would not exist but for the federal grant funds and would disappear without them.

39.     At issue in this case are two of FEMA's largest grant programs, the Homeland Security Grant Program ("HSGP") and the Emergency Management Performance Grant ("EMPG"). Both are "preparedness grant programs"—two of a handful of programs that annually provide "more than two billion dollars in funding to state, local, tribal Nations, and territorial governments, as well as transportation authorities, nonprofit organizations, and other eligible entities." *Simplifying FEMA Preparedness Grants*, 88 Fed. Reg. 62098, 62099 (Sept. 8, 2023). "For decades, FEMA has provided federal assistance to aid states in building and sustaining capabilities to measurably improve the nation's readiness in preventing, preparing for, protecting against, and responding to terrorist attacks and other hazards." *Id.* at 62098–99. HSGP and EMPG constitute over half of that funding, with appropriations of over $1.3 billion annually.

40.     Congress established HSGP in direct response to the horrific events of September 11, 2001. The USA PATRIOT Act, enacted on October 26, 2001, established a grant program to allow States "to prepare for and respond to terrorist acts," Pub. L. No. 107-56, § 1014(a), 115 Stat. 272, 399—a program that became HSGP. When Congress expanded the preparedness programs in 2007 with comprehensive legislation "[t]o provide for the implementation of the

recommendations of the" 9/11 Commission, Pub. L. No. 110-53, 121 Stat. 266, 266, it made HSGP permanent. Today, Plaintiff States rely on hundreds of millions in HSGP funds annually. Two HSGP sub-programs, as well as the EMPG program, are primarily relevant here.[2]

> **a.    Homeland Security Grant Program – State Homeland Security Program ("SHSP")**

41.    Homeland Security Grant Program – State Homeland Security Program ("SHSP") grants exist to provide federal funding to States to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

42.    SHSP funds have been available to States since the first version of the program was created by the USA PATRIOT Act in 2001. The program is codified at 6 U.S.C. §§ 603, 605–609.

43.    FEMA is required to allocate SHSP funds pursuant to a risk assessment, which determines each State's "relative threat, vulnerability, and consequences from acts of terrorism," considering objective factors such as population density and history of threats. *Id*. § 608(a)(1). Recipients may then use SHSP funds for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id*. § 609(a). None of the permitted uses include civil immigration enforcement. *See id.*

44.    Because SHSP grants are based on a statutory risk formula, not an exercise of the agency's discretion, each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted.

45.    The FEMA Administrator "shall ensure" that each State receives no less than an amount equal to 0.35% of the total funds Congress appropriated for SHSP grants. *Id*. § 605(e)(1)(A)(v).

---

[2] A third HSGP sub-component, known as "Operation Stonegarden," which supports state efforts to enhance border security, was not affected by the Reallocation Decision and is not at issue here.

46.     States collectively receive hundreds of millions of dollars per year in SHSP grants. They use these funds for myriad counterterrorism and emergency preparedness purposes, including, but not limited to, funding state special operations command teams (including SWAT teams and bomb squads) and funding mutual aid networks of police departments, fire departments, emergency services, and public works departments to mobilize first responders from outside an immediate jurisdiction in the event of a disaster.

47.     SHSP funds allow States to advance counterterrorism and emergency preparedness purposes in ways they otherwise could not. The multijurisdictional emergency response organizations funded by SHSP would be forced to shut down absent federal funding.

48.     Because—until this year—each SHSP grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter, and many Plaintiff States are currently relying on funding from the SHSP awards for FYs 2021–2024.

49.     As an example of how States use SHSP funding, Illinois has used its SHSP funding for a wide range of initiatives that prevent, prepare for, protect against, and respond to acts of terrorism. Those efforts include first responder mutual aid networks, which coordinate terrorism responses from outside an immediate jurisdiction. SHSP funds also support the Illinois Statewide Terrorism and Intelligence Center, which facilitates communication across jurisdictions between public safety officials regarding national terrorism trends. SHSP funds also pay for the Illinois State Police's SWAT and Statewide Weapons of Mass Destruction Team.

50.     New Jersey has used its SHSP funding to fund the salaries of state agency staff who provide cybersecurity training, plan risk mitigation efforts, and combat domestic violent extremism. SHSP funds have also enabled the development and maintenance of several

technological systems, including automated license plate recognition, unmanned aircraft detection, and the New Jersey Interoperability Communications System, which is a statewide radio system designed to strengthen communication among local, county, state, and federal first responders.

51.    Furthermore, New York has used SHSP funds to administer and manage terrorism and targeted violence prevention grants and 12 local FBI-certified bomb squads to detect and respond to explosive incidents throughout the State. SHSP funding has also been critical in New York's establishment of local specialty teams, including explosive detection canine teams, tactical teams, and HazMat teams. SHSP funding supports the operations of the State's only fusion center, the New York State Intelligence Center (NYSIC). This funding is critical to supporting incident command operations, radiation interdiction efforts, cybersecurity activities, and weapons of mass destruction programs and staffing for intelligence analysts. In addition, SHSP funding supports citizen preparedness initiatives across the State, and New York has used SHSP funds to reduce vulnerabilities in crowded open spaces.

### b.    Homeland Security Grant Program – Urban Area Security Initiative ("UASI")

52.    Homeland Security Grant Program – Urban Area Security Initiative ("UASI") grants serve the same overall purposes as SHSP grants. These funds are used to build necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism but with a focus on high-threat, high-density urban areas.

53.    UASI funds have been available to States since the first version of the program was created by appropriations statute in 2003. *See* Pub. L. No. 108-90, 117 Stat. 1137, 1146. The program is codified at 6 U.S.C. §§ 603–604, 606–609.

54.    FEMA is required to follow considerations set by statute to determine "the relative threat, vulnerability, and consequences from acts of terrorism" faced by metropolitan areas to

designate high-risk urban areas that may submit applications for UASI grants. *Id*. §§ 604(b). FEMA is required to allocate UASI funds pursuant to a risk assessment, which determines each high-risk urban area's "relative threat, vulnerability, and consequences from acts of terrorism," considering factors such as population density and history of threats. *Id*. § 608(a)(1).

55.     Because UASI grants are based on a statutory risk formula, not an exercise of the agency's discretion, each eligible State is entitled to a specific allocation based on the risk assessment whenever a notice of funding opportunity is posted, tied to the FEMA-designated eligible urban area or areas in that State.

56.     Recipients must use UASI funds for permitted uses, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id*. § 609(a). None of the permitted uses include civil immigration enforcement. *See id.*

57.     States that receive UASI funds must provide the high-risk urban area with at least 80% of the grant funds. *Id*. § 604(d)(2)(A). Any funds retained by the State must be expended on items, services, or activities that benefit the high-risk urban area. *Id*.

58.     States collectively receive hundreds of millions of dollars per year in UASI grants, passing most of these funds along to the high-risk urban areas. States and the local government entities to which they pass these funds use UASI funds for myriad counterterrorism and emergency preparedness purposes, including support for urban fusion centers, SWAT teams, canine units, and bomb squads.

59.     UASI funds allow States and local government entities to advance counterterrorism and emergency preparedness purposes in ways they otherwise could not.

60.    Because—until this year—each UASI grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter.

61.    As an example of how States use UASI funding, Illinois has one eligible high-threat, high-density urban area, the Chicago metropolitan statistical area. Illinois passes approximately 90% of UASI funds on to fire departments, law enforcement, other first responders, and emergency preparedness offices in the greater Chicago area. These funds provide critical funding for the Chicago Office of Emergency Management, the Chicago Crime Prevention and Intelligence Center, and the Cook County Department of Emergency Management and Regional Security. Chicago uses UASI funds for preparedness purposes including, but not limited to, replacing and sustaining its stock of respirators necessary for mass casualty incidents, maintaining training for fire department special operations teams, and developing policy and training regarding active shooters and coordinated terrorist attack scenarios.

62.    Similarly, New Jersey passes UASI funds through to seven contiguous counties in the New York City metropolitan area, including the major cities of Newark and Jersey City, eight medical centers in urban areas throughout the state, and six State-level agencies that perform preparedness work in service of those geographic areas. New Jersey has used UASI funds to enhance urban search and rescue, including training and equipment and gear upgrades and replacements.

### c.    Emergency Management Performance Grant Program ("EMPG")

63.    The Emergency Management Performance Grant Program ("EMPG") provides federal funding to States to assist state, local, tribal, and territorial emergency management agencies in implementing FEMA's National Preparedness System, including by building continuity-of-government capabilities to ensure essential functions in a catastrophic disaster.

16

64.     EMPG funds have been available to States since an initial appropriation for the program in 2003. *See* Pub. L. No. 108-7, 117 Stat. 11, 515–16. The program is now codified at 6 U.S.C. § 762 after being made permanent by the Post-Katrina Emergency Management Reform Act of 2006.

65.     FEMA's allocation of EMPG funds is set by statutory formula. For each year's apportioned amount of EMPG, FEMA must allocate to certain territories a baseline amount of 0.25% of the appropriated funds and to the States a baseline amount of 0.75% of the appropriated funds. *Id*. § 762(d)(1). FEMA must apportion the remaining amount among the States on a population-share basis. *Id*. § 762(d)(2).

66.     Because EMPG grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

67.     States collectively receive hundreds of millions of dollars per year in EMPG grants. They use these funds for emergency preparedness purposes, including funding the salaries of operations personnel who coordinate disaster response efforts and funding communications, facilities, and vehicles used for disaster response.

68.     EMPG funds allow States to advance emergency preparedness purposes in ways they otherwise could not. States would otherwise not be able to employ the emergency management staff funded by EMPG funds, severely diminishing States' ability to coordinate a disaster response.

