# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF ILLINOIS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, *et al.*, <br><br> *Defendants*. | No. 1:25-cv-00495 |

## PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................iii

INTRODUCTION .............................................................................................. 1

BACKGROUND ................................................................................................ 4

    A.    Congress's Longstanding Support For State Emergency Preparation And Response. ............................................................................................. 4

    B.    The Department's Enjoined Attempt To Conscript States In Immigration Enforcement.......................................................................................... 6

    C.    The Reallocation Decision................................................................... 9

    D.    *New York v. Noem*. .......................................................................... 12

    E.    The Performance Period Decision and Population Certification Requirement...................................................................................... 13

ARGUMENT AS TO LIABILITY ...................................................................... 14

I.    The Reallocation Decision Is Unlawful. ....................................................... 15

    A.    The Reallocation Decision Exceeds Defendants' Statutory Authority and Disregards Procedure Required by Law. ............................................... 15

    B.    The Reallocation Decision Is Arbitrary and Capricious. ....................... 20

        1.    Defendants improperly relied on extra-statutory factors. ...........21

        2.    Defendants failed to acknowledge or explain the changes from the NOFO.........................................................................................22

        3.    Defendants ignored the States' reliance interests......................23

II.    The Population Certification Requirement Is Unlawful. ................................. 25

    A.    The Population Certification Requirement Is Contrary to Law. ........................ 26

    B.    The Population Certification Requirement Is Arbitrary and Capricious. ............. 27

        1.    The Population Certification Requirement is impossible and vague.........28

        2.    Defendants failed to offer any explanation for the Population Certification Requirement..........................................................31

        3.    Defendants failed to consider the States' reliance interests. ......................33

    C.    Defendants Failed to Observe Required Procedures When Imposing the Population Certification Requirement. ................................................. 34

i

III.    The Performance Period Decision Is Unlawful. ................................................. 36

ARGUMENT AS TO REMEDY ..................................................................................... 39

    A.    The Court Should Vacate The Reallocation Decision, Population Certification Requirement, And Performance Period Decision. ........................... 39

    B.    The Court Should Also Enter Appropriate Permanent Injunctive Relief To Effectuate Its Judgment. ......................................................................................... 40

        1.    The Court Should Enjoin Defendants' Unlawful Reallocation of HSGP Funds. .................................................................................................... 41

        2.    The Court Should Enjoin Defendants from Imposing the Population Certification Requirement on EMPG Grants. ............................................. 43

        3.    The Court Should Enjoin Defendants from Reducing the Performance Period for the HSGP and EMPG Grants. ........................... 45

        4.    The Balance of Equities and Public Interest Favor Permanent Injunctive Relief in the Form Requested. ................................................... 47

CONCLUSION ................................................................................................................... 48

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*AFL-CIO v. Chao*, 496 F. Supp. 2d 76 (D.D.C. 2007) ..................................................40

*All. for Cannabis Therapeutics v. DEA*, 930 F.2d 936 (D.C. Cir. 1991) ...............................28, 31

*Am. Council of the Blind v. Mnuchin*, 878 F.3d 360 (D.C. Cir. 2017) .........................................47

*Am. Fed'n of Tchrs. v. Dep't of Educ.*, ___ F. Supp. 3d ___, 2025 WL 2374697 (D. Md. Aug. 14, 2025) ................................................................................................................36

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ............................................21, 36

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229 (9th Cir. 2001) ..................30

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42 (1st Cir. 2016) .......................3–4, 14

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)..................................................................33

*Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640 (7th Cir. 2022) .............47

*Center for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027 (9th Cir. 2023) ......21

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).......................................43

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .................................................................15

*City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017)........................................43

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020).........................................15–16, 19, 22, 27

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ...................39

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022) ...........................................15

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)...........................................................1, 18, 20, 32

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020)....................................
...............................................................................20, 23–25, 33–34, 36–38

*Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54 (D.D.C. 2016) .........................21

*Dole v. United Steelworkers of Am.*, 494 U.S. 26 (1990) .................................................34

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)........................................................41

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .........................................20, 22–23, 32

*FDA v. RxUSA Wholesale, Inc.*, 285 F. App'x 809 (2d Cir. 2008) .................................................31

*Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411 (1st Cir. 2017) ....................................14

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ...................................................................39

*Healey v. Spencer*, 765 F.3d 65 (1st Cir. 2014) ...............................................................................40

*Illinois v. FEMA, __ F. Supp. 3d __*, 2025 WL 2716277 (D.R.I. Sept. 24, 2025) .........................
........................................................................................2, 7–8, 17, 39–40, 43, 45, 47

*Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169 (D.C. Cir. 2023) .........................25

*K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989) ...........................................41

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ...................................................................15

*Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9 (1st Cir. 2018) .......................................14

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).........................................................15–6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................................................................................20–22, 27–28, 36

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ..................41

*New York v. Noem*, No. 25-cv-8106, 2025 WL 2939119 (S.D.N.Y. Oct. 16, 2025). ...............2, 12

*News-Press v. U.S. DHS*, 489 F.3d 1173 (11th Cir. 2007) ............................................................48

*Or. Nat. Res. Council v. Thomas*, 92 F.3d 792 (9th Cir. 1996) ....................................................21

*Orr v. Trump*, 778 F. Supp. 3d 394 (D. Mass. 2025); ...................................................................36

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ...........................................21–22

*Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10 (D.D.C. 2021) ...........................41

*Riley v. Bondi*, 145 S. Ct. 2190 (2025) .........................................................................................30

*Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985) .........................................................................23

*SEC v. Locke Cap. Mgmt., Inc.*, 794 F. Supp. 2d 355 (D.R.I. 2011) ............................................39

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ...............................................................................39–40

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ..................................................39

*United States v. North Carolina*, 192 F. Supp. 3d 620 (M.D.N.C. 2016) .....................................43

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301 (1987) ...............48

*United Steel, Paper, & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ...........................39

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440 (D.R.I. Apr. 15, 2025) ...............................................................................................31–32

## Constitutional Provisions, Statutes & Rules

Pub. L. No. 107-56, 115 Stat. 272 (2001) ........................................................................4

Pub. L. 107-296, 116 Stat. 2135 (2002)...........................................................................4

Pub. L. No. 108-7, 117 Stat. 11 (2003) ...........................................................................4

Pub. L. 110-53, 121 Stat. 266 (2007)...........................................................................4, 16

5 U.S.C.
§ 703..........................................................................................................................41
§ 706..........................................................................15, 19–20, 26–27, 34, 39

6 U.S.C.
§ 113..........................................................................................................................19
§ 603.................................................................................................................4, 16, 19
§ 604.................................................................................................................5, 24
§ 605.................................................................................................................4–5, 11, 24
§ 608.................................................................................................1–2, 5, 16–19, 22
§ 762.................................................................................................................5, 14, 26–27

8 U.S.C.
§ 1229a......................................................................................................................30
§ 1229c......................................................................................................................31

13 U.S.C. § 183 ...............................................................................................5, 14, 26–27

44 U.S.C.
§ 3501......................................................................................................................34–35
§ 3502......................................................................................................................35
§ 3506......................................................................................................................35
§ 3507......................................................................................................................35

**Executive & Administrative Materials**

2 C.F.R.
    § 200.204 ........................................................................................................23
    § 3002.10 ........................................................................................................23

5 C.F.R. § 1320.5 ...............................................................................................35

58 Fed. Reg. 69 (Jan. 4, 1993) ...........................................................................27

70 Fed. Reg. 70628 (Nov. 22, 2005) ..................................................................36

77 Fed. Reg. 27076 (May 8, 2012) .....................................................................36

83 Fed. Reg. 33244 (July 17, 2018) ....................................................................36

Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ................................6

Exec. Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025). ........................5– 6

Exec. Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025) .............................7

**Other Authorities**

Ceci Villa Ross, U.S. Census Bureau, *Uses of Decennial Census Programs Data in Federal Funds Distribution: Fiscal Year 2021* (2023), https://tinyurl.com/yscmp678 ........................26

Off. of Homeland Sec. Stats., DHS, *Immigration Enforcement and Legal Processes Monthly Tables* (Jan. 16, 2025), https://tinyurl.com/2s44mczy .....................................................28, 31

Off. of Homeland Sec. Stats., DHS, *State Immigration Data* (May 14, 2025), https://tinyurl.com/55jkeud6 ........................................................................................29

S. Rep. No. 94-1256 (1976) ................................................................................27

S. Rep. 116-323 (2020) .......................................................................................16

U.S. Gov't Accountability Off., GAO-23-105819, *2020 Census: A More Complete Lessons Learned Process for Cost and Schedule Would Help Next Decennial* (2023), https://tinyurl.com/ypzvyj8n .......................................................................................29

U.S. Gov't Accountability Off., GAO-25-107503, *Population Estimates: Results of the Census Bureau's Challenge Program* 1 (2024), https://tinyurl.com/65c5wetp ..................................29

U.S. Immigr. & Customs Enf't, *ICE Enforcement and Removal Operations Statistics*, https://tinyurl.com/bdzsu39j .........................................................................................28

## INTRODUCTION

In the wake of two of the Nation's most catastrophic disasters—the September 11, 2001 terrorist attacks and the tragedy of Hurricane Katrina—Congress created substantial federal grant programs to strengthen the Nation's preparedness and its ability to respond to major disasters and emergencies. Congress appropriates billions of dollars to these programs annually and has directed the Administrator of the Federal Emergency Management Agency ("FEMA") to allocate these funds to the States based on objective factors, including the States' "relative threat, vulnerability, and consequences from acts of terrorism." 6 U.S.C. § 608(a)(1). Every year prior to 2025—across presidential administrations of both political parties—FEMA has followed Congress's instructions, evenhandedly administering the Nation's most important emergency grant programs.

This year, however—in the final days of the federal fiscal year—this administration opted for a different approach. Rather than allocating these homeland-security funds according to risk-based criteria, as Congress required, FEMA followed an unidentified Department of Homeland Security ("DHS") "directive" to dramatically reduce Plaintiff States' awards under the Homeland Security Grant Program ("HSGP"). As compared to the notice of funding opportunity ("NOFO") for HSGP that issued just three months ago, the allocation to Illinois was cut by 69%, to New York by 79%, to the District of Columbia by 70%, to New Jersey by 49%, and to California by 33%. In total, Plaintiff States lost over $240 million in HSGP funds—nearly half of the amount they were initially allocated to protect their residents from catastrophic threats.

The only explanation FEMA has given for the devastating cuts was a four-word phrase: "Adjusted per DHS directive." The award documents repeatedly intone these words, in line item after line item, as the sole reason for the dramatic funding cuts. Yet "[r]easoned decisionmaking under the Administrative Procedure Act [("APA")] calls for an explanation for agency action." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). DHS gave no reason at all for what it did

1

here. Moreover, Congress has directed that the FEMA Administrator—not DHS Secretary Noem—allocate these funds based on the States' "relative threat, vulnerability, and consequences from acts of terrorism." 6 U.S.C. § 608(a)(1). No such risk-based allocation happened here. Instead, in a clearly pretextual rearguard attack on disfavored jurisdictions, DHS retroactively slashed awards to some States and gave that funding to others. Ohio saw a gain of 124%, Tennessee a gain of 113%, Florida a gain of 81%, and Missouri a gain of 68%.

Indeed, although FEMA has provided no public justification for its decision to reallocate over $240 million in homeland-security funds without any notice or explanation, it appears that its purpose was part of an ongoing effort to coerce States into enforcing federal immigration law, and to punish States and localities that it views as insufficiently supportive of that goal. Last month, a federal district court held that DHS could not lawfully condition the award of federal funds to States and localities on requiring them "to certify that they will assist in enforcing federal immigration law." *Illinois v. FEMA*, __ F. Supp. 3d __, 2025 WL 2716277, at *1–2 (D.R.I. Sept. 24, 2025). Only three days later, DHS tried to achieve the same result in another way, cutting funds to jurisdictions whose domestic law enforcement policies it dislikes. Indeed, in subsequent litigation, defendants have *admitted* that they cut nearly $34 million from New York's Metropolitan Transit Authority ("MTA") because, in the words of defendants' own declarant, the MTA was "based in New York City, a designated Sanctuary Jurisdiction city." *New York v. Noem*, No. 25-cv-8106, 2025 WL 2939119, at *9 (S.D.N.Y. Oct. 16, 2025). That decision, the U.S. District Court for the Southern District of New York held, was unlawful, because defendants' "reliance on a non-risk factor" (defendants' view that New York City was a "sanctuary" jurisdiction) "constituted reliance on a factor proscribed by statute." *Id.* at *8, 11. So too here: defendants' decision to reallocate HSGP funds is arbitrary, capricious, and illegal.

