**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>                  *Plaintiffs*,<br><br>   v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, *et al.*,<br><br>                *Defendants.* | No. 1:25-cv-00495 |

# EXHIBIT 20

## Declaration of Lee Fiorio

## DECLARATION OF LEE FIORIO

I, Lee Fiorio, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am Senior State Demographer at the Illinois Department of Public Health (IDPH). I am responsible for producing, and overseeing the preparation and vetting of, IDPH's intrastate population estimates and projections and for developing and analyzing statistical and demographic data for the State of Illinois.

3.      Before joining IDPH, I served as a Senior Research Methodologist at the National Opinion Research Center (NORC) at the University of Chicago. At NORC I worked on the design of several large population surveys and performed an evaluation of Census Bureau population estimates for the State of Illinois. I earned my Masters' Degree in Geography from the University of Washington where I also received a Graduate Certificate in Demographic Methods from the Center for Studies in Demography and Ecology.

4.      In total, I have 15 years of experience working on problems and methods for the statistical study of population, with particular emphasis on measuring migration.

### Background

5.      IDPH's estimates of Illinois's total population are derived exclusively from federal data promulgated by the United States Census Bureau. Neither IDPH nor any other Illinois state agency estimates the total population of Illinois. For total population, Illinois relies on the federal Census Bureau estimates.

1

6.    IDPH also relies on the Census Bureau for intrastate estimates of population, including counties and municipalities within Illinois. In certain cases, IDPH will adjust the Census Bureau intrastate estimates to produce custom estimates for more detailed subpopulations not available in Census Bureau data releases. Estimates of the intrastate distribution of population assist with planning service expansions and rolling out new programs, estimating costs of service uptake, and structuring economic development programs.

7.    IDPH produces intrastate population projections using data from the U.S. Census Bureau and adjusting it based on trends in births, deaths, and migration. These projections rely on a combination of aggregate data from state and federal sources including IDPH, the Census Bureau and the Internal Revenue Service (IRS). Importantly, IDPH relies exclusively on U.S. Census Bureau data to estimate changes in international migration.

<b><u>The EMPG Population Certification Condition</u></b>

8.    I am aware that on September 27, 2025, the Federal Emergency Management Agency (FEMA) issued a federal funding award for the Emergency Management Performance Grant (EMPG) for Fiscal Year 2025 to the Illinois Emergency Management Agency – Office of Homeland Security (IEMA-OHS). Three days later, on September 30, FEMA released revised (though not re-dated) EMPG award letters through the FEMAGo portal, including the new term described in the next paragraph.

9.    The award letter received by IEMA-OHS includes a lengthy list of "Agreement Articles," the last of which reads as follows:

2

### Article 62 Funding Hold: Verification of State's Population

FEMA has placed a funding hold on this award, and the full amount of the award is on hold in the FEMA financial systems. The recipient is prohibited from obligating, expending, or drawing down the funds associated with the award.

To release the funding hold, the SAA must provide a certification of the recipient state's population as of September 30, 2025. In so doing, the State will explain the methodology it used to determine its population and certify that its reported population does not include individuals that have been removed from the State pursuant to the immigration laws of the United States.

FEMA will rescind the funding hold upon its review and approval of the State's methodology and population certification.

10. I was asked to evaluate FEMA's population certification requirement, whether the State could feasibly produce and certify such an estimate, and whether the State had ever been required to produce such an estimate before.

11. I have reviewed the available information at IDPH and consulted with relevant personnel, and I am not aware of the State ever being required to calculate or certify its calculation of state population in order to access federal grant funding or for any other reason.

12. IDPH does not have any record of people who have been removed from the State pursuant to federal immigration laws, and as far as I am aware no other agency in Illinois keeps such records.

13. Based on my experience and knowledge acquired in the usual course of my duties, I understand that the federal government typically relies on its own data when administering federal programs that require tallies of state population. In particular, the U.S. Census Bureau produces an annual estimate of each State's population through the Population Estimates Program (PEP). It is my understanding that the Department of Homeland Security (DHS) has access to data compiled and maintained by U.S. Census Bureau, and that using that data ensures uniformity within and across programs and policies.

3

14.     Requiring the States to produce their own distinct population calculations would result in different States relying on different assumptions and using different methodologies, almost certainly producing inconsistent results. Based on my knowledge and experience, asking each State to propose its own methodology to calculate its population and then comparing those disparate figures is not a sound methodological approach.

## No Feasible Method to Comply

15.     Moreover, based on my knowledge and expertise, even for States like Illinois that produce intrastate population and demographic projections, FEMA's population certification request is infeasible as a practical matter.

