**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF ILLINOIS, *et al.*,

                 *Plaintiffs*,

    v.

KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, *et al.*,

                 *Defendants*.

No. 1:25-cv-00495

# EXHIBIT 30

## Declaration of Eric Forand

## DECLARATION OF ERIC FORAND

I, Eric Forand, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am over the age of eighteen and understand the obligations of an oath.

2.      I am currently the Director of the Division of Emergency Management at the Vermont Department of Public Safety. In this role, I oversee the administration of the Emergency Management Performance Grant Program in Vermont.  I make this declaration based on personal knowledge and on my review of information and records gathered by Department of Public Safety staff.

3.      The Department of Public Safety is an executive-branch state agency.

4.      FEMA administers many grant programs where States are the primary grant recipients. The Department of Public Safety administers FEMA's annually funded preparedness grants, including the Emergency Management Performance Grant.

## I.      Emergency Management Performance Grant Program

5.      I am familiar with the Emergency Management Performance Grant Program ("EMPG"). EMPG provides federal funding to States to assist state, local, tribal, and territorial emergency management agencies to implement FEMA's National Preparedness System, including by building continuity-of-government capabilities to ensure essential functions in a catastrophic disaster.

6.      EMPG funding is administered in Vermont by the Department of Public Safety.

7.      EMPG grants are formula grants and not competitive grants.

8.      In addition to using EMPG funds themselves, States may pass EMPG funds through to subgrantees for the same purposes. The Department of Public Safety passes approximately 20% of EMPG funds on to regional planning commissions to conduct emergency planning activities.

1

9.    The Department of Public Safety has applied for and received funds from EMPG since it was codified in the Post-Katrina Emergency Management Reform Act of 2006.

10.    The Department of Public Safety has two open EMPG awards from FFYs 2023 and 2024:

a.    FFY 2023: Total award amount of $2,750,000; and

b.    FFY 2024: Total award amount of $2,750,000.

11.    EMPG funding is the primary enabler to develop both state and local resilience programs for emergency management.

12.    EMPG grant funds pay for the salaries of 11.5 full-time equivalent positions in the Division of Emergency management at the Department of Public Safety.

13.    The amounts passed through to localities under the EMPG program fund the planning activities of the Regional Planning Commissions.

14.    EMPG grants fund the ongoing costs of the disaster management software program used at the State Emergency Operations Center. The State Emergency Operations Center is the physical location where a state emergency manager would direct all strategic and operational activities in the event of a disaster or public health emergency.

**II.    Cuts to the Periods of Performance**

15.    The term of FEMA preparedness awards has generally been three years, meaning that the award remains open for a three-year period for completing reimbursable activities. Any program activities supported by the awarded funds must be completed within the time the award remains open.

16.    It is typical for FEMA preparedness awards to take several years to fully disburse. The EMPG programs have used multi-year periods of performance, sometimes even longer than three years, for almost every year of their existence. These programs fund ongoing operational

2

needs of state and local public safety agencies. As a result, the Department of Public Safety has structured their budgeting systems for EMPG grants around multi-year disbursements.

17.    The Department of Public Safety would face significant challenges to fiscally accommodate a sudden change to a one-year period of performance. There are outstanding funds on prior-year grants yet to be expended for their planned uses approved by FEMA in prior years. A one-year period of performance would require the fiscal year 2025 funds to be expended at the same time of prior-year funds, making it challenging to expend all outstanding awards for their intended purposes.

18.    A one-year period of performance would also create administrative challenges to ensure there is no gap in funding from year to year.

19.    In addition, FEMA typically extends flexibility during the multi-year periods of performance to make adjustments to funding lines by using the required biannual strategy implementation reports to re-calibrate needs as they evolve during the grant period. The biannual report adjustments represent a way in which FEMA has built multi-year periods of performance into the basic functioning of EMPG.

20.    This year, in keeping with past practice, the EMPG NOFO announced that there would be a three-year period of performance.

21.    The NOFO explained that applications should frame their budget needs by reference to the anticipated three-year period of performance. EMPG stated that "[e]ach goal must be specific, measurable, and achievable within the period of performance."

22.    The Department of Public Safety proposed projects for the NOFO on that understanding.

23.    When the awards issued, the period of performance was reduced to one year on both awards without explanation, running from October 1, 2025, to September 30, 2026.

3

24. The Department of Public Safety will face significant challenges in obligating the funds within this time period. This will likely result in a portion of the unexpended funds expiring unused.

25. In my 8 years of experience with the Division of Emergency Management, I have not seen FEMA reduce the period of performance announced in a NOFO and relied upon by applicants like this.

### III. The EMPG Population Certification Condition

26. The Department of Homeland Security (DHS) published the EMPG notice of funding opportunity on July 28, 2025, amending it the next day to correct the program title. The NOFO did not include any language stating that States would have to provide any verification of their population in order to apply for or receive EMPG funds.

27. On September 27, 2025, FEMA issued EMPG awards for FY 2025 (Award Letter). Three days later, on September 30, FEMA released revised (though not re-dated) EMPG award letters through the FEMAGo portal including the new term described in the next paragraph.

28. The Award Letter included a lengthy list of "Agreement Articles," the last of which reads as follows:

**Article 62 Funding Hold: Verification of State's Population**

FEMA has placed a funding hold on this award, and the full amount of the award is on hold in the FEMA financial systems. The recipient is prohibited from obligating, expending, or drawing down the funds associated with the award.

To release the funding hold, the SAA must provide a certification of the recipient state's population as of September 30, 2025. In so doing, the State will explain the methodology it used to determine its population and certify that its reported population does not include individuals that have been removed from the State pursuant to the immigration laws of the United States.

FEMA will rescind the funding hold upon its review and approval of the State's methodology and population certification.

29.    In my 8 years of experience, I have never seen a funding hold based on a population certification condition imposed on any federal grant.  Instead, I understand that EMPG has always been administered using U.S. census data, without any additional calculations performed by States.

30.    FEMA has offered the Department of Public Safety no explanation as to why it was imposing this new population certification condition.

31.    The Department of Public Safety does not have a record of people who have been removed from the State pursuant to immigration laws, and as far as I am aware no other state agency in Vermont keeps such a record.

32.    In trying to understand this population certification condition, I have found many of the terms ambiguous. The population certification condition fails to define what it means for an individual to be removed "pursuant to the immigration laws of the United States."

33.    I believe it would likely be impossible to certify the precise population in Vermont as of September 30, 2025, without significant efforts and substantial funds toward the task—and possibly not even then.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of October, 2025, in Waterbury, Vermont.

Eric Forand
Director, Division of Emergency Management
Department of Public Safety

5