# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, *et al*.,<br><br>        *Defendants*. | No. 1:25-cv-00495 |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.     Statutory Background ........................................................................................... 2

     A.    Homeland Security Grant Program ("HSGP") ......................................... 2

     B.    Emergency Management Performance Grant ("EMPG")........................... 4

     C.    The Paperwork Reduction Act ("PRA") ................................................... 5

     D.    13 U.S.C. § 183(a) ................................................................................... 5

II.    Factual Background ............................................................................................. 6

     A.    Fiscal Year 2025 HSGP Funding............................................................. 6

     B.    Fiscal Year 2025 EMPG Funding............................................................ 8

III.   Procedural History .............................................................................................. 9

ARGUMENT ................................................................................................................ 11

I.     The Court Lacks Subject-Matter Jurisdiction Where Plaintiffs Seek Payment of Increased Grant Funds and Seek to Modify the Terms of Federal Grants...................... 11

II.    Plaintiffs' Reallocation Decision Claims Are Moot. ......................................... 14

     A.    The Reallocation Decision Claims Are Moot Because the HSGP Funds Have Been Fully Obligated. ........................................................................ 15

     B.    The Reallocation Decision Claims Are Moot Because the Appropriations Lapsed on September 30, 2025. .................................................................... 16

III.   Defendants Lawfully Allocated FY 2025 HSGP Funding. ............................... 19

     A.    Defendants' Allocation of HSGP Funding was Consistent with Statutory Authority and in Observance of Procedures Required by Law. ................... 19

     B.    Defendants' Allocation of HSGP Funding was Well-Reasoned. ......................... 21

IV.   *Ultra Vires* Review of Plaintiffs' Reallocation Decision Claims is Unavailable. ............ 24

V.      Plaintiffs' "Population Certification" and Period of Performance Claims are Unreviewable Under the APA Because Outlining Grant Terms and Conditions is Committed to Agency Discretion by Law. ........................................................................ 25

VI.     Plaintiffs' Claims that the Population Verification Requirement Cannot Be Satisfied are Not Ripe. ................................................................................................ 27

VII.    The Population Verification Requirement is Lawful. ....................................................... 28

        A.      The Population Verification Requirement is Consistent with Statutory Authority and in Observance of Procedures Required by Law. ........................... 28

                1.      Consistent with 13 U.S.C. § 183(a), Defendants Used Federal Census Data to Allocate EMPG Funding. .................................................. 29

                2.      The Population Verification Requirement is Permitted Under the Paperwork Reduction Act. .......................................................................... 29

        B.      The Population Verification Requirement is Well-Reasoned.............................. 30

VIII.   The Period of Performance Term is Well-Reasoned. ....................................................... 31

IX.     Plaintiffs Have Failed to Establish Irreparable Harm. ..................................................... 32

X.      The Balance of the Equities and the Public Interest Tip in Defendants' Favor................ 34

XI.     Any Relief Should be Limited to Plaintiff States. ............................................................. 35

XII.    Any Relief Should be Stayed Pending Appeal ................................................................. 37

CONCLUSION...................................................................................................................... 37

## INTRODUCTION

Plaintiffs—twelve States and the District of Columbia—bring this action under the Administrative Procedure Act (the "APA") challenging the Federal Emergency Management Agency's ("FEMA") award of emergency preparedness grants to eligible jurisdictions around the country, and challenging FEMA's inclusion of grant terms that Plaintiffs do not prefer. Because Plaintiffs seek payment of increased grant funds and seek to modify the terms of their grant agreements, their claims belong in the Court of Federal Claims and this Court lacks jurisdiction to hear each challenge.

Plaintiffs ask this Court to de-obligate $245,565,440 million in Homeland Security Grant Program ("HSGP") funds that FEMA and the Department of Homeland Security ("DHS") have already obligated to eligible recipients and re-obligate this money to Plaintiff States.  However, Plaintiffs cannot obtain the relief they seek because Plaintiffs' "Reallocation Decision" claims are moot.  Not only have the funds at issue already been fully obligated to other jurisdictions, but the relevant appropriations expired on September 30, 2025, and this Court's equitable authority does not extend to staying the expiration of appropriations. Even if Plaintiffs could establish jurisdiction, Plaintiffs fail to show that FEMA's funding decision-making was unlawful under the APA or *ultra vires*.

Plaintiffs further challenge the fiscal year 2025 HSGP and EMPG grants terms.  Plaintiffs seek to amend the terms of their awards to reflect their preferred period of performance (3 years instead of 1 year), and they seek the removal of a term conditioning the receipt of EMPG funds on the submission of population information by grantees. Even if Plaintiffs could establish jurisdiction, their challenges to these grant terms are not subject to APA review because decisions about how long to contract with grantees and what information to seek from them are committed to agency discretion by law. Plaintiffs' challenge to the population verification term also fails for the separate reasons that it is not ripe for judicial review because FEMA intends to provide guidance to the states about compliance with that provision. And, even if Plaintiffs could establish jurisdiction *and* a cognizable APA claim, Plaintiffs fail to show that the period of

1

performance and population verification terms are unlawful under the APA.

As to the equities, Plaintiffs cannot show that failing to receive funds to which they were never entitled and being presented with grant terms they do not prefer causes them to suffer irreparable harm. They cannot show that the balance of the equities and public interest mandate the extraordinary relief they seek.

For these reasons, and the additional reasons explained herein, this Court should deny Plaintiffs' motion for summary judgment, grant Defendants' cross-motion, and enter judgment for Defendants.

## **BACKGROUND**

### I.    **Statutory Background**

This suit concerns two federal grant programs created by Congress to strengthen the Nation's preparedness and its ability to respond to major disasters and emergencies: the Homeland Security Grant Program ("HSGP") and the Emergency Management Performance Grant ("EMPG").  "These grant programs are part of a comprehensive set of measures authorized by Congress and implemented by DHS/FEMA to assist state, local, tribal and territorial emergency management agencies to implement the National Preparedness System and the National Preparedness Goal of a secure and resilient nation." FY 2025 EMPG Program Fact Sheet at https://perma.cc/K948-48K4.

### A.  **Homeland Security Grant Program ("HSGP")**

The Homeland Security Grant Program was created in 2003. The authorizing section is Section 2002 of The Homeland Security Act of 2002, Pub. L. No. 107-296, § 430, 116 Stat. 2135, 2191–92.  The program was codified in its current form by the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, § 101, 121 Stat. 266, 273–85 (codified as amended at 6 U.S.C. §§ 603–609).  Ex. 3, FY 2025 HSGP NOFO at 11. HSGP includes three key grant programs designed to enhance the capabilities of state, local, tribal, and territorial governments, as well as nonprofits, in preventing, protecting against, and responding to terrorist attacks: the State Homeland Security Grant Program ("SHSP"), the Urban

2

Area Security Initiative ("UASI"), and Operation Stonegarden ("OPSG"). These programs are part of a comprehensive set of measures authorized by Congress and implemented by DHS to strengthen the nation's communities against potential terrorist threats. *Id*. at 12.

The State Homeland Security Grant Program and Urban Area Security Initiative are relevant to this case. The goal of the SHSP is to support statewide and state, local, tribal, and territorial ("SLTT") governments in building, enhancing, and sustaining the capabilities needed to prevent, prepare for, protect against, and respond to acts of terrorism. Ex. 3, FY 2025 HSGP NOFO at 12. The aim for the UASI is to enhance the security and resilience of high-risk urban areas by building, sustaining, and improving capabilities to prevent, prepare for, protect against, and respond to acts of terrorism. *Id*. Together, these grants aim to build a cohesive and collaborative approach to homeland security by promoting national preparedness and resilience. *Id*.

In allocating HSGP funds among States applying for SHSP grants and eligible high-risk urban areas applying for UASI grants, the FEMA "Administrator shall consider, for each State or high-risk urban area, [the jurisdiction's] relative threat, vulnerability, and consequences from acts of terrorism" (or "relative risk"), and "the anticipated effectiveness of the [jurisdiction's] proposed use of the grant. . . .in increasing the [jurisdiction's ability] to prevent, prepare for, protect against, and respond to acts of terrorism" and "otherwise reduce the overall risk to the [jurisdiction] or the Nation." 6 U.S.C. § 608(a)(1)-(2).

In considering an applicant jurisdiction's relative risk, the Administrator must consider factors that include population density; history of threats; degree of threat, vulnerability, and consequences related to critical infrastructure or key resources; current threat assessments available to DHS; and whether the jurisdiction is located at or near an international border. *Id*. § 608(a)(1)(A)-(J). At his discretion, the FEMA Administrator may consider additional factors "specified in writing." *Id*. § 608(a)(K).

