# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF ILLINOIS, *et al.*,

                *Plaintiffs*,

    v.

KRISTI NOEM, in her official capacity as
Secretary of the Department of Homeland
Security, *et al.*,

                *Defendants.*

No. 1:25-cv-00495

## PLAINTIFF STATES' RESPONSE TO
## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Introduction ............................................................................................................. 1

Background ............................................................................................................. 2

    A.    The Reallocation Decision. .................................................................. 3

    B.    The Performance Period Decision. ....................................................... 7

    C.    Population Certification Requirement. .................................................. 8

Argument ............................................................................................................... 9

I.    The Court Has Jurisdiction Over Plaintiff States' Claims. ............................ 9

    A.    The Tucker Act Does Not Deprive This Court of Jurisdiction. ........... 10

    B.    Plaintiff States' Challenge To The Reallocation Decision Is Not Moot. .............. 15

    C.    Plaintiff States Claims' Against the Population Certification Requirement Are Ripe. ......................................................... 19

II.    The Challenged Agency Actions Violate The APA ..................................... 21

    A.    The Reallocation Decision Is Unlawful. ............................................ 21

        1.    The Reallocation Decision contravenes the Homeland Security Act. ....... 22

        2.    The DHS Directive fails to explain the Reallocation Decision. ............ 24

        3.    Defendants changed position at the last minute without explanation and without considering reliance interests. ................. 29

        4.    At minimum, defendants' motion for summary judgment should be denied as to the Reallocation Decision. ................ 31

    B.    The Population Certification Requirement And Performance Period Decision Are Not Committed To Agency Discretion By Law. ........... 33

    C.    The Population Certification Requirement Is Unlawful. ..................... 35

    D.    The Performance Period Decision Is Unlawful. .................................. 39

III.    The Court Should Award Plaintiff States The Requested Relief. ................. 43

    A.    The Court Should Vacate The Challenged Actions. ............................ 43

    B.    The Court Should Grant Injunctive Relief Sufficient To Redress Plaintiff States' Injuries. ...................................................... 44

IV.    The Court Should Not Stay Any Relief That It Orders. ............................... 46

Conclusion ........................................................................................................... 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner,* 387 U.S. 136 (1967) .........................................................19

*Aguasvivas v. Pompeo,* 984 F.3d 1047 (1st Cir. 2021) .........................................19–20

*All. for Cannabis Therapeutics v. Drug Enf't Admin.,* 930 F.2d 936 (D.C. Cir. 1991) ...............36

*Am. Sci. & Eng'g, Inc. v. Califano,* 571 F.2d 58 (1st Cir. 1978) ...........................10, 12

*Amerijet Int'l, Inc. v. Pistole,* 753 F.3d 1343 (D.C. Cir. 2014) ....................................42

*Bailey v. United States,* 516 U.S. 137 (1995) ................................................................37

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87 (1983) ........24–25, 27, 30

*Bennett v. Butz,* No. 4-73 Civil 284 (D. Minn. June 25, 1973) ...............................16–17

*Bowen v. Massachusetts,* 487 U.S. 879 (1988) ...........................................................14

*Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156 (1962) ...........................28

*California v. U.S. Dep't of Education,* No. 25-cv-10548, 2025 WL 3165713
(D. Mass. Nov. 13, 2025) .........................................................................................11

*California v. U.S. Dep't of Transp.,* _ F. Supp. 3d _, 2025 WL 3072541
(D.R.I. Nov. 4, 2025) .......................................................................................20–21, 37

*California ex rel. Becerra v. Sessions,* 284 F. Supp. 3d 1015 (N.D. Cal. 2018) ..........................21

*Chicago v. Noem,* No. 25 CV 12765, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025) ..............33–35

*Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971) ...........................33

*City of Chicago v. Sessions,* 321 F. Supp. 3d 855 (N.D. Ill. 2018) ..............................21

*City of Houston v. Dep't of Hous. & Urb. Dev.,* 24 F.3d 1421 (D.C. Cir. 1994) .........................18

*City of Providence v. Barr,* 954 F.3d 23 (1st Cir. 2020) .........................................37–38

*City of Taunton v. EPA,* 895 F.3d 120 (1st Cir. 2018) .................................................33

*Clark Cnty. v. F.A.A.,* 522 F.3d 437 (D.C. Cir. 2008) .................................................20

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.,*
137 F.4th 932 (9th Cir. 2025) .................................................................................10

*Cody v. Cox,* 509 F.3d 606 (D.C. Cir. 2007) ...............................................................33

*Colorado v. U.S. Dep't of Health & Hum. Servs.,* 788 F. Supp. 3d 277 (D.R.I. 2025) ...............12

*County of Suffolk v. Sebelius,* 605 F.3d 135 (2d Cir. 2010) ........................................18

*Dep't of Com. v. New York,* 588 U.S. 752 (2019) ..............................................22, 28, 30–33

*Dep't of Com. v. U.S. House of Representatives,* 525 U.S. 316 (1999) ........................39

*Dep't of Education v. California,* 604 U.S. 650 (2025) .........................................10–12

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ...........31, 39–43

*Dole v. United Steelworkers of Am.*, 494 U.S. 26 (1990) ..................................................35–36, 38

*Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024) .......................................................17

*Gulf of Me. Fisherman's All. v. Daley*, 292 F.3d 84 (1st Cir. 2002) ...........................15

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ...........................................29

*Energy Future Coal. v. E.P.A.*, 793 F.3d 141 (D.C. Cir. 2015) ...................................20

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...........................29–31, 41

*Harrington v. Chao*, 280 F.3d 50 (1st Cir. 2002) .......................................................43

*Healey v. Spencer*, 765 F.3d 65 (1st Cir. 2014) .........................................................44

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ................................................................47

*Hous. Auth. of the City and Cnty. of S.F. v. Turner*, No. 25-CV-08859-JST,
2025 WL 3187761 (N.D. Cal. Nov. 14, 2025) .......................................................35

*Illinois v. Fed. Emergency Mgmt. Agency*, _ F. Supp. 3d _, 2025 WL 2716277
(D.R.I. Sept. 24, 2025) ................................................................................. *passim*

*Ill. Pub. Telecommunications Ass'n v. F.C.C.*, 117 F.3d 555 (D.C. Cir. 1997) ............................27

*Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279 (D.C. Cir. 1995) ...........14

*La. Pub. Serv. Comm'n v FCC*, 475 U.S. 355 (1986) ...................................................38

*Level the Playing Field v. Fed. Election Comm'n*, 961 F.3d 462 (D.C. Cir. 2020) ......................2

*Lincoln v. Vigil*, 508 U.S. 182 (1993) .......................................................................34

*Me. Cmty. Health Options v. United States*, 590 U.S. 296 (2020) ...............................26

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ...........................................12

*Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002) ......................................34

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm
Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .......................................24, 28, 36, 41–42

*Mount Evans Co. v. Madigan*, 14 F.3d 1444 (10th Cir. 1994) ....................................34

*National Institutes of Health v. American Public Health Ass'n*,
145 S. Ct. 2658 (2025) ................................................................................10–14, 46

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ...................44

*Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200 (D.C. Cir. 2013) .........................28–29

*New York v. Noem*, No. 25-cv-8106 (LAK), 2025 WL 2939119
(S.D.N.Y. Oct. 16, 2025) .........................................................................7, 17, 23

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025) ................................................16, 46

*N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38 (1st Cir. 2021) ..................................19–20

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................44

*Orr v. Trump*, 778 F. Supp. 3d 394 (D. Mass. 2025) ....................................................38

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ........................................13

*Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020) ..........................31

*Population Inst. v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986) ...................................18

*RFE/RL, Inc. v. Lake*, No. 1:25-CV-799-RCL, 2025 WL 2023252 (D.D.C. July 18, 2025) ........35

*Rhode Island v. Trump*, No. 1:25-CV-128-JJM-AEM, 2025 WL 3251113 (D.R.I. Nov. 21, 2025) ........................................................................34

*Rhode Island v. Trump*, 155 F.4th 35 (1st Cir. 2025) ...........................................46–47

*R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-CV-342-MRD-PAS, 2025 WL 2988705 (D.R.I. Oct. 23, 2025) ...........................................................35

*Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985) ........................................................31

*Rodriguez v. Carson*, 401 F. Supp. 3d 465 (S.D.N.Y. 2019) .........................................18

*Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78 (1st Cir. 2013) ..............20

*Sasen v. Spencer*, 879 F.3d 354 (1st Cir. 2018) ...........................................................39

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) ...............................34–35, 45

*Sierra Club v. Marsh*, 976 F.2d 763 (1st Cir. 1992) .....................................................28

*Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018) ......................................................17

*Succar v. Ashcroft*, 394 F.3d 8 (1st Cir. 2005) ............................................................20

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .............................................19

*Tootle v. Sec'y of the Navy*, 446 F.3d 167 (D.C. Cir. 2006) ..........................................10

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ..............................................................44–46

*United States v. Texas*, 599 U.S. 670 (2023) ...........................................................43–44

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ..................................20

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261 (2021) ...........................21

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440 (D.R.I. 2025) ...............................................................12, 43

## Constitutional Provisions, Statutes & Rules

U.S. Const.
   art. I, § 2, cl. 3 ...............................................................................................39
   art. I, § 9, cl. 7 ...............................................................................................15

Pub. L. 107-56, § 1014, 115 Stat. 272, 399 (2001) ......................................................22

5 U.S.C.
   § 701...........................................................................................................33–34
   § 706...............................................................................................12, 38, 43–44

6 U.S.C.
    § 601 ........................................................................................................................23
    § 604 ........................................................................................................................34
    § 605 ........................................................................................................................34
    § 606 ........................................................................................................................34
    § 607 ...........................................................................................................23–24, 34
    § 608 ...........................................................................................................23–24, 34
    § 609 ........................................................................................................................34
    § 762 ..................................................................................................................35–37

13 U.S.C. § 183 ..............................................................................................................36–37

28 U.S.C.
    § 1346 ......................................................................................................................10
    § 1491 ................................................................................................9–10, 11, 13

31 U.S.C.
    § 702 ........................................................................................................................16
    § 1501 ......................................................................................................................16
    § 1502 ................................................................................................................16–17
    § 1552 ................................................................................................................16, 18
    § 1553 ...........................................................................................................15–16, 17

44 U.S.C.
    § 3502 ......................................................................................................................38
    § 3506 ................................................................................................................38–39

30 Ill. Comp. Stat. Ann. 105/1 .............................................................................................42

Fed. R. App. P. 8 ..................................................................................................................47

**Other Authorities**

Documents from Docket in *Illinois v. Fed. Emergency Mgmt. Agency,* 25-cv-206 (D.R.I.)
    Complaint, *Illinois v. FEMA*, ECF 1 (D.R.I. May 13, 2025) ....................................3
    Decl. of David Richardson, *Illinois v. FEMA*, ECF 52-1.........................................3
    Amended Complaint, *Illinois v. FEMA*, ECF 57 ......................................................3
    Defendants' Mot. for Summary Judgment and Opp. to Plaintiffs' Mot. for Summary
        Judgment, *Illinois v. FEMA*, ECF 61 ..............................................................34

Fed. Emergency Mgmt. Agency, *Fiscal Year 2025 State Homeland Security Program
    (SHSP) and Urban Area Security Initiative (UASI) Risk Methodology Data Sources*
    (Mar. 2025) ........................................................................................................23–24

Grant Programs Dir., Fed. Emergency Mgmt. Agency, Info. Bull. No. 540, *Compliance
    with Temporary Restraining Order in* State of Illinois, et al. v. Kristi Noem, et al.*,
    No. 25-00495 (D. R.I.) – Amendment of Homeland Security Grant Program Awards*
    (Oct. 24, 2025) ..........................................................................................................16

*In re Impounded Food Stamp Program Appropriations*, 54 Comp. Gen. 962 (1975)...................16

Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report*
    (2004)........................................................................................................................23

U.S. Gen. Accounting Office, *Principles of Federal Appropriations Law*
(3d ed. 2004) ............................................................................................16–17, 19

## INTRODUCTION

Congress created the Homeland Security Grant Program ("HSGP") after the September 11 attacks to "enhance the capabilities of state, local, tribal, and territorial governments, as well as nonprofits, in preventing, protecting against, and responding to terrorist attacks." ECF 46-4, AR 00115.[1] HSGP and a second grant program—the Emergency Performance Grant ("EMPG")— provide essential funding to States to safeguard against terrorist attacks, natural disasters, and other life-threatening emergencies. In the waning days of the federal fiscal year, defendants launched an ambush attack on Plaintiff States' access to these funds as retaliation for their refusal to walk in lockstep with the administration's immigration enforcement policies.