69.     Because—until this year—each EMPG grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter.

70.     Further, until this year, the start of three-year performance period was consistently the beginning of the federal fiscal year in question, meaning, for example, that the start of the term for the FY **2025** EMPG award would be October 1, **2024**. Indeed, the NOFO for the FY 2025 EMPG award indicated that the beginning of the period of performance would be October 1, 2024. Yet the period of performance in Plaintiff States' actual EMPG awards begins on October 1, 2025. That leaves many Plaintiff States and their sub-awardees (including many county governments) with a year of critical emergency expenses—from October 1, 2024 to September 30, 2025—that they expected to be covered by the FY 2025 award but that are no longer reimbursable. Many Plaintiff States and their subgrantees have no alternative funding sources for these already incurred expenses.

71.     States use EMPG funding for a wide range of emergency response programming. For instance, EMPG dollars fund the salaries of state agency personnel who lead statewide coordination efforts in response to a natural disaster or mass casualty event, such as state emergency operations plans, hurricane response plans, severe weather plans and procedures. The EMPG program also funds communications, facilities, and vehicles for disaster response in State-level agencies. EMPG monies also fund the ongoing costs of the software program used at the state emergency operations centers, which are the physical locations where state emergency managers direct all strategic and operational activities in the event of a disaster or public health emergency. For example, Rhode Island uses EMPG funds to lead statewide coordination efforts in response to disasters or mass casualty events. EMPG funds pay for communications, facilities, vehicles and equipment for disaster response.

72.     States also pass through EMPG funds to localities, who likewise fund the salaries of local emergency managers and local support staff statewide as well as software and

communications to support local emergency response. For instance, California distributes EMPG funding to 59 local government entities and tribes to improve and fill critical gaps for existing emergency management systems.

73.     Plaintiff States rely on EMPG funds being available to cover emergency response and preparation costs in a manner consistent with FEMA's past practices. Plaintiff States engage in months-long preparation processes and negotiations with subgrantees to identify priority initiatives and projects in anticipation of receiving EMPG funds at the beginning of the fiscal year. Any impediment to accessing EMPG funds as anticipated would require Plaintiff States and their subgrantees to re-engage in this process and find alternative funding for past expenses, causing not only delays in the implementation of these projects, but wholesale elimination of certain projects and termination of staff.

**B.     States Have Exercised Their Sovereign Prerogative To Choose How To Deploy Law Enforcement Resources Within Their Jurisdictions.**

74.     Plaintiff States are responsible for maintaining the day-to-day safety of all residents of their communities. Plaintiff States enact statutes and establish policies to effectively enforce state and local laws, keep public order, and provide public safety services that meet their specific needs. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

75.     One critical choice that Plaintiff States can make in doing so is whether to devote their scarce law enforcement and other agency resources to assisting the federal government in enforcing federal civil immigration law.

76.     Plaintiffs States have made different choices about how to allocate law enforcement resources, and many (but not all) Plaintiff States have, for decades, chosen to limit their

entanglement in the enforcement of federal immigration law. *See, e.g.*, 5 Ill. Comp. Stat. 805/1 to /20; 5 Cal. Gov. Code §§ 7282, 7282.5, 7283–7283.2, 7284–7284.12; N.J. Att'y Gen. Directive 2018-6; Wash. Rev. Code Ann. §§ 10.93.160, 43.10.315; Conn. Gen. Stat. Ann. § 54-192h; Vt. Stat. Ann. tit. 20, § 4651; N.Y. Exec. Orders 170 and 170.1. Some political subdivisions have made similar choices.

77.    The States that have made this choice have determined that public safety and law enforcement benefit from a relationship of trust between immigrant communities and state and local law enforcement. Their laws and policies uniformly authorize state and local authorities to comply with all applicable federal laws but impose limitations on the circumstances under which state and local officers can devote their own resources to assisting the federal government in enforcing federal immigration law.

78.    These laws and policies are based on the considered experience of state and local law enforcement agencies, which demonstrates that persons who lack lawful immigration status or have family members or friends who lack lawful immigration status are less likely to report a crime as victims or witnesses if they fear that the responding officer will turn them over to civil immigration authorities. This reluctance makes it increasingly difficult for officers to solve crimes and bring suspects to justice, putting all residents at risk. *See, e.g.*, Directive 2018-6, at 1; Cal. Gov. Code § 7284.2.

79.    These States' determination is also well supported by analyses of empirical data. Numerous studies have confirmed that immigration-related fears prevent witnesses, victims, and others from reporting crimes. Surveys of law enforcement officers and analyses of victim reporting data conclude that fear of immigration enforcement decreased immigrant victims' likelihood of making police reports and reporting domestic violence, participating in investigations, and

20

working with prosecutors. *See* Rafaela Rodrigues et al., Nat'l Immigrant Women's Advoc. Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* (2018).[3] One study estimated that policies designed to foster greater trust between immigrant communities and police could cause an additional 90,000 violent incidents per year to be reported to law enforcement nationwide. *See* Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Socio. Rev. 154, 170 (2021).

80.    Some States have likewise determined that it will interfere with important public welfare functions if state employees divert non-law enforcement resources to engage in unnecessary inquiries into individuals' immigration status, fulfill information requests by federal immigration officials not required by law, or facilitate civil immigration arrests in state buildings. *E.g.*, New York Exec. Order 170 (Sept. 15, 2017); New York Exec. Order 170.1 (Apr. 25, 2018).

81.    Other Plaintiff States have made different decisions or are subject to different rules in this context. For instance, some Plaintiff States must comply with state court rulings that prevent them from cooperating with civil immigration detainer requests. *See Lunn v. Commonwealth*, 477 Mass. 517, 518–19 (2017).

82.    Still other Plaintiff States without codified directives of the kind described above have not imposed categorical limitations on the use of law enforcement or state agency resources to assist in the enforcement of federal immigration law. However, they do not impose categorical *requirements* of this kind on their law enforcement officers and state agency employees.

---

[3] http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf.

83.    Some of these States have concluded that participating in federal immigration enforcement efforts imposes substantial costs on local jurisdictions, not only in the form of personnel and resources but also in the form of potential civil liability. And some such States have reasoned that even where law enforcement resources are dedicated to assisting with enforcement of federal immigration law, it is preferable to retain critical decisionmaking authority regarding when to offer those resources and how many resources to offer.

84.    Thus, although Plaintiff States have made different decisions regarding the use of their law enforcement and agency resources, all Plaintiff States' decisions in this area are consistent with the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz v. United States*, 521 U.S. 898, 928 (1997)—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

## C.    Defendants Announce Their Opposition To Certain Plaintiff States' Policies.

85.    Since January 2025, defendants have engaged in a concerted campaign to pressure States to use their state resources to enforce federal immigration law, subverting the design of DHS grant programs.

86.    On January 20, 2025, his first day in office, President Trump issued an executive order directing the Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds," and to take "any other lawful actions, criminal or civil" that the Secretary of Homeland Security deems warranted. Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

87.    This was not President Trump's first time announcing an intent to use conditions on federal funding to coerce states into adopting his preferred set of policies. The first Trump Administration imposed immigration-enforcement conditions on funding Plaintiff States received

from the Byrne Justice Assistance Grant Program. These immigration-enforcement conditions prompted extensive litigation, in which courts repeatedly held the immigration-enforcement conditions to exceed the Department's statutory authority. *City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020); *City of Philadelphia v. Att'y Gen.* , 916 F.3d 276, 291 (3d Cir. 2019); *City of Chicago v. Barr*, 961 F.3d 882, 931 (7th Cir. 2020); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 761 (9th Cir. 2020); *City of Los Angeles v. Barr*, 941 F.3d 931, 944 (9th Cir. 2019); *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1040 (D. Colo. 2020); *City of Evanston v. Sessions*, No. 18-cv-4853, 2018 WL 10228461, at *4 (N.D. Ill. Aug. 9, 2018). *But see New York v. U.S. Dep't of Just.*, 951 F.3d 84, 90 (2d Cir. 2020).

88.     On February 19, 2025, the DHS Secretary issued a memorandum to all DHS agencies and offices titled "Restricting Grant Funding for Sanctuary Jurisdictions," attached as Exhibit 6. The memorandum directed all DHS agencies and offices to review all federal financial assistance and, consistent with DHS's immigration initiatives, cease federal funding to what DHS deems "sanctuary" jurisdictions. The DHS Secretary also directed components to make criminal referrals to the Department of Justice for any resistance or noncompliance with lawful immigration-related commands.

89.     On March 20, 2025, then-interim FEMA head Cameron Hamilton sent a memorandum to the DHS Secretary titled "Approval of FEMA-Administered Grant Disbursements," attached as Exhibit 7. Hamilton's memorandum listed FEMA's grant programs and identified twelve specific grant programs that, in his view, might lawfully be limited to non-"sanctuary" jurisdictions. Hamilton recommended applying targeted terms that would limit funding under these twelve programs to States that helped assist in enforcing federal immigration law—but only those twelve programs. Hamilton's recommendation regarding these twelve

programs was not supported by any statutory authority or any analysis of the basis for DHS's authority to impose conditions on grant programs.

90.     On April 28, 2025, President Trump issued another executive order relating to jurisdictions with policies designed to improve relations between law enforcement and communities. *See* Exec. Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025). The EO requires "the Attorney General, in coordination with [DHS]" to "publish a list" of "sanctuary jurisdictions" and to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.* § 2. The Attorney General and DHS were to publish this list within 30 days, meaning May 28, 2025. *Id.*

91.     Section 3(a) of the April 28 executive order then directs agencies to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate," *id.* § 3(a), expanding to all federal agencies a similar directive in the January 20 executive order that applied only to the Attorney General and DHS, Exec. Order No. 14159, § 17, 90 Fed. Reg. at 8446.