FEMA also made other unreasoned, unlawful changes to the HSGP program and the Emergency Management Performance Grant ("EMPG") at the last minute. First, as to the strictly population-based EMPG formula grant, it demanded that States certify their own populations as of September 30, 2025, to exclude individuals who have been "removed from the State pursuant to the immigration laws of the United States." Never before has the federal government, which is required by law to administer the census and estimate state populations to allocate federal monies, demanded that States themselves develop methodologies to determine their own populations. Moreover, it is functionally impossible for anyone, including the federal Census Bureau, to deliver up population estimates on a real-time basis, let alone to exclude "removed" individuals from such estimates. Second, FEMA suddenly changed the period of performance for both grant programs from three years—as it was for past grants and in the NOFO—to just one year, and it changed the performance period's start date for the EMPG program. These changes are calculated to break these critical grant programs by making it impossible for state grantees to expend the funds on allowable costs in time.

Federal agencies are not free to disregard Congress's instructions—and certainly cannot do so to pressure the States or their municipalities into enacting agencies' preferred policy goals. That is just what defendants have done in reallocating hundreds of millions of dollars in homeland-security funds, while simultaneously implementing other unreasoned changes that will effectively prevent the States from using those funds at all. The Court should issue permanent injunctive relief to ensure Plaintiff States' timely access to critical emergency preparedness funds.[1]

---

[1] In the parties' agreement and stipulation, ECF 34, they asked that the Court waive the requirement that a motion for summary judgment "be accompanied by a separate Statement of Undisputed Facts," L.R. Civ. 56(a)(1), and Plaintiff States accordingly have not filed such a statement here. *See Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) ("in the

## BACKGROUND

### A.     Congress's Longstanding Support For State Emergency Preparation And Response.

For over 70 years, Congress has addressed the threat of unpredictable disasters and emergencies by providing robust and unflagging financial support—today totaling tens of billions of dollars annually—for a complex infrastructure of emergency preparedness and response, anchored by FEMA but administered in the first instance by the States. After the September 11 terrorist attacks, Congress added funding programs to support States and localities in counterterrorism measures, with the goal of ensuring that a disaster of that sort never happens again. In October 2001, Congress passed the USA PATRIOT Act, establishing grant programs to States "to prepare for and respond to terrorist acts." Pub. L. No. 107-56, § 1014(a), 115 Stat. 272, 399. Congress went on to pass the Homeland Security Act of 2002, Pub. L. No. 107-296, § 430, 116 Stat. 2135, 2191–92, which increased support for state preparedness measures. A companion preparedness program, EMPG, was established by Congress around the same time. Pub. L. No. 108-7, 117 Stat. 11, 515–16. HSGP was codified in its current form five years later by the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, § 101, 121 Stat. 266, 273–85 (codified as amended at 6 U.S.C. §§ 603–609).

FEMA annually distributes over $1 billion to States through HSGP and over $300 million through EMPG. HSGP itself has two statutory subcomponents relevant here: the State Homeland Security Grant Program ("SHSP"), which focuses on the state level, 6 U.S.C. § 605, and the Urban Area Security Initiative ("UASI"), which "provide[s] grants to assist high-risk urban areas,"

---

administrative law context," "a motion for summary judgment is simply a vehicle to tee up a case for judicial review," rather than a vehicle to "determine whether a dispute of fact remains" (cleaned up)). If the Court denies the parties' joint request, Plaintiff States will promptly comply with this requirement and file a statement of undisputed material facts to support their motion.

though again through grants to the States, *id.* § 604(a), (c)(4), (d).[2] Each State is entitled to a minimum amount of funding under SHSP. *See id.* § 605(e)(1) (FEMA Administrator "shall ensure that . . . each State receives . . . not less than an amount equal to" 0.35% of total appropriated funds). The balance of SHSP and UASI funds are allocated among the States and their high-risk urban areas by way of a risk-based formula that enumerates certain factors the FEMA Administrator "shall consider." *Id.* § 608(a). They include things like population density, degree of threat, and the "anticipated effectiveness of the proposed use of the grant by the State or high-risk urban area." *Id.* § 608(a)(1)(B), (a)(1)(D), (a)(2). The FEMA Administrator may consider other factors relevant to the grantee's "relative threat, vulnerability, and consequences from acts of terrorism," within constitutional limits, as long as the additional factors are "specified in writing." *Id.* § 608(a)(1).

EMPG has an even simpler statutory formula: each State receives a minimum allocation, and the remaining funds are distributed based on population alone. *See id.* § 762(d). When "administering any law of the United States in which population" is "used to determine the amount of benefit received by State, county, or local" governments, "departments and agencies of the executive" must use the most recent population estimates published by the U.S Census Bureau. 13 U.S.C. § 183(a).

These programs form an indispensable part of Plaintiff States' public safety budgets. HSGP funds are the mainstay of federal support for terrorism prevention since the September 11 terrorist attacks. Ex. 15 (Hammett Decl.), ¶¶ 10, 16; Ex. 24 (Engelhardt Decl.), ¶ 15; Ex. 32 (Ezelle Decl.), ¶¶ 7–19. HSGP funds also support multi-jurisdictional coordination programs that mobilize first

---

[2] The third HSGP sub-component, known as "Operation Stonegarden," which supports state efforts to enhance border security, was not affected by the Reallocation Decision.

responders from outside the immediate vicinity in any kind of major emergency. *See* Ex. 1 (Supp. Evans Decl.), ¶ 13; Ex. 19 (Osborn Decl.), ¶¶ 16, 18; Ex. 28 (Padfield Decl.), ¶¶ 9, 15. EMPG is the backbone of emergency management that funds state and local emergency managers across the country—the on-the-ground personnel who do the actual work of pre-disaster planning and post-disaster coordination. Ex. 15 (Hammett Decl.), ¶¶ 23–25; Ex. 21 (Brantley Decl.), ¶¶ 11–12; Ex. 29 (Pappas Decl.), ¶¶ 21–23. States do not have the budgetary resources or flexibility to make up for the lost funding without drawing funding away from other important public safety and law enforcement operations. Ex. 1 (Supp. Evans Decl.), ¶ 79; Ex. 24 (Engelhardt Decl.), ¶ 48; Ex. 29 (Pappas Decl.), ¶ 52; Ex. 32 (Ezelle Decl.), ¶ 71.

**B.      The Department's Enjoined Attempt To Conscript States In Immigration Enforcement.**

In the seven decades in which the federal government has supported the States in protecting their residents against catastrophic disasters, to Plaintiff States' knowledge, no presidential administration has threatened to withhold emergency and disaster funds to conscript the States into adhering to its policy preferences. But the current administration took that step. On January 20, 2025, his first day in office, President Trump expressly directed DHS to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). Another order on February 19, 2025, directed not only DHS but all executive departments to "ensure, consistent with applicable law, that Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies." Exec. Order No. 14218, § 2(a)(ii), 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025). That same day, the DHS Secretary issued a memorandum to all DHS agencies and offices titled "Restricting Grant Funding for Sanctuary Jurisdictions," directing DHS agencies to review all federal financial assistance and cease federal funding to sanctuary jurisdictions. *See* Ex. 2.

Then, "[o]n March 27, DHS revised the standard terms and conditions governing <u>all</u> federal grants it oversees, adding provisions requiring state and local recipients to certify that they will assist in enforcing federal immigration law." *Illinois v. FEMA*, 2025 WL 2716277, at \*2. The States of Illinois, California, New Jersey, Rhode Island, Colorado, Connecticut, Delaware, Hawaiʻi, Maine, Maryland, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, and Wisconsin, and the District of Columbia brought suit, claiming that the immigration conditions imposed on all DHS funds were unlawful. *See* Complaint, *Illinois v. FEMA*, ECF 1 (D.R.I. May 13, 2025).[3]

Even as the litigation unfolded, defendants continued to make clear that they would press forward with punishing disfavored jurisdictions whenever and however they could. On April 28, 2025, the President issued yet another executive order denouncing "State and local officials" who "use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws," calling States' sovereign choice about how to employ their own law enforcement "a lawless insurrection." Exec. Order No. 14287, § 1, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025). This executive order also directed DHS to "publish a list of" so-called "sanctuary jurisdictions" by May 28, 2025. *Id.* § 2(a). DHS did so, though the list was later taken down. *See* Exs. 3–5. DHS did not provide any explanation for the "sanctuary" designations. Defendant Secretary Noem has publicly stated in a television interview that the sanctuary list "is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice." Ex. 6.

---

[3] The District of Columbia was joined with the first amended complaint on July 2, 2025. Amended Complaint, *Illinois v. FEMA*, ECF 57 (D.R.I. July 2, 2025). Governor Shapiro is the only plaintiff in this suit who was not part of the earlier action.

The parties cross-moved for summary judgment, and the court ruled for the plaintiffs, finding that DHS's attempt to impose the immigration conditions was both arbitrary and capricious and unconstitutional. To begin, "DHS made no attempt to claim that it examined the relevant data or articulated a fact-based reason for its actions." *Illinois v. FEMA*, 2025 WL 2716277, at *12. The court concluded that DHS "engaged in a wholly under-reasoned and arbitrary process," "did not meaningfully evaluate the [S]tates' reliance interests," and compounded these failures by using "vague and confusing language" that "ma[de] compliance a nearly impossible-to-achieve moving target." *Id.* To the extent DHS had any reasons at all, "the string of memoranda on which the [d]efendants rel[ied] were drafted in direct response to the Executive Order calling upon the agencies to terminate funding to 'sanctuary jurisdictions,'" and the court concluded "DHS cannot avoid the arbitrary and capricious analysis simply by claiming it was acting at the instruction of the President." *Id*. (cleaned up). "With these conditions, [S]tates [were] left to guess at what conduct satisfie[d] the requirements under threat of losing billions in essential funding." *Id.* For similar reasons, the court held that, because "[S]tates rely on these grants for billions of dollars annually in disaster relief and public safety funds that cannot be replaced by state revenues," the immigration conditions were unconstitutionally coercive under the Spending Clause. *Id.* at *14.

Accordingly, by judgment entered September 24, 2025, the district court vacated the immigration conditions as to all DHS awards and all recipients. *Id.* at *15. The court also issued a permanent injunction because "Plaintiff States st[ood] to suffer irreparable harm; the effect of the loss of emergency and disaster funds [could ]not be recovered later, and the downstream effect on disaster response and public safety [was] real and not compensable." *Id.* at *16. The court therefore "permanently enjoin[ed the d]efendants from enforcing the contested conditions against Plaintiff

States." *Id.*; *see also Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2908807 (D.R.I. Oct. 14, 2025) (further order granting motion to enforce judgment).

### C.    The Reallocation Decision.

When asked about the court's opinion, DHS's spokesperson said: "Cities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding." Ex. 13, Anna Griffin, *Federal Judge Rejects Administration Efforts to Tie State Disaster Funds to Immigration Cooperation*, N.Y. Times (Sept. 24, 2025). She added: "No lawsuit, not this one or any other, is going to stop us from doing that." *Id.*

Three days later, DHS implemented the Reallocation Decision, slashing nearly $242 million in HSGP funding to Plaintiff States and redistributing their funding to other States. The fiscal year 2025 NOFO, as finalized on August 1, 2025, had established "target allocations" for both SHSP and UASI. These target allocations were, by FEMA's own account, grounded in the statutory process: "For FY 2025, DHS/FEMA will distribute SHSP funds based on their risk assessment methodology and legal minimums outlined in the *Homeland Security Act of 2002*, as amended." Ex. 1-A at 53; *see also id.* at 55 (same for UASI). Consistent with that statutory risk evaluation process, on August 13, 2025, FEMA had issued "risk profiles" containing "relative risk scores" for all States and UASI metropolitan areas. Plaintiff States and their metropolitan areas largely held steady or gained in the risk rankings (that is, were deemed higher-risk) as compared to fiscal year 2024. *See* Ex. 14 (Tresnowski Decl.), ¶ 5 & tbl. 1.