16.     The first option available to IDPH if it were to attempt to comply with the certification requirement would be to attempt to adjust the existing U.S. Census Bureau's annual PEP estimates to attempt to derive a figure as of September 30, 2025, subtracting removed individuals. This path would confront many obstacles.

17.     First, FEMA's population certification requirement asks for each State's population estimate to exclude individuals removed under federal immigration laws. But Illinois does not have international migration data. I have learned that in the past DHS published the number of individuals whom it had removed, returned, or expelled, but DHS has not updated that data since November 2024. To my knowledge, DHS does not typically release state-specific data.

18.     Second, even if FEMA could and did provide the relevant federal data to inform an estimate of Illinois' population, FEMA's requirement that the estimate be tied to September 30, 2025 is infeasible for the following reasons:

- The U.S. Census Bureau, which produces the official population estimates for both the nation and States, typically engages in months of research, testing, and

4

validation before making any methodological changes or incorporating new data into their estimates. Similarly, Illinois would require months to process numerous sources of data to make similar estimates, including birth certificates, death records. housing data, driver licenses, and school enrollment data.

- Federal census figures reflect data tied to different dates within the year. The U.S Census Bureau annually publishes PEP estimates for states in December of each year that are current as of July 1 of that year. Neither the federal government nor Illinois has established a methodology for extrapolating the federal data from July 1 to September 30, or to incorporate removals by federal immigration authorities. Moreover, as of today, the most recent population set of state population estimates published by the Census Bureau PEP are for July 1, 2024.

19. In addition, the U.S. Census Bureau's annual estimates already attempt to account for international out-migration, including removals and expulsions. I understand that the U.S. Census Bureau incorporates into its estimates of international out-migration data available to the federal government, and not the States, such as restricted-use American Community Survey information and data provided by the IRS to the Census Bureau. Because the U.S. Census Bureau data would form the baseline of an Illinois population estimate as of September 30, 2025, any attempt by Illinois to identify individuals removed from the State before September 30, 2025, could result in double-counting of removals already included in U.S. Census Bureau's annual PEP estimates.

20. Because adjusting the U.S. Census Bureau's annual PEP estimates would not be feasible, Illinois' second option would be to instead develop its own in-house capabilities for estimating its own population. This second option would face similar obstacles as the first.

5

Namely, to produce such estimates so that they comply with the certification requirement, IDPH would need (1) data on deportations and removals, which the State of Illinois does not collect, and (2) a methodology for estimating population and incorporating the deportation and removal data in an accurate and defensible way, which the State of Illinois would have to develop. As such, producing in-house population estimates for Illinois would be massively costly and take many months, if it were feasible at all.

21.    At a minimum, attempting to comply with FEMA's new funding condition would require IDPH to collect data outside its usual framework and conduct additional surveys. For example, a method that some states use to produce population estimates is to use housing units and housing unit change as a proxy for population. For IDPH to employ this method, it would need to survey thousands of local government units to obtain housing unit or building permit data spanning multiple years, likely to the most recent Decennial Census. This effort could not be done over any reasonable time period to secure funding for a fiscal year 2025 grant. Additionally, even if IDPH were to begin pursuing the housing unit approach today, there is no guarantee that each locality would have up-to-date housing and building permit data to reflect population as of September 30, 2025. Finally, were IDPH to produce an estimate of state population using the housing unit approach, it is not apparent how IDPH would then incorporate data on removals and deportations to subtract this population from its estimate.

22.    Methods other than the housing unit method approach would run into similar methodological and data-related limitations. For instance, if IDPH were to pursue a component-based approach and estimate Illinois population change based on births, deaths, and migrations, producing estimates for September 30, 2025 would be impossible because data on birth, deaths, and migrations are not published in real time. In the case of birth and death data, there is significant

6

lag time of approximately 18 months between the events and when the information is tabulated and disclosed by the Illinois Office of Vital Statistics. Thus, regardless of the approach, not only would data collection take months to complete, but the resulting estimates likely would also be inaccurate.

23.     Because the required data sources will not yet be complete or may not reflect changes in population as of September 30, 2025, IDPH would have to use models to extrapolate or approximate changes in population to try and capture the population on September 30, 2025. Designing such a model would be extraordinarily difficult because IDPH has not collected the same data in past years, so there would be no baseline data to establish any trend that could be carried forward to September 30, 2025. This limitation would call into question the accuracy of any extrapolation.

24.     I believe it would be impossible to certify the population in Illinois as of September 30, 2025, without engaging in months of work and investing substantial funds towards the task—and even then, such estimates would be less accurate than estimates derived from existing U.S. Census data.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of October, 2025, in Chicago, Illinois.

Lee Fiorio
Senior State Demographer
Illinois Department of Public Health

8