To determine a jurisdiction's final SHSP or UASI award amount, FEMA considers: (1) an applicant jurisdiction's relative risk score as determined by a Terrorism Risk Methodology

("TRM") (or "risk formula") that incorporates the statutory and discretionary factors; and (2) the anticipated effectiveness of a jurisdiction's proposed use of grant funds. *See* Ex. 12, FY 2025 HSGP Grant Allocation Summary at 1.  Additionally, FEMA may adjust amounts to ensure each State and four U.S. territories receive an SHSP award that meets the statutory minimum allocation.[1] *See* 6 U.S.C. § 605(e).

Given the evolving nature of the terrorist threat, annually, FEMA and DHS—through the Office of Intelligence and Analysis—work to ensure that the risk formula, including the weight each factor carries, reflects the present risks to the nation. Ex. 1, Arnold Decl. ¶ 15; *see also* Am. Comp., Ex. 13 at 1 ("the risk methodology is changing to be more in line with the current complex and diverse threat environment and the intended use of the SHSP/UASI grants.") Additionally, FEMA and DHS might adjust the relative weights of the TRM risk score and the anticipated grant spending effectiveness. Ex. 1, Arnold Decl. ¶ 16.

### B.  Emergency Management Performance Grant ("EMPG")

Emergency Management Performance Grant funds have been available to States since an initial appropriation for the program in 2003. *See* Pub. L. 108-7, 117 Stat. 11, 515-516.  The program is codified at 6 U.S.C. § 762 after being made permanent by the Post-Katrina Emergency Management Reform Act of 2006.  The EMPG provides federal funding to States to assist state, local, tribal, and territorial emergency-management agencies in preparing for and managing emergencies resulting from natural disasters or accidental or man-made events. Ex. 2, FY 2025 EMPG NOFO at 18.

Because the EMPG is a formula grant and not a competitive grant, each State is entitled to a specific allocation, set by statutory formula. FEMA must allocate to each State a baseline amount of 0.75 percent of the fiscal year's appropriated EMPG funds, and to territories a baseline amount of 0.25 percent of the appropriated funds. *Id*. § 762(d)(1). FEMA must then

---

[1] Each state is entitled to a minimum amount of SHSP funding. 6 U.S.C. § 605(e)(1). Specifically, "the Administrator shall ensure that. . . .each State receives. . . .not less than an amount equal to 0.375 percent of the total" appropriated HSGP funds. Id. And the four territories are to receive "not less than an amount equal to 0.08 percent of the total" appropriated HSGP funds.

apportion the remaining funds "in the ration that the population of each State bears[] to the population of all States." *Id*. § 762(d)(2). In other words, the remaining funding is allocated based on each State's relative population.

### C.  The Paperwork Reduction Act ("PRA")

The Paperwork Reduction Act ("PRA") was enacted in 1995. 44 U.S.C. § 3501. Its purposes include to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government," "minimize the cost to the Federal Government of the creation, collection, maintenance, use, dissemination, and disposition of information," and "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." *Id*. at § 3501(2), (5), (7).  The PRA provides that "consistent with applicable law," the OMB Director is to "oversee the use of information resources to improve the efficiency and effectiveness of governmental operations to serve agency missions, including burden reduction and service delivery to the public." *Id* § 3504(a)(1)–(2).

Before an agency can conduct a "collection of information," the PRA requires the agency to: (1) review the proposed collection; (2) provide notice of the proposed collection in the Federal Register and evaluate public comments; (3) submit the proposed collection to the Office of Management and Budget ("OMB") for approval or disapproval; (4) certify in the submission that each collection of information is, among other things, "not unnecessarily duplicative of information otherwise reasonably accessible to the agency"; (5) publish another notice in the Federal Register stating that the agency has made such submission to the OMB; and (6) if approved by OMB, obtain "a control number to be displayed upon the collection of information." 44 U.S.C. §§ 3506(c), 3507(a).

### D.  13 U.S.C. § 183(a)

13 U.S.C. § 183(a) requires that, when "administering any law of the United States in which population or other population characteristics are used to determine the amount of benefit

received by State, county, or local" governments, "the Secretary [of Commerce] shall transmit to the President for use by the appropriate departments and agencies of the executive branch the [census] data most recently produced and published under [Title 13]."

## II. Factual Background

### A. Fiscal Year 2025 HSGP Funding

In fiscal year 2025, $373,500,000 was allocated to the State Homeland Security Program (SHSP) and $553,500,000 to the Urban Area Security Initiative (UASI). Ex. 3, FY HSGP NOFO at 3; Ex. 1, Arnold Decl. ¶ 12.

On July 24, 2025, FEMA sent risk validation letters to States and eligible UASI jurisdictions, providing stakeholders with the opportunity to submit information believed to be relevant to DHS's determination, and review and remedy erroneous or incomplete information. *See* Ex. 1, Arnold Decl. ¶ 13. They invited jurisdictions to submit feedback, comments, questions, or any additional information believed to be relevant to the risk validation process.

On July 28, 2025, Defendants released the final Fiscal Year 2025 HSGP Notice of Funding Opportunity ("FY 2025 HSGP NOFO" or "HSGP NOFO"), attached as Exhibit 3[2]. The HSGP NOFO solicited SHSP applications from States and UASI applications from eligible urban areas for a three-year period of performance. *Id*. at 38.  Additionally, the HSGP NOFO announced target allocations for grantees under both programs. *Id*. at 53-57.

On August 13, 2025, FEMA sent each state and UASI jurisdiction its fiscal year 2025 risk profile, including the jurisdiction's risk score and each data element considered. Ex. 1, Arnold Decl. ¶ 13.

On September 24, 2025, *after* the publication of the FY 2025 HSGP NOFO and the issuance of the FY 2025 risk profiles, decisions around amending the HSGP allocation methodology were finalized. Ex. 1, Arnold Decl. ¶ 16. And, on September 25, 2025, DHS Secretary Kristi Noem approved a memorandum from the Senior Official Performing the Duties

---

[2] All exhibit cites are in reference to the exhibits contained in the Administrative Record filed by Defendants on November 20, 2025, ECF No. 46.

of the FEMA Administrator, David Richardson, attached as Exhibit 11, that proposed amending the HSGP allocation methodology by: (1) adjusting the weight attributed to each data element considered in FEMA's Terrorism Risk Methodology (TRM) formula; and (2) adjusting the relative weights of a jurisdiction's TRM risk score and anticipated spending effectiveness consideration to 70% and 30%, respectively. This document is the "DHS directive" referenced in the FY 2025 HSGP final award letters.

Consistent with the approved memorandum, DHS amended the HSGP risk formula to better reflect present threats to the nation. Specifically, DHS rebalanced the TRM data element (or "factor") weights, prioritizing two data elements: Transnational Organized Crime ("TOC") and Nationwide Encounters. Ex. 12, FY 2025 Grant Allocations Summary at 1. As recommended by the DHS Office of Intelligence and Analysis, TOC was prioritized to address the significant and escalating threat that transnational criminal organizations pose to national security, public health, and economic stability in the United States. *Id*. The Nationwide Encounters weight was increased to address the elevated vulnerability jurisdictions face from illegal border crossings. Model-generated risk scores determined 70% of SHSP and UASI funding. *Id*.

Additionally, for the anticipated effectiveness calculus required under 6 U.S.C. § 608 (a)(2), FEMA credited jurisdictions with lower balances of unused HSGP funds for their effective use of allocated resources. Ex. 1, Arnold Decl. ¶ 18. As part of the 30% effectiveness evaluation, FEMA provided additional consideration for funding to states who proposed using the funds in support of border interdiction and other border security measures. *Id*.

FEMA then used the amended FY 2025 HSGP methodology to update FY 2025 risk scores and, in turn, calculate the final FY 2025 SHSP and UASI award amounts. *Id*. at 17. On September 26, 2025, FY 2025 HSGP Final Award Notifications were issued, attached as Exhibit 8, with allocations reflecting the updated HSGP allocation methodology. The award notifications included a one-year period of performance, from October 1, 2025 to September 30, 2026. Ex. 8,

FY 2025 Final HSGP Award Letters at 27.[3]

On September 29, 2025, during a congressional briefing, Congress was informed that the weighting for some variables in the risk methodology were changed, resulting in adjustments to risk scores and final HSGP allocations. Ex. 1, Arnold Decl. ¶ 21.

Pursuant to a stipulation between the parties, ECF No. 34, the HSGP award acceptance deadline is now December 31, 2025.