Days after Plaintiff States won a permanent injunction prohibiting defendants from conditioning these antiterrorism and emergency-preparedness funds on the States' agreement to devote their law enforcement resources to civil immigration enforcement, *see Illinois v. Fed. Emergency Mgmt. Agency*, _ F. Supp. 3d _, 2025 WL 2716277 (D.R.I. Sept. 24, 2025), defendants without warning or explanation nevertheless slashed Plaintiff States' awards by hundreds of millions of dollars (the "Reallocation Decision"), truncated the period during which the funds could be used from three years to one year (the "Performance Period Decision"), and demanded for the first time in history that States verify their populations using their own calculations as a condition to accessing EMPG monies (the "Population Certification Requirement").

Defendants attempt to justify their decision with reference to a memorandum issued on September 25—one day after the court enjoined the immigration conditions, two days before disclosing the awards to the States, and a mere five days before the end of the fiscal year. *See*

---

[1] "AR 00000" refers to the Bates-stamped administrative record produced in this matter by defendants at ECF 46, 49. The prefix to the Bates stamp, "DHS/FEMA_", is omitted for readability. "Mot." refers to ECF 39, and "Opp." refers to ECF 47.

ECF 46-2 (Arnold Decl.), ¶¶ 11, 16. That memorandum nearly eliminated from the HSGP risk methodology any consideration of "Counterterrorism," and substituted in it's a place a new 30% "effectiveness" score. *See* ECF 46-17, AR 01666; ECF 46-16, AR 01651. The inputs into the "effectiveness" score—which appeared out of thin air—are a mystery. But the result is clear: devastating funding cuts that fell disproportionately on Plaintiff States perceived to have too strongly resisted the administration's push to enlist local resources for immigration enforcement. The memorandum announcing the new risk methodology and "effectiveness" score does not expressly recognize the overlap, but it contains a large black redaction box that defendants have refused to explain or remove. *See* ECF 46-16, AR 01651.

The Reallocation Decision, Performance Period Decision, and Population Certification Requirement violate the APA. Defendants' backward-looking attempts to manufacture reasons for these actions fail on their own terms: they are vague, internally inconsistent, unsupported by facts or evidence, and ignore Congressionally mandated considerations. The retrospective justifications also cannot cover up the plain reality: Defendants have made "decisions featuring unjustifiable bias or partisanship," which "are precisely the types of agency actions that . . . work a violation of the arbitrary-and-capricious standard." *Level the Playing Field v. Fed. Election Comm'n*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quotation omitted). The challenged agency actions should be set aside and vacated, and injunctive relief should be entered to protect Plaintiff States and their instrumentalities and subdivisions.

## BACKGROUND

Plaintiff States summarize the timeline of defendants' decisionmaking as to the three challenged agency actions to incorporate the evidentiary materials defendants disclosed in response to Plaintiff States' summary judgment motion.

A.      **The Reallocation Decision.**

The story of the Reallocation Decision begins with defendants' earlier attempt to impose immigration-enforcement conditions on all funds they administer. "On March 27, DHS revised the standard terms and conditions governing all federal grants it oversees, adding provisions requiring state and local recipients to certify that they will assist in enforcing federal immigration law." *Illinois v. FEMA*, 2025 WL 2716277, at *2. Plaintiff States sued on May 13 to secure relief against these civil immigration conditions on access to all DHS-funded programs. *See* Complaint, *Illinois v. FEMA*, ECF 1 (D.R.I. May 13, 2025).[2] On June 9, defendant Richardson submitted a declaration in that case stating that DHS was still actively considering imposing civil immigration conditions on EMPG and HSGP. *See* Decl. of David Richardson ¶ 12, *Illinois v. FEMA*, ECF 52-1.

On July 16, in the midst of summary-judgment briefing in the first case, defendant Richardson issued a memorandum titled "Fiscal Year 2025 Homeland Security Grant Program Policy Recommendations." *See* ECF 49-1. The memorandum reveals that, as of July 16, defendants were planning not to award the funds appropriated under the Urban Area Security Initiative ("UASI"), which is one component of HSGP, *see id.*, AR 01670, leaving only the State Homeland Security Program ("SHSP") component. The July 16 memorandum proposed to hold SHSP funding levels flat for all grantees as compared to fiscal year 2024. *Id.* at 01679. The memorandum also discussed the HSGP risk methodology—on which defendants now stake their defense, Opp. 20–21—but it proposed only "minor percentage shifts," *id.* at 01676. The July 16 memorandum did not mention, much less incorporate into the allocation formula, any "effectiveness" score. *Contra* Opp. 21.

---

[2] The District of Columbia was joined with the first amended complaint on July 2, 2025. Amended Complaint, *Illinois v. FEMA*, ECF 57 (D.R.I. July 2, 2025). Governor Shapiro is the only plaintiff in this suit who was not part of the earlier action.

The July 16 memorandum proposed to "[m]odify the funding approach so that jurisdictions designated as sanctuary jurisdictions receive only the minimum funding required by statute." ECF 49-1, AR 01676. "This shift reflects the Trump Administration's . . . policy of *leveraging* sanctuary jurisdiction status to prioritize compliant states and territories." *Id.* (emphasis added). As a result, although SHSP allocations held steady on July 16, the memorandum promised that "if a state is determined to be a sanctuary jurisdiction at the time of application deadline, for the State Homeland Security Program, they will only receive the statutory minimum." *Id.* at 01679. Thus, the July 16 memorandum confirms Plaintiff States' assertion that defendants have been seeking to punish those they view as "sanctuary" jurisdictions by reallocating emergency-preparedness funds. *E.g.*, Mot. at 17–18. Notably, defendants did not at first include this memorandum when they filed the administrative record on November 20, 2025, ECF 46, supplementing the record to include it three days later, ECF 49. And defendants never mention it in their brief.

On July 24, defendants sent "risk validation letters" to States providing them with limited data about the factual basis for the fiscal year 2025 risk profiles and scores. ECF 46-2 (Arnold Decl.), ¶ 13. In a departure from consistent past practice, these letters did not allow States to review the actual draft risk profiles. ECF 40-1 (Supp. Evans Decl.), ¶ 40.

Between July 28 and August 1, defendants issued three versions of the HSGP notice of funding opportunity ("NOFO"). ECF 40-1 (Supp. Evans Decl.), ¶ 6. The two July 28 versions did not include UASI, consistent with defendants' July 16 intention not to release UASI funds. *See* ECF 40-3, 40-4. The third and final August 1 version did include UASI. *See* ECF 40-2; *see also* ECF 46-4, AR 00108. As to the civil immigration conditions challenged in *Illinois v. FEMA*, the August 1 NOFO stated that "[a]n immigration term and condition . . . may be material" to the award. *Id.* at 00154. None of the HSGP NOFOs disclosed any change to the risk methodology. Nor

did they identify a 30%-weighted "effectiveness" score. On the contrary, the final NOFO stated that "HSGP does not use a weighted scoring method." *Id.* at 00144.

On August 13, DHS emailed jurisdictions their 2025 risk profiles. *See* ECF 46-2 (Arnold Decl.), ¶ 13. The email described the risk profiles as "Final." Ex. 1. Plaintiff States' risk rankings held steady or rose. *See* ECF 40-20 (Tresnowski Decl.). California remained first and Illinois fifth among States under SHSP. *Id.* tbl. 1. The city of Philadelphia's UASI ranking rose four places to seventh in the nation, and the city of Boston rose three places to ninth. *Id.* The email also included two informational documents about the 2025 risk methodology, the "Data Sources" and "Risk Graphic," Ex. 1, which are attached as Exhibits 2 and 3 here.

On September 12, defendants published two documents to their website titled "FY 2025 Homeland Security Grant Program Fact Sheet" and "FY 2025 Homeland Security Grant Program Key Changes." *See* ECF 40-15, 40-16. Both documents stated that HSGP allocations would be "based solely on FEMA's relative risk methodology." ECF 40-15 at 2; *see also* ECF 40-16 at 3.

On September 24, the *Illinois v. FEMA* court issued an opinion vacating the civil immigration conditions. The final judgment permanently enjoined defendants from enforcing the civil immigration conditions against the plaintiffs, including nearly all Plaintiff States here. *See Illinois v. FEMA*, 2025 WL 2716277, at *16.

The next day, September 25, defendants issued a memo titled "Grant Approval: Fiscal Year 2025 Homeland Security Grant Program Final Allocations." ECF 46-16, AR 01647. The September 25 memorandum stated, on its first page, that "any [SHSP] and [UASI] recipients designated as a Sanctuary Jurisdiction by the Department of Justice will not receive any allocations posted in the [NOFO] except the [SHSP] minimum." *Id*. In attachments 3 and 4, the memo presented new funding allocations that dramatically cut awards to Plaintiff States and their UASI

5

subdivisions as compared to the August 1 NOFO. *Id.* at 01652–55. Philadelphia's UASI allocation was cut to $0; Boston's was slashed by 45 percent. *Id.* at 01654–55.

The September 25 memorandum also invented a new formula whereby "70% of the funding" would follow "the risk-based approach, and the remaining 30% as effectiveness-based." *Id.* at 01651. The memo contains no information on how "effectiveness" was measured or where any State fell on that measure. For the risk methodology, the memo stated that a risk factor for Transnational Organized Crime would be emphasized, and Population Density would be decreased. *Id.* An accompanying document called the "Grant Allocation Summary" details this "updated risk methodology." ECF 46-2 (Arnold Decl.), ¶ 20; ECF 46-17. The new methodology emphasizes Transnational Organized Crime by cutting "Counterterrorism" and "Population Density Metric" to nearly zero. *See* ECF 46-17, AR 01666.

On the key page of the September 25 memorandum summarizing the new 70-30 formula and the changes to the risk methodology, the bottom third is covered by a large black redaction box. ECF 46-26, AR 01651. There is no explanation for the redaction.

On September 27, defendants sent States their HSGP award letters, though the documents are dated September 26. *See* ECF 40-1 (Supp. Evans Decl.), ¶ 43. The final award letters reflected massive funding cuts, with dozens of specific budget proposals either marked ineligible or drastically reduced. The only support for these changes were vague repeated references to a "DHS directive," *e.g.*, ECF 46-11, AR 00786; ECF 46-12, AR 001084, 01400; which defendants now assert is the September 25 memorandum. *See* ECF 46-2 (Arnold Decl.), ¶ 16 ("This document is the 'DHS directive' referenced in the FY 2025 HSGP final award letters.").

On September 29, defendants gave a presentation to Congress about the updated risk methodology. *See id.* ¶ 21. Defendants presented to Congress a PowerPoint presentation containing all of the final HSGP allocations for all States. *See* ECF 40-17 at 15–22.

On October 6, defendants' sole declarant in this matter, David Arnold, submitted a declaration to the court in *New York v. Noem*, 25-cv-8106 (S.D.N.Y.). In that case, much like this one, defendants cut Transit Security Grant Program funding between the August NOFO and the September award. The Metropolitan Transportation Authority had its award "reduced to $0," with the funds "reallocated to other grantees." *New York v. Noem*, No. 25-cv-8106 (LAK), 2025 WL 2939119, at *3 (S.D.N.Y. Oct. 16, 2025). Arnold's October 6 declaration in *New York v. Noem* explained that the MTA "did not receive funding because the applicant is based in New York City, a designated Sanctuary Jurisdiction city." ECF 40-18 ¶ 5. On October 16, the *New York v. Noem* court consolidated the preliminary injunction with the merits and ordered defendants to restore the MTA's funding as contemplated in the NOFO. 2025 WL 2939119, at *11.

### B. The Performance Period Decision.

Just as defendants prepared a July 16, 2025, memorandum making policy decisions for the HSGP NOFO, ECF 49-1, they prepared a July 22 memorandum as to the EMPG NOFO, ECF 46-5. Both July memoranda announced that the grants would have three-year periods of performance: for HSGP, from September 1, 2025, through August 31, 2028, ECF 49-1, AR 01673; and for EMPG, from October 1, 2024, to September 30, 2027, ECF 46-5, AR 00184. The EMPG memorandum explained that the EMPG program "is typically awarded with a retroactive Period of Performance dating back to the beginning of the respective fiscal year." *Id.*

The HSGP and EMPG NOFOs reflected these same periods of performance. ECF 46-4, AR 00108; ECF 46-3, AR 00013. Both NOFOs solicited information about projects by reference to this three-year period. The HSGP NOFO explained that "proposed projects" should be "able to

be fully completed within the three-year period of performance." ECF 46-4, AR 00142. The EMPG NOFO required applications to set forth an "EMPG Program Work Plan" including "performance goal[s]" that were "specific, measurable, and achievable *within the period of performance*." ECF 46-3, AR 00079–80 (emphasis added).