92.     On May 29, 2025, DHS published a list of so-called "sanctuary jurisdictions," which included almost all Plaintiff States here and many of their political subdivisions. The list was taken down two days later, after 9:19 PM on Saturday, May 31. *See* Dep't of Homeland Sec., *Sanctuary Jurisdictions Defying Federal Immigration Law* (captured June 1, 2025 1:19 AM GMT) (Ex. 8).

93.     In an interview with Fox News on June 1, 2025, however, Defendant Secretary Noem stated that the "list is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice."

**D.      Defendants Allocate HSGP Funds In The HSGP NOFO.**

94.      On July 28, 2025, DHS first posted the fiscal year 2025 notice of funding opportunity for the Homeland Security Grant Program to the grants.gov website. *See* U.S. Dep't of Homeland Sec., *Notice of Funding Opportunity (NOFO): Fiscal Year 2025 Homeland Security Grant Program* (July 28, 2025 Version 1) (Ex. 2).

95.      Later on July 28, 2025, without any explanation, DHS updated the fiscal year 2025 NOFO on the grants.gov website with a new version. *See* U.S. Dep't of Homeland Sec., *Notice of Funding Opportunity (NOFO): Fiscal Year 2025 Homeland Security Grant Program* (July 28, 2025 Version 2) (Ex. 3).

96.      The major change between the first and second versions appears to have been that defendants cut a section titled "Immigration Conditions" from the first NOFO and replaced it with a statement that the decision on whether to impose the immigration conditions remained pending at that time. *Compare* Ex. 2 at 48–50 *with* Ex. 3 at 48.

97.      Both the first and second versions of the HSGP NOFO solicited applications and set allocations for only SHSP and did not mention UASI. *See* Ex. 2 at 53–54; Ex. 3 at 51–52.

98.      On August 1, 2025, DHS released the third and final version of the Homeland Security Grant Program NOFO. *See* Ex. 1. That NOFO stated DHS's intention of awarding to the States the $1.008 billion that Congress appropriated for the HSGP program in federal fiscal year 2025, for both SHSP and UASI. *Id.* at 4; *see* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 607 (fiscal year 2024 appropriation); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(6), 139 Stat. 9, 11 (continued fiscal year 2025 appropriation under the same terms).

99.      Office of Management and Budget administrative requirements, which DHS has adopted as its own binding regulation, require DHS to disclose "the expected dollar values of

individual awards." 2 C.F.R. §§ 200.204(a)(6), 3002.10. Consistent with that requirement, all three versions of the HSGP NOFO included "target allocations" for grantees. Ex. 1 at 53–57.

100.    Defendants have announced HSGP funding allocations in each year's notice of funding opportunity for at least 15 years. For instance, DHS announced funding allocations in the NOFO for fiscal year 2024. *See* U.S. Dep't of Homeland Sec., *Notice of Funding Opportunity (NOFO): Fiscal Year 2024 Homeland Security Grant Program* (Apr. 15, 2025) (Ex. 5).

101.    The final fiscal year 2025 NOFO explained that for SHSP, "DHS/FEMA [would] distribute SHSP funds based on their risk assessment methodology and legal minimums outlined in the Homeland Security Act of 2002, as amended." Ex. 1 at 53. And the NOFO accordingly set out the allocations that resulted from that "risk assessment methodology." *Id.* at 54.

102.    As FEMA itself publicly declared on September 12, 2025: "*Final* allocations are published in the FY 2025 HSGP NOFO." Fed. Emergency Mgmt. Agcy., *FY 2025 Homeland Security Grant Program Fact Sheet*, at 3 (Sept. 12, 2025) (Ex. 9) (emphasis added).

103.    Under those allocations, Plaintiff States were slated to receive over $156 million in HSGP-SHSP funds, including over $55 million for California, $38 million for New York, $10 million for Illinois, and $5 million for New Jersey. Ex. 1 at 54.

104.    The NOFO likewise explained that for UASI, defendants had determined program eligibility "through an analysis of relative risk of terrorism faced by the 100 most populous Metropolitan Statistical Areas . . . in the United States," as required by the Homeland Security Act. *Id.* at 54. And it set out the allocations for designated urban areas "based on DHS/FEMA's risk-informed assessment." *Id.* at 55.

105.    Under those allocations, Plaintiff States were slated to receive over $336 million in UASI funds, including over $109 million for California, $92 million for New York, $33 million for Illinois, and $13 million for New Jersey. *Id.* at 55–56.

106.    All in, Plaintiff States were allocated over $492 million in funds under the NOFO associated with SHSP and UASI, including $156 million under SHSP and $336 million under UASI.[4]

107.    Notably, the third and final version of the HSGP NOFO imposed substantial reductions on several Plaintiff States—California, the District of Columbia, Illinois, New Jersey, and New York—as compared to fiscal year 2024 and the earlier versions of the fiscal year 2025 NOFO.

108.    The first and second versions of the HSGP NOFO proposed to hold funding levels steady as to these Plaintiff States as compared to the prior year, as shown in the below table:

| State | Fiscal Year 2024 HSGP NOFO | | | July 28, 2025, HSGP NOFO | | | Total Change |
|---|---|---|---|---|---|---|---|
| | SHSP | UASI | Total | SHSP | UASI | Total | |
| CA | $51,332,060 | $118,534,552 | $169,866,612 | $51,332,060 | N/A | N/A | $0 |
| DC | $4,576,849 | $45,201,207 | $49,778,056 | $4,576,849 | N/A | N/A | $0 |
| IL | $12,505,419 | $59,395,378 | $71,900,797 | $12,505,419 | N/A | N/A | $0 |
| NJ | $6,367,357 | $16,722,687 | $23,090,044 | $6,367,357 | N/A | N/A | $0 |
| NY | $61,229,940 | $156,131,176 | $217,361,116 | $61,229,940 | N/A | N/A | $0 |

---

[4] Plaintiff States also were allocated about $17 million under HSGP's third subprogram, Operation Stonegarden. *Id.* at 57. The Reallocation Decision does not, as of this writing, appear to have affected these funds.

109.    But the final August 1, 2025 version of the HSGP NOFO imposed large cuts on the target allocations for these Plaintiff States:

| State | Fiscal Year 2024 HSGP NOFO | | | Final FY2025 HSGP NOFO | | | Total Change |
|---|---|---|---|---|---|---|---|
| | SHSP | UASI | Total | SHSP | UASI | Total | |
| CA | $51,332,060 | $118,534,552 | $169,866,612 | $55,863,486 | $109,325,268 | $165,188,754 | -$4,677,858 |
| DC | $4,576,849 | $45,201,207 | $49,778,056 | $4,362,750 | $25,270,521 | $29,633,271 | -$20,144,785 |
| IL | $12,505,419 | $59,395,378 | $71,900,797 | $10,419,556 | $33,479,819 | $43,899,375 | -$28,001,422 |
| NJ | $6,367,357 | $16,722,687 | $23,090,044 | $5,065,776 | $13,928,247 | $18,994,023 | -$4,096,021 |
| NY | $61,229,940 | $156,131,176 | $217,361,116 | $38,200,874 | $92,180,364 | $130,381,238 | -$86,979,878 |

110.    Therefore, even before the fiscal year 2025 HSGP awards issued, defendants had imposed approximately $144 million of cuts on five disfavored jurisdictions without any explanation. In particular, New York had already faced a cut of nearly $87 million between July 29 and August 1, 2025.

**E.    Defendants Issue Fiscal Year 2025 Risk Profiles.**

111.    The HSGP statute "requires that the 'relative threat, vulnerability, and consequences from acts of terrorism' be considered when allocation funds for DHS' and FEMA's preparedness grant programs." Fed. Emergency Mgmt. Agency, *Fiscal Year 2023 SHSP/UASI Risk Methodology Updates*, at 5 (Feb. 17, 2023) (Ex. 13) (quoting 6 U.S.C. § 608(a)(1)).

112.    In furtherance of that statutory requirement, defendants produce annual "relative risk scores" using a pre-announced "risk methodology." *Id.* The methodology does not produce an estimate of "*absolute* risk" but rather "relative comparisons" between jurisdictions. *Id.*

113.    Each year, in connection with the setting of target allocations under SHSP and UASI, defendants send States and their UASI jurisdictions the risk profiles that show where the jurisdictions fall in the relative risk rankings each year. In past years, defendants have also provided draft risk profiles for review and input before finalizing the risk profiles. Defendants did not send draft risk profiles to the States this year.

114.    Instead, on or about August 13, 2025, defendants sent all States and UASI jurisdictions their final risk profiles for fiscal year 2025. On balance, Plaintiff States and many of the UASI jurisdictions within Plaintiff States either maintained their relative risk rankings as compared to prior years or saw only minor changes, as shown by the below table:

| Plaintiff State or UASI Metropolitan Statistical Area | Fiscal Year 2024 Rank | Fiscal Year 2025 Rank | Change |
|---|---|---|---|
| CA | 1 | 1 | 0 |
| Anaheim–Santa Ana–Irvine | 17 | 18 | -1 |
| Los Angeles–Long Beach–Glendale | 2 | 2 | 0 |
| Riverside–San Bernardino–Ontario | 19 | 23 | -4 |
| Sacramento–Roseville–Folsom | 28 | 33 | -5 |
| San Diego–Chula Vista–Carlsbad | 13 | 8 | +5 |
| San Francisco–San Jose–Oakland | 4 | 4 | 0 |
| CT | 35 | 35 | 0 |
| DC | 24 | 24 | 0 |
| Washington–Arlington–Alexandria | 5 | 6 | -1 |
| DE | 41 | 36 | +5 |
| IL | 5 | 5 | 0 |
| Chicago–Naperville–Elgin | 3 | 3 | 0 |
| MA | 15 | 11 | +4 |
| Boston–Cambridge–Newton | 12 | 9 | +3 |
| MN | 17 | 17 | 0 |
| Minneapolis–St. Paul–Bloomington | 16 | 16 | 0 |
| NJ | 10 | 12 | -2 |
| Newark–Jersey City–New Brunswick | 10 | 13 | -3 |
| PA | 6 | 6 | 0 |
| Philadelphia–Camden–Wilmington | 11 | 7 | +4 |
| Pittsburgh | 31 | 30 | +1 |
| RI | 47 | 47 | 0 |
| VT | 53 | 53 | 0 |
| WA | 11 | 10 | +1 |
| Seattle–Tacoma–Bellevue | 15 | 15 | 0 |

115.    Therefore, even though defendants' assessment of the relative risk faced by Plaintiff States had barely changed, defendants cut Plaintiff States' UASI allocations by approximately $144 million in the August 1, 2025 NOFO.