To be sure, the NOFO announced that "final allocations may be different in the award letter." Ex. 1-A at 53, 55. But, as FEMA itself publicly declared on September 12, 2025, it considered the NOFO's target allocations to be "final." Ex. 10, Fed. Emergency Mgmt. Agcy., *FY 2025 Homeland Security Grant Program Fact Sheet* (Sept. 12, 2025), at 3. In practice, in past years, final allocations have never meaningfully differed from target allocations by more than

fractions of percentages. In fact, Plaintiff States have *never* experienced reductions between the NOFO allocations and the final award under the SHSP and UASI programs. Ex. 1 (Supp. Evans Decl.), ¶¶ 34–35; Ex. 15 (Hammett Decl.), ¶¶ 26–27; Ex. 19 (Osborn Decl.), ¶¶ 27–28; ¶¶ 34–35; Ex. 22 (Stanton Decl.), ¶ 16; Ex. 23 (Farole Decl.), ¶¶ 24–25; Ex. 24 (Englehardt Decl.), ¶¶ 16–17; Ex. 26 (Bray Decl.), ¶¶ 57–58; Ex. 28 (Padfield Decl.), ¶¶ 35–36; Ex. 32 (Ezelle Decl.), ¶¶ 29–30.[4]

But the September 27, 2025 Reallocation Decision imposed dramatic cuts. At the award stage, nine Plaintiff States (and their municipalities, via the UASI component) received awards reduced substantially relative to the August 1 NOFO allocations, as shown by the below chart:

| Plaintiff State | August 1 NOFO | | | Final Award | | | Total Change |
|---|---|---|---|---|---|---|---|
| | SHSP | UASI | Total | SHSP | UASI | Total | |
| CA | $55,863,486 | $109,325,268 | $165,188,754 | $17,156,754 | $93,473,801 | $110,630,555 | -$54,558,199 |
| CT | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| DC | $4,362,750 | $25,270,521 | $29,633,271 | $4,362,750 | $4,416,737 | $8,779,487 | -$20,853,784 |
| DE | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| IL | $10,419,556 | $33,479,819 | $43,899,375 | $4,362,750 | $9,395,829 | $13,758,579 | -$30,140,796 |
| MA | $5,390,887 | $16,838,838 | $22,229,725 | $6,000,629 | $9,301,839 | $15,302,468 | -$6,927,257 |
| MN | $4,362,750 | $9,526,217 | $13,888,967 | $4,362,750 | $2,973,810 | $7,336,560 | -$6,552,407 |
| NJ | $5,065,776 | $13,928,247 | $18,994,023 | $6,000,629 | $3,768,628 | $9,769,257 | -$9,224,766 |
| NY | $38,200,874 | $92,180,364 | $130,381,238 | $5,624,924 | $22,069,395 | $27,694,319 | -$102,686,919 |
| PA | $9,407,455 | $23,181,198 | $32,588,653 | $11,362,750 | $12,305,323 | $23,668,073 | -$8,920,580 |
| RI | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| VT | $4,362,750 | $0 | $4,362,750 | $4,362,750 | $0 | $4,362,750 | $0 |
| WA | $5,483,241 | $12,713,580 | $18,196,821 | $4,362,750 | $11,782,120 | $16,144,870 | -$2,051,951 |

Nearly all Plaintiff States are listed on DHS's now-removed list of "sanctuary" jurisdictions and are home to impacted UASI municipalities that are listed as well. *See* Ex. 4. The sole exception is

---

[4] Notably, even the August 1 NOFO had already made substantial cuts for five Plaintiff States—California, the District of Columbia, Illinois, New Jersey, and New York. The August 1 version was actually the third version of the fiscal year 2025 NOFO, with two earlier versions posted and then revised in quick succession. *See* Ex. 1 (Supp. Evans Decl.), ¶ 6. Not until the third, August 1 version did DHS release allocations for UASI. *Compare* Ex. 1-A, *with* Ex. 1-C. The August 1 version also imposed large cuts on these five States as compared to fiscal year 2024, including a cut of over $87 million to New York. *See* Am. Compl. ¶¶ 108–110.

Pennsylvania. But it contains the city of Philadelphia, which DHS evidently regards as a "sanctuary" jurisdiction, *see id.* at 15, and which saw its UASI funding reduced from over $18 million at the NOFO stage to **$0** at the award stage. Ex. 28 (Padfield Decl.), ¶¶ 44, 48. Philadelphia's award was cut to $0 even as defendants' assessment of Philadelphia's relative risk ranking *rose* four places, deeming it the seventh-highest-risk city in the nation. *See id.* ¶¶ 47–48.

DHS redistributed the funds that it cut from the losing jurisdictions to jurisdictions that it views as aligned with its policy preferences. On September 29, 2025, FEMA presented to congressional staff a PowerPoint presentation with comprehensive information on the award-stage allocations to all States and territories. *See* Ex. 11, Fed. Emergency Mgmt. Agency, *Fiscal Year 2025 Preparedness Grant Final Allocations*, (Sept. 29, 2025), at 14–19. Defendants do not dispute the genuineness of this document and it is undisputed that the information it contains is accurate. *See* ECF 30 at 3 & n.2. The presentation reveals that nearly all non-plaintiffs here saw multi-million-dollar gains in their allocations between the August 1 NOFO and the final awards. Florida gained over $40 million, Texas over $26 million, and Ohio over $22 million. *See* Am. Compl. ¶ 131. The only non-plaintiffs who lost funding were Georgia and Louisiana, but their losses were targeted at cities that DHS regards as "sanctuary" jurisdictions: Atlanta and New Orleans. *See* Ex. 4 at 6, 9. In addition, all non-plaintiff States benefited from an elevated SHSP funding floor that defendants set at $6,000,629 instead of the statutory minimum of "0.35 percent of the total funds appropriated," 6 U.S.C. § 605(e)(1)(A)(v), meaning $4,362,750 in fiscal year 2025.[5] But Plaintiff

---

[5] For Arkansas, Utah, and Wyoming, the floor was one dollar lower, $6,000,628. The States that received final SHSP allocations lower than Wyoming, the least populous State in the union with less than 600,000 residents, are Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Minnesota, Nevada, New York, Oregon, Rhode Island, Vermont, and Washington.

States, including Connecticut, Delaware, Rhode Island, and Vermont, were excluded from that elevated floor and held at the actual statutory minimum.

As to the redistributions away from Plaintiff States and toward jurisdictions that DHS and FEMA view as aligned with their policy preferences, the entire explanation was a four-word phrase placed on various budget lines in the award documents themselves: "Adjusted per DHS directive." Ex. 1-E at 9–53 (Illinois award); *accord, e.g.,* Ex. 23-A at 15–20 (Minnesota award); Ex. 28-B at 34–60 (Pennsylvania award). The DHS directive in question has not been specified or made public.

### D. *New York v. Noem*.

At the same time that defendants reallocated HSGP funds away from Plaintiff States and subdivisions that they disfavor, defendants did substantially the same thing to New York State's Metropolitan Transit Association ("MTA"), taking away $34 million in funds that had been preliminarily allocated to the MTA under the Transit Security Grant Program ("TSGP") and providing those funds to other public-transit agencies across the United States. New York sued in the Southern District of New York, claiming the TSGP reallocation was contrary to law and arbitrary and capricious. *See New York v. Noem*, No. 25-cv-08106 (S.D.N.Y.) (filed Sept. 30, 2025). On October 6, 2025, in a sworn declaration opposing New York's preliminary-injunction motion, defendants admitted that they eliminated MTA's funding allocation because it is "based in New York City, a designated Sanctuary Jurisdiction city." Ex. 12, *New York*, ECF No. 24, ¶ 5.

On October 16, 2025, the court in *New York v. Noem* entered final judgment after consolidating the merits with the preliminary-injunction motion. *New York v. Noem*, 2025 WL 2939119, at *1, *4. The court held that New York's challenge was not moot because the funds in question had not yet been disbursed, *id.* at *6, and that DHS and FEMA's reallocation of TSGP funds was arbitrary and capricious, *id.* at *8–10. The court explained that "Congress precluded DHS from imposing, and in any case did not authorize it to impose, [immigration-related]

conditions on TSGP funds." *Id.* at \*9. In any event, regardless of DHS's actual (unlawful) reasons, it also "did not provide a reasonable, contemporaneous explanation for the decision." *Id.*

### E.    The Performance Period Decision and Population Certification Requirement.

Defendants made two other last-minute changes to the HSGP and EMPG programs at the award stage without warning or explanation. First, although FEMA has long issued preparedness awards with three-year performance periods, and stated in the HSGP and EMPG NOFOs that these programs would once more operate on three-year performance periods, Ex. 1-A at 4; Ex. 1-D at 4, it reduced the period of performance on all HSGP and EMPG awards to one year, Ex. 1 (Supp. Evans Decl.), ¶ 61. The Performance Period Decision departs from past agency practice and disrupts the basic functioning of HSGP and EMPG. Because HSGP and EMPG have used multi-year periods of performance for almost their entire existence, Plaintiff States have budgeted their use of the funds for these multi-year terms. *E.g.*, Ex. 17 (Higgins Decl.), ¶¶ 25–26; Ex. 22 (Stanton Decl.), ¶ 29; Ex. 26 (Bray Decl.), ¶ 67, 71–72. And EMPG budget periods, in particular, have historically been dated to the *start* of the federal fiscal year in question. So, for instance, the fiscal year 2024 EMPG awards allowed reimbursement of costs beginning on October 1, **2023**, the start of the 2024 fiscal year. *See* Ex. 28 (Padfield Decl.), ¶ 54. Similarly, this year's EMPG NOFO stated that the budget period would begin on October 1, **2024**. Ex. 1-D at 4. But, when the awards issued, they instead placed the start at October 1, **2025**, effectively skipping over an entire year of EMPG funding without explanation for costs that States and counties have already incurred. *See, e.g.,* Ex. 1 (Evans Decl.), ¶ 57; Ex. 17 (Higgins Decl.), ¶ 30; Ex. 29 (Pappas Decl.), ¶ 32.

Second, as to EMPG, on or around September 30, 2025—three days after Plaintiff States had received their initial EMPG award letters, and a day after Plaintiff States filed their original complaint—DHS re-issued revised EMPG grant award letters with yet another sudden and unexplained modification: the Population Certification Requirement. *See* Ex. 1 (Supp. Evans

Decl.), ¶¶ 65–66 & Ex. 1-F. The revised EMPG award letters notified recipient States that FEMA had placed a funding hold on the award, prohibiting Plaintiff States from "obligating, expending, or drawing down the funds associated with the award." Ex. 1-F at 30. To end this funding freeze, the revised award requires each recipient State to "provide a certification of the recipient state's population as of September 30, 2025," "certify that its reported population does not include individuals that have been removed from the State pursuant to the immigration laws of the United States" and "explain the methodology it used to determine its population." *Id.* As noted above, EMPG funds are distributed based on population alone. *See* 6 U.S.C. § 762(d). Until this year, defendants have never demanded that States and territories certify their own populations; rather, they have used U.S. Census Bureau data—as is required by law. *See* 13 U.S.C. § 183(a); *e.g.*, Ex. 19 (Osborn Decl.), ¶ 52; Ex. 29 (Pappas Decl.), ¶ 42. Indeed, in a two-decade career in public demography, the California Chief Demographer is not aware of any prior occasion where the State has been asked to calculate its own population in order to access federal funds. Ex. 16 (Schwarm Decl.), ¶ 11.

## ARGUMENT AS TO LIABILITY

"A grant of summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (cleaned up). "A genuine issue of fact exists where the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* (cleaned up). "The court must examine the record in the light most favorable to the nonmovant and must make all reasonable inferences in that party's favor." *Id.* (cleaned up). "Where, as here, the parties cross-move for summary judgment, the court must assay each motion separately, drawing inferences against each movant in turn." *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018) (cleaned up).

14

"[T]he summary judgment rubric has a special twist in the administrative law context." *Bos. Redevelopment Auth.*, 838 F.3d at 47 (cleaned up). "In that context, a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id.*

## I.    The Reallocation Decision Is Unlawful.

The Reallocation Decision, which deprived Plaintiff States of over $240 million in HSGP antiterrorism funding, is unlawful several times over. First, by disregarding the statutory funding criteria and transparently basing funding decisions on their views of Plaintiff States' or their subdivisions' purported "sanctuary" policies, defendants exceeded their statutory authority and disregarded legally required procedure. And defendants' reliance on that impermissible factor—as well as their failure adequately to explain their reasoning or consider Plaintiff States' reliance interests—renders the Reallocation Decision arbitrary and capricious.