**B. Fiscal Year 2025 EMPG Funding**

On July 28, 2025, the Fiscal Year 2025 EMPG Notice of Funding Opportunity ("FY 2025 EMPG NOFO" or "EMPG NOFO"), attached as Exhibit 2, was issued soliciting project applications for a three-year period of performance. In mid-September, after the EMPG NOFO was issued, a decision was made to include a population verification requirement in the final EMPG awards that would condition a state's drawdown of its awarded EMPG funds on the state's submission of: (1) a certification with the state's population as of September 30, 2025, (2) an explanation of how the state determined its population, and (3) a certification that the reported population does not include illegal aliens who have been removed. *See* Ex. 1, Arnold Decl. ¶ 6. Submitted numbers will be used to ensure States received the appropriate amount of funding based on their true population totals, accounting for factors, like removals, that have led to state population swings. *See id.*

On September 27, 2025, FEMA issued the FY 2025 Final EMPG Award Notifications. The award notifications included a one-year period of performance, from October 1, 2025 to September 30, 2026. *Id.* at 38. Due to an administrative oversight, the population verification requirement was not included in the award letters. Ex. 1, Arnold Decl. ¶ 7. On September 30, 2025, once this mistake was realized, Defendants issued amended EMPG awards, attached as

---

[3] The final HSGP Award letters also contain a "Compliance with Federal Immigration Law" Agreement Article term that prohibits a grant recipient designated by Department of Justice ("DOJ") as a sanctuary jurisdiction from "making any financial obligations under the grant award on or after the date of designation until the Department of Homeland Security removes that designation." Ex. 8, FY 2025 Final HSGP Awards at 31. This Agreement Article is explicitly not applied to plaintiffs protected by the preliminary injunction in *County of San Francisco, et al. v. Trump, et. al*, No. 3:25-cv-01350 (N.D. Cal.), and plaintiffs protected under the permanent injunction in *Illinois, et al. v. Federal Emergency Management Agency, et. al*, No. 25-206 (D.R.I.).

Exhibit 6, with an Agreement Article entitled "Funding Hold: Verification of State's Population." *Id.* The Agreement Article outlines that "the full amount of the award is on hold in the FEMA financial systems" and "[t]he recipient is prohibited from obligating, expending, or drawing down the funds associated with the award" until the State "provide[s] a certification of the recipient state's population as of September 30, 2025, "explain[s] the methodology it used to determine its population," and "certifie[s] that its reported population does not include individuals that have been removed." Ex. 6, Final Amended EMPG Awards at 34. Further, FEMA must review and approve "the State's methodology and population certification" before the agency will rescind the State's EMPG funding hold.[4] *Id.*

FEMA was in the process of developing guidance for states regarding the EMPG population verification requirement before Government-wide funding expired on October 1, 2025. Ex. 1, Arnold Decl. ¶ 9. Following the recent restoration of appropriations, FEMA restarted work on the guidance and remains committed to addressing any questions or concerns that grantees may have about this provision. *Id.*

Pursuant to a stipulation between the parties, ECF No. 34, the EMPG award acceptance deadline is now December 31, 2025.

## III.    Procedural History

On September 30, 2025, this Court entered TRO as to grants administered by DHS as part of HSGP. *See* ECF No. 14. The TRO (1) directed Defendants to "rescind all fiscal year 2025 Homeland Security Grant Program award notifications and de-obligate the associated funds"; (2) enjoined Defendants from "from disbursing, processing, returning to the U.S. Treasury, re-programming, re-allocating, or otherwise making unavailable by any means *all* fiscal year 2025 Homeland Security Grant Program funds" (emphasis added); and (3) ordered that the "statutory

---

[4] The final EMPG Award letters also contain a "Compliance with Federal Immigration Law" Agreement Article term that prohibits a grant recipient designated by Department of Justice ("DOJ") as a sanctuary jurisdiction from "making any financial obligations under the grant award on or after the date of designation until the Department of Homeland Security removes that designation." Ex. 6, FY 2025 Final EMPG Awards at 36. This Agreement Article is explicitly not applied to plaintiffs protected by the preliminary injunction in *County of San Francisco, et al. v. Trump, et. al*, No. 3:25-cv-01350 (N.D. Cal.), and plaintiffs protected under the permanent injunction in *Illinois, et al. v. Federal Emergency Management Agency, et. al*, No. 25-206 (D.R.I.).

lapse of the funds appropriated by Congress for the fiscal year 2025 Homeland Security Grant Program is immediately suspended pending further order of the Court." *Id.*

Defendants moved for reconsideration of the TRO, ECF No. 27, which the Court granted in part. ECF No. 31. The Modified TRO (1) narrowed the scope of injunctive relief to apply only to the contested funds at issue in this case (the funds re-allocated between the final August 1, 2025, HSGP NOFO and the final HSGP award notifications, which total $245,565,440); (2) ordered Defendants to "de-obligate $245,565,440 of fiscal year 2025 Homeland Security Grant Program funds by amending the award notifications issued to those jurisdictions that experienced funding gains between the NOFO and award"; and (3) enjoined Defendants "from disbursing, processing, returning to the U.S. Treasury, re-programming, re-allocating, or otherwise making unavailable by any means the de-obligated $245,565,440 of fiscal year 2025 Homeland Security Grant Program funds." *Id.*

Thereafter, the parties agreed to convert the Modified TRO into a preliminary injunction and proceed to expedited cross-motions for summary judgment. ECF No. 34. To facilitate prompt resolution of this case, Defendants agreed to extend the deadline for Plaintiffs to accept their HSGP and EMPG awards to December 31, 2025. *Id.*

Plaintiffs filed an amended complaint on October 24, 2025, and subsequently moved for summary judgment on October 30, 2025. *See* ECF Nos. 33, 39. Plaintiffs' motion for summary judgment challenges three aspects of the fiscal year 2025 HSGP and EMPG awards. First, Plaintiffs argue that DHS unlawfully changed the amount of money allocated for Plaintiffs' HSGP awards between the NOFO and final award decision. Plaintiffs characterize this claim as a challenge to Defendants' "Reallocation Decision." *See* Am. Compl. (Counts I-IV). Second, Plaintiffs assert DHS unlawfully changed the duration of the fiscal year 2025 HSGP and EMPG awards from three years to one year. Plaintiffs characterize this claim as Defendants' "Period of Performance Decision." *See id.* (Count V). Third, Plaintiffs challenge DHS's decision to require States receiving EMPG awards to provide updated information about their current populations

10

before funding is dispersed.  Plaintiffs characterize this claim at the "Population Certification Requirement." [5]  *See id.* (Counts VI-VIII).

## ARGUMENT

**I.     The Court Lacks Subject-Matter Jurisdiction Where Plaintiffs Seek Payment of Increased Grant Funds and Seek to Modify the Terms of Federal Grants.**

The Court lacks jurisdiction over each of Plaintiffs' claims because Congress has specifically divested federal courts of jurisdiction over matters arising from Government contracts. Here, Plaintiffs seek payment in the amount of their FY 2025 HSGP NOFO projections. Pls.' Mot. at 48.  Further, Plaintiffs ask the Court to "set aside" grant terms they dislike and permanently enjoin Defendants from including similar grant terms. *Id.* at 49.  At bottom, Plaintiffs seek to increase the amount of money they receive under their own grant awards and modify the Government's grant terms to align with terms they prefer.  This triggers jurisdiction in the Court of Federal Claims under the Tucker Act, which grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded" on "any express or implied contract with the United States" involving amounts over ten thousand dollars. 28 U.S.C. § 1491(a)(1). That court may hear "claim[s] against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.*

As the First Circuit has long recognized, a district court lacks jurisdiction where "the essence of the action is in contract"—and plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise[.]" *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Ct. of the U.S.*, 340 F.2d 947, 948 (1st Cir. 1965)). Thus, regardless of how a claim is styled, a case must proceed only in the Court of Federal claims if a case "is in 'its essence' contractual[.]" *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591,

---

[5] Defendants dispute Plaintiffs' characterization of their claims, but will refer to them as appropriate in this brief for the sake of consistency across the parties' briefs for the Court's convenience.

619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004). This prohibition on district court jurisdiction extends to claims founded on grants that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

Determining whether "a particular action" is "at its essence a contract action" outside the jurisdiction of district courts requires looking at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted); *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (applying *Megapulse*). Here, both prongs point toward a lack of district court jurisdiction. "[I]f rights and remedies are *contractually* based then only the Court of Federal Claims [has jurisdiction], even if the plaintiff formally seeks injunctive relief." *Id.* (emphases in original).

First, the source of the rights Plaintiffs assert in their Reallocation Decision claims (Counts I-IV) is the FY 2025 HSGP NOFO. While Plaintiffs posit various regulations and statutes they find relevant to their claims, no statute or regulation requires the Government to award final grant allocations identical to the projections outlined in a notice of funding opportunity.

The relief prong likewise weighs against jurisdiction. The Supreme Court in *U.S. Department of Education v. California* recently explained that an injunction barring termination of various federal grants was effectively an order "to enforce a contractual obligation to pay money," and was not covered by the APA's limited waiver of sovereign immunity. 145 S. Ct. 966, 968 (2025) (citation omitted). Thus, the Tucker Act governed the suit—not the APA—and the district court exceeded its jurisdiction. *Id.* ("Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.' 28 U.S.C. § 1491(a)(1)."). In *National Insts. of Health v. American Pub. Health Ass'n* (*NIH*), 145 S. Ct. 2658 (2025), the Supreme Court reiterated *California*'s reasoning that the APA

12

"does not provide [district courts] with jurisdiction to adjudicate claims based on [federal] grants or to order relief designed to enforce any obligation to pay money pursuant to those grants."