According to Arnold's November 20, 2025, declaration, on September 17, defendants "decided to change the period of performance from three years to one year for HSGP and EMPG grants." ECF 46-2 (Arnold Decl.), ¶ 22. The final awards that issued for both HSGP and EMPG had a one-year period of performance, from October 1, 2025 to September 30, 2026. *See, e.g.*, ECF 46-11, AR 00821; ECF 46-7, AR 00229. No contemporaneous document in the administrative record reflects the decision to shorten both HSGP and EMPG to one year. There is also no explanation anywhere in the administrative record for defendants' decision to advance the start date for the EMPG grants by a year.

### C.    Population Certification Requirement.

The July 22 memorandum in preparation for the EMPG NOFO observed that "[a]s required by the authorizing statute, the [EMPG] Program funding is awarded to the 56 states and territories using a population-based statutory formula." ECF 46-5, AR 00184. Accordingly, "[t]he allocation amounts for Fiscal Year 2025 [were] provided in Annex C," *id.* at 00184, 00187; and these formulaic amounts did not differ from the final EMPG totals. The July 22 memorandum did not mention any requirement that recipient States certify their own populations to gain access to funds.

The July 28 EMPG NOFO similarly observed that, for EMPG, "FEMA uses a population-based allocation formula as dictated by statute." ECF 46-3, AR 00048.

In "mid-September," according to Arnold's declaration dated November 20, defendants "made the decision to include a population verification requirement in EMPG awards." ECF 46-2 (Arnold Decl.), ¶ 6. No contemporaneous documentation in the administrative record reflects this

decision. The Population Certification Requirement imposes a hold on all EMPG monies and requires each recipient State to "provide a certification of the recipient state's population as of September 30, 2025," "certify that its reported population does not include individuals that have been removed from the State pursuant to the immigration laws of the United States" and "explain the methodology it used to determine its population." *E.g.*, ECF 46-7, AR 00228.

## ARGUMENT

The Court should deny defendants' motion for summary judgment and grant Plaintiff States' motion. To start, Defendants' efforts to evade review on jurisdictional grounds are meritless, as Plaintiff States' claims do not implicate the Tucker Act, are not moot, and are ripe for judicial review. Defendants' merits arguments similarly fail: Each of the challenged actions is contrary to law, arbitrary and capricious, or both. Because the challenged actions are unlawful—and because of the harms they would inflict on Plaintiff States, their subdivisions, and their residents—the Court should vacate the Decisions and enjoin their enforcement. And the Court should reject defendants' request that any relief it issues be stayed pending appeal.

## I.     The Court Has Jurisdiction Over Plaintiff States' Claims.

Defendants raise various objections to the Court's jurisdiction, but none persuades. First, because Plaintiff States are not parties to any contracts with the federal government concerning fiscal year 2025 EMPG and HSGP awards—let alone "founded [their claims] upon" such contracts—the Tucker Act does not deprive this Court of jurisdiction. 28 U.S.C. § 1491(a)(1). Second, Plaintiff States' challenge to the Reallocation Decision is not moot; this Court's orders granting preliminary relief ensure that HSGP funds remain available. Nothing prevents defendants from amending the relevant award documents to redress Plaintiff States' injuries. And third, Plaintiff States' claims challenging the Population Certification Requirement is ripe for review because the Requirement is a final decision with immediate consequences for the Plaintiff States.

9

A.    **The Tucker Act Does Not Deprive This Court of Jurisdiction.**

Defendants wrongly assert that the Tucker Act strips this Court of jurisdiction over Plaintiff States' claims. That Act grants the Court of Federal Claims exclusive jurisdiction over "any claim against the United States founded . . . upon any express or implied contract with the United States" for amounts over ten thousand dollars. 28 U.S.C. § 1491(a)(1); *see id.* § 1346(a)(2). It deprives district courts of jurisdiction over cases that are "essentially . . . contract dispute[s]." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir. 1978). This is not such a case. As an initial matter, Plaintiff States have not accepted the awards, so there are no contracts in dispute. Both the Supreme Court's recent stay decisions and more established precedent concerning the Tucker Act confirm that Plaintiff States' claims belong in this Court.

To sue in the Court of Federal Claims, a party must identify "a contract . . . between the plaintiff and the government." *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 938 (9th Cir. 2025) (cleaned up) (rejecting similar Tucker Act argument where plaintiff had no contract with government). There is no such contract here: Plaintiff States have not accepted the EMPG or HSGP awards at issue, and the parties have not executed any grant agreements. Defendants do not explain—or even *attempt* to explain—how Plaintiff States' claims could be "founded . . . upon contract[s]" that do not exist. 28 U.S.C. § 1491(a)(1). Nor do defendants cite any case holding that the Tucker Act applies in the absence of a contract. *Cf. Cmty. Legal Servs.*, 137 F.4th at 938–39 (holding Tucker Act inapplicable). "[A] federal district court [cannot] be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Id.* at 938 (quoting *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006)). That deficiency alone dooms defendants' argument.

The Supreme Court's recent stay decisions in *National Institutes of Health v. American Public Health Ass'n* ("*APHA*"), 145 S. Ct. 2658 (2025), and *Department of Education v.*

*California*, 604 U.S. 650 (2025) (per curiam), confirm this Court's jurisdiction. In her controlling concurrence ruling on the stay application in *APHA*, Justice Barrett reasoned that there is a jurisdictionally dispositive distinction between general agency policies, which are subject to APA review, and terminations of individual existing grant agreements, which may be governed by the Tucker Act. *See* 145 S. Ct. at 2661 (Barrett, J., concurring); *see also Dep't of Educ.*, 604 U.S. at 651.[3] *APHA* involved policies that dealt directly with grant funding, providing, for instance, that the National Institutes of Health would no longer fund research on certain topics. *See* 145 S. Ct. at 2661 (Barrett, J., concurring). Justice Barrett explained that the fact that the "policies related to grants d[id] not transform a challenge to [those policies] into a claim 'founded . . . upon' contract that only the [Court of Federal Claims could] hear." *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

Here, Plaintiff States' claims track the challenges to general agency policies that the Court in *APHA* allowed to proceed in district court, and bear no resemblance to the challenges to individual grant terminations that, the Supreme Court said, likely belonged in the Court of Federal Claims. The Reallocation Decision, Performance Period Decision, and Population Certification Requirement each established an across-the-board, prospective agency policy governing all EMPG and HSGP awards for the next award period. *See id.* And none affected any existing grant agreements. *Cf. Dep't of Educ.*, 604 U.S. at 650 (concluding that the Tucker Act applied because the district court's order purportedly "enforce[d] a contractual obligation to pay money" under existing grant agreements (cleaned up)). *APHA* and *Department of Education* thus demonstrate that this case properly is before this Court.

---

[3] Some Plaintiff States are also plaintiffs in *APHA*, *Department of Education*, or related cases. Those States maintain that the Tucker Act did not implicitly strip the district courts of jurisdiction over any claims in those cases, and will defend that position as those cases proceed. But even assuming that the Court's preliminary determinations that some of the claims in those cases belong in the Court of Federal Claims were correct, the same is not true of Plaintiff States' claims here.

That result also follows longstanding Tucker Act precedent, which explains that "[t]he classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *accord Califano*, 571 F.2d at 61 (examining "whether a breach of contract had occurred" and what "relief [the] plaintiff requested"); *see Colorado v. U.S. Dep't of Health & Hum. Servs.*, 788 F. Supp. 3d 277, 294–98 (D.R.I. 2025); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 463–67 (D.R.I. 2025). Both factors make clear that this case is not "essentially a contract dispute." *Califano*, 571 F.2d at 61.

First, "the source[s] of [Plaintiff States'] rights," *Megapulse*, 672 F.2d at 968, are the APA and other federal statutes. The APA gives Plaintiff States the right to challenge "arbitrary and capricious action, action contrary to law, and action in excess of statutory authority" in district court. *Colorado*, 788 F. Supp. 3d at 296; *see* 5 U.S.C. § 706. Plaintiff States have explained why the challenged agency actions violate the comprehensive statutory scheme that Congress created to govern EMPG and HSGP awards. *See, e.g.*, Am. Compl. ¶¶ 192–255. And the rights at issue thus do not flow from any contract; instead, Plaintiff States' claims turn on whether defendants' grant administration—prior to any agreement—violates the APA and other applicable statutes. "These are precisely the type of claims that belong in district court." *Colorado*, 788 F. Supp. 3d at 296.

The fact that the challenged agency actions might affect *future* contracts between Plaintiff States and the federal government, or that some of Plaintiff States' arguments reference past grant agreements to highlight the arbitrariness of defendants' conduct, does not change this conclusion. The relevant question is whether Plaintiff States have filed suit *on* a contract, not whether the case

12

*involves* contracts. *See, e.g.*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) ("[W]e do not think that any case requiring some reference to . . . a contract is necessarily on the contract and therefore directly within the Tucker Act.") (cleaned up). *APHA* illustrates this point. The agency policies challenged there would have affected the plaintiffs' ability to access future grant money by, for example, prohibiting funding for certain research areas. *See* 145 S. Ct. at 2661 (Barrett, J., concurring). Yet the Supreme Court allowed challenges to those policies to proceed in district court. Thus, *APHA* shows that this suit challenging actions that may diminish Plaintiff States' future grant funding is not "founded upon contract." 145 S. Ct. at 2661 (Barrett, J., concurring) (cleaned up).

This principle applies equally to Plaintiff States' reference to defendants' past approach to administering EMPG and HSGP grants. *Contra* Opp. 13–14. Those past agreements bring into sharp relief the unreasonableness of the changes imposed by the Population Certification Requirement and Period of Performance Decision. *See infra* pp. 35–43. But Plaintiff States do not claim breach of those agreements or any right to sue based on past grant agreements. 28 U.S.C. § 1491(a)(1). And defendants' incorrect assertion that "the source of [Plaintiff States'] right[]" to challenge the Reallocation Decision "is the FY 2025 HSGP NOFO" does nothing to bolster their Tucker Act argument. Opp. 12. The HSGP NOFO *is not a contract*. So even if defendants were correct, which they are not, the Tucker Act still would not apply. But, more fundamentally, defendants mischaracterize Plaintiff States' claims, which do not rest on the notion that defendants somehow breached the NOFO, but instead allege that the Reallocation Decision was contrary to law and arbitrary and capricious under the APA, with the NOFO as one relevant piece of evidence. *Cf. APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring). Defendants' attempt to characterize this quintessential APA challenge to agency policy as a breach of contract claim fails in every respect.

13

Second, Plaintiff States do not seek a contract remedy, such as money damages. Instead, they seek equitable and statutory remedies: the vacatur of the challenged agency actions and declaratory and injunctive relief prohibiting their implementation. Am. Compl. 59–60. Contrary to defendants' argument, *see* Opp. 12–14, the possibility that such relief might have downstream consequences for Plaintiff States' future grant funding does not transform this case into one for money damages. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see also APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring). *Bowen*, for example, held that a district court had jurisdiction over a State's APA claims seeking vacatur of two agency decisions denying reimbursement of certain Medicaid expenditures. *See* 487 U.S. at 887–88, 912. The Court reasoned that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893; *see also Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) (a claim does not become one for money damages merely because "success on the merits may obligate the United States to pay the complainant"). Rather, *Bowen* distinguished money damages, which "substitute" for a suffered loss and may be subject to the Tucker Act, from "a suit seeking to enforce [a] statutory mandate," even if that mandate "happens to be one for the payment of money." 487 U.S. at 895–96, 900. Here, too, Plaintiff States seek equitable relief to enforce the APA's "statutory mandate[s]," *id.* at 900, and so can proceed under the APA, even if it is possible that the requested relief might impact their ability to access future grant funding.[4] Put simply, Plaintiff States are not suing for breach of contract, so the Tucker Act does not oust this Court's jurisdiction.

---

[4] Indeed, the connection between the challenged agency actions and potential future payment is less immediate here than in *Bowen*: the district court there directly "reversed" an agency determination that the plaintiff was not eligible for federal reimbursement of various Medicaid expenditures. 487 U.S. at 888. Here, Plaintiff States will still need to perform relevant work and meet other conditions before accessing funding.