F.      **Defendants Try But Fail To Condition All DHS Federal Funds On Their Views About Plaintiff States' Policies.**

116.    *Illinois v. FEMA*, No. 25-cv-206 (D.R.I.), successfully countered DHS's first attempt to act on its animus toward certain States by depriving them of federal funds unrelated to civil immigration enforcement. In March and April 2025, DHS posted on its website revised versions of the DHS Standard Terms and Conditions (the "Terms and Conditions").[5] These Terms and Conditions govern "all new federal awards of federal financial assistance . . . for which the federal award date occurs in FY 2025." The revised versions included "provisions requiring state and local recipients to certify that they will assist in enforcing federal immigration law." *Illinois v. FEMA*, 2025 WL 2716277, at *2.

117.    The States of Illinois, California, New Jersey, Rhode Island, Colorado, Connecticut, Delaware, Hawaiʻi, Maine, Maryland, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, and Wisconsin, and the District of Columbia brought suit, claiming that the civil immigration conditions imposed on all DHS funds were unlawful. *See* Complaint, *Illinois v. FEMA*, ECF 1 (D.R.I. May 13, 2025).[6]

118.    The parties cross-moved for summary judgment, and, on September 24, the district court issued an opinion granting the *FEMA* Plaintiff States' motion for summary judgment and holding that the promulgation of the immigration conditions violated the APA and the Constitution. *Illinois v. FEMA*, 2025 WL 2716277, at *1.

119.    The court explained that the decision to promulgate the conditions was arbitrary and capricious because DHS had failed to "examine[] the relevant data or articulate[] a fact-based

---

[5] Available at https://www.dhs.gov/publication/dhs-standard-terms-and-conditions.
[6] The District of Columbia was joined with the first amended complaint on July 2, 2025. First Amended Complaint, *Illinois v. FEMA*, ECF 57 (D.R.I. July 2, 2025).

reason" for its actions, instead relying principally on the President's executive order "calling upon . . . agencies to terminate funding to 'sanctuary jurisdiction[s].'" *Id.* at *12 (alteration in original). DHS, the court explained, had provided no "actual explanation of why it [was] necessary to attach sweeping immigration conditions to all the grants at issue . . . , regardless of their statutory purpose or programmatic objectives." *Id.* Moreover, the Court concluded that DHS "engaged in a wholly under-reasoned and arbitrary process," "did not meaningfully evaluate the [S]tates' reliance interests," and compounded these failures by using "vague and confusing language" that "ma[de] compliance a nearly impossible-to-achieve moving target." *Id.*

120.    The court also explained that the conditions violated the Spending Clause because they were "not reasonably related to the purposes of the grants to which they attach[ed]" and were coercive, amounting to "'economic dragooning' of the sort condemned in" *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012). *FEMA*, 2025 WL 2716277, at *14.

121.    Accordingly, by judgment entered September 24, 2025, the district court vacated the immigration conditions as to all DHS awards and all recipients. *Id.* at *15. The court also issued a permanent injunction because "Plaintiff States st[ood] to suffer irreparable harm; the effect of the loss of emergency and disaster funds [could ]not be recovered later, and the downstream effect on disaster response and public safety [was] real and not compensable." *Id.* at *16. The court therefore "permanently enjoin[ed] Defendants from enforcing the contested conditions against Plaintiff States." *Id.*

122.    When asked about the court's opinion, a DHS spokesperson said: "Cities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding." Griffin, *supra*. She added: "No lawsuit, not this one or any other, is going to stop us from doing that." *Id.*

**G.    Defendants Reallocate HSGP Funds Away From Disfavored States.**

123.    The DHS's spokesperson's explicit threat bore fruit just three days later when DHS slashed HSGP funding to many States protected by the *Illinois v. FEMA* injunction, redistributing their funding to other States.

124.    Plaintiff States had each applied for HSGP funding under the FY 2025 NOFO on or before the August 15, 2025 deadline. *See supra* ¶¶ 98–106.

125.    On Saturday, September 27—four days before the funds were set to expire—DHS issued award notifications under the HSGP program, with the award letters dated September 26.

126.    Plaintiff States have not yet ratified their awards by counter-signature through the FEMAGo system.

127.    The award notifications contained significant—indeed, extraordinary—deviations from the final NOFO allocations as released on August 1, 2025.

128.    Although New York had been preliminarily allocated $130 million in SHSP and UASI funds by the NOFO, it received only $28 million in funding—a 79% decrease.

129.    Although the District of Columbia had been preliminarily allocated $30 million in SHSP and UASI funds by the NOFO, it received only $9 million in funding—a 70% decrease.

130.    Although Illinois had been preliminarily allocated $44 million in SHSP and UASI funds by the NOFO, it received only $14 million in funding—a 69% decrease.

131.    And although California had been preliminarily allocated $165 million in SHSP and UASI funds by the NOFO, it received only $110 million in funding—a 33% decrease.

132.    In total, nine Plaintiff States (and their municipalities, via the UASI subcomponent) received awards reduced substantially relative to the NOFO allocations, as shown by the below chart:

| Plaintiff State | August 1 Notice of Funding Opportunity | | | Final Award | | | Total Change |
|---|---|---|---|---|---|---|---|
| | SHSP | UASI | Total | SHSP | UASI | Total | |
| CA | $55,863,486 | $109,325,268 | $165,188,754 | $17,156,754 | $93,473,801 | $110,630,555 | -$54,558,199 |
| CT | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| DC | $4,362,750 | $25,270,521 | $29,633,271 | $4,362,750 | $4,416,737 | $8,779,487 | -$20,853,784 |
| DE | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| IL | $10,419,556 | $33,479,819 | $43,899,375 | $4,362,750 | $9,395,829 | $13,758,579 | -$30,140,796 |
| MA | $5,390,887 | $16,838,838 | $22,229,725 | $6,000,629 | $9,301,839 | $15,302,468 | -$6,927,257 |
| MN | $4,362,750 | $9,526,217 | $13,888,967 | $4,362,750 | $2,973,810 | $7,336,560 | -$6,552,407 |
| NJ | $5,065,776 | $13,928,247 | $18,994,023 | $6,000,629 | $3,768,628 | $9,769,257 | -$9,224,766 |
| NY | $38,200,874 | $92,180,364 | $130,381,238 | $5,624,924 | $22,069,395 | $27,694,319 | -$102,686,919 |
| PA | $9,407,455 | $23,181,198 | $32,588,653 | $11,362,750 | $12,305,323 | $23,668,073 | -$8,920,580 |
| RI | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| VT | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| WA | $5,483,241 | $12,713,580 | $18,196,821 | $4,362,750 | $11,782,120 | $16,144,870 | -$2,051,951 |

133.    Nearly all Plaintiff States are listed on DHS's now-removed list of "sanctuary" jurisdictions and have impacted UASI municipalities that are. *See* Ex. 8. The sole exception is Pennsylvania, but it contains the listed city of Philadelphia, *see id.* at 15, which saw its UASI funding reduced from over $18 million at the NOFO stage to $0 at the award stage. Philadelphia's award was cut to $0 even as defendants' assessment of Philadelphia's relative risk ranking rose four places to seventh in the Nation. *See supra* ¶ 114.

134.    Not only did defendants take money away from disfavored States, they reallocated the money away to other jurisdictions.

135.    Defendants provided comprehensive data on the reallocation in a PowerPoint presentation delivered to a congressional committee on September 29, 2025, which was not available at the filing of the original complaint in this matter, but which is now attached as Exhibit 10.

136.    The comprehensive data in the PowerPoint reveals that, with only a few exceptions, States *not* on DHS's "sanctuary" jurisdiction list did not experience decreases in funding. Quite the opposite: The vast majority received substantial *increases* in HSGP funding, as shown by the below table of changes affecting jurisdictions not listed on the "sanctuary" list:

| State or Territory | August 1 Notice of Funding Opportunity | | | Final Award | | | Total Change |
|---|---|---|---|---|---|---|---|
| | SHSP | UASI | Total | SHSP | UASI | Total | |
| AK | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| AL | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| AR | $4,362,750 | $0 | $4,362,750 | $6,000,628 | $0 | $6,000,628 | $1,637,878 |
| AS | $997,200 | $0 | $997,200 | $2,635,078 | $0 | $2,635,078 | $1,637,878 |
| AZ | $5,023,205 | $12,910,357 | $17,933,562 | $7,362,750 | $21,938,710 | $29,301,460 | $11,367,898 |
| FL | $15,745,665 | $34,181,770 | $49,927,435 | $18,395,245 | $71,849,604 | $90,244,849 | $40,317,414 |
| GA | $7,272,801 | $14,564,394 | $21,837,195 | $9,362,750 | $9,372,418 | $18,735,168 | -$3,102,027 |
| GU | $1,110,150 | $0 | $1,110,150 | $2,748,028 | $0 | $2,748,028 | $1,637,878 |
| HI | $4,362,750 | $6,338,443 | $10,701,193 | $6,000,629 | $16,694,331 | $22,694,960 | $11,993,767 |
| IA | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| ID | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| IN | $4,362,750 | $3,367,289 | $7,730,039 | $6,000,629 | $10,111,002 | $16,111,631 | $8,381,592 |
| KS | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| KY | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| LA | $4,362,750 | $4,546,754 | $8,909,504 | $8,362,750 | $0 | $8,362,750 | -$546,754 |
| ME | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| MI | $4,362,750 | $8,123,989 | $12,486,739 | $6,000,629 | $14,114,393 | $20,115,022 | $7,628,283 |
| MO | $4,362,750 | $10,473,154 | $14,835,904 | $6,000,629 | $18,986,236 | $24,986,865 | $10,150,961 |
| MP | $997,200 | $0 | $997,200 | $2,635,078 | $0 | $2,635,078 | $1,637,878 |
| MS | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| MT | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| NC | $4,631,809 | $4,285,035 | $8,916,844 | $6,862,750 | $14,200,846 | $21,063,596 | $12,146,752 |
| ND | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| NE | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| NH | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| NM | $4,362,750 | $0 | $4,362,750 | $8,362,750 | $0 | $8,362,750 | $4,000,000 |
| NV | $4,362,750 | $8,958,896 | $13,321,646 | $4,362,750 | $10,954,761 | $15,317,511 | $1,995,865 |
| OH | $5,643,542 | $12,538,962 | $18,182,504 | $7,862,750 | $32,893,878 | $40,756,628 | $22,574,124 |
| OK | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| PA | $9,407,455 | $23,181,198 | $32,588,653 | $11,362,750 | $12,305,323 | $23,668,073 | -$8,920,580 |
| PR | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| SC | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| SD | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| TN | $4,362,750 | $4,150,624 | $8,513,374 | $6,000,629 | $12,131,222 | $18,131,851 | $9,618,477 |
| TX | $26,066,797 | $53,412,309 | $79,479,106 | $28,759,327 | $77,028,653 | $105,787,980 | $26,308,874 |
| UT | $4,362,750 | $0 | $4,362,750 | $6,000,628 | $0 | $6,000,628 | $1,637,878 |
| VA | $8,770,850 | $11,867,416 | $20,638,266 | $11,362,750 | $23,485,484 | $34,848,234 | $14,209,968 |
| VI | $997,200 | $0 | $997,200 | $2,635,078 | $0 | $2,635,078 | $1,637,878 |
| WI | $4,362,750 | $3,086,934 | $7,449,684 | $6,000,629 | $13,353,970 | $19,354,599 | $11,904,915 |
| WV | $4,362,750 | $0 | $4,362,750 | $6,000,629 | $0 | $6,000,629 | $1,637,879 |
| WY | $4,362,750 | $0 | $4,362,750 | $6,000,628 | $0 | $6,000,628 | $1,637,878 |

137. The three exceptions, the losing States in the above table, are Georgia, Louisiana, and Pennsylvania. DHS did not list these States as "sanctuary" jurisdictions, but the UASI cuts that they suffered were directed at listed "sanctuary" cities: Philadelphia, Atlanta, and New Orleans. *See* Ex. 8 at 6, 9, 15.

138. The four Plaintiff States with no net change were Connecticut, Delaware, Rhode Island, and Vermont. These four received the statutory minimum of "0.35 percent of the total funds appropriated," 6 U.S.C. § 605(e)(1)(A)(v), meaning $4,362,750 in fiscal year 2025. *See* Ex. 1 at 53–54. But nearly all other States (other than Plaintiff States) benefited from an elevated floor funding level that defendants apparently set at $6,000,629 (instead of the statutory minimum), as shown in the table above.[7] Connecticut, Delaware, Rhode Island, and Vermont were excluded from that elevated floor. These four States were also listed on DHS's now-removed list of "sanctuary" jurisdictions. *See* Ex. 8 at 5, 16.

139. No award notification provided any substantive explanation for the reallocation of HSGP funds. Instead, almost all reduced fields state only that the field has been "[a]djusted per DHS directive." The Illinois award letter contained this phrase, with no elaboration, 26 times. *See* Illinois HSGP Award (Ex. 11), at 9–53.

140. And, as noted, these massive reallocations occurred despite the fact that the relative risk scores of Plaintiff States and UASI jurisdictions in Plaintiff States remained largely unchanged from last year. *See supra* ¶¶ 114–115.

141. Plaintiff States have applied for funding under the HSGP program every year since its enactment during the Bush Administration. In that time, Plaintiff States have never seen a last-minute reallocation of this sort—one that deviates from the NOFO allocations for the transparent

---

[7] For Arkansas, Utah, and Wyoming, the floor was one dollar lower, $6,000,628.

purpose of rewarding States that align with the Administration's policy priorities and punishing those States that deviate from those priorities.

142.    Indeed, in that time, Illinois has *never* seen a deviation from the NOFO that exceeds a nominal sum. In the eight prior years dating to 2017, including all of President Trump's first Administration, Illinois has seen a total of $0 in adjustments between the NOFO and the award for its SHSP and UASI funding lines, across all grants and across all years. The same is true of New York and California.

143.    On information and belief, the drastic and unexplained reallocations of HSGP funds between the NOFO stage and the award stage is unprecedented in the history of post-September 11 emergency preparedness funding.

144.    If not vacated, defendants' last-minute decision to reallocate funds from States that disagree with it and award those funds to other States—the Reallocation Decision—will cost Plaintiff States nearly $242 million in critical homeland-security funds as compared to the final FY 2025 NOFO.

145.    If the changes that occurred between July 28, 2025, and August 1, 2025, are included—that is, the changes between version 2 of the HSGP NOFO and the final version—then the total injury inflicted on Plaintiff States rises to over $360 million.

## H.    The Reallocation Decision Is Unlawful And Should Be Vacated.

146.    The Reallocation Decision is unlawful in multiple respects.

147.    First, it exceeds defendants' statutory authority. DHS and its sub-agencies are "charged with administering congressional statutes," which means that "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the [APA]." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020)

(cleaned up); *see* 5 U.S.C. § 706(2)(C). The HSGP statute establishes a prescriptive list of factors that "the Administrator shall consider" "[i]n allocating funds among States and high-risk urban areas." 6 U.S.C. § 608(a). An unexplained "DHS directive" is not among them. Congress has specifically barred DHS from asserting some free-floating and, in any event, completely unspecified DHS directive, outside the confines of the HSGP statute, as a basis for tinkering with the allocations among the States.

148.    Indeed—although defendants themselves have given no explanation at all for what they did—the facts are plain enough. Defendants discarded the relative risk scores that would have directed the funding levels for Plaintiff States and UASI jurisdictions in Plaintiff States remain constant. *See supra* ¶¶ 114–115. Disregarding the statutory factors, they considered the extra-statutory consideration of whether defendants regard the jurisdiction in question, or one of its subdivisions, as a "sanctuary" jurisdiction. *See supra* ¶¶ 132–133; *infra* ¶ 190.

149.    Second, the Reallocation Decision was arbitrary and capricious. DHS effected drastic funding cuts without a word of explanation. The APA requires exactly the opposite. When changing positions, an agency must consider both the "alternatives that are within the ambit of the existing policy" and the "serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up). The agency must not "entirely fail[] to consider an important aspect of the problem" or "rel[y] on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

150.    DHS has done both. The explanation that can be gleaned from circumstantial evidence is that DHS set out to punish States or municipalities that DHS views as having policies concerning law enforcement cooperation with federal immigration enforcement that it opposes.

That is an impermissible factor under the statute at issue. 6 U.S.C. § 608(a). In any event, DHS also did not explain its decision in any transparent way. Again, it simply said, over and over: "Adjusted per DHS directive." The APA requires far more when an agency proposes to so drastically disrupt existing reliance interests measured in the hundreds of millions of dollars.

151.    The Reallocation Decision, if not vacated, will irreparably harm the Plaintiff States. For one, there is the simple loss of funds from a fixed-sum appropriation, which will be likely irrecoverable once disbursed to other grantees. More broadly, defendants' actions in this case undermine our "system of dual sovereignty between the States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), by punishing States for their sovereign choices about how to enforce state and local laws, keep public order, and "suppress[] violent crime," *Morrison*, 529 U.S. at 618. The impact of an invasion of state sovereignty "cannot be economically quantified" and thus constitutes irreparable harm. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (quoting *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022)). States suffer an "irreparable" injury when forced to abandon their "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

152.    For these reasons, Plaintiff States seek declaratory and injunctive relief setting aside the Reallocation Decision and requiring DHS and FEMA to adhere to their responsibilities in allocating homeland-security funds.

**I.     Defendants Unlawfully Reduce The Period Of Performance On HSGP And EMPG Awards From Three Years To One Year and Change the EMPG Start Date.**

153.    Another dramatic shift that DHS effected between the NOFO stage and the award stage for preparedness grants is a sudden and unexplained reduction in the period of performance from three years to one year and a change to the funding's start date. These changes, made without

any explanation, will debilitate the ability of state agencies to implement the purposes of the HSGP and EMPG grants.

154.    The term of FEMA preparedness awards has generally been three years, meaning that the award remains open for a three-year period for completing reimbursable activities. Any program activities supported by the awarded funds must be completed within the time the award remains open.

155.    It is typical for FEMA preparedness awards to take several years to fully disburse. The HSGP and EMPG programs have used multi-year periods of performance, sometimes even longer than three years, for almost every year of their existence. Moreover, these programs fund essential ongoing operational needs of state and local public safety agencies. As a result, States have structured their budgeting systems for HSGP and EMPG grants around multi-year sub-obligation periods.

156.    Consistent with that past practice, the fiscal year 2025 HSGP and EMPG NOFOs announced that there would be a three-year period of performance for both programs. Ex. 1 at 4; U.S. Dep't of Homeland Sec., *Notice of Funding Opportunity (NOFO): Fiscal Year 2025 Emergency Management Performance Grant* (Ex. 4), at 4.