### A.    The Reallocation Decision Exceeds Defendants' Statutory Authority and Disregards Procedure Required by Law.

DHS and its subagencies are "charged with administering congressional statutes," which means that "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Indeed, "an agency literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), especially in the area of federal funding, *see Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022) (emphasizing that it is Congress that "has broad power . . . to set the terms on which it disburses federal funds"). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the [APA]." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (cleaned up); 5 U.S.C. § 706(2)(C). "Courts

must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

The Homeland Security Act establishes a comprehensive list of factors that "the [FEMA] Administrator shall consider" "[i]n allocating [HSGP] funds among States and high-risk urban areas." 6 U.S.C. § 608(a). The two overall factors are (1) each State's or urban area's "relative threat, vulnerability, and consequences from acts of terrorism" and (2) "the anticipated effectiveness of the proposed use of the grant." *Id.* The statute also enumerates ten subsidiary "consideration[s]" for assessing each recipient's terrorism risk—for example, population, population density, any history of threats, and the needs of neighboring jurisdictions. *Id.* § 608(a)(1). The listed factors are exclusive: "The allocation of grants authorized under section 604 [(UASI)] or 605 [(SHSP)] of this title shall be governed by the terms of this part and not by any other provision of law." *Id.* § 603(c)(2). Basing preparedness allocations on risk alone was a core recommendation of the 9/11 Commission report, *see* S. Rep. 116-323, at 2 (2020), and the HSGP statute assumed its current form through passage of the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, § 101. This explicit bar on outside factors only confirms what the detailed statutory scheme "strongly implies": "Congress did not intend to give [defendants] the power to advance [their] own priorities" by manipulating funding levels. *Providence*, 954 F.3d at 35.

Until at least last month, FEMA agreed. In a September 12 statement, for example, the agency asserted that it is "required by the Homeland Security Act" to "base[] [HSGP allocations] solely on . . . relative risk," and not on "policy considerations." Ex. 9. Similarly, the program's NOFO stated that FEMA would "distribute [HSGP] funds[,] based on the[] [statutory] risk

assessment methodology," with risk determined by "three components: Threat x Vulnerability x Consequence." Ex. 1-A at 37, 53–55; *cf.* 6 U.S.C. § 608(a)(1) (identifying same considerations for risk assessment). Consistent with those statements and with past practice, FEMA claimed to base the NOFO funding allocations on a numerical "relative risk methodology" for each State and UASI metropolitan area. *See* Ex. 10, Fed. Emergency Mgmt. Agcy., *FY 2025 Homeland Security Grant Program Fact Sheet* (Sept. 12, 2025), at 3; *supra* p. 9. These scores quantified each jurisdiction's terrorism risk based on the statutory criteria, assigning each a ranking for use in allocating HSGP funds. *See* Ex. 8, Fed. Emergency Mgmt. Agency, *Fiscal Year 2023 SHSP/UASI Risk Methodology Updates*, (Feb. 17, 2023), at 5. Plaintiff States and their subdivisions largely received similar or higher rankings as in the previous funding cycle. *See* Ex. 14 (Tresnowski Decl.), ¶ 5 & tbl. 1. The NOFO allocations reflected these rankings, awarding Plaintiff States and their subdivisions amounts commensurate with FEMA's assessment of their relative risks and at least comparable to—if in some cases reduced from—previous years' awards. As late as September 12, 2025, the agency publicly called those risk-based allocations "[f]inal." Ex. 10 at 3.

And yet, without updating the rankings, the agency radically changed course in the Reallocation Decision. Because FEMA itself acknowledged that the risk profiles and corresponding NOFO allocations accounted for the statutory factors, the only conceivable explanation for this sudden change is a factor not identified in the statute: Plaintiff States' or their subdivisions' purported "sanctuary" policies. The funding cuts harmed only States and localities that defendants had previously labelled as "sanctuary jurisdictions." *Supra* pp. 10–11. The reallocation occurred shortly after this Court held unlawful DHS's previous attempt to condition a broader swath of grants, including HSGP, on assistance with federal civil immigration enforcement, *Illinois v. FEMA*, 2025 WL 2716277, at *1, and the agency declared that it

nonetheless intended to prevent so-called "sanctuary" jurisdictions from "receiv[ing] federal funding, " and that "[n]o lawsuit, not this one or any other" would stop the administration from doing so. Ex. 13 at 2. And, contemporaneously with the Reallocation Decision, defendants deprived the MTA of $34 million in transit-security funding based, as defendants later admitted, on New York City's "sanctuary" status. *Supra* p. 12. Under the circumstances, viewing the Reallocation Decision as anything other than an effort to punish Plaintiff States for their disfavored policy choices would "require[] . . . a naiveté from which ordinary citizens are free." *Dep't of Com.*, 588 U.S. at 785.

Reliance on this punitive consideration exceeded the agency's authority, as "sanctuary" policies are irrelevant to the statutory criteria, and have no place in the HSGP allocation calculus. Comparing this extratextual factor to the appropriate "consideration[s]" identified by Congress demonstrates as much. 6 U.S.C. § 608(a)(1). The statutory considerations, which include population, proximity to coastlines and international borders, and past threats, are objective demographic, geographic, and historical facts with clear implications for jurisdictions' "threat, vulnerability, and consequences from acts of terrorism." *Id.* Defendants' dislike for a jurisdiction's perceived decision not to assist in federal civil immigration enforcement to the administration's satisfaction, in contrast, is precisely the sort of "policy consideration[]" that, in FEMA's own telling, is not relevant to terrorism risk and should not factor in the analysis. Ex. 9 at 2. By relying on this consideration without authorization from Congress, defendants exceeded their statutory authority.

Congress's inclusion of a residual clause in the list of risk "consideration[s]" underscores, rather than undercuts, this conclusion. *See* 6 U.S.C. § 608(a)(1)(K). That provision, which permits the use of "such other factors as are specified in writing by the Administrator," *id.*, appears within

18

the list of "consideration[s]" relevant to the risk assessment, which the statute introduces with the word "including," *id.* § 608(a)(1). As the First Circuit explained in rejecting a similar attempt by DHS to exceed its statutory grantmaking authority, "'include' generally signifies that what follows is a subset of what comes before," and "'including' most commonly connotes an . . . application of the general principle.'" *Providence*, 954 F.3d at 40 (cleaned up). Thus, the residual clause authorizes the FEMA Administrator to consider additional factors bearing on a State's or urban area's "relative threat, vulnerability, and consequences from acts of terrorism." 6 U.S.C. § 608(a)(1). It does not confer general authority to add additional, unrelated funding conditions. *See id.* § 608(a); *Providence*, 954 F.3d at 40–41. On the contrary, the residual clause confirms that the Administrator has no such authority: Congress plainly knew how to insert a residual clause to make a list nonexhaustive, but chose to have HSGP allocations depend solely on the factors identified in § 608. *Cf.* 6 U.S.C. § 603(c)(1) ("The allocation of grants authorized under section 604 or 605 of this title shall be governed by the terms of this part and not by any other provision of law.").

At minimum, even if the residual clause permitted FEMA to make funding decisions based on its perception of grantees' "sanctuary" policies—which it does not—the agency's reliance on that factor here would still violate the APA, as it acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The residual clause covers "such other factors as are specified in writing by the Administrator." 6 U.S.C. § 608(a)(1)(K). But the Administrator has specified nothing here, in writing or otherwise; the "directive" to alter the allocations came from "DHS." *See, e.g.*, Ex. 1-E at 9–53 (Illinois award); Ex. 23-A at 15–20 (Minnesota award); Ex. 28-B at 34–60 (Pennsylvania award); *see also* 6 U.S.C. § 113(a)(1)(D) (establishing separate office of FEMA Administrator). Indeed, the Administrator has not even *rewritten above his own signature* the

factors on which DHS relied in issuing the "directive" at issue, as the nature of that command remains a mystery. *Supra* pp. 11–12. The Reallocation Decision is thus both substantively and procedurally unlawful.

### B.    The Reallocation Decision Is Arbitrary and Capricious.

The Reallocation Decision is independently unlawful because, by depriving Plaintiff States of hundreds of millions of dollars without any explanation, it violates the APA's requirement of "reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020); *see* 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency, or [that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When changing positions, an agency "must show that there are good reasons for the new policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and consider any "serious reliance interests" engendered by the status quo, *Regents*, 591 U.S. at 30 (2020).

As a threshold matter, the Court may consider only the reasoning (or lack thereof) that defendants gave at the time of the Reallocation Decision, not any *post hoc* justification provided in litigation. *Id.* at 20 ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." (cleaned up)). That principle alone resolves this case. FEMA provided *no* substantive explanation for the precipitous funding cuts—simply the phrase "[a]djusted per DHS directive." *See supra* p. 12. Those four words do not satisfy the agency's obligation to provide "reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785 (concluding that agency action based on undisclosed rationale was arbitrary and capricious). With no supporting analysis, the

Reallocation Decision is necessarily arbitrary and capricious. *E.g.*, *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350–51 (D.C. Cir. 2014) (holding that unexplained agency actions violated the "fundamental requirement of administrative law . . . that an agency set forth its reasons for decision").

In any event, defendants' gutting of state antiterrorism budgets bears all the hallmarks of unreasoned decisionmaking. Defendants (1) relied on extra-statutory considerations; (2) changed positions from the NOFO without acknowledgement or explanation; and (3) ignored the States' profound reliance interests in continued, consistent federal funding, and the attendant impacts on public safety. Each of these defects independently renders the Reallocation Decision arbitrary and capricious.

### 1.    Defendants improperly relied on extra-statutory factors.

First, although defendants have not explained their reasoning, the record makes clear that they acted arbitrarily and capriciously by basing the Reallocation Decision on a "factor[] which Congress has not intended [them] to consider," *State Farm*, 463 U.S. at 43—namely, Plaintiff States' and their subdivisions' purported "sanctuary" policies. The factors that an agency may consider in its decisionmaking necessarily "turn[] on what a relevant substantive statute makes important." *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) (cleaned up); *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1039 (9th Cir. 2023). Put differently, the universe of information an agency must (and must not) consider depends on "the scope of the duty imposed on the agency by Congress in the relevant substantive statute." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 78 (D.D.C. 2016), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018). This principle is particularly pressing in the grantmaking context: "*Congress may fix the terms on which it shall disburse federal money to the States*," meaning that any "federally imposed conditions" on States must square with the relevant "legislation enacted pursuant to the

21

spending power." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added). The statutory authorization for a grant program, by definition, sets forth the factors that Congress requires—and permits—an agency to consider in issuing funds. As the First Circuit has explained, the agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities." *Providence*, 954 F.3d at 39.

Defendants have attempted to do just that by cutting Plaintiff States' HSGP awards based on their or their subdivisions' purported "sanctuary" policies. As discussed, *supra* pp. 9–10, defendants developed quantitative risk rankings of HSGP awardees that captured the relevant statutory factors and provided the basis for the NOFO allocations. And FEMA acknowledged, as recently as last month, that "policy considerations" form no part of the "risk methodology . . . required by the Homeland Security Act." Ex. 9 at 2. Then, without updating those rankings or providing any public explanation, the agency drastically altered the allocations. The only conceivable motivation for that change was to punish Plaintiff States for their or their subdivisions' perceived "sanctuary" policies—a consideration that is not among the factors that Congress allowed the agency to consider in allocating HSGP funds. 6 U.S.C. § 608(a); *see supra* pp. 18–19. In other words, FEMA determined what it believed to be correct funding allocations under the statute, then set those allocations aside in pursuit of an unrelated, extra-statutory policy objective. The agency's overt reliance on a "factor[] which Congress has not intended it to consider" was arbitrary and capricious. *State Farm*, 463 U.S. at 43.

### 2. Defendants failed to acknowledge or explain the changes from the NOFO.

The Reallocation Decision is arbitrary and capricious for the additional, independent reason that defendants did not adequately explain the changes from the HSGP NOFO. "An agency may not . . . depart from a prior policy *sub silentio*," and "must show that there are good reasons

for the new policy." *Fox Television Stations*, 556 U.S. at 515. A "more detailed justification" is required when the "new policy rests upon factual findings that contradict those which underlay [the agency's] prior policy." *Id.* Those requirements apply equally in the grantmaking context. *See Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985). Defendants did not satisfy them here.