This Court should follow the Supreme Court's ruling in *California* and *NIH*. Plaintiffs have not explained how their alleged Reallocation Decision injury could be remedied without the Government being required to make (higher) *payments* to Plaintiff States. Indeed, in asking the Court to "amend the Homeland Security Grant Program awards issued to [Plaintiff States] to reflect the August 1, 2025 Homeland Security Grant Program notice of funding opportunity," Pls.' Mot. at 48, Plaintiffs are asking the Court to amend their final award agreements and order payment of additional funds—not to mention the relief sought would require the Government to rescind legally obligated funds from other States, implicating additional contract documents. Plain and simple, Plaintiffs are seeking payment of their NOFO target allocations—this relief is purely contractual.

As to Plaintiffs' Period of Performance claim (Count V), Plaintiffs point to previous HSGP and EMPG final award letters—contracts with the Federal Government—in an attempt to establish their right to an identical three-year period of performance term in their FY 2025 HSGP and EMPG awards.  Indeed, Plaintiffs do not, and cannot, point to any regulation or statute to support their asserted right to a longer contractual performance period.

While Plaintiffs challenge the one-year period of performance under various theories, all ultimately stem from past contracts without which their Performance Period claims would not exist. In other words, "it is likely that no cause of action would exist at all" in the absence of the grant documents from prior fiscal years. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted). That Plaintiffs' claims could not "exist[] prior to and apart from rights created under the [agreements]" weighs sharply against district court jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).

As to Plaintiffs' Population Verification claims (Counts VI-VIII), although they purport to seek an injunction against the inclusion of that term in their grant agreements, the relief Plaintiffs request is fundamentally contractual and monetary. Indeed, Plaintiffs' primary basis for irreparable

harm is they will lose federal funding and be forced to curtail or eliminate certain programs. *See* Pls.' Mot. at 41-48. Because Plaintiffs' theories of standing, relief, and irreparable harm hinge on the contractual routing of funding to them as provided for in their grant agreements, cloaking their claims as seeking equitable relief under the Constitution and the APA is irrelevant. *See, e.g.*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (district court lacks jurisdiction over any case that "is in 'its essence contractual'"); *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act . . . .").

In short, Plaintiffs "want[] the Government to keep paying up" to maintain funding pursuant to grant agreements with the United States. *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025), *dismissed sub nom. United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025). A such, their claims are "founded upon a contract" and "must be heard in Claims Court." *Id.* at 165 (quoting *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual obligations.")).

## II.    Plaintiffs' Reallocation Decision Claims Are Moot.

Even if this Court had jurisdiction over this lawsuit, Plaintiffs' Reallocation Decision claims (Counts I-IV) are moot because the funds they seek are unavailable. Plaintiffs want more money over and above their final HSGP award amount, but those additional funds were obligated to other recipient jurisdictions prior to the end of the recent federal fiscal year. The obligation of funds—even before disbursement occurs—constitutes a legal commitment to pay, thus Plaintiffs cannot obtain the relief they seek. Additionally, Plaintiffs' Reallocation Decision claims are moot because even if unobligated balances from appropriations for HSGP existed, those funds would have lapsed on September 30, 2025, and the Court does not have the equitable authority to stay the expiration of appropriated funds. Accordingly, Plaintiffs' Reallocation

14

Decision claims do not present a live case or controversy.

### A. The Reallocation Decision Claims Are Moot Because the HSGP Funds Have Been Fully Obligated.

"Article III of the Constitution limits federal judicial Power, that is, federal-court jurisdiction, to Cases and Controversies." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980) (internal quotation marks omitted). "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994). "A case is 'moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307, 132 S. Ct. 2277 (2012) (citation and quotation marks omitted).

Plaintiffs' Reallocation Decision claims (Counts I-IV) do not present a live case or controversy because the funds they seek are unavailable. Appropriated funds "can become unavailable in three circumstances: if the appropriation lapses; if the funds have already been awarded to other recipients; or if Congress rescinds the appropriation." *City of Houston*, 24 F.3d at 1426. Here, Plaintiffs finds themselves in the first two circumstances. The funds Plaintiffs demand have already been obligated by DHS to other recipients. And, if those funds were not already obligated, those funds would no longer be available for obligation at this point because the period of availability has expired.

When this lawsuit was filed on September 30, DHS had issued final HSGP grant awards to States, including the Plaintiff States who filed suit here. Ex. 8, FY 2025 HSGP Award Letters at 1. The issuance of these grant award letters constituted a legal obligation of funds under established fiscal law principles. *See* 31 U.S.C. 1501(a)(5) (explaining the "documentary evidence" required to record a grant "as an obligation of the United States Government"). An obligation is a commitment by a federal agency "that creates a legal liability of the government for the payment of goods and services ordered or received . . . ." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020) (internal quotations and citation omitted). Because

15

the contested HSGP funds were fully obligated to other jurisdictions, this Court cannot reach them to award relief to Plaintiffs. *City of Houston*, 24 F.3d at 1426; *see also id*. at 1424 ("It is a well-settled matter of constitutional law" that where an appropriation "has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation."); *Cnty. of Suffolk, N.Y. v. Sebelius*, 605 F.3d 135, 142 (2d Cir. 2010) ("Under *City of Houston*, which we now follow, plaintiffs' claims are moot."). Put simply, "once the relevant funds have been obligated, a court cannot reach them in order to award relief." *City of Houston*, 24 F.3d at 1426.

### B. The Reallocation Decision Claims Are Moot Because the Appropriations Lapsed on September 30, 2025.

Plaintiffs' Reallocation Decision claims are moot for a second reason: the relevant appropriation expired on September 30, 2025, and this Court's equitable authority does not extend so far as to suspend or re-write the time limits Congress has imposed on appropriations statutes pursuant to its Appropriations Clause power. *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 428 (1990) (stating that a fundamental purpose of the Appropriations Clause is to ensure that federal funds are spent only "according to the letter of the difficult judgments reached by Congress . . . .") As the Supreme Court has emphasized, "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation." *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483 (2001).

The imposition of time limits on appropriations is one of the primary ways Congress exercises control over its Appropriations Clause power. A time-limited appropriation is available to incur an obligation only during the period of time designated by Congress. *See* 31 U.S.C. § 1502(a) (stating that "the balance of an appropriation or fund limited for obligation to a definite period is available only for payment of expenses properly incurred during the period of availability"); OMB Cir. A-11, § 20.4(c). For the fiscal year 2025 HSGP program, Congress gave DHS one fiscal year, until September 30, 2025, to obligate the funds. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 607, (1)–(2); Full-

16

Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, § 1101(a)(6), 139 Stat. 9, 11. After September 30, federal law prohibits DHS from incurring any new obligations with those funds. *See* 31 U.S.C. § 1502(a).

The Court's equitable power does not extend so far as to re-write a congressional statute to prevent appropriations from lapsing. To the extent Plaintiffs rely on the line of cases from the D.C. Circuit in the 1970s authorizing such relief in limited circumstances, those decisions have more recently been criticized as "belonging to a time when courts took a much more freewheeling approach to remedies." *Goodluck v. Biden,* 104 F.4th 920, 928 (D.C. Cir. 2024). In any event, "the equitable doctrine permitting a judicial award of funds after the statutory lapse date will ordinarily, as here, have no application to a case in which all funds have properly been awarded." *W. Virginia Ass'n of Cmty. Health Centers, Inc. v. Heckler*, 734 F.2d 1570, 1577 (D.C. Cir. 1984) (finding case moot where "funds have been awarded by the Secretary to various recipients"). Further, such relief would exceed the Court's equitable authority beyond the limits recognized in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025) (stating that courts' equitable authority "encompass only those sorts of equitable remedies traditionally accorded by courts of equity' at our country's inception") (internal quotations omitted).

31 U.S.C. § 1502(b) also does not provide its own basis to extend the appropriation's period of availability. Rather than extending the period of availability for an appropriation to permit obligations beyond that date, § 1502(b) suggests that the reversion of appropriated funds back to the general fund of Treasury under 31 U.S.C. 1551 through 1557 does not affect valid legal claims against those appropriations. Specifically, section 1502(b) provides that "a provision of law requiring that the balance of an appropriation or fund be returned to the general fund of the Treasury at the end of a definite period does not affect the status of lawsuits or rights of action involving the right to an amount payable from the balance." In this case, the appropriations at issue remained available until September 30, and those funds would not be immediately returned to the Treasury's general fund on that date. When budget authority expires,

expired appropriations remain in an agency's Treasury account for a period of five years to liquidate obligations incurred the before period of availability expired and the appropriation lapsed. *See* 31 U.S.C. § 1553. After those five years, funds revert to the Treasury's general fund, as provided under 31 U.S.C. § 1551, *et seq*. Section 1502(b) thus cannot be read as authorizing the Court to extend the fiscal year 2025 HSGP appropriation's period of availability or suspend its lapse.