**B.    Plaintiff States' Challenge To The Reallocation Decision Is Not Moot.**

Plaintiff States' claims' concerning the Reallocation Decision are not moot because all HSGP funds remain available, so this Court is fully "capable of providing . . . relief which will redress [Plaintiff States'] alleged injury." *Gulf of Me. Fisherman's All. v. Daley*, 292 F.3d 84, 88 (1st Cir. 2002). No fiscal year 2025 HSGP monies have been disbursed because on September 30, 2025, this Court issued a TRO, which was converted with defendants' agreement to a preliminary injunction. This injunctive relief prevented defendants from disbursing disputed funds or "otherwise making [them] unavailable by any means." ECF 14 ¶ 3; ECF 31 ¶ 3; ECF 34 ¶ 1. The preliminary injunction also required defendants to de-obligate the monies that they had taken from Plaintiff States and given to others. ECF 31 ¶ 2. Defendants say they have abided by this Court's orders. Nevertheless, they argue this Court is powerless to direct the re-allocation of admittedly available funds to reflect a lawful statutory allocation. Opp. 14–18. Defendants are wrong. To provide Plaintiff States relief, defendants merely need to amend existing award documents. Nothing prevents this Court from commanding that non-monetary relief.

Start with the mechanics of federal appropriations. The Appropriations Clause requires that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I § 9, cl. 7. Congress fulfilled this requirement in Chapter 15 of Title 31 of the U.S. Code, outlining how the Executive must spend appropriated funds. When Congress appropriates a "fund limited for obligation to a definite period," agency contracts must be "made within that period of availability and obligated consistent with section 1501." 31 U.S.C. § 1502(a). Section 1501 addresses the kinds of "documentary evidence" that "support[]" a valid obligation, which include not only "a grant" but also "a liability that may result from pending litigation." *Id.* § 1501(a)(5)–(6). And Congress provided that an appropriation account can "retain its fiscal-year identity and remain available for recording, adjusting, and liquidating obligations properly

15

chargeable to that account," even "[a]fter the end of the period of availability for obligation." *Id.* § 1553(a). Appropriation accounts remain available for five years, *id.* § 1552(a), both "to liquidate obligations properly chargeable to the account" and "to make legitimate obligation adjustments." 1 U.S. Gen. Accounting Office, *Principles of Federal Appropriations Law*, 5-72 (3d ed. 2004) [hereinafter, *GAO Redbook*].[5]

Defendants' mootness argument ignores the fact that the contested funds are not grant-obligated to anyone but instead are preserved by Court order as a litigation-related obligation. They assert that "[t]he funds Plaintiffs demand have already been obligated by DHS to other recipients," and that "the period of availability has expired." Opp. 15. Neither statement is true. Defendants have twice confirmed that they complied with this Court's order "to de-obligate $245,565,440 of fiscal year 2025 [HSGP] funds by amending the award notifications issued to those jurisdictions that experienced funding gains" and to "record as an obligation of the United States" all the de-obligated funds "pursuant to 31 U.S.C. § 1501(a)(6)." ECF 31 ¶ 2; *see* ECF 35 (defendants' notice of compliance); *see also* Grant Programs Dir., Fed. Emergency Mgmt. Agency, Info. Bull. No. 540, *Compliance with Temporary Restraining Order in* State of Illinois, et al. v. Kristi Noem, et al.*, No. 25-00495 (D. R.I.) – Amendment of Homeland Security Grant Program Awards* (Oct. 24, 2025) (Ex. 4). Defendants' compliance freed up the contested funds and then "established a valid obligation against the unexpended balance" of the HSGP appropriation, *In re Impounded Food Stamp Program Appropriations*, 54 Comp. Gen. 962, 966 (1975), which prevented the expiration of any funds at issue. *See Bennett v. Butz*, No. 4-73 Civil 284, slip op. at 6–7 (D. Minn. June 25,

---

[5] Federal courts routinely rely on the *GAO Redbook*, produced under the authority of the Comptroller General of the United States, 31 U.S.C. § 702(b), for authoritative guidance in federal appropriations law. *See, e.g.*, *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 308–10 (2020); *New York v. Trump*, 133 F.4th 51, 56 n.3 (1st Cir. 2025).

1973) (Ex. 5) (employing this mechanism to prevent a lapse of funds); *GAO Redbook* at 5-82 (endorsing the use of this mechanism).

Thus, the funds needed to redress Plaintiff States' injuries are neither obligated to other recipients nor expired. While defendants *object* to the Court's de-obligation order, *see* Opp. 18, they do not deny that they *followed* it. *Cf. Sindi v. El-Moslimany*, 896 F.3d 1, 32 (1st Cir. 2018) (collateral bar rule). As a result, there was a valid and timely litigation obligation under 31 U.S.C. § 1502(a), and there are no lingering grant obligations to non-parties that could affect this Court's jurisdiction.

Defendants' mootness argument is independently foreclosed by the Court's order that "[t]he statutory lapse of the funds appropriated by Congress for the fiscal year 2025 Homeland Security Grant Program is immediately suspended pending further order of the Court, pursuant to the Court's equitable authority, 31 U.S.C. § 1502(b), and any other applicable provision of law." ECF 14 ¶ 4; *see also* ECF 31 ¶ 4. Section 1502(b) "expressly authorize[s] courts to suspend the lapse of budget authority while lawsuits play out." *Goodluck v. Biden*, 104 F.4th 920, 928 (D.C. Cir. 2024). Defendants argue that the five-year wind-down period for appropriations renders § 1502(b) inapplicable. Opp. 18. But that argument would effectively nullify § 1502(b) in all cases. Logic and precedent point the other way.

Finally, even if defendants had not complied with the de-obligation order, and even if § 1502(b) did not mean what it says, this case would not be moot because no HSGP funds have been *disbursed* to any grant recipient. The funds therefore remain "available as a subject of specific relief" under the APA's waiver of sovereign immunity. *New York v. Noem*, 2025 WL 2939119, at *5. Right now the funds are in a "a fixed appropriation account" that can be used to "record[], adjust[], and liquidat[e] obligations properly chargeable to that account," 31 U.S.C. § 1553(a), for

17

another five years, *id.* § 1552(a). "[W]here, as here, Congress has appropriated funds and those funds are still around; to comply with a court order requiring those funds to be used for reimbursement, no other money would need to be '*drawn* from the Treasury.'" *Rodriguez v. Carson*, 401 F. Supp. 3d 465, 470 (S.D.N.Y. 2019) (quoting U.S. Const. art. I, § 9, cl. 7). Instead, agency action "after the close of a fiscal year can properly effect the allocation of funds left *undisbursed* during a fiscal year as a result of a pending lawsuit." *Population Inst. v. McPherson*, 797 F.2d 1062, 1071 (D.C. Cir. 1986) (emphasis added).

Defendants rely on two cases that did not address the difference between "obligation" and "disbursement" and so did not resolve which moment in the life of an appropriation matters for mootness purposes. *See City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994) (using both terms in quick succession); *County of Suffolk v. Sebelius*, 605 F.3d 135, 142 (2d Cir. 2010) (case moot where the funds were "exhausted"). But *New York v. Noem*, 2025 WL 2939119, and *Rodriguez v. Carson*, 401 F. Supp. 3d 465, squarely confronted this question and held that it is disbursement, not mere obligation, that counts: "[F]unds that remain in the Government's possession are not 'unavailable' as a source of specific relief as far as the Appropriations Clause and *County of Suffolk* are concerned." *Id.* at 470.

To make this concrete, all defendants need to do at this point is to amend Plaintiff States' award documents. Defendants do not contend, nor could they, that they lack the ability to amend award documents after issuance. The HSGP awards themselves contemplate post-award amendments: "You must submit scope or budget revision requests for FEMA's prior approval, via an amendment request . . . ." *E.g.*, ECF 46-11, AR 00785. Defendants have already amended award documents to comply with this Court's preliminary injunction in this very case. *See* Ex. 4. And federal appropriations law permits agencies to alter recorded obligations after the end of a fiscal

year, so long as "the subsequent price adjustment" reflects "a *bona fide* need of the same year in which funds were obligated for payment." *GAO Redbook*, at 5-35. So defendants have the power to make appropriate amendments to effectuate any relief entered by this Court.

    **C.**    **Plaintiff States' Claims Against the Population Certification Requirement Are Ripe.**

    Plaintiff States' challenge to the Population Certification Requirement is ripe for review because the claims raise pure questions of law and defendants have unequivocally frozen funding awarded to Plaintiff States until they satisfy the Population Certification Requirement. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148, 153 (1967) (holding that agency action is "'ripe' for judicial resolution" where it "requires an immediate and significant change in the plaintiffs' conduct of their affairs").

    Defendants argue that Plaintiff States' claims are prudentially unripe because defendants intend to promulgate unidentified guidance at some undefined later date. Opp. 27–28. Both the Supreme Court and the First Circuit have cast doubt on whether it is proper for courts to consider prudential ripeness at all, given a federal court's "unflagging" duty to exercise its jurisdiction. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014); *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1053 (1st Cir. 2021) (citation omitted) ("[I]t is unclear whether prudential ripeness concerns in particular may still be entertained."). Defendants do not dispute that Plaintiff States' claims meet the constitutional requirement of a case or controversy. Their attempt to oust jurisdiction based on "prudential" ripeness should be rejected at the outset.

    In any event, prudential ripeness favors immediate resolution. Prudential ripeness has two prongs: fitness and hardship. *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52 (1st Cir. 2021). The Population Certification Requirement is fit for resolution because no further facts are needed to clarify the contours of this purely legal dispute. *See Susan B. Anthony List*, 573 U.S. at 167.

Plaintiff States assert that the Population Certification Requirement is contrary to law, arbitrary, and procedurally improper. These claims present legal questions. *See Succar v. Ashcroft*, 394 F.3d 8, 19 (1st Cir. 2005); *Energy Future Coal. v. E.P.A.*, 793 F.3d 141, 146 (D.C. Cir. 2015). Defendants' vague intention to provide further guidance at some point in the indeterminate future, Opp. 27, does not undermine the finality of the Requirement or its fitness for immediate review. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (the "possibility" of later revisions to an agency action "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal"); *Clark Cnty. v. F.A.A.*, 522 F.3d 437, 441 (D.C. Cir. 2008) (ongoing "periodic review" of the challenged action does not render the challenge unripe). The Court need not wait to adjudicate this case while defendants "purport[] to deliberate without end." *N.H. Lottery*, 986 F.3d at 53.

And withholding judicial consideration would impose hardship on Plaintiff States because they face "a direct and immediate dilemma." *Id.* The deadline set by defendants for accepting EMPG awards now stands only a month away at December 31, 2025. *See* ECF 34 ¶ 9. So Plaintiff States must immediately commit to accepting the Population Certification Requirement or forgo millions of dollars in federal funding for emergency preparedness. *See* Mot. 44 (EMPG grant furnishes "the primary source of funds" for "state and local programming for emergency management"). Even just "delay, uncertainty, and expense" suffice to show hardship, *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 92 (1st Cir. 2013), and Plaintiff States face far graver harms than that. Courts have accordingly held challenges to funding conditions to be ripe as soon as the conditions are imposed because grantees must "either certify compliance with contested [conditions] or risk losing critical emergency and disaster-relief funding." *Illinois v. FEMA*, 2025 WL 2716277, at *9; *see also, e.g., California v. U.S. Dep't of Transp.*,

20

_ F. Supp. 3d _, 2025 WL 3072541, at *7 (D.R.I. Nov. 4, 2025); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 865–66 (N.D. Ill. 2018); *California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1030–31 (N.D. Cal. 2018). The legality of the Population Certification Requirement is ripe for adjudication.

## II.    The Challenged Agency Actions Violate The APA.

With no jurisdictional barriers to normal APA review, the challenged agency actions cannot survive. Defendants made three dramatic changes to HSGP and EMPG in the waning days of the federal fiscal year: They slashed HSGP funding to States based on extra-statutory considerations, imposed a novel requirement that States become their own census-takers in order to use EMPG funds, and cut two years off both the HSGP and EMPG grants. None of these decisions satisfied the APA's requirement of reasoned decisionmaking.

### A.    The Reallocation Decision Is Unlawful.

The additional materials that defendants produced last week as the administrative record do not resuscitate the Reallocation Decision. When Plaintiff States were obliged to file this case on an emergency basis on September 29, 2025, the only official rationale for slashing Plaintiff States' awards was the cryptic reference "per DHS directive." *E.g.*, ECF 46-11, AR 00786; ECF 46-12, AR 01075; ECF 46-13, AR 01556. Defendants have now revealed the supposed "DHS Directive" in question, a September 25 memorandum that defendant Richardson wrote to defendant Noem. *See* ECF 46-2 (Arnold Decl.), ¶ 16; ECF 46-16, AR 01647.[6] This Directive

---

[6] More accurately, defendants have revealed *part* of the DHS Directive. Even while asserting that this Directive provides the sole support for the Reallocation Decision, they have redacted material portions of it, ECF 46-16, AR 01651, claiming privilege for "pre-decisional deliberations" without elaboration. But documents reflecting a final agency decision and the supposed reasons supporting it—exactly what Defendants assert the September 25 memo constitutes—"embody a final decision" and do not fall under the deliberative-process privilege. *See U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021). Defendants' decision to rely on some portions of the administrative record while concealing other portions speaks volumes.

purports to defend the Reallocation Decision as the result of a complete overhaul of the formula for allocating HSGP funds. This fundamental restructuring of the grant criteria occurred after a public pronouncement by defendants that the risk scores were "final," Ex. 1, a mere five days before the end of the federal fiscal year, and without Congressional input.