157.    Both NOFOs explained that applications should frame their budget needs by reference to the anticipated three-year period of performance. The HSGP NOFO stated that projects must be "able to be fully completed within the three-year period of performance." Ex. 1 at 38. The EMPG NOFO stated that "[e]ach goal must be specific, measurable, and achievable within the period of performance." Ex. 4 at 50.

158.    Plaintiff States had each applied for EMPG funding under the FY 2025 NOFO on or before the August 11, 2025 deadline.

159.     DHS issued award notifications under the EMPG program on or about September 26 and 27, 2025.

160.     Yet, without explanation, when the HSGP and EMPG awards issued, the period of performance was reduced to one year on both HSGP and EMPG awards, running from October 1, 2025, to September 30, 2026.

161.     As to EMPG in particular, its awards have historically been backdated to the start of the federal fiscal year, meaning October 1, 2024, for federal fiscal year 2025. DHS's decision to instead start the performance period on October 1, 2025—the first day of federal fiscal year 2026—without any explanation and in departure from past years, has effectively skipped an entire year of program funding.

162.     Plaintiff States have not yet ratified their EMPG awards by counter-signature through the FEMAGo system.

163.     On information and belief, defendants reduced the period of performance in this manner as to all States, not just disfavored "sanctuary" jurisdictions.

164.     That unreasoned decision to shorten and move the period of performance was arbitrary. All States submitted applications in reliance on the specific statements in the NOFOs, *supra* ¶¶ 156–157, calling for three years of project planning. In addition, all States have substantial outstanding funds from prior grant years that must also be obligated in this upcoming fiscal year, creating a direct collision between prior-year funds and new funds.

165.     The reduced performance period also exacerbates the injury to the Plaintiff States that received a reduced allocation. Plaintiff States constructed their projects based on the expectation that they would receive the full amount set forth in the NOFO. Now Plaintiff States would have to redo those projects and ask their subrecipients to redo their budgets to align with

the significantly reduced amounts. Only then would Plaintiff States be able to seek approval from FEMA to remove a hold on funds. This process could take several months, thus curtailing the Plaintiff States' ability to draw down the funds within the reduced one-year performance period.

166.    An agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). DHS did not do so here, or even attempt to do so.

## J.    Defendants Unlawfully Freeze EMPG Funding Already Awarded to Plaintiff States Until Plaintiff States Satisfy a Novel Population Certification Requirement.

167.    In late September, DHS issued letters notifying Plaintiff States that they had been awarded EMPG funding for fiscal year 2025. Collectively, the award letters informed Plaintiff States they had been awarded just under $100 million in funds. These award letters did not contain any population certification requirement or any funding holds; each letter contained the allocated amount due to the state per statutory formula. 6 U.S.C. § 762(d).

168.    On or around September 30, 2025—three days after Plaintiff States had received their initial EMPG award letters, and a day after Plaintiff States filed their original complaint—— DHS re-issued revised EMPG grant award letters with yet another sudden and unexplained modification: the Population Certification Requirement. The revised EMPG award letters notified recipient States that FEMA had placed a funding hold on the award, prohibiting States from "obligating, expending, or drawing down the funds associated with the award." Illinois EMPG Award (Ex. 12), at 30. To end this funding freeze, the revised award requires each recipient State to "provide a certification of the recipient [S]tate's population as of September 30, 2025," "certify that its reported population does not include individuals that have been removed from the State

pursuant to the immigration laws of the United States," and "explain the methodology it used to determine its population." *Id.*

169.    The award letters mandate that each State's awarded EMPG funding for fiscal year 2025 will remain frozen until FEMA reviews and approves a State's population certification and methodology for determining its population. *Id.*

170.    FEMA gave no explanation for the Population Certification Requirement either in the provision describing the Requirement or anywhere else in the EMPG award letter. *See id.*

171.    This is the first time FEMA has required States to certify their populations as a condition of the EMPG grant.

172.    On information and belief, for all EMPG awards before fiscal year 2025, FEMA allocated appropriated EMPG funds using U.S. census data, consistent with the EMPG authorizing statute. FEMA even issued EMPG award letters with this population-based allocation.

173.    Many States lack independent state agencies tasked with or capable of tallying the state population. For all Plaintiff States, it would be impossible to tally the State's population as of September 30, 2025, minus the population removed pursuant to federal immigration laws. Plaintiff States do not have records of the number of "individuals that have been removed from the State pursuant to the immigration laws of the United States." This information is in the possession of the federal government and is not relayed or reported to Plaintiff States. Moreover, any process to tally the State's population on a specific day would take significant time and resources—several months, at minimum. Even if Plaintiff States had access to all relevant data, no Plaintiff State could practicably tally the State's population as of September 30, 2025, in a quick enough manner to timely fund the emergency preparedness projects that rely upon EMPG funding.

174.    The Population Certification Requirement is unlawful for several reasons. First, it violates federal statutes that require defendants to rely upon U.S. census data when "administering any law of the United States in which population" is "used to determine the amount of benefit received by State[s]." 13 U.S.C. § 183(a); *see* 6 U.S.C. § 762(d)(2) (requiring EMPG funding to be awarded based on a ratio comparing the "population of each State" to "the population of all States"). Defendants violate these requirements by requiring Plaintiff States to calculate and certify this data—rather than relying upon U.S. census data already available to defendants.

175.    Second, defendants failed to observe the Paperwork Reduction Act's procedural requirements when seeking to collect information from the States through the Population Certification Requirement. Congress enacted the Act, in part, to "minimize the paperwork burden for . . . State, local, and tribal governments . . . resulting from the collection of information by or for the Federal Government" and to "maximize the utility of information created, collected, maintained, used, shared and disseminated by . . . the Federal Government." 44 U.S.C. § 3501(1)-(2); *see also Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32–33 (1990) ("The Act prohibits any federal agency from adopting regulations which impose paperwork requirements on the public unless the information is not available to the agency from another source within the Federal Government . . . .").

176.    Before conducting a "collection of information," the Paperwork Reduction Act requires defendants to follow certain procedures, including providing notice of the proposed collection in the Federal Register, soliciting and evaluating public comments, and certifying to the Office of Management and Budget that the collection of information is "not unnecessarily duplicative of information otherwise reasonably accessible to the agency." 44 U.S.C. § 3506(c). Yet defendants failed to comply, or even attempt to comply with, any of the Act's procedural

requirements. *See Orr v. Trump*, 778 F. Supp. 3d 394, 425 (D. Mass. 2025) (finding plaintiffs likely to succeed on 5 U.S.C. § 706(2)(D) claim for violation of Paperwork Reduction Act); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, ___ F. Supp. 3d ___, 2025 WL 2374697, at *19 (D. Md. Aug. 14, 2025) (granting plaintiffs summary judgment, in part, on similar grounds).

177.     Third, the unreasoned and unexplained Population Certification Requirement is arbitrary and capricious in violation of the APA. In imposing the Population Certification Requirement, defendants relied on factors which Congress had not intended them to consider. The allocation formula in the EMPG authorizing statute requires a uniform system of calculating state population consistent with the methodology of calculating national population. *See* 6 U.S.C. § 762(d)(2). Further, defendants entirely failed to consider that the Population Certification Requirement cannot practically be implemented. Defendants do not provide a definition of the data they are seeking. And Plaintiff States do not have data on the number of people removed from the State by federal immigration enforcement; defendants do.

178.     Defendants also entirely failed to consider the legitimate reliance Plaintiff States had on receiving EMPG funds at the start of the fiscal year. All States submitted applications with the expectation that FEMA would allocate funds without the need for States to calculate or certify their population, as has been the case for every prior fiscal year. Indeed, FEMA allocated the appropriated EMPG funds in its award letters without the need for duplicative reporting by the States.

179.     The funding hold further exacerbates the injury to Plaintiff States caused by the reduced and changed EMPG period of performance. It will take months before Plaintiff States can even estimate their populations on a specific date, further reducing the time Plaintiff States will have to draw down their funds. And it may be impossible for Plaintiff States to comply with this

requirement to release the funding hold. The EMPG award letter does not define how to determine the amount of "individuals that have been removed from the State pursuant to the immigration laws of the United States." Ex. 12 at 30. Further, Plaintiff States do not, and are unable to, track the number of people removed from each State by federal immigration enforcement. Defendants presumably have these figures, but do not make this information readily available to Plaintiff States.

180.    An agency must provide a "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account." *Fox Television Stations*, 556 U.S. at 515. DHS did not do so here, or even attempt to.

## K.    Plaintiff States Bring This Suit.

181.    Plaintiff States originally filed this suit on an emergency basis on Monday, September 29, the penultimate day of the federal fiscal year. ECF 1. This Court issued temporary relief to freeze matters in place and preserve its ability to adjudicate the merits of Plaintiff States' claims. ECF 14. In particular, the Court issued immediate relief that prevented the statutory lapse of any funds at issue in this suit. *See id.* ¶ 4.

182.    On October 7, 2025, defendants filed a motion to reconsider the Court's temporary restraining order, asking the Court to narrow the application of the order to contested funds and to eliminate the order's requirement that defendants rescind 2025 HSGP award notifications and de-obligate the associated funds.  ECF 27.

183.    Plaintiffs opposed defendants' request to eliminate the requirement to rescind and de-obligate, but they agreed to limit the temporary restraining order to the $245,565,440 that was subject to the Reallocation Decision. ECF 28.

184.    On October 21, 2025, the Court issued a revised temporary restraining order that narrowed the scope of the order to the contested funds but did not otherwise change defendants' obligations with respect to those funds. ECF 31.