Defendants have not offered any explanation, let alone a reasoned one, for the changes in HSGP allocation amounts and methodology from the NOFO. FEMA did not issue the NOFO on a whim: binding regulations required the agency to disclose "the expected dollar values of individual awards" up front. 2 C.F.R. §§ 200.204(a)(6), 3002.10. Both in the NOFO and elsewhere, FEMA stated that the original allocations reflected a "risk assessment methodology" as "outlined in the Homeland Security Act." Ex. 1-A at 53, 54–55. And as recently as September 12, it described those allocations as "[f]inal." Ex. 10 at 3. Yet the agency radically departed from those positions in the final awards, acknowledging the changes only with the wholly opaque "[a]djusted per DHS directive." That phrase falls well short of establishing that there are "good reasons" for the changed allocations. *Fox Television Stations*, 556 U.S. at 515. Nor does it explain why the agency has reversed its view of how the Homeland Security Act "require[s]" FEMA to allocate HSGP funds. Ex. 9. And this unexplained change is even more striking when placed in historical context: officials from Plaintiff States' emergency-management agencies cannot remember *any* year in which there was *any* material change between the NOFO allocation and the final award amount, much less reductions on this scale. *See supra* pp. 9–10. This unexplained change in position violates the APA.

### 3. Defendants ignored the States' reliance interests.

The Reallocation Decision is also arbitrary and capricious because defendants "failed to address whether there was legitimate reliance on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30 (cleaned up). As the Supreme Court has explained, "[w]hen an agency

changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 30, 33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id.* at 30 (cleaned up).

Plaintiff States, which depend on HSGP for an array of vital antiterrorism and public safety programming, have profound reliance interests in continued, consistent funding. In Illinois, for example, HSGP supports mutual-aid organizations for law enforcement and fire services, enabling local fire and police departments to request assistance from other jurisdictions for emergencies that require extra resources. Ex. 1 (Supp. Evans Decl.), ¶¶ 73–76. In California, the grants fund preparedness efforts for the 2026 FIFA World Cup, 2027 Super Bowl, and 2028 Summer Olympics. Ex. 15 (Hammett Decl.), ¶ 58. And other States put the funds to similar use, underwriting efforts to prevent and respond to terrorist attacks and other life-threatening disasters. *See, e.g.*, Ex. 24 (Engelhardt Decl.), ¶ 15; Ex. 26 (Bray Decl.), ¶ 17–20; 30–37; Ex. 32 (Ezelle Decl.), ¶¶ 11–12, 17–19. The loss of funding would force Plaintiff States to drastically curtail or eliminate these programs. *E.g.*, Ex. 1 (Supp. Evans Decl.), ¶ 73; Ex. 15 (Hammett Decl.), ¶ 58; *infra* pp. 41–48 (discussing irreparable injuries that Reallocation Decision would cause).

This reliance was foreseeable and reasonable. Enabling States to fund additional public safety programs is, after all, HSGP's *entire point*. *See* 6 U.S.C. §§ 604(a), 605(a). And the specific purpose of allocating funds to grantees in the NOFO is to allow grantees to develop and propose specific projects for which the funds will be used—a planning process that is rendered moot when, as here, a federal agency substantially departs from the NOFO allocations without any warning or explanation. The result of defendants' change in position is to leave critical programs unfunded— including programs that defendants themselves have described as vital to the Nation's security.

For instance, DHS has described how the National Network of Fusion Centers—an information-sharing network supported, in many States, by HSGP funding, and which the Reallocation Decision threatens to defund, *e.g.*, Ex. 1 (Supp. Evans Decl.), ¶ 45—provides "a unique perspective on threats" that "no other federal or local organization can replicate." Ex. 7, U.S. Dep't of Homeland Sec., Fusion Centers. The HSGP NOFO in fact *requires* applicants to include one project in support of their state fusion center, Ex. 1-A at 16, and yet DHS decimated such projects at the award stage. Illinois saw funding allocated for its fusion center cut from $2 million to a single dollar. Ex. 1 (Supp. Evans Decl.), ¶ 45. Plaintiff States could not reasonably have expected the cuts introduced by the Reallocation Decision, which radically depart not only from past funding levels and methodology, *e.g.*, Ex. 1 (Supp. Evans Decl.), ¶ 35; Ex. 15 (Hammett Decl.), ¶ 27, but also from FEMA's own statements and projected allocations in the HSGP NOFO, *see supra* pp. 9–10.

Rather than reckon with these reliance interests as the APA requires, defendants simply "ignore[d]" them. *Regents*, 591 U.S. at 30. Neither FEMA nor DHS has provided any rationale for defunding the ongoing antiterrorism programs that Plaintiff States developed in reliance on HSGP funding. Because defendants made the Reallocation Decision "with no regard for the [States'] reliance interests," and DHS "did not acknowledge—much less justify"—the funding cuts' deleterious effects, the Decision is arbitrary and capricious. *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023).

## II.  The Population Certification Requirement Is Unlawful.

Defendants' decision to withhold already-awarded EMPG funds until Plaintiff States certify their populations as of September 30, 2025, is likewise unlawful on multiple grounds. First, the Population Certification Requirement is contrary to law because it violates statutes requiring FEMA to rely on U.S. Census Bureau data to calculate funding amounts for federal awards that

are statutorily based on state population. Second, defendants' departure from their longstanding policy of using U.S. Census Bureau data to determine state populations is arbitrary and capricious because it (1) is impossible for Plaintiff States to fulfill; (2) lacks any explanation; and (3) fails to consider important aspects of the decision, including States' reliance interests. Finally, defendants' attempt to collect this information from States fails to observe the procedures required by the Paperwork Reduction Act.

### A.     The Population Certification Requirement Is Contrary to Law.

FEMA's requirement that the States provide and certify population figures as a condition of receiving EMPG funding is contrary to law. *See* 5 U.S.C. § 706(2)(C). EMPG's authorizing statute requires the FEMA Administrator to apportion EMPG money appropriated by Congress according to a State's population. 6 U.S.C. § 762(d)(2). Specifically, the statute requires FEMA to apportion EMPG funding to each State according to a "ratio" comparing "the population of each State" to "the population of all States." *Id.* FEMA has relied upon uniform data produced by the U.S. Census Bureau to calculate that figure. *See* Ceci Villa Ross, U.S. Census Bureau, *Uses of Decennial Census Programs Data in Federal Funds Distribution: Fiscal Year 2021*, at 15 (2023), https://tinyurl.com/yscmp678 (noting reliance on census data to allocate EMPG funding in fiscal year 2021). When, as is the case here, federal funds are apportioned to States based on population, it is not only common sense and good policy to rely on official census data, but it also is required by federal law.

Federal law provides that, in "administering *any* law of the United States in which population" is "used to determine the amount of benefit received by State, county, or local" governments, the Secretary of Commerce "*shall* transmit to the President for use by the appropriate departments and agencies of the executive branch the data most recently produced and published" by the U.S. Census Bureau. 13 U.S.C. § 183(a) (emphasis added). As the Commerce Department

has explained, this statute "*requires* use of the current population estimate" produced by the Census Bureau for federal "formula program funds" unless "the formula has been specifically tied to the decennial census." 58 Fed. Reg. 69, 71 (Jan. 4, 1993) (emphasis added); *see* S. Rep. No. 94-1256, at 1 (1976) ("The purposes of this legislation are: . . . (2) to *require* the use of current population data . . . for the determination of the amount of benefit to be received by State and local government from any Federal program administered on the basis of population." (emphasis added)). Accordingly, FEMA must by law use official Census Bureau data, not 50 individual population estimates produced by the States themselves, to allocate EMPG funds among the States.

Congress established the EMPG formula, 6 U.S.C. § 762(d)(2), and required defendants to employ uniform national population data when applying the formula, 13 U.S.C. § 183(a). Defendants have no remaining discretion; they must distribute the funds pursuant to the statutory formula, as Congress directed. *See Providence*, 954 F.3d at 34 (where "Congress did not make an allowance for any deviation that would justify the actions undertaken by" an executive agency, additional conditions "destabilize[d] the statutory formula"). Defendants' demand that States produce their own population estimates exceeds their authority under federal law, thereby violating the APA. 5 U.S.C. § 706(2)(C). The Court can hold the Population Certification Requirement unlawful—and vacate it—on that basis alone.

### B.    The Population Certification Requirement Is Arbitrary and Capricious.

The Population Certification Requirement is also arbitrary and capricious. 5 U.S.C. § 706(2)(A). First, as discussed, *supra* pp. 26–27, by requiring that the States provide their own population estimates that exclude "removed" individuals, DHS "has relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, because Congress has mandated solely the use of U.S. Census Bureau data for funding allocation purposes, 13 U.S.C. § 183(a). Defendants' imposition of the Population Certification Requirement also fails the APA's

test of reasoned decisionmaking for multiple other reasons: (1) it is impossible for Plaintiff States to fulfill; (2) defendants failed to give *any* explanation for changing FEMA's longstanding practice; and (3) defendants failed to consider important aspects of the problem, including States' reliance interests.

### 1. The Population Certification Requirement is impossible and vague.

"Impossible requirements imposed by an agency are perforce unreasonable." *All. for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 940 (D.C. Cir. 1991). The Population Certification Requirement is "perforce unreasonable" because it cannot plausibly be implemented—a problem that defendants "entirely failed to consider." *State Farm*, 463 U.S. at 43.

FEMA's requirement that Plaintiff States certify their population, minus those individuals who have been removed "pursuant to the immigration laws of the United States," is impossible to satisfy for multiple reasons. Most basically, Plaintiff States do not have a record of people who have been removed by the federal government; only defendants do. *See, e.g.*, Ex. 16 (Schwarm Decl.), ¶ 15; Ex. 17 (Higgins Decl.), ¶ 42; Ex. 20 (Fiorio Decl.), ¶ 17; Ex. 27 (Supp. Bray Decl.), ¶ 9; Ex. 29 (Pappas Decl.), ¶¶ 44–45; Ex. 30 (Forand Decl.), ¶ 31. While DHS has, at times, published statistics regarding the number of individuals removed, returned, or expelled, DHS has not provided data beyond November 2024, nor has DHS published State-specific removal or expulsion data. *See* Off. of Homeland Sec. Stats., DHS, *Immigration Enforcement and Legal Processes Monthly Tables* (Jan. 16, 2025), https://tinyurl.com/2s44mczy (providing data "available through November 2024," along with a statement that "[t]his monthly report is delayed while it is under review"); U.S. Immigr. & Customs Enf't, *ICE Enforcement and Removal Operations Statistics*, https://tinyurl.com/bdzsu39j (providing data "as of December 31, 2024") (last visited

Oct. 29, 2025); *see also* Ex. 20 (Fiorio Decl.), ¶ 17.[6] If a State wishes to obtain relevant immigration data from DHS, it must submit a Freedom of Information Act request, a process that can take months. Ex. 16 (Schwarm Decl.), ¶ 15. In any event, subtracting a figure for removed individuals from U.S. Census Bureau data would double-count removals because the Bureau already includes out-migration, including removals and expulsions, in its annual Population Estimates Program data. Ex. 20 (Fiorio Decl.), ¶ 19.

Additionally, it is impractical for a State to make a certifiable estimate of a population "as of" September 30, 2025, quickly enough to access the funds that have been awarded for limited periods of performance. The decennial census conducted by the federal government is costly and takes *years* of preparation before official data is released. *See* U.S. Gov't Accountability Off., GAO-23-105819, *2020 Census: A More Complete Lessons Learned Process for Cost and Schedule Would Help Next Decennial* 1, 5 (2023), https://tinyurl.com/ypzvyj8n (explaining that the 2020 federal census cost $13.7 billion to conduct and that the U.S. Census Bureau spent years planning for it). For example, the U.S. Census Bureau's annual population estimates of States and state subdivisions are released years after the date of the estimate. *See* U.S. Gov't Accountability Off., GAO-25-107503, *Population Estimates: Results of the Census Bureau's Challenge Program* 1 (2024), https://tinyurl.com/65c5wetp (noting that an estimate for April 1, 2020, through July 1, 2022, was released in February 2024). But the Requirement demands that each of the 50 States— most of which lack any independent state agency tasked with tallying state population, *see, e.g.* Ex. 18 (Schall Decl.), ¶ 43; Ex. 29 (Pappas Decl.), ¶ 45—duplicate for their respective populations a task that takes the Census Bureau many years and billions of dollars to accomplish, and that they

---

[6] While DHS publishes some state-specific data, that data is limited to immigration in-flows—not removals—and is not available beyond 2023. *See* Off. of Homeland Sec. Stats., DHS, *State Immigration Data* (May 14, 2025), https://tinyurl.com/55jkeud6.

do so quickly enough to access the funds that defendants have frozen. Ex. 16 (Schwarm Decl.), ¶ 16.