Further, where appropriated funds have expired and/or have been exhausted, "'federal courts are without authority to provide monetary relief" because the Appropriations Clause prevents additional funds from being paid out of the Treasury" and "awarding 'funds available from sources other than the [relevant] appropriation' would contravene the 'fundamental requirement' of § 702 of the APA that a plaintiff seek relief *'other than money damages*.'" *Cnty. of Suffolk*, 605 F.3d at 142 (quoting *City of Houston*, 24 F.3d at 1428 (cleaned up)) (emphasis in original). Here, the funds that Congress appropriated were otherwise obligated, meaning that those funds are no longer available from the now-expired appropriation for FY 2025. Consequently, Plaintiffs essentially seek monetary damages that they cannot obtain under the APA.

Although the Court's Modified TRO (now converted to a preliminary injunction) required Defendants to de-obligate funds that have already been obligated to other jurisdictions, Defendants respectfully submit that the Court lacked the power to order that relief and to take the additional step of suspending the statutory expiration deadline set by Congress.  The Modified TRO did not provide an explanation for the Court's conclusions on these issues.  Here, because the funds Plaintiffs seek were obligated to other States and that obligation of funds constitutes a legal commitment to pay, Plaintiffs cannot obtain the relief they seek.  Plaintiffs Reallocation Decision claims are further moot because appropriations of HSGP funds expired on September 30, 2025, and the Court does not have the equitable authority to stay the expiration of appropriated funds.  Accordingly, Plaintiffs' Reallocation Decision claims do not present a live case or controversy that this Court has jurisdiction to adjudicate.

### III.    Defendants Lawfully Allocated FY 2025 HSGP Funding.

Even if the Court were to reach APA review of Plaintiffs' "Reallocation Decision" claims challenging the bases of their final HSGP award allocations (Counts I-IV), these claims fail because Plaintiffs' final HSGP allocations were calculated exclusively using the mandatory considerations outlined by Congress: (1) relative risk score resulting from FEMA's latest Terrorism Risk Methodology (or "risk formula"), and (2) anticipated grant use effectiveness. *See* 6 U.S.C. § 608 (a)(1)-(2).  Despite Plaintiffs' speculation about impermissible policy considerations entering the calculus, Plaintiffs' FY 2025 HSGP final award allocations reflect lawful adjustments to the FY 2025 HSGP allocation methodology that resulted in updated relative risk scores for HSGP jurisdictions.

### A.    Defendants' Allocation of HSGP Funding was Consistent with Statutory Authority and in Observance of Procedures Required by Law.

For fiscal year 2025, FEMA allocated HSGP funds using: (1) a risk formula that included the statutorily-required data elements (or "factors") for threat, vulnerability, and consequence; and (2) anticipated grant use effectiveness. Ex. 1, Arnold Decl. ¶¶ 16-18.  These considerations are identical to those outlined in 6 U.S.C. § 608 (a)(1)-(2) (outlining that, in allocating HSGP funds, the FEMA "Administrator shall consider, for each State or high-risk urban area, [the jurisdiction's] relative threat, vulnerability, and consequences from acts of terrorism" and "the anticipated effectiveness of the [jurisdiction's] proposed use of the grant. . . .in increasing the [jurisdiction's ability] "to prevent, prepare for, protect against, and respond to acts of terrorism" and "otherwise reduce the overall risk to the [jurisdiction] or the Nation.").

Defendants did not, as Plaintiffs repeatedly claim, "disregard[] statutory criteria," Pls.' Mot. at 15, or consider sanctuary designation policy considerations in place of risk calculations, *Id*. at 18, when allocating HSGP funds to Plaintiff States.  Instead, changes between HSGP NOFO projections for Plaintiff States and their final award allocations resulted from an updated HSGP allocation methodology. Ex. 1, Arnold Decl. ¶¶ 17-18.

As Plaintiffs recognize, the FEMA Administrator is authorized to exercise discretion in

weighing each data element in the risk formula and regularly exercises this discretionary authority. *See* Am. Comp. Ex. 13, FEMA FY 2023 SHSP/UASI Risk Methodology Update (outlining changes made to the FY 2022 risk methodology and the new methodology for FY 2023). Section 608(a) requires the Administrator to "include" listed factors in FEMA's risk formula, but does not limit the agency's allocation considerations to those factors, dictate the weight that must be attributed to each mandatory factor in calculating a jurisdiction's relative risk score, or outline a process that the Administrator must follow to adjust factor weights. *See* 6 U.S.C. § 608(a).

The HSGP risk assessment formula has changed over time to reflect evolving threats to the Nation, changes in risk assessment practice, and national priorities, and FEMA's discretion to adjustment the risk formula has never been challenged, nor have any of the amended risk formulas themselves.

Consistent with this precedent, in mid-September, FEMA amended the FY 2025 risk formula to better account for the present threats to the United States. Specifically, two data elements were given greater weight: Transnational Organized Crime and Nationwide Encounters. Ex. 12, FY 2025 HSGP Grant Allocation Summary at 1. As recommended by the DHS Office of Intelligence and Analysis, TOC was prioritized to address the significant and escalating threat that transnational criminal organizations pose to national security, public health, and economic stability in the United States. *Id*. The Nationwide Encounters weight was increased to address the elevated vulnerability jurisdictions face from illegal border crossings. *Id*.

The FY 2025 TRM aligns grant program priorities with the terrorism risk environment. As the threat has shifted from large-scale, coordinated attacks to more dispersed incidents against soft targets and targets of opportunity nationwide, the formula directs more resources to smaller, historically underfunded jurisdictions, strengthening their ability to prevent, protect against, and respond to terrorist attacks. *Id*.

Additionally, Section 608(a)(2) gives the agency broad latitude to assess the anticipated effectiveness of grant use proposals submitted by applicants. While, Plaintiffs essentially ignore

this second consideration required by statute, anticipated effectiveness accounted for 30% of the funding allocation in the final FY 2025 HSGP allocation methodology. *Id.* As part of the 30% effectiveness evaluation, FEMA credited jurisdictions with lower balances of unused HSGP funds for their effective use of allocated resources. Ex. 1, Arnold Decl. ¶ 18. FEMA provided additional consideration for funding to states who proposed using their preparedness funds in support of border interdiction and other border security measures. *Id.*

Plaintiffs' final FY 2025 HSGP award allocations reflect their relative risk scores reached using the amended risk formula (70% of allocations) and the anticipated effectiveness consideration (30% of allocations), extinguishing their claims that FEMA relied on extra-statutory factors that Congress did not intend them to consider in making allocation decisions (Counts II-III), as well as their insistence that FEMA added a new discretionary factor to the risk formula without specifying that factor in writing, in violation of procedure required by law (Count IV).

### B. Defendants' Allocation of HSGP Funding was Well-Reasoned.

Plaintiffs' challenges to their final FY 2025 HSGP award allocations cannot survive APA review under the deferential arbitrary and capricious standard. Plaintiffs' final HSGP allocations did not stem from a changed "funding landscape," Pls.' Mot. at 23, but reflect lawful, well-reasoned adjustments made to the FY 2025 TRM and anticipated efficiency considerations. Plaintiffs' insistence on an agency explanation of any deviation between their NOFO projections and final award allocations, *id.* at 22-23, misunderstands the nature of a notice of funding opportunity document. And Plaintiffs' attempt to argue that they hold legitimate reliance interests in receiving allocations "consistent" with previous years' funding is unpersuasive in light of the changing threats to the Nation and the FEMA Administrator's discretion to amend the HSGP allocation methodology—a discretion Plaintiffs recognize.

Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v.*

*Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). "Judicial review under [the arbitrary and capricious] standard is deferential" and the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citation omitted).

As outlined above, FEMA considered "all relevant factors" in calculating Plaintiffs' final FY 2025 HSGP award amounts. And, in exercising his discretionary authority to rebalance the HSGP allocation methodology and the TRM data elements, the Administrator followed the recommendations of the Office of Intelligence and Analysis that considered the risks presently faced by the country, thereby acting within "a zone of reasonableness."