Defendants' reliance on the DHS Directive to support the Reallocation Decision violates the APA many times over. First, the DHS Directive contravenes the HSGP statute by disregarding the factors that Congress thought most important. Second, the DHS Directive does not explain the Reallocation Decision. Third, the DHS Directive does not account for the agency's change in position or consider Plaintiff States' reliance interests. Fourth, and in the alternative, the DHS Directive provides only more reason to suspect "a significant mismatch between the decision [defendants] made and the rationale [they] provided," *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019), which at a minimum precludes summary judgment in their favor.

### 1.    The Reallocation Decision contravenes the Homeland Security Act.

The DHS Directive dramatically altered the risk methodology that defendants had pronounced "final" on August 13, 2025. Ex. 1. The two largest changes were to reduce the consideration of "Counterterrorism" and "Population Density Metric," with both factors cut to near-zero 1.67% weights in the calculus. *See* ECF 46-17, AR 01666.[7] In short, in allocating counterterrorism funding, defendants decided to dramatically de-prioritize *counterterrorism efforts* in *dense cities*. That decision flouts the will of Congress.

Congress created the first version of the HSGP in the USA Patriot Act, passed on October 26, 2001, in direct response to the horrific events of September 11. *See* Pub. L. 107-56, § 1014, 115 Stat. 272, 399 (2001). So the preparedness programs at issue here stem from the "devastating

---

[7] The sum of the final weights is 300, and these two factors were reduced to a weight of 5 each. *See* ECF 46-17, AR 01666. 5 divided by 300 equals approximately 1.67%.

terrorist attack that destroyed the World Trade Center," and Congress deliberately drafted the statutes to ensure that "'[h]omeland security assistance should be based *strictly on an assessment of risks and vulnerabilities*.'" *New York v. Noem*, 2025 WL 2939119, at *2 (emphasis in original) (quoting Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* 396 (2004)). Now, in 2025, defendants have slashed funding to high-density, high-threat places like New York City and the District of Columbia, deeming it more important to "capture the vulnerabilities associated with illegal border crossings." ECF 46-16, AR 01651.

Congress thought differently. Congress mandated that at least 25 percent of all HSGP funding be devoted to "law enforcement terrorism prevention activities." 6 U.S.C. § 607(a)(1). It then enumerated a prescriptive set of factors to consider when assessing a jurisdiction's risk of terrorism. *See id.* § 608(a)(1). One is, quite simply, "population density," meaning "population divided by land area in square miles." *Id.* §§ 601(11), 608(a)(1)(B). The population-density metric came straight from the 9/11 Commission Report's recommendation. *See 9/11 Commission Report*, *supra*, at 396. Defendants have nearly zeroed it out as a factor for allocating funds. *See* ECF 46-17, AR 01666.

Two other factors are the "history of threats" and "the most current threat assessments available to the Department." 6 U.S.C. § 608(a)(1)(C), (E). Until September 25, 2025, defendants captured these factors under the threat measure labeled "Counterterrorism." As summarized in defendants' own public records, the "Counterterrorism" factor relies on a survey of available intelligence "to identify concrete, geographically specific terrorist threats including terrorist plots and attacks." Fed. Emergency Mgmt. Agency, *Fiscal Year 2025 State Homeland Security Program (SHSP) and Urban Area Security Initiative (UASI) Risk Methodology Data Sources*, at 2 (Mar.

2025) (Ex. 2). Defendants have nearly zeroed out their own counterterrorism threat analysis as a factor for allocating funds. *See* ECF 46-17, AR 01666.

Defendants have instead focused on a single threat that they seek to mitigate through HSGP funding—"Transnational Organized Crime"—and landed upon one remedy for this risk—States' willingness to "propose[] using the funds in support of border interdiction and other border security measures." *See* Opp. 7; ECF 46-2 (Arnold Decl.), ¶¶ 17–18. Congress prohibited this transformation of the HSGP program. As Judge Smith held, DHS cannot simply ignore statutory language and conflate its immigration enforcement efforts with its counterterrorism objectives. *See Illinois v. FEMA*, 2025 WL 2716277, at *12. And the HSGP statute prohibits this single-minded focus on border security. First, § 608(a)(1) forecloses allocating these funds based on a single threat, as it requires FEMA to "includ[e] consideration" of the full list of factors. 6 U.S.C. § 608(a)(1). Second, Congress listed many kinds of terrorist threats to be addressed by SHSP and UASI funds, including "biological," "chemical," "cyber," and "nuclear." *Id*. § 608(b). Third, Congress defined nine "law enforcement terrorism prevention activities" to be funded, and only one even mentions "border security." *Id.* § 607(a)(2). Defendants' sudden attempt to turn SHSP and UASI into border security programs, to the total exclusion of their core mission to prevent terrorist attacks, contravenes the HSGP statute multiple times over.

## 2. The DHS Directive fails rationally to explain the Reallocation Decision.

The threadbare and incomplete DHS Directive, far from saving the Reallocation Decision, highlights defendants' failure to "examine the relevant data and articulate a satisfactory explanation" for the Reallocation Decision. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The APA's core requirement is that defendants must "articulate[] a rational connection between the facts found and the choice

made." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The DHS Directive fails to clear even this low bar.

Start with the fact that the September 25 DHS Directive's allocation amounts do not even match the amounts in the final awards for the SHSP program issued on September 26; instead, the final awards were even less favorable to Plaintiff States. For most jurisdictions, the final awards issued on September 26 were greater than the allocations in the September 25 Directive. *Compare* ECF 46-16, AR 01652–53, *with* ECF 40-17 at 15–16:

| State or Territory | 9/25/2025 Allocation | Final Award | Increase |
|---|---|---|---|
| AK | $4,362,750 | $6,000,629 | $1,637,879 |
| AL | $4,362,750 | $6,000,629 | $1,637,879 |
| AR | $4,362,750 | $6,000,628 | $1,637,878 |
| AS | $997,200 | $2,635,078 | $1,637,878 |
| AZ | $4,362,750 | $7,362,750 | $3,000,000 |
| FL | $8,395,245 | $18,395,245 | $10,000,000 |
| GA | $4,362,750 | $9,362,750 | $5,000,000 |
| GU | $1,110,150 | $2,748,028 | $1,637,878 |
| HI | $4,362,750 | $6,000,629 | $1,637,879 |
| IA | $4,362,750 | $6,000,629 | $1,637,879 |
| ID | $4,362,750 | $6,000,629 | $1,637,879 |
| IN | $4,362,750 | $6,000,629 | $1,637,879 |
| KS | $4,362,750 | $6,000,629 | $1,637,879 |
| KY | $4,362,750 | $6,000,629 | $1,637,879 |
| LA | $4,362,750 | $8,362,750 | $4,000,000 |
| MA | $4,362,750 | $6,000,629 | $1,637,879 |
| MD | $4,362,750 | $6,000,629 | $1,637,879 |
| ME | $4,362,750 | $6,000,629 | $1,637,879 |
| MI | $4,362,750 | $6,000,629 | $1,637,879 |
| MO | $4,362,750 | $6,000,629 | $1,637,879 |
| MP | $997,200 | $2,635,078 | $1,637,878 |
| MS | $4,362,750 | $6,000,629 | $1,637,879 |
| MT | $4,362,750 | $6,000,629 | $1,637,879 |
| NC | $4,362,750 | $6,862,750 | $2,500,000 |
| ND | $4,362,750 | $6,000,629 | $1,637,879 |
| NE | $4,362,750 | $6,000,629 | $1,637,879 |
| NH | $4,362,750 | $6,000,629 | $1,637,879 |
| NJ | $4,362,750 | $6,000,629 | $1,637,879 |

| State or Territory | 9/25/2025 Allocation | Final Award | Increase |
|---|---|---|---|
| NM | $4,362,750 | $8,362,750 | $4,000,000 |
| OH | $4,362,750 | $7,862,750 | $3,500,000 |
| OK | $4,362,750 | $6,000,629 | $1,637,879 |
| PA | $4,362,750 | $11,362,750 | $7,000,000 |
| PR | $4,362,750 | $6,000,629 | $1,637,879 |
| SC | $4,362,750 | $6,000,629 | $1,637,879 |
| SD | $4,362,750 | $6,000,629 | $1,637,879 |
| TN | $4,362,750 | $6,000,629 | $1,637,879 |
| TX | $16,759,327 | $28,759,327 | $12,000,000 |
| UT | $4,362,750 | $6,000,628 | $1,637,878 |
| VA | $4,362,750 | $11,362,750 | $7,000,000 |
| VI | $997,200 | $2,635,078 | $1,637,878 |
| WI | $4,362,750 | $6,000,629 | $1,637,879 |
| WV | $4,362,750 | $6,000,629 | $1,637,879 |
| WY | $4,362,750 | $6,000,628 | $1,637,878 |

Florida was given $10 million more than the Directive indicated; Georgia got an extra $5 million; and Texas' allocation was increased by $12 million.

A different set of States stayed flat between September 25 and September 26, nearly all of them Plaintiff States:

| State or Territory | 9/25/2025 Allocation | Final Award | Increase |
|---|---|---|---|
| CA | $17,156,754 | $17,156,754 | $0 |
| CO | $4,362,750 | $4,362,750 | $0 |
| CT | $4,362,750 | $4,362,750 | $0 |
| DC | $4,362,750 | $4,362,750 | $0 |
| DE | $4,362,750 | $4,362,750 | $0 |
| IL | $4,362,750 | $4,362,750 | $0 |
| MN | $4,362,750 | $4,362,750 | $0 |
| NV | $4,362,750 | $4,362,750 | $0 |
| NY | $5,624,924 | $5,624,924 | $0 |
| OR | $4,362,750 | $4,362,750 | $0 |
| RI | $4,362,750 | $4,362,750 | $0 |
| VT | $4,362,750 | $4,362,750 | $0 |
| WA | $4,362,750 | $4,362,750 | $0 |

Defendants do not even attempt to explain this discrepancy. To the contrary, the DHS Directive purports to contain the "final allocations." ECF 46-16, AR 01648. But it clearly did not, as a matter

26

of undisputed fact. After all, the SHSP allocations in the DHS Directive totaled only $261,450,000, *id.* at 01653, but the SHSP appropriation was $373,500,000, ECF 46-2 (Arnold Decl.), ¶ 12. So defendants made final upward adjustments to exhaust the SHSP appropriation—final adjustments that disfavored Plaintiff States and that defendants make no attempt to explain.

Next, the DHS Directive provides no detail at all about the *results* of the alleged "changes to the risk formula." ECF 46-16, AR 01651. The DHS Directive and attached "Grant Allocation Summary" claim that the Terrorism Risk Methodology was "rebalanced" on September 25, *id.* at 01651, ECF 46-17, AR 01665; with an attached chart detailing the "data element weight changes," *id.* at 01666. All jurisdictions had been able to see their actual risk scores on August 13, 2025. ECF 46-2 (Arnold Decl.), ¶ 13. Indeed, the email that defendants sent to grantees stated that it contained the "***Final*** FY 2025 Risk Profile, including the data elements, relative scores and ranks." Ex. 1 (emphasis added). Plaintiff States have compiled those risk rankings; they showed minimal changes from prior years and several changes in Plaintiff States' favor. *See* ECF 40-20 (Tresnowski Decl.). At a bare minimum, to "articulate[] a rational connection between the facts found and the choice made," *Baltimore Gas*, 462 U.S. at 105, defendants had to explain how the risk scores shifted against Plaintiff States—apparently to a dramatic degree. But the DHS Directive did not contain any allegedly changed risk scores. Defendants have provided only an "*ipse dixit* conclusion" about relative risk, which "epitomizes arbitrary and capricious decisionmaking." *Ill. Pub. Telecommunications Ass'n v. F.C.C.*, 117 F.3d 555, 564 (D.C. Cir. 1997).

What's more, defendants invented a new scoring criterion—"effectiveness." ECF 46-16, AR 01651; *see also* ECF 46-17, AR 01665 ("30% on grant spending effectiveness"). The "effectiveness" metric accounted for "30%" of the final allocations, but the DHS Directive fails to explain what this criterion measured or how it was applied. It is a total black box. The Directive

does not even list out the States and their scores on this effectiveness metric, so this Court cannot tell whether there is any actual connection between the effectiveness metric and the Reallocation Decision. "[I]n order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Com.*, 588 U.S. at 780 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Defendants have not.