**L.    Final Judgment Is Entered Against Defendants In *New York v. Noem*.**

185.    At the same time that defendants reallocated HSGP funds away from States and subdivisions that they disfavor, defendants did substantially the same thing to New York State's Metropolitan Transit Authority ("MTA"), taking $34 million in funds that had been preliminary allocated to the MTA under the Transit Security Grant Program ("TSGP") and providing those funds to other public-transit agencies across the United States. FEMA did not even inform New York of its decision; instead, the State learned of it on September 30, 2025, the last day of the federal fiscal year, through public reporting.

186.    New York sued in the Southern District of New York, claiming the TSGP reallocation was contrary to law and arbitrary and capricious, and New York also sought a temporary restraining order. *See New York v. Noem*, No. 25-cv-08106 (S.D.N.Y.) (filed Sept. 30, 2025).

187.    The court granted that temporary restraining order on October 1, 2025.

188.    The court ordered a briefing schedule on New York's motion, construing the motion as one for preliminary injunction, with briefing to conclude by October 8, 2025.

189.    On October 3, 2025, the New York Times reported that the Trump Administration would restore $187 million in cuts it had made to law enforcement funding in New York. Grace Ashford & Tyler Pager, *Trump Administration Reverses $187 Million in N.Y. Counterterrorism Cuts*, N.Y. Times, (Oct. 3, 2025).[8] The New York Times, citing "White House officials," reported

---

[8] https://www.nytimes.com/2025/10/03/nyregion/trump-new-york-counterterrorism-funds.html.

that the cuts were made "without explanation and without the approval of President Trump." *Id*. The cuts reportedly reversed by President Trump included "rolling cuts made to the Homeland Security Grant Program," including "$100 million slashed over the weekend." *Id*. The reported $187 million in funds reportedly restored to New York is roughly equivalent to the $86,979,878 reduction in HSGP funds New York received from the 2024 NOFO to the 2025 NOFO, plus the $102,686,919 in funds allocated away from New York due to the Reallocation Decision. *See supra* ¶¶ 109–110, 128.

190.    On October 6, 2025, in a sworn declaration opposing New York's preliminary-injunction motion, defendants admitted that they eliminated MTA's funding allocation because it is "based in New York City, a designated Sanctuary Jurisdiction city." Declaration of David Arnold, *New York v. Noem*, ECF 24 (S.D.N.Y. Oct. 6, 2025).

191.    On October 16, 2025, the court in *New York v. Noem* entered final judgment in that matter, finding that DHS and FEMA's reallocation of TSGP funds was arbitrary and capricious and contrary to law. *New York v. Noem*, No. 25-cv-8106, 2025 WL 2939119, at *1 (S.D.N.Y. Oct. 16, 2025). The court explained that TSGP requires the DHS Secretary to select recipients of grants based "solely on risk," but the reallocation of TSGP was not based on risk. *Id.* at *8–9. HSGP contains similar requirements to allocate funds based on risk. *See supra* ¶¶ 43, 54, 111. Furthermore, the court concluded that DHS failed to provide a reasoned explanation for its reallocation of TSGP funds. *Id.* at *9.

**FIRST CAUSE OF ACTION**

**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action (Reallocation Decision)**

192.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

193.    Defendants DHS and FEMA are "agencies" under the APA, 5 U.S.C. § 551(1), and the Reallocation Decision is an "agency action" under the APA, *id.* § 551(13).

194.    Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see State Farm*, 463 U.S. at 52 (agency action must be supported by a "rational connection between the facts found and the choice made"); *Fox Television Stations*, 556 U.S. at 515 (an agency must provide a "reasoned explanation" for departing from a prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025) (similar).

195.    Defendants failed to comply with these bedrock requirements in making the Reallocation Decision in multiple respects.

196.    First, defendants provided no explanation for why they reallocated funding away from many Plaintiff States. Agencies may not keep the reasons for their decisions secret. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

197.    Second, defendants abandoned the risk allocation set out in the NOFO without explanation. DHS's own regulations require the NOFO to disclose "the expected dollar values of individual awards" up front. 2 C.F.R. §§ 200.204(a)(6), 3002.10. Despite this requirement, the HSGP awards differ drastically from the NOFO's dollar values. In making such a drastic policy change, an agency must "articulate a satisfactory explanation for its action." *Fox Television Stations*, 556 U.S. at 513. Defendants have provided no such explanation.

198.    Third, defendants relied on an extra-statutory factor when making the Reallocation Decision. Congress provided a list of factors FEMA "shall consider" when allocating HSGP funds.

6 U.S.C. § 608(a). A state or local government's perceived willingness to enforce federal immigration law is not one of those statutory factors. *Id*. Yet DHS ordered the reallocation of HSGP funds based on whether DHS believes that the recipient has policies DHS dislikes. An agency cannot "create qualification requirements unrelated to [a statutory] grant program simply to advance its own policy priorities." *Providence*, 954 F.3d at 39; *see also, e.g., State Highway Comm'n v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973) (agency cannot set spending requirements "remote and unrelated" to underlying statute).

199.    Fourth, defendants entirely failed to consider Plaintiff States' legitimate reliance on the allocations contained in the NOFO and dictated by federal law. Before an agency adopts a new policy, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. Here, States have structured budgets in reliance on the money they expect to receive from DHS-administered grants, including HSGP. To change those funding levels, without notice or explanation, disrupts the operation of crucial emergency preparedness programs in Plaintiff States.

200.    The Reallocation Decision will cause harm to Plaintiff States and their residents.

201.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that defendants' actions in implementing and maintaining the Reallocation Decision violate the APA because they are arbitrary and capricious and a preliminary and permanent injunction preventing defendants from putting this condition into effect. The Reallocation Decision therefore must be set aside under the APA.

### SECOND CAUSE OF ACTION

### *Ultra Vires* Agency Action Not Authorized by Congress (Reallocation Decision)

202.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

203. An executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

204. Defendants may exercise only that authority that is conferred by statute. *See City of Arlington*, 569 U.S. at 297 (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

205. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

206. Defendants lack the statutory authority to make the Reallocation Decision. The HSGP statute establishes a prescriptive list of factors that the FEMA Administrator must consider in allocating funds among States and high-risk urban areas. *See* 6 U.S.C. § 608(a). None of those factors include FEMA's perception of state or local policies concerning cooperation with federal immigration officials.

207. Defendants did not make the Reallocation Decision pursuant to the statutory factors, but instead they acted pursuant to a free-standing DHS directive.

208. Defendants also acted contrary to the residual clause of the HSGP statue, which permits allocation decisions pursuant to "such other factors as are specified in writing by the Administrator" that are relevant to assessing a jurisdiction's "relative threat, vulnerability, and consequences from acts of terrorism." 6 U.S.C. § 608(a)(1)(K). A jurisdiction's purported "sanctuary" status has no bearing on the risk of terrorism. In addition, defendants specified nothing

in writing regarding the Reallocation Decision and acted pursuant to a directive from DHS, rather than from the FEMA Administrator.

209.    In making the Reallocation Decision, defendants exceeded the statutory authority granted to DHS by Congress. The Reallocation Decision is therefore an *ultra vires* executive agency action.

210.    The Reallocation Decision will cause harm to Plaintiffs and their residents.

### THIRD CAUSE OF ACTION

**Violation of Administrative Procedure Act**
**Agency Action in Excess of Statutory Authority (Reallocation Decision)**

211.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

212.    Defendants DHS and FEMA are "agencies" under the APA, 5 U.S.C. § 551(1), and the Reallocation Decision is an "agency action" under the APA, *id.* § 551(13).

213.    The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

214.    Defendants lack the statutory authority to make the Reallocation Decision. The HSGP statute does not permit DHS to reallocate funds based on secret "DHS directive" or pursuant to DHS's beliefs about any state or local policies concerning cooperation with federal immigration enforcement.

215.    The Reallocation Decision will cause harm to Plaintiffs and their residents.

216.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that defendants' actions in implementing and maintaining the Reallocation Decision violate the APA because they are contrary to law, and a preliminary and permanent injunction

preventing defendants from putting this condition into effect. The Reallocation Decision therefore must be set aside under the APA.

## FOURTH CAUSE OF ACTION

### Violation of Administrative Procedure Act
### Agency Action Without Observance of Required Procedure (Reallocation Decision)

217.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

218.    Defendants DHS and FEMA are "agencies" under the APA, 5 U.S.C. § 551(1), and the Reallocation Decision is an "agency action" under the APA, *id.* § 551(13).

219.    The APA requires that a court set aside agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

220.    Defendants made the Reallocation Decision pursuant to a secret "DHS Directive," issued after the HSGP NOFOs were posted to States.

221.    The HSGP statute does not permit DHS to relocate funds pursuant to a secret directive. Instead, funds must be allocated pursuant to statutory formula. When FEMA considers an additional factor in making an allocation decision, the FEMA Administrator must specify that factor in writing. 6 U.S.C. § 608(a)(1)(K). The FEMA Administrator has specified no such additional factor in writing.

222.    The Reallocation Decision will cause harm to Plaintiffs and their residents.

223.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that defendants' actions in implementing and maintaining the Reallocation Decision violate the APA because they were made without observance of required procedure, and a preliminary and permanent injunction preventing defendants from putting this condition into effect. The Reallocation Decision therefore must be set aside under the APA.

## FIFTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action (Performance Period Decision)

224.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

225.    Defendants DHS and FEMA are "agencies" under the APA, 5 U.S.C. § 551(1), and the Performance Period Decision is an "agency action" under the APA, *id.* § 551(13).

226.    Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see State Farm*, 463 U.S. at 52 (agency action must be supported by a "rational connection between the facts found and the choice made"); *Fox Television Stations*, 556 U.S. at 515 (an agency must provide a "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *Wages & White Lion Invs.*, 145 S. Ct. at 917 (similar).