Even the few States that have such agencies would face practical problems. California, for example, relies upon numerous sources of data to make population estimates, including birth certificates, death records, driver's licenses, housing data, and school enrollment data—data that takes months to collect, let alone process. Ex. 16 (Schwarm Decl.), ¶¶ 7, 17. Further, these sources of data generally reflect dates other than September 30, 2025, meaning States still would need to make a number of extrapolations to adjust that data to approximate population as of September 30, 2025, resulting in less accurate estimates. *Id.* ¶ 18; *see also* Ex. 20 (Fiorio Decl.), ¶¶ 21–23 (inherent limitations on "models to extrapolate or approximate changes in population . . . would call into question the accuracy of any extrapolation").

Even if States had the resources to conduct fifty separate state-wide censuses (they do not) and even if such an endeavor could be completed in time to secure EMPG funds (it cannot), the Population Certification Requirement fails to define its terms with sufficient clarity to enable compliance. *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1233 (9th Cir. 2001) ("[I]t was arbitrary and capricious for [a federal agency] to issue terms and conditions so vague as to preclude compliance therewith."). Defendants did not define the population of persons removed "pursuant to the immigration laws of the United States." There is no statutory definition of removal. *See Riley v. Bondi*, 145 S. Ct. 2190, 2197 (2025) ("[T]he Immigration and Nationality Act does not define the term 'order of removal . . . .'"). While the term "removal" could refer to individuals removed solely due to a specific procedure in the Immigration and Nationality Act, *see, e.g.*, 8 U.S.C. § 1229a, because the certification seeks to capture population more generally, such a figure could include those who have voluntarily departed prior to the

completion of removal proceedings, *see id.* § 1229c(a); *see also* Off. of Homeland Sec. Stats., DHS, *Immigration Enforcement and Legal Processes Monthly Tables*, *supra* (providing aggregate figures for "repatriation[s]," which include "removal[s] (which carries administrative penalties)," "return[s] (which do[] not carry administrative penalties)," or "expulsion[s] based on Title 42"). Nor is it clear how FEMA expects the States to tally those who have resided in one State but were arrested and then moved to a facility in another State pursuant to federal immigration law. Thus, even leaving aside the information, resource, and timing problems that make compliance with the Population Certification Requirement impossible, the States cannot comply because they cannot discern whom defendants want included and excluded from the count.

Because of this vagueness, and because States cannot certify the accuracy of data that they do not possess, defendants' Population Certification Requirement is impossible to satisfy, rendering it arbitrary and capricious. *See FDA v. RxUSA Wholesale, Inc.*, 285 F. App'x 809, 811 (2d Cir. 2008) (affirming holding that drug-distribution regulations were arbitrary and capricious because "all lower-level distributors would be required to provide . . . information that [was] currently held only by authorized distributors," which "would effectively make it impossible for lower-level distributors to comply with the law"); *see also All. for Cannabis Therapeutics*, 930 F.2d at 940.

### 2.    Defendants failed to offer any explanation for the Population Certification Requirement.

By suddenly imposing the Population Certification Requirement after failing to include it in the NOFO—and, indeed, after already allocating and formally awarding EMPG funds—FEMA arbitrarily changed its position without acknowledging that fact. "An agency action is arbitrary or capricious 'if it is not reasonable and reasonably explained.'" *Woonasquatucket River Watershed*

31

*Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 468 (D.R.I. 2025) (quoting *Ohio v. EPA*, 603 U.S. 279, 292 (2024)). "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy." *Fox Television Stations*, 556 U.S. at 515 (cleaned up).

As explained, *supra* pp. 26–27, federal law requires FEMA to rely on the U.S. Census Bureau's figures to tabulate population when allocating EMPG funding. Consistent with that requirement, FEMA has relied on federal population data in calculating allocations since the inception of the EMPG program decades ago. *See supra* p. 26. States have never previously been required to provide any population estimates to FEMA in order to receive EMPG funds. *E.g.*, Exs. 15 (Hammett Decl.), ¶ 51; Ex. 18 (Schall Decl.), ¶ 40; Ex. 21 (Brantley Decl.), ¶ 25; Ex. 29 (Pappas Decl.), ¶ 42. FEMA's last-minute decision to impose a freeze on all EMPG funds until States provide population data is quintessential arbitrary action: not only did defendants not "show that there [we]re good reasons" to impose their novel requirement, but they did not even "display awareness" that they were "changing position." *Fox Television Stations*, 556 U.S. at 515.[7] FEMA's departure from its decades-long policy of using federal population data to calculate EMPG

---

[7] The eleventh-hour timing of the Population Certification Requirement, in conjunction with its impracticability, also suggests that defendants may be imposing it for political reasons. Notably, the Requirement, in addition to the other agency actions challenged in this litigation, was implemented just days after the court in *Illinois v. FEMA* vacated the immigration conditions placed on FEMA grants and enjoined their enforcement. *See supra* pp. 8, 10, 13. Defendants have themselves already tabulated each State's population, which informed the funding allocations in both the EMPG NOFO and the actual awards granted to States. Defendants' last-minute hold on funding to ask recipients to provide figures and data that are more readily accessible to defendants suggests that defendants are imposing the condition for contrived reasons, which further underscores the arbitrary and capricious nature of the Population Certification Requirement. *See Dep't of Com.*, 588 U.S. at 784–85.

allocations, all without acknowledging or explaining the change, is arbitrary and capricious for this reason, too.

### 3.    Defendants failed to consider the States' reliance interests.

Finally, the Population Certification Requirement is also arbitrary and capricious because FEMA "failed to address" Plaintiff States' "legitimate reliance" on EMPG funds and the consequences that would flow from its decision to freeze EMPG funds until States complied with its impossible demand. *Regents*, 591 U.S. at 30.

Plaintiff States rely on consistent annual EMPG funding for critical safety and emergency preparedness needs. *E.g.,* Ex. 15 (Hammett Decl.), ¶¶ 24–25; Ex. 26 (Bray Decl.), ¶¶ 53–55; Ex. 29 (Pappas Decl.), ¶¶ 49–50. And for more than 20 years, since the inception of the EMPG program, States have obtained those funds at the beginning of the fiscal year, without arbitrary freezes conditioned on erratic demands. Relying on the predictability and reliability of EMPG funding, State agencies have engaged in the months-long process of reviewing project proposals from subgrantees and allocating money based on the usual timeline for disbursement of EMPG funds. *See* Ex. 15 (Hammett Decl.), ¶ 59; *see also Bowen v. Massachusetts*, 487 U.S. 879, 906–07 (1988) (States' "interest in planning future programs" is an "important" one).

Yet the Population Certification Requirement jeopardizes States' access to those funds for months, if not permanently. Estimating and certifying state populations to satisfy this requirement would take months, if not longer, if States can even comply at all. *See, e.g.*, Ex. 16 (Schwarm Decl.), ¶ 18 (explaining how state estimates would require vital statistics that take 11 months to fully complete); Ex. 20 (Fiorio Decl.), ¶ 20 ("massively costly" and "many months"). The Requirement thus jeopardizes States' ability to access these funds and fulfill critical public safety functions. This delay, combined with the sudden and unexpected shortening of the grant's period of performance, *see infra* pp. 37–38, will require State agencies and subgrantees to reconfigure

33

and modify projects to conform with the shortened timeline. Ex. 15 (Hammett Decl.), ¶ 59; Ex. 25 (Ottobre Decl.), ¶¶ 17–19; 37. The combination of these arbitrary modifications to EMPG effectively deprive the States of the emergency funding they have long relied on. Defendants acted arbitrarily by wholly ignoring these reliance interests when imposing the Population Certification Requirement. *See Regents*, 591 U.S. at 30–33.

### C.    Defendants Failed to Observe Required Procedures When Imposing the Population Certification Requirement.

Finally, defendants failed to comply with the Paperwork Reduction Act in imposing the Population Certification Requirement, thus violating the APA for the independent reason that they failed to observe procedures required by law. *See* 5 U.S.C. § 706(2)(D). Congress enacted the Act, in part, to "minimize the paperwork burden for . . . State, local, and tribal governments . . . resulting from the collection of information by or for the Federal Government" and to "maximize the utility of information created, collected, maintained, used, shared and disseminated by . . . the Federal Government." 44 U.S.C. § 3501(1)–(2); *cf. Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990) ("The Act prohibits any federal agency from adopting regulations which impose paperwork requirements on the public unless the information is not available to the agency from another source within the Federal Government . . . ."). Before an agency attempts to conduct a "collection of information," the Act requires the agency to (1) review the proposed collection; (2) provide notice of the proposed collection in the Federal Register and evaluate public comments; (3) submit the proposed collection to the Office of Management and Budget for approval or disapproval; (4) certify in the submission that each collection of information is, among other things, "not unnecessarily duplicative of information otherwise reasonably accessible to the agency"; (5) publish another notice in the Federal Register stating that the agency has made such submission

to the OMB; and (6) if approved by OMB, obtain "a control number to be displayed upon the collection of information." 44 U.S.C. §§ 3506(c), 3507(a).

Defendants failed to comply with the Act—and thus violated the APA—in imposing the Population Certification Requirement. Defendants' request for the States' "reported population" numbers on September 30, 2025, and the "methodology" used to calculate those numbers, plainly constitutes a "collection of information" under the Paperwork Reduction Act. *See* 44 U.S.C. § 3502(3) (defining a "collection of information" to include the "obtaining" or "soliciting" of "facts or opinions by or for an agency, regardless of form or format," if requested in identical "requirements imposed on[] ten or more persons"); *id.* § 3502(10) (defining "person" to include "a State" or "a political subdivision of a State"). But defendants wholly failed to comply—or even attempt to comply—with any of the Paperwork Reduction Act's procedural requirements. Defendants did not provide notice of the Requirement in the Federal Register before imposing it; indeed, they imposed it *after* calculating the States' entitlement to EMPG funds using their own data and *after* sending the States award letters. Nor is there any evidence that defendants considered whether the Requirement sought information that was "unnecessarily duplicative of information otherwise reasonably accessible" to them; indeed, as discussed, *supra* pp. 26–27, had they done so, they would have realized that it was duplicative of U.S. Census Bureau data they were legally obligated to employ.

Indeed, defendants' request for States' populations plainly runs counter to the purpose of the Paperwork Reduction Act by *increasing* the "paperwork burden" for the States, requiring time and resources to be devoted to collecting information that defendants themselves already possess. *See* 44 U.S.C. 3501(1); 5 C.F.R. § 1320.5(d) (to obtain approval of a collection of information, an agency shall demonstrate that the proposed collection "[i]s not duplicative of information

otherwise accessible to the agency").[8] Defendants' conduct, in other words, creates exactly the problem that the Act was designed to prevent. Courts have not hesitated to vacate requirements of this sort, *see Orr v. Trump*, 778 F. Supp. 3d 394, 425–26 (D. Mass. 2025); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, ___ F. Supp. 3d ___, 2025 WL 2374697, at *19 (D. Md. Aug. 14, 2025), and this Court should do the same here. The Population Certification Requirement should be vacated, and its enforcement enjoined.

### III.    The Performance Period Decision Is Unlawful.

Lastly, the Performance Period Decision is also arbitrary and capricious, and thus unlawful, under the APA. As discussed, *supra* p. 20, an agency must "articulate a satisfactory explanation" for its decisions, *State Farm*, 463 U.S. at 43. But—as with the Reallocation Decision and Population Certification Requirement—FEMA provided no rationale for cutting the performance periods for HSGP and EMPG grants from three years to one while simultaneously moving the start date for the EMPG grant. *E.g.*, Ex. 1 (Supp. Evans Decl.), ¶ 61. The "agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet*, 753 F.3d at 1350.