Plaintiffs' insistence on a written explanation for Defendants' decision to award Plaintiff States less HSGP funding than their HSGP NOFO projections, Pls.' Mot. at 22-23, is misguided. A NOFO is simply a document describing a funding opportunity the Government is making available and setting out the application process for eligible applicants. A NOFO has no definitive legal effect—it does not determine rights or obligations to potential applicants. It does not create any legal entitlement to projected funding levels or guarantee unchanged terms and conditions. Only with the issuance of a final award does the Government make an offer to an applicant jurisdiction, who may then choose to decline the offer or accept the final award amount and the attached terms and conditions prior to the award acceptance deadline. *See Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004) (holding that until the agency "completes its review and reaches a decision [on the grant award], there has been no final agency action . . . and the matter is not ripe for judicial review"); *Planned Parenthood v. Azar*, 316 F. Supp.3d 291, 300 (D.D.C. 2018) (concluding that a notice of funding opportunity that set out intermediate criteria by which applications would be evaluated was not final agency action because it announced only how "an agency decision will be made," and the plaintiffs challenged only "intermediate criteria by which applications will be evaluated") (emphasis omitted)),

*vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019); *see also* U.S.C. § 704 (explaining that "preliminary, procedural, or intermediate" agency actions are not directly reviewable, but may be reviewed on final agency action).

Plaintiffs do not, and cannot, cite to statute or precedent to support the proposition that a NOFO establishes a legal obligation on behalf of the agency to pay the projected funding amounts at the final award stage. Nor is there any authority supporting the proposition that final grant awards may not differ—even substantially—from NOFO projections, or the notion that an agency must explain changes between NOFO projections and final award amounts.  Here, FEMA does not complete its review of HSGP grant applications and decide how to allocate HSGP funds until after applications are submitted and reviewed. Indeed, Section 608 requires Defendants to consider, in their calculation of final award amounts, the anticipated effectiveness of each jurisdiction's proposed use of grant funds submitted in response to the NOFO.  6 U.S.C. § 608. This is all the explanation Plaintiffs need.

Plaintiffs assert that they "have profound reliance interests in continued, *consistent* funding[,]"and describe the final FY 2025 HSGP allocations as a "change in [Defendants'] position." Pls.' Mot. at 24 (emphasis added).  However, an agency need only consider and weigh a party's valid, reasonable reliance interests—not "unreasonable" ones. *See Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977), *aff'd*, 595 F.2d 887 (D.C. Cir. 1979). Here, it is entirely unreasonable for any jurisdiction to expect unchanged HSGP allocations from one year to another given the FEMA Administrator's discretion to amend the HSGP allocation methodology—including the weight attributed to each TRM factor, the factors considered in the anticipated efficiency consideration, and the relative weights of the TRM risk score and the anticipated efficiency consideration.  Accordingly, any reliance by Plaintiffs on continued funding levels was clearly unreasonable. *Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 742 (1996) (requiring agencies to consider "legitimate reliance").

IV.     ***Ultra Vires* Review of Plaintiffs' Reallocation Decision Claims is Unavailable.**

As a threshold matter, Plaintiffs' *ultra vires* claim (Count II) is merely a repackaged version of their Reallocation Decision APA claims (Counts I, III, IV) in different form.  Like the APA claims, the *ultra vires* claim argues that Defendants lacked statutory authority to consider administration priorities in its HSGP allocation methodology.  *See, e.g.*, Am. Comp. at 50 ("None of those factors include FEMA's perception of state or local policies concerning cooperation with federal immigration officials. Defendants did not make the Reallocation Decision pursuant to the statutory factors, but instead they acted pursuant to a free-standing DHS directive."); *id.* at 48-49 ("[D]efendants relied on an extra-statutory factor when making the Reallocation Decision.  Congress provided a list of factors FEMA "shall consider" when allocating HSGP funds....Yet DHS ordered the reallocation of HSGP funds based on whether DHS believes that the recipient has policies DHS dislikes.").

The Supreme Court has "strictly limited" the scope of *ultra vires* review, reasoning that "ultra vires review could become an easy end-run around the limitations of . . .  judicial-review statutes."  *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (noting than an *ultra vires* claim "is essentially a Hail Mary pass-and in court as in football, the attempt rarely succeeds" (quotation omitted)).  Thus, the Supreme Court has held that *ultra vires* claims must fit within "painstakingly delineated procedural boundaries"; such review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*'" in a statute.  *Id.* (emphasis in original) (quoting *Railway Clerks v. Assoc. for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)).  Here, Plaintiffs "basically dress up a typical statutory-authority argument as an ultra vires claim." *Nuclear Regul. Comm'n*, 605 U.S. at 682. "That is a fairly common maneuver" in trying to bring an ultra vires claim—which the Supreme Court has now squarely rejected. *Id.*

While Plaintiffs extensively discuss, in their *ultra vires* challenge, considerations *required* to be included in FEMA's HSGP allocation calculus, Pls.' Mot. at 16, nowhere do Plaintiffs point to a specific statutory provision prohibiting the extra-statutory consideration they

24

accuse Defendants of including in their final allocation calculus.  Therefore, *ultra vires* review is unavailable here.

Regardless, Plaintiffs' *ultra vires* claim rests entirely on Plaintiffs' mere *assumption* that FEMA advanced the agency's own priorities by manipulating funding levels, *id*.  Plaintiffs boldly assert that Defendants exceeded the statutory authority granted to them by Congress by considering sanctuary jurisdiction designation in their HSGP allocation analysis, Am. Comp. ¶ 209. Contrary to Plaintiffs' speculation, FEMA considered only (1) relative risk score—as determined by a rebalanced TRM—and (2) "the anticipated effectiveness of the proposed use of the grant" to make final FY 2025 HSGP allocations to Plaintiff States. Thus, Defendants did not act in excess of their delegated powers, and Plaintiffs' *ultra vires* claim is without merit.

Plaintiffs' *ultra vires* claim also fails for the independent reason that *ultra vires* review is unavailable if, "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review."  *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)).  Here, Congress enacted the APA to enable courts to review appropriate challenges to final agency actions.  Given this "alternative path to judicial review," *Nuclear Regul. Comm'n*, 605 U.S. at 681, an *ultra vires* claim is not available.

## V.    Plaintiffs' "Population Certification" and Period of Performance Claims are Unreviewable Under the APA Because Outlining Grant Terms and Conditions is Committed to Agency Discretion by Law.

Even assuming Plaintiffs could establish jurisdiction (which they cannot), Plaintiffs' Population Verification claims (Counts VI-VIII) and Period of Performance claim (Count V) fail because they seek to challenge decisions quintessentially "committed to agency discretion by law[,]" for which the APA provides no avenue for review. 5 U.S.C. § 701(a)(2). An agency's determination of how best to condition appropriated funds to fulfill its legal mandates is classic discretionary agency action.

While the APA establishes a waiver of sovereign immunity and a cause of action for

injunctive relief for parties adversely affected by either final agency action or an agency's failure to act, 5 U.S.C. §§ 702, 706(1)-(2), the waiver of sovereign immunity is limited. It does not apply in circumstances where "agency action is committed to agency discretion by law," *id.* § 701(a)(2). FEMA's decision to include lawful terms and conditions in final HSGP and EMPG awards fits neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 191, 191-92 (1993) (quoting 5 U.S.C. § 701).  In the allocation of funds context, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 193. "Of course," this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But, as long as the agency abides by the relevant statutes, the courts may not "intrude" via arbitrary-and-capricious review. *Id*.

Here, Plaintiffs offer no evidence that Congress intended to limit FEMA's inherent discretion to set the period of performance for annual preparedness grants. They identify no statutory provision requiring HSGP or EMPG grants to have three-year periods of performance, or prohibiting FEMA from implementing a one-year period of performance for these *annual* grants. Indeed, there is no discussion of period of performance in the relevant statutory provisions. *See* 6 U.S.C. §§ 603–609, 762.  Accordingly, Congress's appropriation of grant funds provides no standards "against which to judge the agency's exercise of discretion" in choosing how long to contract with particular grantees. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Similarly, Plaintiffs cannot point to any authority where Congress restricted FEMA's ability to condition the release of awarded EMPG funds on the provision of population information by States.  Again, FEMA has broad discretion to set the terms and conditions in its grant awards to meet its policy goals in "what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. And no statute or regulation prohibits FEMA from asking the States to

26

provide supplemental information about their current populations before releasing federal funds.

APA review is therefore unavailable for Counts V-VIII because the Defendants' addition of lawful terms and conditions to final awards is committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

## VI. Plaintiffs' Claims that the Population Verification Requirement Cannot Be Satisfied are Not Ripe.

Plaintiffs' claims that it is impossible for States to comply with the population verification requirement—or impossible to comply quickly enough to access their FY 2025 EMPG funds—rendering the requirement unreasonable, Pls.' Mot. at 29-30, are premature.  In assessing prudential ripeness, courts evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Perry Capital LLC v. Mnuchin*, 864 F.3d at 832.  The doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807.  It also "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 807-08.