Perhaps recognizing this, Arnold attempts to flesh out the effectiveness metric a bit in his *post-hoc* November 20 declaration. *See* ECF 46-2 (Arnold Decl.), ¶ 18. He states that "FEMA credited jurisdictions with lower balances of unused HSGP funds" and those that promised to "us[e] the funds in support of border interdiction and other border security measures." *Id.* Neither explanation can be found in the actual DHS Directive. *Contra* ECF 46-16, AR 01651; ECF 46-17, AR 01665. So Arnold's statements are "new rationalizations" that "should be disregarded" when assessing APA compliance. *Sierra Club v. Marsh*, 976 F.2d 763, 772–73 (1st Cir. 1992).

And even if Arnold could opine on what happened on September 25, his statements are woefully inadequate and do not match the facts. What were the balances of unused HSGP funds in each of the States? Were Plaintiff States' unused balances systematically higher than other States' balances? Defendants do not say, and the Court cannot "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43. As to border security, Plaintiff States—in compliance with this year's NOFO—proposed HSGP projects on border interdiction. Defendants dramatically cut those budget lines at the award stage, again and again. *E.g.*, ECF 46-11, AR 00787, 00789, 00915; ECF 46-12, AR 01109, 01110; ECF 46-13, AR 01558. In what way did Plaintiff States' rejected projects fail to support border interdiction? In reviewing the Reallocation Decision, this Court need not "defer to an agency's conclusory or unsupported suppositions" about Plaintiff States' effectiveness. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716

F.3d 200, 214 (D.C. Cir. 2013) (quotation omitted). But the DHS Directive did not bother with the details, so it cannot possibly explain why, in the Reallocation Decision, defendants slashed funding on line item after line item.

### 3. Defendants changed position at the last minute without explanation and without considering reliance interests.

The DHS Directive also fails to explain why defendants shifted their position so dramatically on September 25, 2025, as to both the risk methodology and the overall funding formula. On August 13, defendants provided each State with what they called the "***Final*** FY 2025 Risk Profile." Ex. 1 (emphasis added). As late as September 12, defendants proclaimed that those final risk profiles, and nothing else, would determine the allocation: "FY 2025 SHSP and UASI allocations were based solely on FEMA's relative risk methodology." ECF 40-15 at 2. Defendants also added a 30% "grant spending effectiveness" weight at the last minute. *See* ECF 46-17, AR 01665. This 30% factor did not exist on August 1, when the HSGP NOFO stated that "HSGP does not use a weighed scoring method." ECF 46-4, AR 00144. All NOFO references to "effectiveness" bore instead on specific investments proposed by grantees: "The proposed investment will be subject to DHS/FEMA's evaluation of the effectiveness of the proposed investment." *Id.* at 00119; *see also id.* at 00142. If projects failed this test, then the remedy was that "funds may be placed on hold until revisions are made," not that the jurisdiction would suffer funding cuts without warning. *Id.* at 00143. The new "effectiveness" metric—unexplained, inherently vague, yet surpassingly important—bears all the hallmarks of outcome-driven data manipulation.

It is clear, then, that defendants "change[d] their existing policies" on September 25, so they needed to "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). An agency may not, for starters, "depart from a prior policy *sub silentio*." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But that is what

happened here: The DHS Directive does not acknowledge that, just a month earlier, the risk scores were "final." Ex. 1. It does not mention that it is shifting hundreds of millions of dollars in awards one day before disclosing them, upsetting expectations for that fiscal year—to say the least. The Directive's 70-30 risk-effectiveness formula was invented sometime between September 12 and September 25 and never disclosed to recipients—a fact that the Directive fails to acknowledge.

Further, because their "prior policy has engendered serious reliance interests," defendants also needed to "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox Television Stations*, 556 U.S. at 515. The Directive does not meet the "blank slate" standard, so it necessarily fails to meet the more stringent requirements applicable here. Plaintiff States' reliance interests are vastly important, as they explained in detail. *See* Mot. 24. The HSGP NOFO identified specific types of projects on which SHSP and UASI moneys may be spent, including "protection of soft targets and crowded places," "cybersecurity resiliency," and "fusion centers." ECF 46-4, AR 00117. Plaintiffs States proposed projects for these counterterrorism priorities, only to find funding for those projects cut without any explanation. *E.g.* Mot. 25 (noting Illinois' fusion center funding was cut from $2 million to a single dollar). Defendants offer no rebuttal on the facts.

Instead, defendants boldly claim that they have unfettered "discretion to amend the HSGP allocation methodology," rendering any reliance "unreasonable." Opp. 23. Similarly, they claim that because a "NOFO has no definitive legal effect," they can freely abandon longstanding positions and need not "explain changes between NOFO projections and final award amounts." *Id.* at 22–23. But the APA's reason-giving requirement restricts defendants' discretion. Because agencies must "remain[] 'within the bounds of reasoned decisionmaking,'" *Dep't of Com.*, 588 U.S. at 773 (quoting *Baltimore Gas & Elec*, 462 U.S. at 105), they "must show that there are good

reasons for the new policy," *Fox Television Stations*, 556 U.S. at 515. This principle applies with equal force to policy changes found in relatively informal agency actions like memoranda, NOFOs, and guidance documents. In *Fox Television Stations* itself, for instance, the prior enforcement policy was found in "staff rulings and Commission dicta," not a rulemaking. *Id.* at 512; *see also Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (change-in-position doctrine applies to "precedents or practices"); *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985) (same as to "commitment of funds"). So, here as in any other context, defendants were "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020). The DHS Directive reflects none of that.

### 4. At minimum, defendants' motion for summary judgment should be denied as to the Reallocation Decision.

Defendants' proffered reasons for the Reallocation Decision contravene the Homeland Security Act, fail to set forth a reasoned basis for the Reallocation Decision, and do not rationally explain defendants' change in position, so Plaintiff States are entitled to judgment as a matter of law. *See supra* pp. 21–31. At minimum, however, defendants' cross-motion for summary judgment should be denied as to the Reallocation Decision because there is a clear "disconnect between the decision made and the explanation given." *Dep't of Com.*, 588 U.S. at 785. In particular, there is evidence in the record, and more potentially still withheld by defendants, that defendants relied on an extra-statutory factor that they are now unwilling to defend: Plaintiff States' and their subdivisions' purported "sanctuary" policies. *See* Mot. 17–18.

To be sure, Arnold claims that "[s]anctuary jurisdiction designation did not play any role in calculating grant funding for states." ECF 46-2 (Arnold Decl.), ¶ 19. But the record is littered with statements from defendants openly admitting the opposite of what Arnold now declares:

- In the July 16, 2025, HSGP NOFO memorandum, defendant Richardson stated that defendants would "[r]edirect funds away from sanctuary jurisdictions toward compliant ones" and that "if a state is determined to be a sanctuary jurisdiction at the time of application deadline, for the [SHSP], they will only receive the statutory minimum." ECF 49-1, AR 01674, 01679.

- On September 24, a DHS spokesperson said: "Cities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding." "No lawsuit, not this one or any other, is going to stop us from doing that." ECF 40-19.

- On September 25, the DHS Directive *itself* provided that "any [SHSP] and [UASI] recipients designated as a Sanctuary Jurisdiction by the Department of Justice will not receive any allocations posted in the Notice of Funding Opportunity except the [SHSP] minimum." ECF 46-16, AR 01647.

- On October 6, in the *New York v. Noem* matter, the same declarant Arnold said the opposite about the closely related Transit Security Grant Program, swearing under penalty of perjury that the Metropolitan Transportation Authority "did not receive funding because the applicant is based in New York City, a designated Sanctuary Jurisdiction city." ECF 40-18 ¶ 5.

These statements follow on multiple executive orders that have commanded defendants to do all they can to cut funding to Plaintiff States based on the extra-statutory consideration of "sanctuary" status. *See* Mot. 6–7 (discussing the executive orders).

Judges "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com.*, 588 U.S. at 785. Philadelphia was the seventh-highest-risk city in the nation on August 13, ECF 40-20 at 2, but the September 25 memo allocated no funds to Philadelphia, ECF 46-16, AR 01655. Boston also rose in the risk rankings but saw its award slashed by half. ECF 40-20 at 2; ECF 46-16, AR 01654. Others were luckier: Sometime between September 25 and 26, defendants manually topped up most States with round-numbered and uniform SHSP bonuses that lack any record explanation. *See supra* pp. 25–26. To put it mildly, it remains disputed how such results could follow from a mathematical, formula-based process, of whatever nature. And, to top it all off, the DHS Directive literally has a black box—an unexplained redaction on the key page of the document. *See* ECF 46-16, AR 01651. Plaintiff States have asked defendants to provide an

unredacted version, and defendants have refused, citing the deliberative-process privilege. *See supra* p. 21 n.6.

Thus, if the Court does not grant Plaintiff States' motion for summary judgment on the Reallocation Decision, it should direct expedited discovery to complete and supplement the record as necessary. *See City of Taunton v. EPA*, 895 F.3d 120, 127 (1st Cir. 2018) (supplementation the administrative record); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (extra-record discovery). There is ample reason to conclude that the September 25 memorandum was not the driving force behind the Reallocation Decision. To the extent the Court finds that more evidence is necessary, Plaintiff States should be given the opportunity to uncover what hides within defendants' figurative and literal black box. *See* ECF 46-16, AR 01651.

### B.    The Population Certification Requirement And Performance Period Decision Are Not Committed To Agency Discretion By Law.

Defendants argue that the Population Certification Requirement and the Performance Period Decision are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), because APA review does not extend to "[a]n agency's determination of how best to condition appropriated funds," Opp. 25. Multiple courts, including this one, already have rejected this argument as to the statutes defendants administer. *See Illinois v. FEMA*, 2025 WL 2716277, at *10; *Chicago v. Noem*, No. 25 CV 12765, 2025 WL 3251222, at *5 (N.D. Ill. Nov. 21, 2025). These holdings reflect that § 701(a)(2) is "quite narrow[]," applying only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com.*, 588 U.S. at 772 (cleaned up). Defendants bear the "burden" of "rebut[ting] the presumption that agency action is judicially reviewable," *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007). They did not carry their burden.

Defendants principally rely on *Lincoln v. Vigil*, 508 U.S. 182 (1993), but that case has no bearing here. *Lincoln* involved an effort to obtain judicial review of an agency's allocation of funds to a program from unrestricted lump-sum appropriations. *See* 508 U.S. at 186–87. "[N]o statute or regulation even mention[ed] the [p]rogram" in question, *id.* at 190; rather, the agency had created the program. The Court held that, in such a case, the agency's decision to shutter the program was unreviewable under the APA. *Id.* at 192. Because the relevant statutes "d[id] not so much as mention" the defunded program, and its replacement program "clearly f[ell] within the [agency's] statutory mandate," the decision to defund it was unreviewable. *Id.* at 194. Thus, *Lincoln* precludes review only when Congress provides no "statutory reference point" to assess the legality of an agency's action. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002); *accord Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100–01 (D.C. Cir. 2021); *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1449–50 (10th Cir. 1994); *Rhode Island v. Trump*, No. 1:25-CV-128-JJM-AEM, 2025 WL 3251113, at *11–12 (D.R.I. Nov. 21, 2025).

The HSGP and EMPG statutes are "nothing like the statutes at issue in *Lincoln*." *Shawnee Tribe*, 984 F.3d at 100. On the contrary, Congress provided granular direction about how and where to spend HSGP and EMPG monies. *See* 6 U.S.C. §§ 604–609, 762. In fact, defendants have implicitly conceded that *Lincoln* does not apply to HSGP and EMPG. In *Illinois v. FEMA*, they argued for unreviewable discretion only as to "eight discretionary grant programs," not including HSGP and EMPG. *See* Defendants' Mot. for Summary Judgment and Opp. to Plaintiffs' Mot. for Summary Judgment at 7–8, 30, *Illinois v. FEMA*, ECF 61. Judge Smith then rejected the *Lincoln* argument as to *all* grant programs administered by defendants: "Defendants' reliance on *Lincoln* is misplaced: unlike the lump-sum funding decisions in *Lincoln*, the grants at issue here are governed by statutory and regulatory frameworks that provide judicially manageable standards for

34

review." *Illinois v. FEMA*, 2025 WL 2716277, at *10. That holding was consistent with numerous district court decisions that have rebuffed the United States' recent efforts to extend *Lincoln* far beyond its original holding to preclude review of grant condition challenges writ large. *See Chicago v. Noem*, 2025 WL 3251222, at *5 (same statutes); *see also, e.g.*, *Hous. Auth. of the City and Cnty. of S.F. v. Turner*, No. 25-CV-08859-JST, 2025 WL 3187761, at *17 (N.D. Cal. Nov. 14, 2025); *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-CV-342-MRD-PAS, 2025 WL 2988705, at *6 (D.R.I. Oct. 23, 2025); *RFE/RL, Inc. v. Lake*, No. 1:25-CV-799-RCL, 2025 WL 2023252, at *5 (D.D.C. July 18, 2025). Normal APA review applies.