227.    Defendants failed to comply with these bedrock requirements in making the Performance Period Decision.

228.    First, defendants provided no explanation for why they truncated the performance period for HSGP and EMPG grants from three years to one year, after announcing a three-year period of performance in the NOFOs. Nor did defendants explain why they started the EMPG period of performance on October 1, 2025, after announcing October 1, 2024, as the start date in the NOFO. Agencies may not keep the reasons for their decisions secret. *See Dep't of Com.,* 588 U.S. at 785.

229.    Second, defendants entirely failed to consider the legitimate reliance Plaintiff States had on the period of performance announced in the NOFO. Before an agency adopts a new policy, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. Here, States proposed projects for spending HSGP and EMPG funds in reliance on the announcement that there would be a three-year period of performance. Such reliance was reasonable, as States had never seen a post-NOFO reduction in performance period on either of these grants. Yet defendants never considered such reliance when making the Performance Period Decision.

230.    Further, States and their subgrantees incurred expenses from October 1, 2024, to September 30, 2025, that they reasonably believed based on past practice would fall within the period of performance for the FY 2025 EMPG awards. These expenses covered essential aspects of States' and counties' emergency response operations. In moving the beginning of the performance period from October 1, 2024, to October 1, 2025, defendants failed to consider these reliance interests or the harms that would follow from excluding expenses incurred between October 1, 2024, and September 30, 2025 from the FY 2025 awards.

231.    The Performance Period Decision will cause harm to Plaintiffs and their residents.

232.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that defendants' actions in implementing and maintaining the Performance Period Decision violate the APA because they are arbitrary and capricious and a preliminary and permanent injunction preventing defendants from putting this condition into effect. The Performance Period Decision therefore must be set aside under the APA.

## SIXTH CAUSE OF ACTION

**Violation of the Administrative Procedure Act**
**Agency Action in Excess of Statutory Authority (Population Certification Requirement)**

233.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

234.    Defendants DHS and FEMA are "agencies" under the APA, 5 U.S.C. § 551(1), and the Population Certification Requirement is an "agency action" under the APA, *id.* § 551(13).

235.    The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

236.    Defendants' Population Certification Requirement violates statutory requirements. When "administering any law of the United States in which population" is "used to determine the amount of benefit received by State[s]," the federal government must use "the data most recently produced and published" by the federal census bureau. 13 U.S.C. § 183(a). The EMPG statute is one such federal law that requires the amount of benefit awarded to the States to be determined based on "population." 6 U.S.C. § 762(d)(2).

237.    The Population Certification Requirement harms Plaintiffs and their residents.

238.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that defendants exceeded statutory authority by requiring States to determine and certify their population totals as a condition on the EMPG grant, contrary to the statutory requirement that defendants use federal census data, and a preliminary and permanent injunction preventing defendants from putting this condition into effect. The Population Certification Requirement therefore must be set aside under the APA.

## SEVENTH CAUSE OF ACTION

**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action (Population Certification Requirement)**

239.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

240.    Defendants DHS and FEMA are "agencies" under the APA, 5 U.S.C. § 551(1), and the Population Certification Requirement is an "agency action" under the APA, *id.* § 551(13).

241.    Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious when it "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"); *Fox Television Stations*, 556 U.S. at 515 (an agency must provide a "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. at 917 (similar). An agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or [that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

242.    Defendants failed to comply with these bedrock requirements in imposing the Population Certification Requirement.

243.    First, in imposing the Population Certification Requirement, defendants relied on factors which Congress "has not intended [them] to consider." *Id.* The allocation formula in the

EMPG statute requires a uniform system of calculating state population consistent with the methodology of calculating national population. *See* 6 U.S.C. § 762(d)(2).

244.    Second, defendants provided no explanation for why they placed a funding hold on EMPG grants conditioned on States' certification of their populations. Agencies may not keep the reasons for their decisions secret. *See Dep't of Com.*, 588 U.S. at 785.

245.    Third, defendants entirely failed to consider that the Population Certification Requirement cannot practically be implemented. Defendants do not provide a definition of the data they are seeking. Plaintiff States do not have data on the number of people removed from the State by federal immigration enforcement; defendants do. And even if the data sought by defendants were clearly defined and available to Plaintiff States, Plaintiff States would need months to make an estimate of their state populations on any given day.

246.    Fourth, defendants entirely failed to consider Plaintiff States' legitimate reliance on receiving EMPG funds at the start of the fiscal year. Before an agency adopts a new policy, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. Here, Plaintiff States proposed projects utilizing EMPG funds in reliance on FEMA's making these funds available at the start of the fiscal year. Such reliance was reasonable, as States had never seen a funding hold conditioned on the provision of information already possessed by defendants. The funding hold will further delay the disbursement of EMPG funds and require even further revision of State and subgrantee projects. Yet, defendants never considered such reliance when making the Population Certification Requirement.

247.    The Population Certification Requirement harms Plaintiff States and their residents.

248.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that defendants' actions in implementing and maintaining the Population Certification Requirement violate the APA because they are arbitrary and capricious, and a preliminary and permanent injunction preventing defendants from putting this condition into effect. The Population Certification Requirement therefore must be set aside under the APA.

### EIGHTH CAUSE OF ACTION

**Violation of the Administrative Procedure Act**
**Agency Action Without Observance of Required Procedure (Population Certification Requirement)**

249.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

250.     Defendants DHS and FEMA are "agencies" under the APA, 5 U.S.C. § 551(1), and the Population Certification Requirement is an "agency action" under the APA, *id.* § 551(13).

251.     The APA requires that a court set aside agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

252.     By conditioning the release of EMPG funds on Plaintiff States' reporting and certification of their populations on September 30, 2025, defendants are engaging in a "collection of information" as defined by the Paperwork Reduction Act. 44 U.S.C. § 3502(3).

253.     In order to engage in a "collection of information" under the Paperwork Reduction Act, defendants must follow certain procedures, including providing notice of the proposed collection in the Federal Register, soliciting and evaluating public comments, and certifying to the Office of Management and Budget that the collection of information is "not unnecessarily duplicative of information otherwise reasonably accessible to the agency," among other requirements. *Id.* § 3506(c). Defendants have not followed any of these requirements in imposing the Population Certification Requirement.

254.    The Population Certification Requirement harms Plaintiff States and their residents.

255.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that by imposing the Population Certification Requirement, defendants did not observe the procedure required by Congress, and a preliminary and permanent injunction preventing defendants from putting this condition into effect. The Population Certification Requirement therefore must be set aside under the APA.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a.   Enter judgment for Plaintiff States and against defendants;

b.   Declare that the Reallocation Decision is unlawful because it violates the APA and is *ultra vires*;

c.   Set aside the Reallocation Decision;

d.   Direct defendants to obligate fiscal year 2025 Homeland Security Grant Program funds to reflect the fiscal year 2025 notice of funding opportunity;

e.   Enjoin DHS and FEMA from disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable by any means all fiscal year 2025 Homeland Security Grant Program funds to the full extent necessary to permit obligation of revised Homeland Security Grant Program awards to Plaintiff States at the levels of the target allocations specified in the fiscal year 2025 Homeland Security Grant Program notice of funding opportunity;

f.   Continue to suspend the September 30, 2025, statutory lapse of Homeland Security Grant Program funds to the full extent necessary to permit obligation of revised Homeland Security Grant Program awards to Plaintiff States at the levels of the target

allocations specified in the fiscal year 2025 Homeland Security Grant Program notice of funding opportunity;

g.  Set aside the Performance Period Decision and direct defendants to re-issue award notifications that reflect a three-year performance period;

h.  Set aside the Population Certification Requirement and direct defendants to re-issue Emergency Management Performance Grant award notifications that exclude that condition;

i.  Enjoin defendants against enforcing by any means against Plaintiff States and their instrumentalities and subdivisions the Emergency Management Performance Grant award terms titled "Verification of a State's Population" or any materially similar terms requiring self-certification of a State's population as a condition on the receipt of federal funds;

j.  Direct defendants to disburse, in the ordinary course, all allowable costs for which Plaintiff States seek payment from their fiscal year 2025 Homeland Security Grant Program and Emergency Management Performance Grant awards on behalf of themselves and their sub-grantees;

k.  Retain jurisdiction to monitor defendants' compliance with this Court's judgment;

l.  Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

m.  Award such additional relief as this Court may deem just and proper.

October 24, 2025

Respectfully submitted,

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
Lee I. Sherman
James E. Stanley
  *Supervising Deputy Attorneys General*

/s/ Deylin Thrift-Viveros
Deylin Thrift-Viveros
  *Deputy Attorney General*
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6000
deylin.thriftviveros@doj.ca.gov

*Attorneys for the State of California*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
  *Deputy Solicitor General*
Mayur P. Saxena
  *Assistant Attorney General*
Olivia C. Mendes
Phoenix N. Meyers
Daniel Resler
  *Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Christopher G. Wells
  *Chief of the Public Interest Division*
Paul Berks
  *Complex Litigation Counsel*
R. Sam Horan
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (R.I. Bar No. 8486)
  *Chief, Civil Division*
  *Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Ashley Meskill
Ashley Meskill
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorneys for the State of Connecticut*


**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

/s/ Mitchell P. Reich
Mitchell P. Reich
  *Senior Counsel to the Attorney General*
Office of the Attorney General for the District
  of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*


**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Rose Gibson
  *Assistant Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*


**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Stephen Thompson
Rabia Muqaddam
  *Chief Counsel for Federal Initiatives*
Stephen C. Thompson
  *Special Counsel*
Julie Dona
  *Special Counsel*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*

**JENNIFER SELBER**
  GENERAL COUNSEL

/s/ Jacob B. Boyer
Jacob B. Boyer
  *Deputy General Counsel*
Pennsylvania Office of the Governor
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Jonathan T. Rose
  *Solicitor General*
Julio A. Thompson
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

<u>/s/ Tyler Roberts</u>
Tyler Roberts
  *Assistant Attorney General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov

*Attorneys for the State of Washington*