That lack of reasoning is particularly notable given Plaintiff States' reliance on FEMA's previous practice. Again, when an agency changes positions, it must consider any "serious reliance

---

[8] Indeed, defendants' conduct here appears to diverge from their own long-established practice of complying with the Paperwork Reduction Act. *See, e.g.*, Office of State and Local Government Coordination and Preparedness; SAFER Grant Program, 70 Fed. Reg. 70628, 70628 (Nov. 22, 2005) (DHS soliciting comments "on the proposed collection of information in connection with" a specific grant program "[p]ursuant to the Paperwork Reduction Act"); Agency Information Collection Activities: Proposed Collection; Comment Request, 77 Fed. Reg. 27076, 27076 (May 8, 2012) (FEMA collecting comments "on a revision of a currently approved information collection" in "accordance with the Paperwork Reduction Act"); Agency Information Collection Activities: Generic Clearance for the Collection of Qualitative Feedback on Agency Service Delivery, 83 Fed. Reg. 33244, 33244 (July 17, 2018) (DHS publishing notice that it was submitting information collection request to Office of Management and Budget "in accordance with the Paperwork Reduction Act").

interests" engendered by the existing policy. *Regents*, 591 U.S. at 30. Plaintiff States reasonably anticipated that FEMA would continue to use multiyear performance periods—not only because that was the agency's "longstanding" policy, *id.*; *see* Ex. 1 (Supp. Evans Decl.), ¶¶ 52–57, but also because the NOFOs for both HSGP and EMPG *explicitly* stated as much, Ex. 1 (Supp. Evans Decl.), ¶ 58; *see also id.* ¶ 63 (noting that, over the past two decades, FEMA has "never . . . reduce[d] the period of performance announced in a NOFO and relied upon by applicants like this"). Indeed, the agency expressly instructed applicants to plan around a three-year performance period. The HSGP NOFO specified that projects must be "able to be fully completed within the three-year period of performance," Ex. 1-A at 38, and the EMPG NOFO stated that "[e]ach goal must be specific, measurable, and achievable within the period of performance," Ex. 1-D at 50. Plaintiff States therefore structured their proposals around three-year performance periods. *E.g.*, Ex. 1 (Supp. Evans Decl.), ¶ 60; Ex. 29 (Pappas Decl.), ¶¶ 33–35. Defendants' last-minute decision to truncate the performance periods without explanation or justification is arbitrary agency action.

The consequences of defendants' decision illustrate its arbitrary nature. Truncating the performance period without *any* prior notice now leaves state budgeting offices scrambling to cram three years of proposed projects into a period of only a few months.[9] This squeeze limits States' ability to fund multiyear trainings, forecloses their opportunities to procure equipment subject to a multiyear procurement process, makes funding multiyear capital projects impossible, and poses staffing challenges for positions that rely on federal funding an on annual basis. Ex. 21 (Brantley Decl.), ¶ 32; Ex. 25 (Ottobre Decl.), ¶¶ 18–19; Ex. 31 (LaFond Decl.), ¶ 16. The likely upshot of

---

[9] While the grants are subject to a one-year period of performance, due to funding holds on EMPG and HSGP, as well as the federal government shutdown, the actual period the States will have to spend these dollars could be much shorter. *See* Ex. 18 (Schall Decl.), ¶ 28 (calculating an effective eight-month performance period for EMPG and HSGP).

this fabricated re-budgeting emergency, in contravention of decades of FEMA's pattern and practice as to preparedness grants, is that "allocated monies will expire unused, depriving [Plaintiff States] of millions of dollars in needed funds for emergency management and preparedness." Ex. 1 (Supp. Evans Decl.), ¶ 62.

Defendants' decision to impose a one-year period of performance on EMPG grants is particularly problematic. EMPG awards have historically been backdated to the start of the federal fiscal year in question—for instance, Illinois's Fiscal Year **2023** EMPG award, which was signed in October **2023**, had a three-year period of performance that began on October 1, **2022**, and ended on September 30, **2025**. Ex. 1 (Supp. Evans Decl.), ¶ 57. This historical practice permits States to obtain reimbursement for expenses they and their subgrantees accrued during the year before the award is actually signed. But in truncating the EMPG period of performance from three years to one, defendants also started the EMPG Fiscal Year 2025 performance period on October 1, **2025**, rather than (consistent with past practice) on October 1, **2024**. Defendants, in other words, effectively skipped an entire year of program funding for fiscal year 2025 awards, leaving grantees without a year of funds to support critical emergency-management services. *Id*.; *see also* Ex. 28 (Padfield Decl.), ¶ 54. Defendants' decision thus squeezes States in two ways—substantially limiting their ability to reimburse grantees for *past* activities under the FY2025 EMPG grants, while also dramatically limiting the *future* window in which to spend these funds.

These consequences are the foreseeable result of defendants' decision to alter the program terms *after* issuing NOFOs and soliciting proposals. Yet FEMA entirely failed to grapple with these obvious reliance interests—or with the consequences of upsetting them. "That failure was arbitrary and capricious in violation of the APA." *Regents*, 591 U.S. at 33.

## ARGUMENT AS TO REMEDY

Plaintiff States are entitled to declaratory relief, vacatur of the challenged agency actions, and a permanent injunction against any future implementation or enforcement of the same actions against Plaintiff States and their subdivisions and instrumentalities. The Court may decide appropriate relief based on undisputed facts without a separate hearing. *See SEC v. Locke Cap. Mgmt., Inc.*, 794 F. Supp. 2d 355, 368–71 (D.R.I. 2011) (determining appropriate remedies based on undisputed facts at summary judgment); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C. Cir. 2001) (no evidentiary hearing on remedy required where "there are no disputed factual issues").

### A.    The Court Should Vacate The Reallocation Decision, Population Certification Requirement, And Performance Period Decision.

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action" found to be unlawful. 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of unlawful agency actions. *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Id.* at 830. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see United Steel, Paper, & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) (acknowledging continuing vitality of this rule); *Illinois v. FEMA*, 2025 WL 2716277, (D.R.I. Sept. 24, 2025) at *15 ("The

holding in *Trump v. CASA* restricted universal injunctions, but the Court expressly left unaffected the APA's command to 'set aside' unlawful agency action.").

Because the Reallocation Decision, Population Certification Requirement, and Performance Period Decision all violate the APA, they should be vacated. "[W]hen a court vacates agency action, it nullifies the action and removes its legal force." *Illinois v. FEMA,* 2025 WL 2716277, at *15; *see also AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 85 (D.D.C. 2007) ("[T]he effect of . . . vacatur . . . is to take the rule off the books and reinstate the prior regulatory regime." (cleaned up)). By vacating the Reallocation Decision, the Court nullifies it and removes the legal force of defendants' unlawful reallocation of 2025 HSGP funds, effectively reinstating the prior allocation of those funds. Vacatur of the Population Certification Decision will likewise remove all legal force from the relevant provision in the 2025 EMPG award letters, permitting EMPG grantees to accept those awards without the challenged provision. And finally, vacating the Performance Period Decision will reinstate the three-year performance period applicable to the 2025 HSGP and EMPG awards, at the dates specified in the 2025 NOFOs.

> **B.    The Court Should Also Enter Appropriate Permanent Injunctive Relief To Effectuate Its Judgment.**

Plaintiff States (including their instrumentalities and subdivisions) are also entitled to permanent injunctive relief to effectuate the vacatur of the challenged agency actions and to protect Plaintiff States from future irreparable harm. In general, courts issue permanent injunctive relief where "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014) (quoting *Asociación de Educación Privada de P.R., Inc. v. García-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007));

*see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989).

As an initial matter, the APA expressly authorizes "actions for . . . prohibitory or mandatory injunction" in addition to vacatur. 5 U.S.C. § 703. "[C]ourts use this broad remedial power to issue permanent injunctive relief for APA violations." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021). The D.C. Circuit has held that, in the APA context, "once the court reache[s] the conclusion that the rule was indeed illegal (i.e., not merely that the plaintiffs had a reasonable probability of success on the merits, as would be necessary for a preliminary injunction), there [is] no separate need to show irreparable injury, as that is merely one possible 'basis for showing the inadequacy of the legal remedy.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting 11A Wright & Miller's Federal Practice & Procedure § 2944 (2d ed. 1995)). This principle alone suffices to support the issuance of permanent injunctive relief against future enforcement of the challenged actions against Plaintiff States. Regardless, as discussed below, examining the equitable factors in greater detail leads to the same result for each of the unlawful actions taken by defendants.

### 1. The Court Should Enjoin Defendants' Unlawful Reallocation of HSGP Funds.

The Court should enjoin the unlawful reallocation of HSGP funds by directing defendants to amend the HSGP awards issued to California, the District of Columbia, Illinois, Massachusetts, Minnesota, New Jersey, New York, Pennsylvania, and Washington, to reflect the August 1, 2025 HSGP NOFO.

41

Such injunctive relief will effectively redress defendants' unlawful Reallocation Decision and prevent Plaintiff States from suffering irreparable injury. The Reallocation Decision requires Plaintiff States to shut down essential counterterrorism programming. States use HSGP funds to enhance infrastructure security, provide personal protective equipment for first responders, purchase security cameras and other systems to support prevent acts of terrorism, pay staff who analyze intelligence regarding potential threats, and train personnel to test preparedness. *See, e.g.*, Ex. 15 (Hammett Decl.), ¶¶ 10, 11, 16; Ex. 28 (Padfield Decl.), ¶¶ 10–11; Ex. 32 (Ezelle Decl.), ¶ 11. Many states use HSGP funds to support intelligence fusion centers, which play an essential role in state and local counterterrorism management by coordinating notification systems, planning, training programs, weapon detection systems, and communications systems. Ex. 19 (Osborn Decl.), ¶ 19; Ex. 23 (Farole Dec.), ¶¶ 12–13; Ex. 32 (Ezelle Decl.), ¶ 12. The work of a fusion center is voluminous and essential. For example, the HSGP-funded Washington State Fusion Center processed more than 21,913 intake items in 2024 and answered over 1,132 requests for information from state, national, and international law enforcement agencies. Ex. 32 (Ezelle Decl.), ¶ 12.

If the drastic HSGP cuts remain in place, state and local preparation for terrorist threats would be devastated. Ex. 15 (Hammett Decl.), ¶ 58; Ex. 19 (Osborn Decl.), ¶ 58; Ex. 26 (Bray Decl.), ¶ 75. Illinois saw the budget line for its fusion center cut from ***nearly $2 million to a single dollar***. Ex. 1 (Supp. Evans Decl.), ¶ 45. Illinois also saw funding cut for (1) school safety and active shooter trainings for local school staff, (2) the radio systems it uses to coordinate local responses as a disaster is unfolding, and (3) overtime pay for local firefighters who join a special response team to respond to a terrorist attack. *Id.* ¶¶ 48–50. California would have to halt all efforts to plan for the 2026 FIFA World Cup, 2027 Super Bowl LXI, and the 2028 Summer Olympics. Ex.

15 (Hammett Decl.), ¶ 58. New York's 90% decrease in SHSP funds would leave funding gaps for FBI-certified bomb squads, explosive detection canine teams, New York's border security operations, and New York's only intelligence fusion center. Ex. 26 (Bray Decl.), ¶¶ 15–19. Washington, D.C., would shutter terrorism watch desks, and a majority of its regional emergency response planning would cease or be understaffed. Ex. 19 (Osborn Decl.), ¶ 58. Minnesota would cut personnel within its Homeland Security and Emergency Management Agency. Ex. 23 (Farole Decl.), ¶ 55. Pennsylvania would cut emergency management personnel and communication systems to account for the 100% reduction of funds allocated under the UASI program to the Philadelphia region. Ex. 28 (Padfield Decl.), ¶¶ 42, 45.

These catastrophic cuts to life-saving counterterrorism programing constitute irreparable harm. *See Illinois v. FEMA*, 2025 WL 2716277, at *16 ("Plaintiff States stand to suffer irreparable harm; the effect of the loss of emergency and disaster funds cannot be recovered later, and the downstream effect on disaster response and public safety are real and not compensable."); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (plaintiff demonstrated a high risk of irreparable harm where funding cuts threaten the provision of public services that could lead to a "loss of human life"); *United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) (finding irreparable harm where a "loss of funding [would] likely . . . have an immediate impact on [government entities'] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").