Plaintiffs' claims about the population verification requirement's feasibility are not fit for judicial review at this time because FEMA intends to provide guidance to States about how to satisfy that provision.  FEMA made the decision to include a population verification requirement in EMPG awards in mid-September and then issued amended awards with the term on September 30. *See* Ex. 1, Arnold Decl. ¶¶ 6-7.  FEMA was in the process of developing guidance for states regarding the EMPG population verification requirement before the lapse in funding on October 1, 2025. *Id.* ¶ 9. Following the recent restoration of appropriations, FEMA restarted work on the guidance and remains committed to addressing any questions or concerns that grantees may have about this provision. *Id.*

Prudential ripeness considerations counsel against the Court prematurely inserting itself

into an abstract dispute that may never materialize.  "The 'fitness' factor takes into account whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final."  *Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.*, 769 F.3d 1173, 1182 (D.C. Cir. 2014).  At this stage, where FEMA intends to issue forthcoming guidance to States about how to comply with this provision, considerations of judicial restraint favor awaiting that development and a concrete dispute between the parties (should there be one).  There is no need for the Court to rush to judgment about legality of this provision before FEMA has an opportunity to engage with the States and other stakeholders.  Further, Plaintiffs will suffer no hardship if the Court withholds review at this time to give the agency an opportunity to address the matter in the first instance.  *See Nat'l Park Hosp. Ass'n v. Dep't of Interior,* 538 U.S. 803, 811-12 (2003) (holding that plaintiff must "demonstrate that deferring judicial review will result in real hardship"); *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 389 (D.C. Cir. 2012) ("Considerations of hardship that might result from delaying review will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions.").

## VII.    The Population Verification Requirement is Lawful.

Even if the Court were to reach APA review of Plaintiffs' Population Verification claims (Counts VI-VIII), Plaintiffs' challenges to the Population Verification Requirement fail.  Consistent with 13 U.S.C. § 183(a), FEMA considered U.S. Census data to allocate EMPG funding.  Additionally, FEMA has OMB approval to request demographic information from preparedness grant recipients, rendering Plaintiffs' Paperwork Reduction Act claim without merit.  Finally, FEMA's decision to include the Population Verification Requirement in EMPG final awards was a carefully considered decision intended to ensure EMPG funds were allocated according to the most up-to-date State population numbers and, thus, survives the arbitrary and capricious standard of review.

### A.  The Population Verification Requirement is Consistent with Statutory Authority and in Observance of Procedures Required by Law.

Plaintiffs' challenge to the Population Verification Requirement as contrary to law, Count

VI, requires the Court to read language into 13 U.S.C. § 183(a) that does not exist, and therefore, cannot succeed. Plaintiffs' assertion that FEMA implemented the Population Verification Requirement without observance of procedures required by the Paperwork Reduction Act, Count VIII, likewise fails, as FEMA's request for population data from States was made pursuant to an OMB-approved information collection request ("ICR").

### 1. Consistent with 13 U.S.C. § 183(a), Defendants Used Federal Census Data to Allocate EMPG Funding.

The EMPG is a formula grant that requires each State to receive a baseline allocation of the fiscal year's appropriated EMPG funds, and the remaining funds to be apportioned according to each State's relative population. 6 U.S.C § 762(d)(2). Plaintiffs assert that 13 U.S.C. § 183(a) "'requires use of the current population estimate' produced by the Census Bureau for federal 'formula program funds'" like the EMPG grant. Pls.' Mot. at 27. Consistent with this assertion, Defendants used U.S. Census data to allocate FY 2025 EMPG funds. Ex. 1, Arnold Decl. ¶ 5. Yet, Plaintiffs seem to suggest that FEMA violated Section 183(a) by requiring States to provide population information before their EMPG funds can be drawn down, *id*. Presumably, Plaintiffs are reading into Section 183(a) language that prohibits an agency from considering *additional* sources of population information, beyond U.S. census data, when allocating formula grant funds based on population. Plaintiffs appear to be inserting into Section 183(a) language that requires an agency to *exclusively* rely on the most recent census data. But this limiting language does not appear anywhere in Section 183(a), nor, for that matter in the EMPG statute, *see* 6 U.S.C. § 762, or anywhere else.

Because census data was used to determine FY 2025 EMPG award amounts beyond the minimum baseline allocation, and State population verifications will simply be used to supplement the census data that FEMA considered, Ex. 1, Arnold Decl. ¶ 6, Defendant's request for population information from States is consistent with the mandates of 13 U.S.C. § 183(a).

### 2. The Population Verification Requirement is Permitted Under the Paperwork Reduction Act.

Plaintiffs outline the steps an agency must take in order to conduct "a collection of

information" in compliance with the Paperwork Reduction Act, culminating in the agency's receipt of approval from OMB and a control number.  Pls.' Mot. at 34-35.  They assert that FEMA's request for the States to report their population as of September 30, 2025 constitutes a "collection of information" under the Act and Defendants' "fail[ed] to observe the procedures required by" the PRA. *Id*. at 26.

In reality, FEMA recognizes the population verification requirement is an information collection request, and FEMA complied with the Act before making the request.  FEMA previously sought clearance for the collection of generic information from applicants for FEMA's preparedness grant programs—which include HSGP and EMPG—and received approval from OMB's Office of Information and Regulatory Affairs ("OIRA").  FEMA's OMB-approved information collection (OMB Control Number: 1660-NW172), attached as Exhibit 9, explicitly authorizes the collection of demographic information from preparedness grant applicants in order to administer these grant programs effectively. *See* Ex. 10, FEMA Information Collection Request Supporting Statement at 4. Here, population data, including adjustments for removed aliens, is a fundamental metric required to calculate EMPG allocations accurately and equitably. Thus, the requested population information falls within the universe of information FEMA is permitted to request from EMPG award recipients.

This authorization extinguishes entirely Plaintiffs' claim that Defendants did not comply with the Paperwork Reduction Act in requesting population data from States under the Emergency Management Performance Grant program.

**B.  The Population Verification Requirement is Well-Reasoned.**

As set forth above, "[j]udicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423.  Agency action need only be "reasonable and reasonably explained," meaning that the agency has "reasonably considered the relevant issues and reasonably explained the [agency's] decision."  *Id.*

Here, FEMA included the Population Verification Requirement as a condition on the

release of awarded EMPG funding in order to ensure EMPG funding allocations—which *were* calculated using the latest U.S. census data—were consistent with the true state populations as of September 30, 2025.  An agency decision intended to ensure the Government is in possession of up-to-date state population numbers in order to abide by statutory provisions requiring grant money to be allocated according to population falls clearly within a "zone of reasonableness." This decision remains within that zone of reasonableness even though the Government has access to (and utilized) U.S. census data to allocate FY 2025 EMPG funds, as state-produced population verifications can account for swings in state population—like removals—that have yet to be represented in prior census data.

**VIII.    The Period of Performance Term is Well-Reasoned.**

Even if the Court conducts APA review of Plaintiffs' Period of Performance claim (Count V), FEMA's decision to include the Period of Performance Requirement survives the deferential arbitrary and capricious standard.  As discussed above, FEMA's decision to institute a one-year period of performance for HSGP and EMPG grants was permissible under the relevant statutes.  And FEMA's decision was based on a larger goal of encouraging increased State investment in emergency preparedness. Ex. 1, Arnold Decl. ¶ 22.

For decades, States across the country have relied on federal funding provided through the EMPG and the HSGP, to staff, train, and equip first responder organizations. As a result, States have limited their own investment in emergency preparedness. DHS and FEMA adjusted the period of performance for FY 2025 HSGP and EMPG grants to align with the President's vision to begin shifting responsibility and authority back to the States. *Id.*

The shorter period of performance allows for: (1) improved accountability and oversight—a one year performance period allows FEMA to more closely monitor grant recipients and ensure funds are being used effectively and in alignment with program goals; (2) accelerated project completion—a one-year performance period encourages grant recipients to expedite their projects and deliver results more quickly, which is particularly important for emergency management initiatives that address urgent needs; (3) alignment with annual budget

cycles—a one-year performance period aligns with annual federal budget cycles, simplifying financial planning and reporting for both FEMA and grant recipients; (4) flexibility in funding allocation—a one-year performance periods enable FEMA to reassess priorities and reallocate funds more frequently to address emerging threats or changing circumstances; and (5) streamlined grant management—managing grants on an annual basis can reduce administrative complexity and allow FEMA to adapt program requirements or priorities more dynamically. *Id.*

Because the period of performance grant term is "reasonable and reasonably explained," *Prometheus Radio Project*, 592 U.S. at 423, the Court should accordingly reject Plaintiffs' arbitrary and capricious claim, Count V.

## IX. Plaintiffs Have Failed to Establish Irreparable Harm.

Plaintiffs ask this Court to permanently enjoin Defendants from putting into effect the "Reallocation Decision," Am. Compl. at 49, the "Performance Period Decision," *id.* at 53, and the Population Verification Requirement, *id.* at 55. But Plaintiffs fail to demonstrate how receipt of lower-than-desired final allocations and award offers with unanticipated terms and conditions constitutes irreparable harm necessitating the issuance of a permanent injunction.