### C.    The Population Certification Requirement Is Unlawful.

The Population Certification Requirement (1) is arbitrary; (2) contravenes a clear statute that requires defendants to use the federal government's own census data for this purpose; and (3) violates the core purpose of the Paperwork Reduction Act to prevent agencies from "impos[ing] paperwork requirements on the public" where the information is "available to the agency from another source within the Federal Government." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990). Each failing provides sufficient basis to set the Requirement aside.

*First*, defendants' decision to impose the Population Certification Requirement is arbitrary and capricious because the Requirement is impossible for Plaintiff States to fulfill, Mot. 28–31, and because defendants failed to consider important aspects of the problem, including States' reliance interests, *id.* at 33–34. Defendants do not respond to these deficiencies, confirming that their decision to impose the Requirement was arbitrary and capricious. *See* Opp. 30–31.

Defendants make only one argument on the merits of the arbitrary-and-capricious claim: that the Population Certification Requirement is reasonable because it is "intended to ensure the Government is in possession of up-to-date state population numbers." *Id.* at 31. But what defendants purportedly "intended" is irrelevant to whether the agency "articulate[d] a satisfactory

explanation for its action" at the time it took the action. *State Farm*, 463 U.S. at 43. No document provides any contemporaneous justification for the new Population Certification Requirement. Indeed, Arnold cannot even recall when defendants decided that they needed to force the States "to confirm FEMA's calculations of state populations," vaguely citing "mid-September." ECF 46-2 (Arnold Decl.), ¶ 6.

And, even if the Court considered Arnold's *post hoc* rationalization, the statement makes no sense. Plaintiff States adduced specific evidence, from state demographers, that States cannot possibly replicate annual U.S. Census Bureau estimates "to confirm" their own populations. *See* ECF 40-22 (Schwarm Decl.), ¶¶ 15–19; ECF 40-26 (Fiorio Decl.), ¶¶ 15–24. The requirement that States somehow subtract "individuals that have been removed from the State" emphasizes the impossibility: Plaintiff States cannot provide or certify population statistics with the sum of individuals removed pursuant to *federal* immigration laws by the *federal* government—data which is exclusively in the *federal* government's possession. Mot. 28–29. Such "[i]mpossible requirements imposed by an agency are perforce unreasonable." *All. for Cannabis Therapeutics v. Drug Enf't Admin.*, 930 F.2d 936, 940 (D.C. Cir. 1991).

*Second*, defendants' decision to impose the Population Certification Requirement on Plaintiff States in the EMPG is contrary to law because Congress has required all "departments and agencies" to use annual census estimates from the U.S. Census Bureau when making funding allocations based on state population. 13 U.S.C. § 183(a).

Defendants argue that Congress did not prohibit them from using other methods to verify a State's population as well. Opp. 29. But the statutes plainly call for defendants to use census data as the sole basis for awarding EMPG funding. The EMPG statute requires a simple funding formula: After "first" awarding a minimum amount to each State and territory, FEMA "*shall*

apportion the remainder" in a "ratio" of the "population of each State" compared to the "population of all States." 6 U.S.C. § 762(d) (emphasis added). So the sole variables in apportioning funding among the States are state and national population data. Using census data to "determine the amount of benefit received by" a State, 13 U.S.C. § 183(a), therefore means simply plugging in the population numbers produced by the U.S. Census Bureau into the EMPG funding formula. *See Bailey v. United States*, 516 U.S. 137, 145 (1995) ("These various definitions of 'use' imply action and implementation."). Additionally, because the EMPG statute calls for funding to be calculated using a "ratio" of state to national population, 6 U.S.C. § 762(d), defendants must use state population figures produced using the *same* methodology used to calculate the national population—*i.e.*, census data.

Defendants' use of the Population Certification Requirement as a funding *condition* further underlines that they cannot impose it. An agency has "no power to act . . . unless and until Congress confers power upon it." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *La. Pub. Serv. Comm'n v FCC*, 475 U.S. 355, 374 (1986)). This limitation is especially salient with the EMPG formula funding at issue here. Where "Congress did not make an allowance for any deviation that would justify the actions undertaken by" an agency, any additional conditions imposed by the agency "destabilize the statutory formula." *Id.* at 34; *see also California v. U.S. Dep't of Transp.*, 2025 WL 3072541, at *8 ("[a]bsent any clear indication" of a Congressional grant of authority, agencies lack "sweeping power" to add conditions to federal funding). Defendants' addition of the Population Certification Requirement as a new condition for formula funding exceeds their statutory authority.

*Third*, defendants paid no heed to the Paperwork Reduction Act ("PRA") before rushing out the Population Certification Requirement. Defendants do not dispute the fundamentals of

Plaintiff States' PRA claim, Opp. 30: The Population Certification Requirement qualifies as a "collection of information," 44 U.S.C. § 3502(3), and failure to satisfy the procedural requirements that the PRA imposes on such collections in turn violates the APA. *See* 5 U.S.C. § 706(2)(D); *Orr v. Trump*, 778 F. Supp. 3d 394, 425–26 (D. Mass. 2025). Instead, defendants argue that they met the requirements of the PRA because the Population Certification Requirement is allegedly covered by a "generic" July 2024 information collection request ("ICR") that allows FEMA to collect information for non-disaster grant applications. Opp. 30; *see* ECF 46-14, 46-15.

Defendants' resort to the 2024 generic ICR only confirms that they have no leg to stand on. The ICR is titled "Generic Clearance for FEMA's Preparedness Grant Programs." ECF 46-14, AR 01626. FEMA finalized it on March 28, 2024, ECF 46-15, AR 01627; for the purpose of ensuring that "control number expiration dates are aligned across the FEMA grants portfolio," *id.* at 01629. The ICR was meant to "maintain compliance with the PRA without unnecessarily delaying funding opportunities" by pre-approving "non-controversial" collections that are "necessary" to implement non-disaster grants. *Id.* at 01629–30. The Population Certification Requirement is neither "non-controversial" nor "necessary"; on the contrary, it represents a drastic shift in federal policy. *See* ECF 40-22 (Shwarm Decl.), ¶ 11 (California Chief Demographer is not aware of any prior instance where the State needed to calculate its own population to receive federal funds). The 2024 generic ICR was meant to help the trains run on time, not to pre-clear a highly controversial, never-before-seen demand that States re-invent the census.

The 2024 ICR cannot cover the Population Certification Requirement because it only authorizes collecting information that "is not collected through other avenues and is not duplicated elsewhere." ECF 46-15, AR 01634. Prohibiting such duplicative information demands by the "Federal Government" writ large is a core purpose of the PRA. *Dole*, 494 U.S. at 32; *see* 44 U.S.C.

§ 3506(c)(3)(B). But the Population Certification Requirement seeks population and immigration enforcement data that the United States has collected through other avenues—namely, the census and DHS's own enforcement records. It is difficult to imagine a better example of a duplicative information request than asking States to re-run the census, which was created by the Constitution, U.S. Const., art. I, § 2, cl. 3, and which the United States has conducted every ten years since 1790, *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 335 (1999).

Defendants cherry-pick language from the ICR supporting statement that the ICR covers applicant information forms, including "details concerning the applicant's demographics." ECF 46-15, AR 01630. The surrounding context makes clear that FEMA was talking about information necessary to evaluate a grant application—that is, to allocate funding in the first instance. Such information is to be "used by FEMA to compile applicant data, determine eligibility, map project activities to financial data, evaluate applicant's proposed projects, monitor awards, and respond to requests from Congress." *Id.* And the ICR authorizes information collection to determine "funding amounts" only "[u]nder *competitive* programs." *Id.* (emphasis added). It thereby excludes formula programs like EMPG. *Cf. Sasen v. Spencer*, 879 F.3d 354, 362 (1st Cir. 2018) ("[I]f one of a category is expressly included within the ambit of a statute, others of that category are implicitly excluded.").

### D.    The Performance Period Decision Is Unlawful.

The Performance Period Decision was also arbitrary and capricious. Defendants' defense of the Decision rests entirely on impermissible *post hoc* rationalizations that the Court should disregard. *See Regents*, 591 U.S. at 20–24. And even those after-the-fact rationalizations do not support the Decision or rectify defendants' failure to consider Plaintiff States' reliance interests. *See* Mot. 36–38.

As a threshold matter, the reasons that defendants now offer for the Decision are impermissible *post hoc* rationalizations that appear only in a declaration filed in support of defendants' motion. The assertions in the declaration are absent from the administrative record. "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents*, 591 U.S. at 20 (cleaned up). In *Regents*, for example, the Court held that an agency could not rebut an arbitrary-and-capricious challenge using an agency memorandum—prepared after the case was filed—that "purport[ed] to explain" the challenged action but "b[ore] little relationship" to the reasoning contained in the administrative record. *Id.* at 21; *see id.* at 20–22. Rather, because the memorandum's rationales were "nowhere to be found" in the record, they could "be viewed only as impermissible *post hoc* rationalizations and thus [were] not properly before [the Court]." *Id.* at 22. The same is true here. The purported reasoning in the Arnold Declaration does not appear in the administrative record. *See* ECF 46-2 (Arnold Decl.), ¶ 22; *see also* ECF 46-16, AR 01649 (setting one-year performance period for HSGP without explanation). As a result, defendants' litigation-driven explanation is "not properly before" the Court, *Regents*, 591 U.S. at 22, and cannot support the Decision.

Even if the Court were to consider *post hoc* rationalizations, however, the Decision still would not meet the APA's requirement of "reasoned decisionmaking," *id.* at 16, for several reasons.

First, none of the proffered rationales explain the change to the start of the performance period for EMPG grants. The administrative record confirms that EMPG grants "typically [have been] awarded with a retroactive [p]eriod of [p]erformance dating back to the beginning of the respective fiscal year," ECF 46-5, AR 00184; *see also* Mot. 38. Under that practice, States would be able to use fiscal year 2025 EMPG awards to cover expenses accrued on or after October 1,

2024. But as part of the Performance Period Decision, defendants set the start date for fiscal year 2025 EMPG awards as October 1, 2025, "effectively skipp[ing] an entire year of program funding for fiscal year 2025 awards." ECF 40-1 (Supp. Evans Decl.), ¶ 57. Defendants nowhere acknowledge this change, and nothing in the administrative record or accompanying declaration attempts to justify it. *See* Opp. 31–32 (not addressing this change); ECF 46-2 (Arnold Decl.), ¶ 22 (same). Taking away a full year of counterterrorism and emergency preparation funding without so much as an acknowledgment of the magnitude of the alteration ignores an "important aspect of the problem," and is *per se* arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Second, defendants failed to analyze—or even acknowledge—Plaintiff States' reliance interests. *See Fox Television Stations*, 556 U.S. at 515 (requiring consideration of reliance interests). As explained, Mot. 36–38, *supra* pp. 30–31; when developing their grant proposals and structuring their operations, Plaintiff States reasonably relied on defendants' longstanding practice of setting a three-year performance period for EMPG and HSGP awards—a practice that the programs' NOFOs explicitly stated would continue for fiscal year 2025 awards—and of backdating the performance start date for EMPG awards. *See* ECF 46-5, AR 00184; ECF 40-1 (Supp. Evans Decl.), ¶¶ 57–58. The APA "required" defendants to consider these reliance interests "and weigh [them] against competing policy concerns." *Regents*, 591 U.S. at 33. This means defendants were bound, among other things, to "consider . . . alternative[]" approaches that were "within the ambit of the existing policy"—such as announcing plans to implement the change in a *future* grant cycle, giving States time to prepare before altering the performance period. *Id.* at 30 (cleaned up) (requiring agency to consider alternative ways of winding down program). By completely "ignor[ing] such matters," *id.*, defendants upended States' operations without warning, *see* Mot. 37–38, and violated the APA.

41

Third, even taken on their own terms, the rationalizations that defendants now offer for the Decision are facially "implausible" and internally inconsistent and ignore "important aspect[s]" of the grant programs' structures. *State Farm*, 463 U.S. at 43. Defendants assert that awarding States the same amount of funding on a shorter performance schedule would encourage States to increase "State investment in emergency preparedness." Opp. 31. But that statement makes no sense, and none of defendants' conclusory supporting rationales have anything to do with States' own spending on emergency preparedness. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." (cleaned up)).