### 2. The Court Should Enjoin Defendants from Imposing the Population Certification Requirement on EMPG Grants.

The Court should direct defendants to amend the EMPG awards issued to all Plaintiff States to remove the award term titled "Verification of a State's Population." If this term is removed,

Plaintiff States will not need to certify compliance with an unworkable requirement as a condition of receiving this essential funding. The Court should further enjoin defendants from enforcing by any means against Plaintiff States and their instrumentalities and subdivisions the "Verification of a State's Population" award term or any materially similar terms requiring certification of a State's population as a condition on the receipt of federal funds. Finally, the Court should order defendants to lift any funding hold premised on the Population Certification Requirement.

Such injunctive relief would prevent the states from suffering catastrophic harm. The EMPG grant is the primary source of funds to develop state and local programming for emergency management. *E.g.*, Ex. 17 (Higgins Decl.), ¶ 20. EMPG funds allow states to develop emergency management plans, train emergency first responders, and purchase infrastructure necessary to respond to emergencies. Ex. 17 (Higgins Decl.), ¶¶ 14, 21; Ex. 18 (Schall Decl.), ¶¶ 14, 21, 23; Ex. 25 (Ottobre Decl.), ¶ 4. States also pass through EMPG funds to county and municipal level to pay the salaries of local emergency managers. Ex. 25 (Ottobre Decl.), ¶ 9; Ex. 17 (Higgins Decl.), ¶ 17.

These funds are completely frozen as a result of defendants' new Population Certification Requirement, and States have no plausible means of complying with this requirement. *See supra* pp. 28–31. As a result, States have no choice but to reduce local emergency management capacity as they lack the budgetary resources or flexibility to make up for lost funding without drawing funding away from other important public safety and law enforcement operations. *See, e.g.,* Ex. 18 (Schall Decl.), ¶¶ 47–48; Ex. 25 (Ottobre Decl.), ¶¶ 36–38. Local emergency management agencies could be shut down entirely if EMPG funding is discontinued. *See* Ex. 1 (Supp. Evans Decl.), ¶ 78; Ex. 32 (Ezelle Decl.), ¶¶ 70–71. Furthermore, without the training funds that EMPG provides, state and local emergency first responders will encounter life-threatening situations, such

as wilderness search-and-rescue operations, a weapon of mass destruction event, or a terrorist attack, without the proper training and expertise. Ex. 25 (Ottobre Decl.), ¶ 37; Ex. 29 (Pappas Decl.), ¶ 51. The funding hold hits at a time that many states are planning to conduct exercises to prepare for major events, including the 2026 FIFA World Cup, future National Football League drafts, and future Major League Baseball All-Star Games. Ex. 25 (Ottobre Decl.), ¶ 8; Ex. 28 (Padfield Decl.), ¶ 72; Ex. 32 (Ezelle Decl.), ¶ 68. Such harms to public services are irreparable and warrant injunctive relief. *See Illinois v. FEMA*, 2025 WL 2716277, at *16.

### 3.    The Court Should Enjoin Defendants from Reducing the Performance Period for the HSGP and EMPG Grants.

Finally, the Court should enjoin defendants from reducing the performance period for both the fiscal year 2025 HSGP and EMPG programs. Specifically, the Court should direct defendants to amend the HSGP awards issued to all Plaintiff States to provide the period of performance set forth in the August 1, 2025 HSGP NOFO, namely September 1, 2025, to August 31, 2028. And the Court should direct defendants to amend the EMPG awards issued to all Plaintiff States to provide the period of performance set forth in the EMPG fiscal year 2025 NOFO, namely October 1, 2024, to September 30, 2027.

Such an order would prevent the States from suffering irreparable harm. By reducing the performance period on EMPG and HSGP grants from three years to one and changing the EMPG start date, the Performance Period Decision has thrown state budgeting and planning processes into disarray, imposing immense administrative costs on Plaintiff States. FEMA preparedness awards have typically been subject to multiyear periods of performance, and States have structured their EMPG and HSGP around multi-year disbursements. Ex. 28 (Padfield Decl.), ¶¶ 53–59; Ex. 30 (Forand Decl.), ¶ 16; Ex. 31 (LaFond Decl.), ¶ 14. States proposed projects when applying for EMPG and HSGP funds based on the understanding that they would have three years to perform

such projects. *E.g.*, Ex. 18 (Schall Decl.), ¶¶ 32–33; Ex. 29 (Pappas Decl.), ¶¶ 34–35. The sudden switch from a three-year to one-year performance period squeezes state budgets, requiring States to expend the fiscal year 2025 funds at the same time as open awards from prior years. Ex. 25 (Ottobre Decl.), ¶ 17; Ex. 30 (Forand Decl.), ¶ 17; Ex. 31 (LaFond Decl.), ¶ 15. Washington State estimates this would involve simultaneously pushing 100 grant agreements through multiple approval channels to preserve any meaningful time for project execution. Ex. 32 (Ezelle Decl.), ¶ 69. Because of the federal government shutdown and other holds on these grants, the effective period of performance for these grants could be eight months or fewer. Ex. 18 (Schall Decl.), ¶ 28. Further complicating matters is the fact EMPG requires a dollar for dollar match from the States, and States would be required to match the grant amount in one year rather than three years. Ex. 25 (Ottobre Decl.), ¶ 25. Cramming three years' worth of projects into one year will cause a portion of the unexpended EMPG and HSGP funds to expire unused. Ex. 30 (Forand Decl.), ¶ 24; Ex. 31 (LaFond Decl.), ¶ 21. This budget squeeze effectively deprives States of millions of dollars that otherwise would be used for emergency management and preparedness. *E.g.*, Ex. 1 (Supp. Evans Decl.), ¶ 62.

Furthermore, a one-year period of performance makes certain uses of these funds impossible. States can no longer use grant funds to prepay for or commit to multi-year training initiatives, which degrades emergency managers' training. Ex. 25 (Ottobre Decl.), ¶ 18. Equipment subject to a lengthy procurement process would be difficult to obtain, including communications systems, detection devices and HazMat supplies. *Id*. ¶ 19. Because the building and upfitting of a vehicle can take over a year, funds subject to a one-year limit cannot be used to purchase essential emergency vehicles. *Id*. ¶ 19. In addition, States rely on EMPG funds for multiyear facility/capital projects like communication tower enhancements or emergency center operations upgrades. Ex.

21 (Brantley Decl.), ¶ 32. Some federally funded projects require time-intensive steps like obtaining permits, security approvals from the appropriate regulators and administrative bodies, and installing complex safety equipment. Ex. 24 (Engelhardt Decl.), ¶ 47. It could be impossible to complete all these steps in a single year. *Id.*; Ex. 32 (Ezelle Decl.), ¶ 69. And employees whose salary is funded by these grants now face substantial budget uncertainty given the truncated performance period. Ex. 31 (LaFond Decl.), ¶ 16. Finally, moving the EMPG start date from October 1, 2024, to October 1, 2025, effectively skips a year of funding that States and local jurisdictions expected to be available for costs they already incurred. Ex. 28 (Padfield Decl.), ¶ 54. The multitude of public safety costs imposed by the Performance Period Decision constitute irreparable harm, warranting injunctive relief. *See Illinois v. FEMA*, 2025 WL 2716277, at *16.

### 4. The Balance of Equities and Public Interest Favor Permanent Injunctive Relief in the Form Requested.

Finally, "the balance of equities tips in [Plaintiff States'] favor," and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Through the Reallocation Decision, DHS aims to punish state and local officials for exercising their reserved sovereign rights to choose how to allocate scarce law enforcement resources. There is no public interest in allowing such gangsterism to continue. Furthermore, Plaintiff States rely extensively on HSGP and EMPG funds to maintain a well-trained, well-equipped, and coordinated response to terrorist risk and other emergencies. *See supra* pp. 4–6. The Reallocation Decision, the Population Certification Requirement, and the Period of Performance Decision all imperil these efforts. The public interest weighs heavily against "jeopardizing national security." *Winter*, 555 U.S. at 33.

The public interest also "takes into account the effects of a decision on non-parties." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 644 (7th Cir. 2022); *accord Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 368 (D.C. Cir. 2017). Allowing defendants to

47

reduce or even eliminate Plaintiff States' capacity to fund counterterrorism readiness and emergency management programming imposes catastrophic risks on the residents of the affected States.

On the other side of the ledger, defendants would suffer no harm by simply maintaining the status quo, in which the HSGP funds are not re-allocated, the EMPG program is not subject to an unworkable population certification requirement, and neither grant is subject to a surprise truncated performance period. *See City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) (no harm to the government where it can "distribute the funds without mandating the conditions—as has been done for over a decade"). "Continuation of [that] status quo will not work an irreparable harm" on defendants. *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers). In the end, defendants have the "awesome statutory responsibility to prepare the nation for, and respond to, all national incidents, including natural disasters and terrorist attacks." *News-Press v. U.S. DHS*, 489 F.3d 1173, 1178 (11th Cir. 2007). They cannot complain of an injunction that merely obliges them to perform that duty.

## CONCLUSION

Plaintiff States respectfully request that the Court:

1. Grant Plaintiff States' motion for summary judgment and enter judgment in favor of Plaintiff States and against defendants;

2. Declare that the Reallocation Decision is unlawful, and set aside and vacate it;

3. Direct defendants to amend the Homeland Security Grant Program awards issued to California, the District of Columbia, Illinois, Massachusetts, Minnesota, New Jersey, New York, Pennsylvania, and Washington, to reflect the August 1, 2025 Homeland Security Grant Program notice of funding opportunity;

4.  Declare that the Performance Period Decision is unlawful, and set aside and vacate it;

5.  Direct defendants to amend the Homeland Security Grant Program awards issued to all Plaintiff States to provide the period of performance set forth in the August 1, 2025 Homeland Security Grant Program notice of funding opportunity, namely September 1, 2025, to August 31, 2028;

6.  Direct defendants to amend the Emergency Management Performance Grant awards issued to all Plaintiff States to provide the period of performance set forth in the Emergency Management Performance Grant fiscal year 2025 notice of funding opportunity, namely October 1, 2024, to September 30, 2027;

7.  Declare that the Population Certification Requirement is unlawful, and set aside and vacate it;

8.  Direct defendants to amend the Emergency Management Performance Grant awards issued to all Plaintiff States to remove the award terms titled "Verification of a State's Population";

9.  Enjoin defendants from enforcing by any means against Plaintiff States and their instrumentalities and subdivisions the Emergency Management Performance Grant award terms titled "Verification of a State's Population" or any materially similar terms requiring certification of a State's population as a condition on the receipt of federal funds; and

10. Direct defendants to disburse, in the ordinary course, all allowable costs for which Plaintiff States seek payment from their fiscal year 2025 Homeland Security Grant

Program and Emergency Management Performance Grant awards on behalf of themselves and their sub-grantees.

October 30, 2025

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
Lee I. Sherman
James E. Stanley
  *Supervising Deputy Attorneys General*
Luke Freedman
Delbert Tran
  *Deputy Attorneys General*

/s/ Deylin Thrift-Viveros
Deylin Thrift-Viveros
  *Deputy Attorney General*
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6000
deylin.thriftviveros@doj.ca.gov

*Attorneys for the State of California*

Respectfully submitted,

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Christopher G. Wells
  *Chief of the Public Interest Division*
Paul Berks
  *Complex Litigation Counsel*
R. Sam Horan
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
  *Deputy Solicitor General*
Mayur P. Saxena
  *Assistant Attorney General*
Olivia C. Mendes
Phoenix N. Meyers
Daniel Resler
  *Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (R.I. Bar No. 8486)
  *Chief, Civil Division*
  *Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Ashley Meskill
Ashley Meskill
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Rose Gibson
  *Assistant Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*

BRIAN L. SCHWALB
  ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

/s/ Mitchell P. Reich
Mitchell P. Reich
  *Senior Counsel to the Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*


ANDREA JOY CAMPBELL
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of Massachusetts*


KEITH ELLISON
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*


LETITIA JAMES
  ATTORNEY GENERAL OF NEW YORK

/s/ Stephen Thompson
Rabia Muqaddam
  *Chief Counsel for Federal Initiatives*
Stephen C. Thompson
  *Special Counsel*
Julie Dona
  *Special Counsel*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*

**JENNIFER SELBER**
  GENERAL COUNSEL

/s/ Jacob B. Boyer
Jacob B. Boyer
  *Deputy General Counsel*
Pennsylvania Office of the Governor
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*


**NICHOLAS W. BROWN**
  ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts
  *Assistant Attorney General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov

*Attorneys for the State of Washington*


**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Jonathan T. Rose
  *Solicitor General*
Julio A. Thompson
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*