The issuance of a permanent injunction requires the plaintiff to demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest will not be disserved by a permanent injunction." *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 148 (1st Cir. 2008) (quoting *eBay Inc v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006)). Irreparable harm is "the essential prerequisite for equitable relief." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (quotation omitted); *see also Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm.").

First, the States cannot establish that they suffer irreparable harm by not receiving funding that was never obligated to them or owed to Plaintiff States under the relevant statute.

Plaintiffs "Reallocation Decision" claims center on their claimed entitlement to the full amount of their HSGP NOFO projections, but grant applicants are never guaranteed to receive final award allocations identical to their NOFO projections. Here, the FY 2025 HSGP NOFO predictions do not reflect the final FY 2025 HSGP Allocation Methodology—a methodology that was lawfully developed consistent with the mandates of 6 U.S.C. § 608(a).

In an attempt to demonstrate irreparable harm, Plaintiffs describe their final FY 2025 HSGP allocations as a "loss of emergency and disaster funds [that] cannot be recovered later," Pls.' Mot. at 43, but Plaintiffs simply cannot lose what never belonged to them in the first place. In any event, the gravamen of Plaintiffs' injury is monetary—the classic example of reparable harm. *Wis. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (it is "well settled that economic loss does not, in and of itself, constitute irreparable harm").

Ironically, Plaintiffs insist that FEMA consider the factors outlined in 6 U.S.C. § 608(a) to make final HSGP award allocations, while also insisting that the results of the agency doing just that caused Plaintiffs' irreparable harm. Plaintiffs' attempt to label as "irreparable harm" the non-receipt of federal funds to which they were never entitled does not warrant injunctive relief.

Next, Plaintiffs assert that FEMA's decision to implement a one-year period of performance for HSGP and EMPG grants results in irreparable harm in the form of "administrative" costs, Pls.' Mot. at 45 ("the Performance Period Decision has thrown state budgeting and planning processes into disarray, imposing immense administrative costs on Plaintiff States"), and forces Plaintiffs to restructure their EMPG and HSGP plans, *id.* But states are simply being required to plan their preparedness budgets on an annual basis—spending *annual* allocations *annually*—and any state that qualifies for preparedness funding according to Section 608(a) will receive additional funding in fiscal year 2026 to be used towards developing emergency management plans, training first responders, purchasing emergency response infrastructure, etc. More fundamentally, it is always the case that "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). If a party makes the voluntary

33

choice to forego those funds, any resulting economic harm cannot constitute an irreparable injury attributable to the federal government.

Finally, Plaintiffs suggest that FEMA's decision to include the Population Verification Requirement for FY 2025 EMPG awards irreparably harms Plaintiffs States by making EMPG funds permanently inaccessible or inaccessible for a lengthy period. Pls.' Mot. at 44; Am. Comp. at 44. But, as outlined above, Plaintiff States' assumption that they will be unable to comply with the population verification requirement or that compliance will take many months is premature and, indeed, speculative until they receive forthcoming guidance about how to satisfy the requirement from FEMA. *See* Arnold Decl. ¶ 9.

Accordingly, Plaintiffs have failed to establish irreparable harm that could support the entry of any injunction.

## X.    The Balance of the Equities and the Public Interest Tip in Defendants' Favor.

An injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See  Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). In this setting, granting the injunction that Plaintiffs seek would require the Government to take preparedness funding away from eligible jurisdictions—jurisdictions who were awarded that funding based on the same statutory considerations that Plaintiffs demand make up the allocation calculus. Such an order here would effectively punish non-Plaintiff States and potentially destabilize funding across a wide range of states. Surely that would not be equitable.

"[A]ny time [the Government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (internal quotation marks and citation omitted). As the Supreme Court has twice reiterated, the government suffers irreparable harm when it is forced to disburse funds that it may be unable to recover. *See NIH*, 145 S. Ct. at 2658; *California*, 145 S. Ct. at 968-69. That is true here: Plaintiffs identify no basis for the Government to recoup funds paid out under grant agreements that are later held to have properly awarded to other states. And they never offer to

repay the funds in that event.

In light of the harm DHS would face if it were prevented from ensuring compliance with federal laws, the balance of equities and public interest tip in favor of the Government.

## XI.    Any Relief Should be Limited to Plaintiff States.

Plaintiffs' request—that the Court vacate the Reallocation Decision, Population Certification Requirement, and Performance Period Decision, Pls.' Mot. at 46—constitutes an over-broad equitable remedy that exceeds any harm to the Plaintiffs States. "Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff.  If the court's remedial order affects nonparties, it does so only incidentally." *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.").  "This tracks the founding-era understanding that courts 'render a judgment or decree upon the right of the litigant[s].'" *Texas*, 599 U.S. at 693 (Gorsuch, J., concurring) (quoting *Rhode Island v. Mass.*, 37 U.S. 657 (1838)).  This notion "ensures that federal courts respect the limits of their Article III authority to decide cases and controversies and avoid trenching on the power of the elected branches to shape legal rights and duties more broadly." *Id.* at 693–94.

As an initial matter, the APA does not permit vacatur of agency action.  *See Texas*, 599 U.S. at 695 (Gorsuch, J., concurring) (The APA "does not say anything about 'vacating' agency action ('wholesale' or otherwise).").  The history and structure of the APA do not support that the "set aside" language in Section 706(2) is synonymous to "vacate," but rather that "set aside" should be understood to mean that a court should "disregard" the action taken by the agency in determining the outcome of a case.  *Id.* ("Routinely, a court will disregard offensive provisions like these and proceed to decide the parties' dispute without respect to them.").

Even if Section 706 could be read to authorize vacatur of agency action, "a district court should think twice—and perhaps twice again—before granting such sweeping relief." *Id.* at 702

35

(citations and internal quotation marks omitted).  As the Supreme Court recently explained in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), there is no basis in equity for a universal injunction that goes beyond remedying the harms incurred by the plaintiffs who have brought the lawsuit. The Supreme Court has long recognized that "equitable relief must be limited to the inadequacy that produced [the] injury in fact" and "[a]ny remedy a judge authorizes must not be more burdensome [to the defendant] than necessary to redress the complaining parties." *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring) (cleaned up).  To grant universal relief under the auspices of vacatur "strains our separation of powers.  It exaggerates the role of the Judiciary in our constitutional order, allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide." *Id.* at 703.  Accordingly, any equitable remedy applied in the nature of vacatur should apply only to the named parties.  *See California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (remedies "ordinarily operate with respect to specific parties" rather than "on legal rules in the abstract") (citations and internal quotation marks omitted); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (observing that the "general rule" is that equitable relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs") (citations omitted).

To the extent the Court is inclined to grant any relief, this relief should be narrowly tailored to Plaintiff States. Any order "directing [D]efendants to amend the HSGP awards….to reflect the August 1, 2025 HSGP NOFO," Pls.' Mot. at 41, should be limited to the amendment of Plaintiff States's HSGP awards. Indeed, Plaintiffs only ask the Court to amend "the Homeland Security Grant Program awards issued to California, the District of Columbia, Illinois, Massachusetts, Minnesota, New Jersey, New York, Pennsylvania, and Washington." *Id*. at 48. And, if the Court orders Plaintiffs' awards to be amended, the Court should permit FEMA to determine the re-allocation of the remaining HSGP funds to non-plaintiff states.  Additionally, any order to amend the one-year period of performance for HSGP and EMPG grants, or the Population Verification Requirement for EMPG grants, should apply only as to Plaintiff States' awards.

## XII.    Any Relief Should be Stayed Pending Appeal

If the Court grants any relief, it should stay that relief pending any appeal authorized by the Solicitor General.  *See* Fed. R. App. P. 8(a).  For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay pending appeal.  *See Nken v. Hoder*, 556 U.S. 418, 434 (2009) (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions"). A stay pending appeal is particularly warranted in this case given the irreparable harm to the federal government if the disputed funds are dispersed to the Plaintiffs State prior to an opportunity to seek appellate review.  Plaintiffs have given no indication that they would return the funds in the event of the federal government were to prevail in this case.  Accordingly, the Court should maintain the status quo of the preliminary injunction during the pendency of any appeal before any permanent injunction takes effect.

<u>**CONCLUSION**</u>

For all the reasons discussed herein, the Court should deny Plaintiffs' Motion, grant Defendants' Cross-Motion, and enter summary judgment in Defendants' favor.


Dated: November 20, 2025                    Respectfully submitted,

 

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ANDREW WARDEN
Assistant Branch Director
Federal Programs Branch

/s/ *Alexandra L. Yeatts*
ALEXANDRA L. YEATTS (CA Bar No. 358762)
U.S. Department of Justice
Civil Division, Federal Programs Branch

1100 L Street, N.W.
Washington, DC  20005
Telephone: (202) 353-5677
Email: Alexandra.Yeatts@usdoj.gov

*Attorneys for Defendants*