Defendants also assert that a "shorter period of performance [will] allow[] . . . close[r] monitor[ing] [of] grant recipients." ECF 46-2 (Arnold Decl.), ¶ 22. But defendants do not explain how requiring that funds be expended *more quickly* will facilitate oversight or "reduce administrative complexity," *id.*, and common sense suggests the opposite. Defendants contend that a shorter period of performance will "encourage[] grant recipients to expedite their projects," *id.*, but ignore that many programs currently funded by EMPG or HSGP—such as long-term staff training programs, ECF 40-31 (Ottobre Decl.), ¶ 18—are expressly designed to be multi-year projects, regardless of how much grantees might prefer to "expedite" them. Nor do defendants explain how a one-year performance period will "simplify[] financial planning" for FEMA— which simply expends the amount Congress appropriates—or for recipients, who will be *less* able to conduct long-term "financial planning," *cf., e.g.*, ECF 40-1 (Supp. Evans Decl.), ¶ 56 (benefits of long-term flexibility). Indeed, States often do not even operate on the "annual federal budget cycle[]" with which defendants purportedly sought to align the performance period, ECF 46-2 (Arnold Decl.), ¶ 22; *see, e.g.*, 30 Ill. Comp. Stat. Ann. 105/1 (setting July-to-June fiscal year).

42

The Performance Period Decision does not withstand APA scrutiny.

### III.    The Court Should Award Plaintiff States The Requested Relief.

Plaintiff States seek three basic remedies: declarations that the challenged actions are unlawful, vacatur of those actions, and injunctions prohibiting their enforcement against Plaintiff States. Mot. 48–50; Am. Compl. 59–60. Defendants do not dispute that declaratory relief is appropriate. *See* Opp. 35–36. But they argue that vacatur is unavailable and that Plaintiff States are not entitled to injunctive relief. *Id.* at 32–36. Those arguments fail.

### A.    The Court Should Vacate The Challenged Actions.

"The normal remedy for a successful APA challenge is vacatur of the [challenged agency action] and its applicability to all who would have been subject to it." *Woonasquatucket*, 778 F. Supp. 3d at 478; *accord, e.g.*, *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) (noting that vacatur "is a proper remedy when an agency fails to explain its reasoning adequately"); *see* Mot. 39–40 (collecting cases). That conclusion follows directly from the APA's text, which authorizes courts to "hold unlawful and set aside agency action" that is arbitrary and capricious or contrary to law. 5 U.S.C. § 706(2). Consistent with this understanding, both the Supreme Court and the First Circuit routinely vacate agency actions found to violate the APA. *See, e.g.*, *Regents*, 591 U.S. at 8 ("[W]e conclude that the [agency] did violate the APA, and that the [challenged action] must be vacated."); *Harrington*, 280 F.3d at 61. Those precedents bind this Court and confirm that vacatur is an appropriate remedy here.

In arguing otherwise, defendants rely primarily on a single concurring opinion that questioned, but reached no final conclusion on, the availability of vacatur under the APA, and which cannot trump the APA's plain text and binding precedent interpreting it. Opp. 35–36 (primarily citing *United States v. Texas*, 599 U.S. 670, 693–703 (2023) (Gorsuch, J., concurring)); *see Texas*, 599 U.S. at 701–02 (Gorsuch, J., concurring) ("raising questions" about vacatur, but

"not pretend[ing]" to decide issue). Defendants' reliance on unrelated dicta from non-APA cases also fails to carry the day for obvious reasons. Opp. 35–36 (citing, *e.g.*, *Trump v. CASA, Inc.*, 606 U.S. 831 (2025)); *see CASA*, 606 U.S. at 847 n.10 ("Nothing we say today [about universal injunctions] resolves the distinct question whether the [APA] authorizes federal courts to vacate federal agency action."). The Court should therefore vacate the challenged actions.

### B. The Court Should Grant Injunctive Relief Sufficient To Redress Plaintiff States' Injuries.

Defendants also wrongly assert that Plaintiff States do not meet the equitable requirements for injunctive relief. Opp. 32–35. However, under the APA, "once [a] court reache[s] the conclusion that [an agency action] was indeed illegal," it is not required to make "express findings as to the [other] elements [ordinarily] necessary for a permanent injunction," such as irreparable harm. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408–09 (D.C. Cir. 1998); *see* Mot. 41. As explained above, the Reallocation Decision, Performance Period Decision and Population Certification Requirement were unlawful. Therefore, the Court should enjoin defendants from implementing them. In any event, as discussed, Mot. 40–48, Plaintiff States satisfy the ordinary equitable requirements: they "would suffer irreparable injury in the absence of injunctive relief," "the harm to [them] would outweigh the harm [defendants] would suffer from the imposition of an injunction," and "the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (final two factors merge when government is opposing party).

Start with irreparable harm. Defendants offer variations on a single theme: the challenged actions were lawful—or are not ripe for review—and thus Plaintiff States suffer no cognizable injury from their implementation. Opp. 32–34. But the challenged actions were unlawful several times over, so this refrain gets defendants nowhere. Nor are defendants correct that Plaintiff States'

injuries from the Reallocation Decision could be redressed through damages. Opp. 33. "[T]he effect of the loss of emergency and disaster funds cannot be recovered later, and the downstream effect on disaster response and public safety are real and not compensable." *Illinois v. FEMA*, 2025 WL 2716277, at *16. The undisputed evidence in the record confirms this: "Even a temporary disruption in funds . . . undermines statewide preparedness programs that protect [Plaintiff States'] residents from life-threatening dangers." ECF 40-1 (Supp. Evans Decl.), ¶ 83; *see, e.g.*, ECF 40-21 (Hammett Decl.) ¶ 58 (noting that disruption of HSGP funding would "halt all [preparedness] efforts" for 2026 FIFA World Cup, 2027 Super Bowl, and 2028 Summer Olympics); Mot. 41–43 (describing harms caused by Reallocation Decision).

Next, Defendants contend that the Performance Period Decision will not affect overall funding, Opp. 33, but the uncontroverted evidence is that the Decision imposed new administrative costs on States and prevents them from obligating all EMPG funds in the "suddenly truncated period of performance." This will cause grant monies to "expire unused" and "depriv[e] [Plaintiff States] of millions of dollars in needed funds." ECF 40-1 (Supp. Evans Decl.), ¶ 62; *see* Mot. 45–47. The challenged actions will irreparably harm Plaintiff States.

The balance of equities and the public interest also favor Plaintiff States. Defendants primarily argue that the federal government suffers an irreparable injury whenever a court prevents it from "effectuating statutes." Opp 34 (quoting *CASA*, 606 U.S. at 861). But, as explained, defendants are violating, not "effectuating," the statutory scheme. And "there is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe*, 984 F.3d at 102 (cleaned up).

Defendants' remaining arguments, which concern only the Reallocation Decision, similarly fail. There is no inequity in vacating the Reallocation Decision, which wrongfully and unlawfully

45

reallocated HSGP funds away from Plaintiff States. *Contra* Opp. 34. Indeed, any reliance on the effect on other states is particularly unpersuasive given the interim relief granted by this Court, which deobligated the relevant funds and barred disbursement. Thus, there is no reasonable basis for other States to expect disbursement of those monies. And defendants' final argument—that "the government suffers irreparable harm when it is forced to disburse funds that it may be unable to recover" if they "are later held to have [been] properly awarded to other [S]tates," *id.* at 34— makes no sense in the context of a final judgment, which by definition would reflect the Court's final determination that the funds were not "properly awarded to other [S]tates." *Cf. APHA*, 145 S. Ct. at 2658 (applying similar irreparable-harm theory only at interlocutory stage). The balance of equities and the public interest support an injunction against defendants' unlawful actions.[8]

## IV.    The Court Should Not Stay Any Relief That It Orders.

A stay "is an intrusion into the ordinary processes of administration and judicial review," and "not a matter of right." *New York v. Trump*, 133 F.4th 52, 65 (1st Cir. 2025) (cleaned up); *accord Rhode Island v. Trump*, 155 F.4th 35, 41 (1st Cir. 2025) (stay pending appeal is "extraordinary relief" (cleaned up)). To justify this "intrusion," defendants must "(1) make a strong showing that they are likely to succeed on the merits in their appeal; (2) show that they will be irreparably injured absent a stay; (3) show that issuance of the stay will not substantially injure the other parties interested in the proceeding; and (4) show that the stay would serve the public

---

[8] Defendants also assert that "any relief . . . should be narrowly tailored to Plaintiff States." Opp. 36. Plaintiff States are entitled to an injunction that affords them "complete relief," *CASA*, 606 U.S. at 850—for instance, by requiring defendants to adjust all States' HSGP awards as needed to undo the cuts that the Reallocation Decision inflicted on Plaintiff States. But Plaintiff States do not seek a universal injunction and have no objection to an order that, for example, enjoins the enforcement of the Performance Period Decision against Plaintiff States and their subdivisions but not against nonparty States. In fact, they have requested that relief. *See* Mot. 48–50.

interest." *Id.* (cleaned up); *accord Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).[9] Rather than meet their burden, Defendants merely incorporate their summary-judgment arguments by reference. Opp. 37. But for the reasons discussed above, those arguments fail and therefore do not warrant a stay pending appeal.

Furthermore, the one argument that defendants do expressly restate—that they may be irreparably harmed if they are unable to recover "disputed funds" disbursed to Plaintiff States during the pendency of a successful appeal, *id.*—cannot justify a blanket stay: As explained, *supra* pp. 45–46, this theory of injury applies, at most, to relief addressing the Reallocation Decision. And, because defendants are unlikely to succeed on the merits, this argument cannot satisfy their burden to show that they "will suffer irreparable harm." *New York*, 133 F.4th at 65. Meanwhile, any stay would "substantially injure" Plaintiff States and "[dis]serve the public interest," *id.*, by prolonging the severe disruptions to emergency-preparedness programs that the challenged actions have caused, *see* Mot. 41–47; *see, e.g.*, ECF 40-1 (Supp. Evans Decl.), ¶¶ 73–83 (discussing harms caused by even temporary disruption in FEMA funding). Defendants have not met their "burden of demonstrating that they are entitled to the extraordinary relief" of a stay pending appeal. *Rhode Island v. Trump*, 155 F.4th at 41.

## CONCLUSION

Plaintiff States respectfully request that the Court deny Defendants' cross-motion for summary judgment and grant Plaintiff States' motion for summary judgment.

---

[9] A party seeking a stay pending appeal "must ordinarily move [for such relief] first in the district court." Fed. R. App. P. 8(a)(1). A single conclusory paragraph in a summary-judgment brief filed before this Court issues the decision that defendants seek to stay does not satisfy that requirement. *Cf. Rhode Island v. Trump*, 155 F.4th at 46 (noting that considering arguments not advanced in stay motion before district court would "undermine[]" Rule 8(a)(1)).

November 28, 2025

Respectfully submitted,

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
Lee I. Sherman
James E. Stanley
  *Supervising Deputy Attorneys General*
Luke Freedman
Delbert Tran
  *Deputy Attorneys General*

/s/ Deylin Thrift-Viveros
Deylin Thrift-Viveros
  *Deputy Attorney General*
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6000
deylin.thriftviveros@doj.ca.gov

*Attorneys for the State of California*

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Christopher G. Wells
  *Chief of the Public Interest Division*
Paul Berks
  *Complex Litigation Counsel*
R. Sam Horan
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
  *Deputy Solicitor General*
Mayur P. Saxena
  *Assistant Attorney General*
Olivia C. Mendes
Phoenix N. Meyers
Daniel Resler
  *Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (R.I. Bar No. 8486)
  *Chief, Civil Division*
  *Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Ashley Meskill
Ashley Meskill
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Rose Gibson
  *Assistant Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

/s/ Mitchell P. Reich
Mitchell P. Reich
  *Senior Counsel to the Attorney General*
Office of the Attorney General for the District
  of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*


**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*


**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*


**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Stephen Thompson
Rabia Muqaddam
  *Chief Counsel for Federal Initiatives*
Stephen C. Thompson
  *Special Counsel*
Julie Dona
  *Special Counsel*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*

**JENNIFER SELBER**
  GENERAL COUNSEL

/s/ Jacob B. Boyer
Jacob B. Boyer
  *Deputy General Counsel*
Pennsylvania Office of the Governor
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*


**NICHOLAS W. BROWN**
  ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts
  *Assistant Attorney General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov

*Attorneys for the State of Washington*


**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Jonathan T. Rose
  *Solicitor General*
Julio A. Thompson
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*