# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br>    Plaintiffs,<br><br>    v.<br><br>KRISTI NOEM, in her official capacity<br>as Secretary of the Department of<br>Homeland Security, *et al.*,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)    C.A. No. 1:25-cv-00495-MSM-PAS<br>)<br>)<br>)<br>)<br>) |

# MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

This case is another example of the executive branch's recent attempts to tie federal grant funding to state and local government assistance with federal immigration enforcement. After a court barred the Department of Homeland Security ("DHS") from expressly conditioning grant funding within its purview on such cooperation, *see Illinois v. Fed. Emerg. Mgt. Agency*, No. CV 25-206 WES, 2025 WL 2716277 (D.R.I. Sept. 24, 2025), DHS issued award letters to state governments indicating that hundreds of millions of dollars of anticipated awards to so-called "sanctuary jurisdictions" were being reallocated to other jurisdictions.[1] *See, e.g.*, ECF

---

[1] The parties supply no concrete definitions for what constitutes a "sanctuary jurisdiction," instead relying on Department of Justice ("DOJ") or DHS designations of jurisdictions that allegedly fail to cooperate with at least some facet of federal civil immigration enforcement. The Court hereafter uses the term "sanctuary jurisdictions" to refer to those DOJ or DHS designations, rather than to jurisdictions' immigration policies.

Nos. 46-11; 46-12.  Twelve States and the District of Columbia (collectively, "Plaintiffs") sued, challenging both that reallocation itself and related decisions by DHS.  (ECF No. 1.)

Before the Court are Plaintiffs' and Defendants' cross-motions for summary judgment. (ECF Nos. 39; 47.)  Plaintiffs claim that Defendants' grant-related decisions violate the Administrative Procedure Act ("APA").  (ECF No. 39 at 22–45.) Defendants counter by contending that the Court lacks jurisdiction over Plaintiffs' claims and by arguing that the challenged decisions are lawful.  (ECF No. 47 at 14–35.)  For the following reasons, the Court GRANTS Plaintiffs' Motion (ECF No. 39) and DENIES Defendants' Motion (ECF No. 47).

## I.    BACKGROUND

### A.    The Reallocation Decision

In the wake of the September 11 terrorist attacks, Congress authorized the Homeland Security Grant Program ("HSGP") to strengthen national security through grant funding to state, local, tribal, and territorial governments.  *See* ECF No. 40-2 at 12; Pub. L. 107-56, § 1014, 115 Stat. 272, 399 (2001).[2]  HSGP includes three grant programs: the State Homeland Security Grant Program ("SHSP"), the Urban Area Security Initiative ("UASI"), and Operation Stonegarden.  (ECF No. 40-2 at 12). "These programs collectively aim to strengthen the nation's ability to prevent,

---

[2] Given the size of the administrative record before the Court, the disparate formats of individual documents, and the sometimes-conflicting ways in which the parties refer to those documents, the Court uses ECF page numbers wherever possible in this Order when citing to the record.  Where ECF page numbers are not available, the Court uses a document's internal page numbers.

prepare for, protect against, and respond to acts of terrorism and other threats." *Id.* DHS administers these programs through the Federal Emergency Management Agency. *See id.*

SHSP and UASI funding allocations are at issue here. Under 6 U.S.C. § 608, in allocating funds from these programs to a State or high-risk urban area, the Federal Emergency Management Agency ("FEMA") Administrator "shall consider, for each State or high-risk urban area," two key factors:

> (1) its relative threat, vulnerability, and consequences from acts of terrorism . . . [and]
>
> (2) the anticipated effectiveness of the proposed use of the grant by the State or high-risk urban area in increasing the ability of that State or high-risk urban area to prevent, prepare for, protect against, and respond to acts of terrorism, to meet its target capabilities, and to otherwise reduce the overall risk to the high-risk urban area, the State, or the Nation.

6 U.S.C. § 608(a)(1) includes an enumerated list of factors in assessing the "relative threat, vulnerability, and consequences from acts of terrorism" (or "relative risk"), including population, population density, "history of threats," "degree of threat, vulnerability, and consequences related to critical infrastructure . . . or key resources," DHS threat assessments, proximity to international borders, position along oceanic or international waters, "its likely need to respond to acts of terrorism occurring in nearby jurisdictions," "the extent to which it has unmet target capabilities," the extent to which a high-risk urban area includes local or tribal governments relevant to responding to terrorist threats, and "such other factors as are specified in writing by the [FEMA] Administrator."

Under 6 U.S.C. § 607(1), the FEMA Administrator also "shall ensure that not less than 25 percent of the total combined funds . . . is used for law enforcement terrorism prevention activities." 6 U.S.C. § 607(2) enumerates ten kinds of law enforcement activities, one of which includes "overtime expenses consistent with a State homeland security plan, including for the provision of enhanced law enforcement operations in support of Federal agencies, including for increased border security and border crossing enforcement." The last of kind of law enforcement activity enumerated by the statute includes "any other terrorism prevention activity authorized by the Administrator." *Id.* § 607(2)(J).

Since the beginning of the current administration, the executive branch has repeatedly sought to tie federal grant funding for programs like HSGP to state and local governments' assistance with federal immigration enforcement. On January 20, 2025, President Trump issued an executive order directing DHS to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). A February 19 executive order further directed all executive departments to "ensure, consistent with applicable law, that Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies." Exec. Order No. 14218, § 2(a)(ii), 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025). That same day, DHS Secretary Noem issued a memorandum to all DHS agencies and offices titled "Restricting Grant Funding for Sanctuary Jurisdictions," directing DHS agencies to review all federal financial assistance and cease federal funding to sanctuary jurisdictions. *See* ECF No. 40-8.

As described in *Illinois v. FEMA*, "[o]n March 27, DHS revised the standard terms and conditions governing <u>all</u> federal grants it oversees, adding provisions requiring state and local recipients to certify that they will assist in enforcing federal immigration law." 2025 WL 2716277, at *2 (emphasis in original). Twenty States and the District of Columbia sued, challenging the imposed immigration conditions as unlawful. *See id.* at *3. Administration officials and the President continued to express their intent to target sanctuary jurisdictions after that lawsuit was filed. *See, e.g.*, Exec. Order No. 14287, § 1, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025) (describing such jurisdictions as engaging in "a lawless insurrection"); ECF No. 40-12 (describing the DHS's list of sanctuary jurisdictions and quoting Secretary Noem as explaining "that list is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice.").

While *Illinois v. FEMA* was pending, on July 16, defendant David Richardson, a FEMA official, issued a memorandum titled "Fiscal Year 2025 Homeland Security Grant Program Policy Recommendations." *See* ECF 49-1. That memorandum indicated that no UASI funds were to be awarded and proposed to hold SHSP funding levels flat for all grantees as compared to fiscal year 2024. *Id.* at 1, 7. The memorandum discussed changes to the way HSGP funding allocations are calculated, specifically with respect to the calculation of relative risk, including by implementation of "minor percentage shifts to current methodology for improved accuracy." *Id.* at 9. It also proposed to "[m]odify the funding approach so that: [j]urisdictions designated as sanctuary jurisdictions receive only the minimum

funding required by statute" and to reallocate remaining funds "to jurisdictions that comply with federal immigration and law enforcement cooperation policies." *Id.* The memorandum states that this shift "reflects the Trump Administration's push for equity in preparedness funding and its policy of leveraging sanctuary jurisdiction status to prioritize compliant states and territories." *Id.* The memorandum makes no mention of any adjustments to the weight of the "effectiveness" score for calculating HSGP allocations. *See id.*

Following that memorandum, Defendants issued three versions of the fiscal year 2025 HSGP notice of funding opportunity ("NOFO"), the final version of which was dated August 1. *See* ECF No. 40-2. The final NOFO established "target allocations" for both SHSP and UASI funding—the latter of which was included notwithstanding the July 16 memorandum—based on DHS and FEMA's "risk assessment methodology" as well as "legal minimums outlined in the *Homeland Security Act of 2002*, as amended." *Id.* at 54, 56. While Plaintiffs allege that the 2025 NOFO reflected substantial cuts to some Plaintiff States as compared to fiscal year 2024, *see* ECF No. 39 at 17 n.4, the full extent of cuts proposed by the July 16 memorandum were evidently not reflected by the target allocations detailed in the 2025 HSGP NOFO.

While the NOFO announced that "final allocations may be different in the award letter," (ECF No. 40-2 at 54, 56), FEMA publicly indicated on September 12 that it considered the target allocations to be "final," *see* ECF No. 40-16 at 4, and sworn declarations by Plaintiffs' officials support Plaintiffs' assertion that they "have

*never* experienced reductions between the NOFO allocations and the final award under the SHSP and UASI programs." *See* ECF No. 39 at 17. FEMA's own subsequently issued "risk profiles" (containing relative risk scores for all Plaintiff States and their metropolitan areas) indicated that Plaintiffs' relative risk scores either remained around the same or were deemed higher as compared to fiscal year 2024, supporting the NOFO's target allocations for Plaintiffs. *See* ECF No. 40-20.

On September 24, the court in *Illinois v. FEMA* entered summary judgment in favor of the plaintiffs in that case, vacating the immigration enforcement cooperation conditions and permanently enjoining DHS and FEMA from enforcing those conditions. *See* 2025 WL 2908807, at *15–16. The next day, Defendants issued a memorandum titled "Grant Approval: Fiscal Year 2025 Homeland Security Grant Program Final Allocations." (ECF No. 46-16) (hereinafter "DHS Directive"). The DHS Directive stated that "any [SHSP] and [UASI] recipients designated as a Sanctuary Jurisdiction by the Department of Justice will not receive any allocations posted in the [NOFO] except the [SHSP] minimum." *Id.* at 2 (footnote omitted). The DHS Directive proposed a revised "risk formula" and a modified allocation of funds, with 70% of funds to be allocated based on the risk-based approach and the remaining 30% to be "effectiveness-based." *Id.* at 6. Purportedly based on this new approach, the DHS Directive presented new funding allocations that dramatically cut awards to Plaintiffs as compared to the August 1 NOFO. *See id.* at 7–10.

The precise methodology through which the changes were reached is not provided by the DHS Directive. The Directive does not explain how "effectiveness"

was measured, or how this measurement impacted any individual state's allocations. However, an accompanying document titled "Grant Allocation Summary" partially details the updated risk methodology by indicating that the metric for "Transnational Organized Crime" was massively increased in weight, while metrics for "Counterterrorism," "Population Density," and "Vulnerability Baseline" were significantly decreased. *See* ECF No. 46-17 at 3. Puzzlingly, a large black redaction box covers the bottom third of the DHS Directive's page summarizing the new allocation formula. (ECF No. 46-16 at 6.) Defendants have refused to explain what information was redacted from the Directive, citing deliberative-process privilege.[3]

On September 27, Defendants sent States HSGP final award letters reflecting massive funding reallocations from Plaintiffs to other jurisdictions. (ECF No. 40-1 ¶ 43.) In total, the difference in target allocations from the August 1 NOFO and the final awards amounted to cuts of over $240 million to Plaintiffs. *See* ECF No. 39 at 17. All affected Plaintiffs were either on DHS's list of sanctuary jurisdictions or contain cities that were on that list. *See* ECF No. 40-10.[4] Plaintiff officials state that these extreme cuts pose an existential threat to their ability to engage in critical, life-saving counterterrorism programming. *See* ECF No. 39 at 48–50.

---

[3] Plaintiffs dispute the extent to which deliberative-process privilege could apply to the DHS Directive given that it reflects a final agency decision by Defendants. (ECF No. 51 at 28 n.6.)

[4] While Connecticut, Delaware, Rhode Island, and Vermont experienced no direct reallocation of funding as compared to the August 1 NOFO, they were excluded from an elevated SHSP funding floor—set above the statutory minimum—that was applied to all non-plaintiff states.

The HSGP award letters to Plaintiffs reveal the extent to which Plaintiffs were obviously and deliberately targeted for funding cuts. *See* ECF Nos. 46-11; 46-12. Some line-item awards to Plaintiffs were reduced from millions of dollars to $1. *See, e.g.*, ECF 46-12 at 11. Others were reduced by conspicuous amounts suggesting that someone had simply crossed off or deleted digits: for example, one item was reduced from $3,820,087.00 to $820,0087.00, while another was reduced from $1,146,026.00 to $46,026.00. *See* ECF No. 46-11 at 134. Still others were eliminated entirely. *See, e.g.*, *id.* at 178. As compared to the allocations proposed in the DHS Directive, jurisdictions that benefited from the reallocations received additional, round-number increases in awards: Florida, for example, received an increase in exactly $10,000,000, while Texas gained an additional $12,000,000. *See* ECF No. 51 at 32–33 (charting the changes between DHS Directive and the final award amounts).

The only reason given for any of these changes was four words: "Adjusted per DHS directive." *See* ECF Nos. 46-11; 46-12. Defendants assert that this directive is the September 25 DHS Directive. (ECF No. 46-2 ¶ 16.) Defendants' decision to reallocate HSGP funding in this manner (the "Reallocation Decision") is Plaintiffs' core challenge in this case.

### B.    The Performance Period Decision

DHS, through FEMA, also administers the Emergency Management Performance Grant Program ("EMPG"), which was established by Congress around the same time as HSGP. Pub. L. No. 108-7, 117 Stat. 11, 515–16. This program "provides funding to states or territorial governments to enhance their emergency

management capabilities" and "allows recipients to address risks and strengthen core emergency management functions." (ECF No. 40-5 at 13.) Plaintiffs assert that "EMPG is the backbone of emergency management that funds state and local emergency managers across the country—the on-the-ground personnel who do the actual work of pre-disaster planning and post-disaster coordination." (ECF No. 39 at 13.)

On July 22, Defendants issued a memorandum regarding the upcoming EMPG NOFO. (ECF No. 46-5.) This memorandum announced that the EMPG grants would have three-year periods of performance, running retroactively from October 1, 2024, to September 30, 2027. *Id.* at 4. The EMPG memorandum explained that the EMPG program "is typically awarded with a retroactive Period of Performance dating back to the beginning of the respective fiscal year." *Id.* The July 16 HSGP memorandum also provided for a three-year period of performance, running from September 1, 2025, through August 31, 2028. (ECF No. 49-1 at 4.)

Both the HSGP and EMPG NOFOs reflected these respective anticipated periods of performance. (ECF Nos. 46-4 at 5; 46-3 at 8.) But, according to Defendants, on September 17, they "decided to change the period of performance from three years to one year for HSGP and EMPG grants." (ECF No. 46-2 ¶ 22.) The final awards for both HSGP and EMPG had a one-year period of performance running from October 1, 2025 to September 30, 2026. *See, e.g.*, ECF Nos. 46-11 at 40; 46-7 at 35. Defendants cite no contemporaneous justification for this decision. *See* ECF No. 47 at 34–35. The change in periods of performance presents an obvious problem

regarding EMPG funds given that an entire year of funding (i.e., October 1, 2024, through October 1, 2025) has been effectively skipped, which is particularly problematic for States and counties who incurred costs based on an anticipated retroactive period of performance. *See* ECF Nos. 40-1 ¶ 57; 23 ¶ 30; 35 ¶ 32. Plaintiffs challenge the decision to change the periods of performance for both HSGP and EMPG (the "Performance Period Decision").

### C.    The Population Certification Requirement

The third decision challenged by Plaintiffs is Defendants' addition of a new condition to EMPG grant awards: the "Population Certification Requirement." EMPG funding to states is based on a population-based allocation formula as dictated by statute. *See* 6 U.S.C. § 762(d). Under 13 U.S.C. 183(a), "for the purpose of administering any law of the United States in which population or other population characteristics are used to determine the amount of benefit received by State, county, or local units of general purpose government," the most recent U.S. Census Bureau population estimates "shall [be] transmit[ted] to the President for use by the appropriate departments and agencies of the executive branch."

Notwithstanding this statutory provision, and without any mention of new population-related requirements in the July 22 EMPG memorandum, on or around September 30—three days after Plaintiffs received their initial EMPG award letters—DHS issued revised EMPG grant letters notifying each recipient State that its funding was to be frozen until the State could do three things: (1) "provide a certification of the recipient state's population as of September 30, 2025"; (2) "certify

that its reported population does not include individuals that have been removed from the State pursuant to the immigration laws of the United States"; and (3) "explain the methodology used to determine its population."  (ECF No. 40-7 at 31.) As with the Performance Period Decision, Defendants cite no contemporaneous documentation reflecting the decision to impose this requirement.  *See* ECF No. 47 at 34–35.

### D. Procedural History

Plaintiffs sued Defendants on September 29, 2025, challenging both the Reallocation Decision and the Performance Period Decision and seeking a temporary restraining order.  (ECF Nos. 1; 3.)  On September 30, the Court entered a temporary restraining order directing Defendant to, *inter alia*, "rescind all fiscal year 2025 [HSGP] award notifications and de-obligate the associated funds" and enjoining Defendants "from disbursing, processing, returning to the U.S. Treasury, re-programming, re-allocating, or otherwise making unavailable by any means all fiscal year 2025 [HSGP] funds appropriated by Congress."  (ECF No. 14.)  Because the HSGP grant funds were set to lapse due to the end of the fiscal year the following day, "pursuant to the Court's equitable authority, 31 U.S.C. § 1502(b), and any other applicable provision of law," the Court ordered the statutory lapse "suspended pending further order of the Court."  *Id.*

Defendants moved for reconsideration of the temporary restraining order, (ECF No. 27), which the Court granted in part.  (ECF No. 31.)  The modified temporary restraining order narrowed the scope of injunctive relief to apply only to

the contested funds at issue in this case (the funds re-allocated between the final August 1 HSGP NOFO and the final HSGP award notifications). *Id.* Thereafter, the parties agreed to convert the Modified TRO into a preliminary injunction and proceed to expedited cross-motions for summary judgment. (ECF No. 34.) Defendants agreed to extend the deadline for Plaintiffs to accept their HSGP and EMPG awards to December 31, 2025. *Id.* Plaintiffs filed an Amended Complaint on October 24, (ECF No. 33), and subsequently moved for summary judgment on October 30. (ECF No. 39.) Defendants cross-moved for summary judgment on November 20. (ECF No. 47.)

## II.    STANDARD OF REVIEW

A motion for summary judgment requires the moving party to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, "[a]ll reasonable inferences are to be drawn in favor of the party opposing summary judgment," and "all disputed facts are viewed in the light most favorable" to that party. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). "Where the parties cross-move for summary judgment, the court must examine each motion separately, drawing inferences against each movant in turn." *Vazquez-Velazquez v. Puerto Rico Highways & Transp. Auth.*, 73 F.4th 44, 51 (1st Cir. 2023) (cleaned up).

"[T]he summary judgment rubric has a 'special twist in the administrative law context.'" *Boston Redevelopment Auth. v. Natl. Park Serv.*, 838 F.3d 42, 47 (1st Cir.

2016) (quoting *Assoc'd Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). "In that context, a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id.* In making that determination, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

## III.   DISCUSSION

Plaintiffs organize their claims according to each of the three decisions described above: the Reallocation Decision, the Performance Period Decision, and the decision to impose the Population Certification Requirement. (ECF No. 39 at 21–45.) Plaintiffs argue that these decisions violate the APA by exceeding Defendants' statutory authority, being contrary to law, and being arbitrary and capricious. *Id.* Plaintiffs also challenge the Population Certification Requirement on separate statutory grounds. *Id.* at 32–34, 41–43. Defendants raise threshold jurisdictional challenges to Plaintiffs' claims before disputing the merits of those claims. (ECF No. 47 at 13–35.)

The Court first addresses Defendants' jurisdictional challenges before evaluating each claim raised by Plaintiffs in their Motion for Summary Judgment.[5]

---

[5] Plaintiffs' Amended Complaint (ECF No. 33) asserts one apparently non-statutory claim: that Defendants' Reallocation Decision was *ultra vires* agency action not authorized by Congress. *Id.* at 49–50. Defendants cite recent authority suggesting that non-statutory *ultra vires* claims are disfavored, applying only where an agency acts contrary to a specific statutory prohibition. (ECF No. 47 at 30–31) (citing

## A.    The Court Has Jurisdiction Over Plaintiffs' Claims

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). This consent is generally necessary because, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Thus, in addition to meeting the standard requirements for subject-matter jurisdiction in this Court—including by presenting a controversy that is ripe for judicial resolution and is not moot—Plaintiffs must demonstrate that their claims are not barred by sovereign immunity. *See Davallou v. United States*, 998 F.3d 502, 504 (1st Cir. 2021) ("Federal courts lack subject-matter jurisdiction over claims against the United States absent a waiver of sovereign immunity.").

Defendants raise three challenges to the Court's jurisdiction over Plaintiffs' claims. (ECF No. 47 at 14–21, 30–31.) First, Defendants argue that the Court lacks jurisdiction over Plaintiffs' claims because those claims essentially seek both payment of increased federal grant funds and modification of the terms of federal grant agreements, and are thus subject to the exclusive jurisdiction of the Court of Federal Claims. *Id.* at 14–17. Second, Defendants argue that Plaintiffs' Reallocation

---

*Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025)). Plaintiffs do not appear to advance their non-statutory *ultra vires* claim in their Motion for Summary Judgment, and—as this case is resolvable based on Plaintiffs' APA claims alone—the Court need not resolve the merits of that non-statutory *ultra vires* claim.

Decision Claims are moot because the funds at issue were already obligated to other States and are therefore beyond the reach of the Court, and because the relevant appropriations expired on September 30, 2025. *Id.* at 17–21. Third, Defendants argue that Plaintiffs' Population Certification Requirement claims are unripe because FEMA intends to provide guidance to States about how to fulfill that requirement. *Id.* at 30–31.

### 1.    The Tucker Act Does Not Apply to Plaintiffs' Claims

The APA waives sovereign immunity for certain suits against the federal government. *See* 5 U.S.C. § 702; *Bowen v. Massachusetts*, 487 U.S. 879, 909 (1988). But "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Dep't. of Educ. v. California*, 604 U.S. 650, 651 (2025) (quoting 5 U.S.C. § 702). "Nor does the waiver apply to claims seeking 'money damages.'" *Id.* Instead, the APA waives sovereign immunity "for all equitable actions for specific relief against a Federal agency or officer acting in an official capacity" and "applies to any suit whether under the APA or not." *Commw. of Puerto Rico v. United States*, 490 F.3d 50, 58 (1st Cir. 2007).

Defendants assert that the APA's waiver of sovereign immunity does not apply to Plaintiffs' claims because the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over those claims. (ECF No. 47 at 14–17) (citing 28 U.S.C. § 1491). The Supreme Court addressed the interplay of the APA and the Tucker Act in *Dep't. of Educ. v. California*, where it explained that "the APA's limited waiver of

immunity does not extend to orders 'to enforce a contractual obligation to pay money.'" 604 U.S. at 651 (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

According to Defendants, "the essence of [this] action is in contract" because Plaintiffs seek to increase the amount of money they were awarded by the final HSGP award letters and because they seek to modify the terms of the HSGP and EMPG grants. (ECF No. 47 at 14) (quoting *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978)). In asserting that the "essence" of this case is contractual, Defendants turn to a test outlined by the D.C. Circuit in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982). (ECF No. 47 at 15.) That test asks the reviewing court to examine both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968. Under that test, "if rights and remedies are *contractually* based then only the Court of Federal Claims [has jurisdiction], even if the plaintiff formally seeks injunctive relief." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (emphasis in original) (applying *Megapulse*).

Defendants assert that the source of the rights upon which Plaintiffs base their Reallocation Decision claims is the 2025 HSGP NOFO, and that the relief that they seek is, effectively, an order requiring higher payments to Plaintiffs. (ECF No. 47 at 15–16.) Plaintiffs counter by arguing that the APA itself is the source of the rights

upon which they base their claims, and that the remedy they seek is vacatur of challenged agency actions, not the payment of money. (ECF No. 51 at 12–14.) The parties dispute the implications of *NIH v. American Pub. Health Ass'n*, where the Supreme Court stayed a portion of a district court judgment that vacated grant terminations but denied a stay with respect to challenges to grant-related policies. *See* 145 S. Ct. 2658 (2025).

At the outset, "[l]ike many other courts that have considered similar arguments, the Court finds that the Tucker Act does not cover challenges to grant funding conditions." *Rhode Island Coal. Against Dom. Violence v. Bondi*, 794 F. Supp. 3d 58, 67 (D.R.I. 2025) (collecting cases); *accord California v. U.S. Dept. of Transportation*, No. 25-CV-208-JJM-PAS, 2025 WL 3072541, at *5 (D.R.I. Nov. 4, 2025); *see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 52 (1st Cir. 2025) (rejecting similar Tucker Act arguments). This is because these are not challenges to the terms and conditions of an executed grant agreement, but rather to the imposition of an allegedly unlawful condition on prospective grant agreements. *See Rhode Island Coalition Against Dom. Violence*, 794 F. Supp. 3d at 67 ("Importantly, the [plaintiffs] do not challenge conditions, terms, or agency action related to grants that the [agency] has previously awarded them; they object to the challenged conditions only to the extent that they are or will be placed upon grants for which they seek to apply."). Thus, the Tucker Act is clearly inapplicable to Plaintiffs' challenges to the Performance Period Decision and the Population Certification Requirement.

For similar reasons, the Tucker Act also does not apply to Plaintiffs' Reallocation Decision claims. Plaintiffs do not seek the payment of money to which they allege to be contractually entitled. Instead, Plaintiffs challenge the administrative decision made by Defendants to allocate HSGP funding in an unlawful manner. While a successful challenge may result in an increase in grant awards to Plaintiffs, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. And even if the Court were to apply the *Megapulse* test— which does not appear to have been expressly adopted by the First Circuit—to evaluate Plaintiffs' claims, and even if the Court were to agree with Defendants that the source of the rights upon which Plaintiffs base their Reallocation Decision claims is the 2025 HSGP NOFO, Defendants elsewhere argue that the NOFO provides no contractual rights to Plaintiffs. *See* ECF No. 47 at 26. The Court therefore fails to see how, under Defendants' theory, the essence of Plaintiffs Reallocation Decision claims is contractual.

## 2.    Plaintiffs' Reallocation Decision Claims Are Not Moot

"Article III of the Constitution limits federal judicial Power, that is, federal-court jurisdiction, to Cases and Controversies." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980) (internal quotation marks omitted). "The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed.'" *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003) (quoting *Steffel v. Thompson*, 415 U.S.

452, 460 n.10 (1974)).  "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969).  "A party can have no legally cognizable interest in the outcome of a case if the court is not capable of providing any relief which will redress the alleged injury."  *Gulf of Me. Fishermen's All. v. Daley*, 292 F.3d 84, 88 (1st Cir. 2002).  "The 'heavy' burden of showing mootness is on the party raising the issue." *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 8 (1st Cir. 2021).

Defendants present two arguments that supposedly render Plaintiffs' Reallocation Decision claims moot.  (ECF No. 47 at 17–21.)  First, Defendants assert that these claims "do not present a live case or controversy because the funds they seek are unavailable." *Id.* at 18.  "Funds appropriated for an agency's use can become unavailable in three circumstances: if the appropriation lapses; if the funds have already been awarded to other recipients; or if Congress rescinds the appropriation." *City of Houston, Tex. v. Dept. of Hous. and Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994).  Defendants argue that the contested funds were obligated to other recipients through the final award letters.  (ECF No. 47 at 18.)  Thus, because the funds were obligated at the time Plaintiffs filed their suit, "a court cannot reach [the funds] in order to award relief."  *City of Houston*, 24 F.3d at 1426; *accord Cnty. of Suffolk, N.Y. v. Sebelius*, 605 F.3d 135, 142 (2d Cir. 2010).

Defendants' second mootness argument is based on the lapse of the relevant statutory appropriation on September 30, 2025.  (ECF No. 47 at 19.)  Defendants acknowledge that the Court ordered both de-obligation of the contested funds and a

20

suspension of the statutory expiration deadline, *see* ECF Nos. 14; 31, but they contend that the Court lacked the equitable or statutory power to order that relief. (ECF No. 47 at 19–21.)  According to Defendants, the line of cases Plaintiffs cited in support of the Court's equitable authority "have more recently been criticized as belonging to a time 'when courts took a much more freewheeling approach to remedies.'" *Id.* at 20 (quoting *Goodluck v. Biden*, 104 F.4th 920, 928 (D.C. Cir. 2024)).[6] Defendants further contend that "the equitable doctrine permitting a judicial award of funds after the statutory lapse date will ordinarily, as here, have no application to a case in which all funds have properly been awarded." *Id.* (quoting *W. Virginia Ass'n of Cmty. Health Centers, Inc. v. Heckler*, 734 F.2d 1570, 1577 (D.C. Cir. 1984)). Defendants also argue that 31 U.S.C. § 1502(b), which the Court cited in its order, does not authorize the extension of an appropriation's period of availability, and that the Appropriations Clause forbids the award of expired or exhausted appropriated funds.  *Id.* at 20–21.

Plaintiffs reject both of Defendants' mootness arguments.  (ECF No. 51 at 15–19.)  First, Plaintiffs dispute Defendants' claim that the contested funds have been obligated, based on the Defendants' confirmed compliance with the Court's order that the funds be de-obligated.  *Id.* at 15–16; *see* ECF No. 35 (confirming compliance).

---

[6] Curiously, while Defendants cite *City of Houston* in support of their first mootness argument, they seemingly reject that case's contrary position with respect to their second mootness argument.  *See City of Houston*, 24 F.3d at 1426 ("There is an equitable doctrine, however, that permits a court to award funds based on an appropriation even after the date when the appropriation lapses, so long as 'the lawsuit was instituted on or before that date.'") (quoting *West Va. Ass'n of Cmty. Health Ctrs. v. Heckler*, 734 F.2d 1570, 1576 (D.C. Cir. 1984)).

Second, and based on that compliance, Plaintiffs assert that the contested funds operate as "a valid obligation against the unexpended balance" of the HSGP appropriation, thus preventing their expiration after September 30. (ECF No. 51 at 16) (quoting *In re Impounded Food Stamp Program Appropriations*, 54 Comp. Gen. 962, 966 (1975)); *see also* 1 U.S. Gen. Accounting Office, *Principles of Federal Appropriations Law*, 5-82 (3d ed. 2004) (explaining this concept). Third, Plaintiffs argue that the Court's order properly stayed any lapse of appropriations, based both on the Court's equitable authority and on 31 U.S.C. § 1502(b), which "expressly authorize[s] courts to suspend the lapse of budget authority while lawsuits play out." (ECF No. 51 at 17) (quoting *Goodluck*, 104 F.4th at 928).[7] Plaintiffs also reject Defendants' Appropriations Clause argument, noting that "funds that remain in the Government's possession are not 'unavailable' as a source of specific relief as far as the Appropriations Clause and *County of Suffolk* are concerned." *Id.* (quoting *Rodriguez v. Carson*, 401 F. Supp. 3d 465, 470 (S.D.N.Y. 2019)).

On a fundamental level, it cannot be that Defendants' reallocation of grant funding—conducted mere days before the lapse in relevant appropriations—is unreviewable simply because it was done at the last minute. To find otherwise would imply that agencies may escape judicial review of *any* grant-related changes, no

---

[7] Again, curiously, Defendants do not address the fact that *Goodluck*—which they cite to cast doubt on the Court's equitable authority to suspend the lapse of appropriated funds—did so based on that court's apparent understanding of 31 U.S.C. § 1502(b) as providing an alternate statutory basis for such authority.

matter how unlawful, by making those changes as close to statutory deadlines as possible. The Court will not be party to this license for lawlessness.

Here, per the Court's order, Defendants were required to de-obligate the contested funds. *See* ECF Nos. 14; 31. Indeed, the Court's order specified that Defendants "are enjoined from disbursing, processing, returning to the U.S. Treasury, re-programming, re-allocating, or otherwise *making unavailable by any means* the de-obligated $245,565,440 of fiscal year 2025 [HSGP] funds." (ECF No. 31 at 2) (emphasis added). This remains true notwithstanding the lapse in the relevant appropriations, whether because the funds operate as an obligation preceding that lapse (per *In re Impounded Food Stamp Program Appropriations*) or through either the Court's statutory authority under 31 U.S.C. § 1502(b) or its inherent equitable powers. The contested funds are therefore not unavailable in any way that would render this case moot.

### 3.    Plaintiffs' Population Certification Requirement Claims Are Ripe

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l. Park Hosp. Ass'n v. Dept. of Int.*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967)). "The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise

jurisdiction.'" *Id.* at 808 (quoting *Reno v. Cath. Soc. Services, Inc.*, 509 U.S. 43, 57 n.18 (1993)). "Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (citing *Abbott Laboratories*, 387 U.S. at 149).

Defendants argue that Plaintiffs' Population Certification Requirement claims are unripe for prudential reasons. (ECF No. 47 at 30–31.) According to Defendants, FEMA intends to provide guidance to states about how to fulfill the Population Certification Requirement. Thus, "[a]t this stage, where FEMA intends to issue forthcoming guidance to States about how to comply with this provision, considerations of judicial restraint favor awaiting that development and a concrete dispute between the parties (should there be one)." *Id.* at 31. Defendants further argue that Plaintiffs will suffer no immediate hardship that would weigh against judicial review at this time. *Id.*

Plaintiffs counter by noting that both the Supreme Court and the First Circuit have challenged the prudential ripeness doctrine. (ECF No. 51 at 26.) As the Supreme Court explained in *Susan B. Anthony List v. Driehaus*, jurisdictional challenges premised on prudential ripeness are "in some tension with [the Supreme Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." 573 U.S. 149, 167 (2014) (cleaned up); *see also Aguasvivas v. Pomepo*, 984 F.3d 1047, 1053 (1st Cir. 2021) (determining that "it is unclear whether prudential ripeness concerns in

particular may still be entertained"). To the extent that the Court evaluates prudential ripeness, Plaintiffs assert that both prongs of that doctrine are satisfied here: this case presents essentially legal questions that are fit for immediate review, and withholding consideration would impose hardship on Plaintiffs because of the "direct and immediate dilemma" posed to Plaintiffs by the upcoming December 31 deadline for accepting grant awards. (ECF No. 51 at 20–21) (quoting *New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 53 (1st Cir. 2021)).

The Court has little trouble in siding with Plaintiffs by finding that this case is ripe for judicial review. Laying aside the continued vitality of the prudential ripeness doctrine, the Court agrees that the issues presented by Plaintiffs' Population Certification Requirement claims are essentially legal questions fit for review: Plaintiffs challenge decisions that Defendants have already made, and APA review of those decisions must be based on the administrative record that existed at the time those decisions were made. *See Dep't. of Homeland Sec. v. Regents of the U. of California*, 591 U.S. 1, 20 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'") (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)). The Court also agrees that withholding review would result in hardship to Plaintiffs, who must "either certify compliance with contested [conditions] or risk losing critical emergency and disaster-relief funding." *Illinois v. FEMA*, 2025 WL 2716277, at *9. Thus, to the extent that prudential ripeness merits consideration,

the Court finds Plaintiffs' Population Certification Requirement claims to be ripe for review.

### B.    The Reallocation Decision Violates the APA

The Court now turns to the merits of Plaintiffs' claims, beginning with their challenges to the Reallocation Decision. Plaintiffs assert two bases for why the Reallocation Decision violates the APA. (ECF No. 39 at 22–32.) First, Plaintiffs claim that the Reallocation Decision exceeds Defendants' statutory authority, in violation of 5 U.S.C. § 706(2)(C). *Id.* at 22–27. Second, Plaintiffs contend that the Reallocation Decision is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). *Id.* at 27–32. Because the second of these arguments is more clearly dispositive, the Court focuses its analysis on there.[8]

Under 5 U.S.C. § 706(2)(A), when reviewing a challenge under the APA, the reviewing court must "hold unlawful and set aside agency action, findings, and conclusion found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The APA thus "requires agencies to engage in 'reasoned decisionmaking.'" *Regents*, 591 U.S. at 16 (quoting *Michigan* 576 U.S. at 750)). "An agency's decision is arbitrary and capricious if the agency relied on improper factors, disregarded 'an important aspect of the problem, offered an explanation that runs counter to the evidence,' or when a reasonable explanation for the agency's decision

---

[8] Plaintiffs' first argument is that Defendants exceeded their statutory authority by basing reallocations on an extra-statutory consideration: whether a recipient was designated a sanctuary jurisdiction. (ECF No. 39 at 16–20.) This argument overlaps with part of Plaintiffs' second argument—that Defendants considered factors that Congress had not intended them to consider—as described below.

cannot be discerned." *Gulluni v. Levy*, 85 F.4th 76, 82 (1st Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). When changing positions, an agency "of course . . . must show that there are good reasons for the new policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and must consider any "serious reliance interests" engendered by the status quo, *Regents*, 591 U.S. at 30.

Plaintiffs advance three reasons why the Reallocation Decision was arbitrary and capricious. (ECF No. 39 at 27–32.) First, Plaintiffs argue that, by cutting HSGP awards based on purported sanctuary policies, Defendants impermissibly relied on a factor which Congress had not intended them to consider: recipients' status as sanctuary jurisdictions. *Id.* at 28–29. Plaintiffs argue that the list of factors specified by Congress for consideration in HSGP fund allocations, *see* 6 U.S.C. § 608(a), is exhaustive, and does not permit consideration of extra-statutory factors like a jurisdiction's cooperation with federal immigration policies. *See* ECF No. 39 at 29; *see also* 6 U.S.C. § 603(c)(2) ("The allocation of grants authorized under section 604 [(UASI] or 605 [(SHSP] of this title shall be governed by the terms of this part and not by any other provision of law."). Plaintiffs assert that, in basing reallocation on sanctuary status, Defendants departed from their previous, statutorily based calculations (as exemplified by the 2025 HSGP NOFO) for the sake of policy considerations not anticipated by Congress. *Id.* at 29.

Second, Plaintiffs argue that Defendants failed to adequately explain their changes from the 2025 HSGP NOFO. *Id.* at 29–30. Plaintiffs note that, under 2

C.F.R. §§ 200.204(a)(6) and 3002.10, Defendants were required to disclose "the expected dollar values of individual awards" up front. The only explanation given by Defendants for their deviations from the 2025 HSGP NOFO's up-front disclosure of anticipated HSGP awards—which Defendants had described as final—was the DHS Directive, as apparently referenced through the words "[a]justed per DHS directive" appended to line-item cuts. (ECF No. 51 at 31–36.) Plaintiffs point out that the amounts specified in the DHS Directive—which purports to contain "final allocations"—did not even match the amounts in the final award letters for SHSP funding, given the subsequent round-numbered increases to favored jurisdictions. *Id.* at 32–26. Plaintiffs otherwise assert that the DHS Directive, while articulating that the formula for grant allocations would be changed, failed to provide sufficient details about *how* the formula would be changed in a manner that would provide any insight as to the results of those changes. *Id.*

Third, Plaintiffs argue that Defendants ignored states' reliance interests when making the Reallocation Decision. (ECF No. 39 at 30–32.) As the Supreme Court has explained, "[w]hen an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33. Plaintiffs—understandably—assert that they have "profound reliance interests in continued, consistent funding" through HSGP given its funding for prevention and response programming related to life-threatening disasters. (ECF No. 39 at 31.) Plaintiffs note that the entire purpose of the HSGP NOFO was "to allow grantees to

develop and propose specific projects for which the funds will be used—a planning process that is rendered moot when, as here, a federal agency substantially departs from the NOFO allocations without any warning or explanation." *Id.*

Defendants contest Plaintiffs' claim that the Reallocation Decision was arbitrary and capricious. (ECF No. 47 at 24–26.) Defendants note that "[j]udicial review under [the arbitrary and capricious] standard] is deferential, and that a reviewing court must simply ensure 'that the agency has acted within a zone of reasonableness.'" *Id.* at 25 (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). Defendants argue that they acted within "a zone of reasonableness" by exercising discretionary authority to rebalance HSGP allocation methodology, and they contend that they were not required to provide any written explanation for deviations from the 2025 HSGP NOFO, which they assert has no definitive legal effect. *Id.* Defendants further argue that any reliance interests engendered by the 2025 HSGP NOFO were unreasonable given their discretion to amend HSGP allocation methodology from year-to-year. *Id.* at 26.

In arguing that the Reallocation Decision was not arbitrary and capricious, Defendants claim that they considered "all relevant factors" in calculating HSGP awards and that they "did not . . . consider sanctuary designation policy considerations in place of risk calculations when allocating HSGP funds to Plaintiff States." *Id.* at 22 (internal citation omitted). This statement appears to be based on a sworn declaration by a FEMA official that, incredibly, states that "[s]anctuary

jurisdiction designation did not play any role in calculating grant funding for states." (ECF No. 46-2 ¶ 19).

That official made that declaration notwithstanding the fact that the DHS Directive—issued the day after *Illinois v. FEMA* held that Defendants could not condition grant funding on cooperation with federal civil immigration priorities— expressly proposes that all "recipients designated as a Sanctuary Jurisdiction by the Department of Justice will not receive any allocations posted in the NOFO except the SHSP minimum." (ECF No. 46-16 at 2.) Defendants have elsewhere repeatedly stated their intent to withhold HSGP funds from sanctuary jurisdictions. *See, e.g.*, ECF Nos. 49-1 at 9 (proposing that "[j]urisdictions designated as sanctuary jurisdictions receive only the minimum funding required by statute" to "reflect[] the Trump Administration's . . . policy of leveraging sanctuary jurisdiction status to prioritize compliant states and territories"); 40–19 at 3 ("Cities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding . . . No lawsuit, not this one or any other, is going to stop us from doing that."). The Reallocation Decision fulfilled that stated intent by blatantly targeting sanctuary jurisdictions for funding cuts.

It may be that Defendants have some clever explanation for how their supposedly revised formula for grant calculations happened to result in severe funding cuts to sanctuary jurisdictions—and only to sanctuary jurisdictions—without considering their sanctuary status as a factor. But because the Court's review is limited to the administrative record that existed at the time of the Reallocation

Decision, *Regents*, 591 U.S. at 20, it need not indulge such sophistry.[9]  The DHS
Directive unequivocally states an intent to use sanctuary status in awarding HSGP
grant funds, and the Reallocation Decision reflects that intent.  The Court therefore
concludes that sanctuary status was a factor in the Reallocation Decision.

Turning to the merits of Plaintiffs' and Defendants' positions, the parties have,
understandably, presented their arguments based on common judicial explanations
of the arbitrary and capricious standard.  But "'[t]he arbitrary or capricious' concept,
needless to say, is not easy to encapsulate in a single list of rubrics because it
embraces a myriad of possible faults and depends heavily upon the circumstances of
the case." *Puerto Rico Sun Oil Co. v. EPA*, 8 F.3d 73, 77 (1st Cir. 1993).  Perhaps
most fundamental to this case, "in order to avoid being deemed arbitrary and

---

[9] The disconnect between Defendants' proffered explanation and the administrative
record is strikingly similar to that confronted by the Supreme Court in *Department
of Commerce v. New York*, where the Supreme Court explained:

> We are presented, in other words, with an explanation for agency action
> that is incongruent with what the record reveals about the agency's
> priorities and decisionmaking process. It is rare to review a record as
> extensive as the one before us when evaluating informal agency action—
> and it should be. But . . . we cannot ignore the disconnect between the
> decision made and the explanation given. Our review is deferential, but
> we are "not required to exhibit a naiveté from which ordinary citizens
> are free." The reasoned explanation requirement of administrative law,
> after all, is meant to ensure that agencies offer genuine justifications for
> important decisions, reasons that can be scrutinized by courts and the
> interested public. Accepting contrived reasons would defeat the purpose
> of the enterprise. If judicial review is to be more than an empty ritual,
> it must demand something better than the explanation offered for the
> action taken in this case.

588 U.S. 752 (2019) (internal citation omitted).

capricious, an agency decision must be rational." *Citizens Awareness Network, Inc. v. U.S. Nuclear Reg. Comm'n.*, 59 F.3d 284, 290 (1st Cir. 1995).

While this requirement "is not very hard to meet," *Puerto Rico Sun Oil*, 8 F.3d at 77, the Court finds it has not been met here. What else could Defendants' decisions to cut funding to specific counterterrorism programming by conspicuous round-numbered amounts—including by slashing off the millions-place digits of awarded sums—be if not arbitrary and capricious? Neither a law degree nor a degree in mathematics is required to deduce that no plausible, rational formula could produce this result. Nor could any reasonable, data-driven approach have resulted in the obviously manual increases in awards to favored jurisdictions. The Court has little hesitation in finding that these reallocations fall within the plain meaning of the APA's prohibition of arbitrary and capricious agency action.

To the extent that the Court need evaluate the Reallocation Decision within the framework the parties advanced, the Court finds that Plaintiffs have easily demonstrated that the Reallocation Decision was arbitrary and capricious. The Court has found that Defendants expressly considered sanctuary status when reallocating grant funding. Sanctuary status was surely not among the factors that Congress considered when, in the aftermath of the September 11 attacks, it authorized HSGP to provide counterterrorism funding to state and local governments. None of the statutory factors for evaluating relative risk encompass recipients' civil immigration priorities, and the existence of a residual clause at the end of that list cannot be read as surrendering unbridled discretion to Defendants that would authorize them to

32

calculate awards based on unrelated factors.  *See City of Providence v. Barr*, 954 F.3d 23, 40–41 (1st Cir. 2020) (rejecting similar arguments reading a residual clause as authorizing discretion to impose unrelated immigration cooperation conditions on grant funding).

The Court likewise finds that Defendants have failed to satisfactorily explain the Reallocation Decision.  Whether the 2025 HSGP NOFO conferred any legally enforceable rights on Plaintiffs is not at issue; instead, the NOFO provides evidence of Defendants' decision to subsequently allocate funding in a way that effectively punishes sanctuary jurisdictions.  The fact that Defendants deviated from an informal decision (i.e., the NOFO) does not absolve Defendants of their responsibility to provide some semblance of adequate reasoning for that change.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 512 (2009) (finding a new policy for which reasoned explanation was required where defendants' prior position "rested only upon staff rulings and Commission dicta"); *see also Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (applying the change-in-position doctrine to "precedents or practices"); *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985) (applying it to "commitment of funds").  And Defendants provide no substantive, contemporaneous justification whatsoever for the funding changes that took place between the DHS Directive and the final award letters, i.e., the round-number increases in awards to favored jurisdictions.  Defendants' failure to do so further renders the Reallocation Decision arbitrary and capricious.

## C.    The Performance Period Decision Violates the APA

The Court next turns to Plaintiffs' Performance Period Decision claims. Plaintiffs' primary contention is that the Performance Period Decision is arbitrary and capricious, and therefore violates the APA, because Defendants failed to provide a reasonable, contemporaneous explanation for that decision.  (ECF No. 39 at 43–45.) Indeed, apart from Defendants' subsequent explanations provided throughout this litigation, the administrative record contains no details regarding how Defendants came to their decision to limit performance periods for HSPG and EMPG grants to one year, as well as their decision to depart from their practice of providing retroactive periods of performance for EMPG grants.  Plaintiffs argue that the consequences of the Performance Period Decision—including its effective skipping over of an entire year of program funding—demonstrate its arbitrary nature.  *Id.* at 45.

Apart from *post hoc* explanations, *see* ECF No. 47 at 34–35, Defendants' only counterargument is their contention that both the Performance Period Decision and the decision to impose the Population Certification Requirement are decisions "quintessentially 'committed to agency discretion by law' for which the APA provides no avenue for review."  *Id.* at 28 (quoting 5 U.S.C. § 701(a)(2)).  According to Defendants, these decisions are essentially the kinds of "categories of administrative decisions" traditionally regarded by courts as committed to agency discretion.  *Id.* at 26 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).  Defendants argue that absent any directive from Congress stating otherwise, an agency has an "unreviewable

'capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.'" *Id.* (quoting *Lincoln*, 508 U.S. at 193). As Congress has not expressly limited FEMA's "inherent discretion" to set the period of performance for these grants, Defendants argue that the court lacks any meaningful standard "against which to judge the agency's exercise of discretion." *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).[10]

Plaintiffs respond by noting that multiple courts, including the court in *Illinois v. FEMA*, have found that 5 U.S.C. § 701(a)(2)'s restriction of judicial review is to be read "quite narrowly," and applies only to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019) (quoting *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 586 U.S. 9, 22 (2018)); *see Illinois v. FEMA*, 2025 WL 2716277, at *10. Indeed, while Defendants' argument is based primarily on *Lincoln*, *Illinois v. FEMA* expressly found that, with respect to all grant programs administered by Defendants (including, impliedly, HSGP and EMPG), "Defendants' reliance on *Lincoln* is misplaced: unlike the lump-sum funding decisions in *Lincoln*, the grants at issue here are governed by statutory and regulatory frameworks that provide judicially

---

[10] While Defendants' arguments would, if they prevailed, implicate the Court's subject-matter jurisdiction given Plaintiffs' reliance of the APA's waiver of sovereign immunity, the Court addresses this issue here given its overlap with the merits of Plaintiffs' APA claims.

manageable standards for review." 2025 WL 2716277, at *10. The Court sees no reason to depart from that finding.

As such, having found that the Performance Period Decision was not a decision committed to agency discretion by law that would render it unreviewable under the APA, the Court is left only with Defendants' *post hoc* explanations for that decision. *See* ECF No. 47 at 34–35. Some of those explanations, such as Defendants' assertions that changing to a one-year period of performance would improve flexibility in funding allocation and streamline grant management, might have been reasonable had they been articulated at the time the Performance Period Decision was made. Other explanations, such as Defendants' assertions that shorter periods of performance would encourage states to increase investment and would improve monitoring of grant recipients, are perhaps more suspect. *See* ECF No. 51 at 49 (challenging this reasoning). Absent from Defendants' explanations, however, is any indication as to why they failed to account for the gap in funding caused by the switch from retroactive to prospective-only EMPG periods of performance.

Ultimately, the facts here fall squarely within the Supreme Court's explicit determination in *Regents* that judicial review is limited to only "the grounds that the agency invoked when it took the action." 591 U.S. at 20 (quoting *Michigan*, 576 U.S. at 758). Here, as in *Regents*, Defendants' proffered reasons "can be viewed only as impermissible *post hoc* rationalizations and thus are not properly before [the Court]." *See id.* at 22. Therefore, given the lack of any contemporaneous explanation for the

Performance Period Decision, the Court concludes that it is, quintessentially, arbitrary and capricious.

### D.    The Population Certification Requirement Violates the APA

Plaintiffs claim the Population Certification Requirement is unlawful for three reasons.   (ECF No. 39 at 32–43.)   First, Plaintiffs claim that the Population Certification Requirement is contrary to law because statutes require FEMA to rely on U.S. Census Bureau data to calculate EMPG awards, not state certifications of their own populations.   *Id.* at 33–34.   Second, Plaintiffs claim that the decision to impose Population Certification Requirement is arbitrary and capricious.   *Id.* at 34–41.   Third, Plaintiffs claim that Defendants' attempt to collect information through the Population Certification Requirement fails to follow procedures required by the Paperwork Reduction Act.   *Id.* at 41–43.   Once again, the Court begins its analysis with Plaintiffs' arbitrary and capricious claim.

Plaintiffs assert three reasons why the decision to impose the Population Certification Requirement is arbitrary and capricious.   First, Plaintiffs allege that the requirement is impossible and vague because it cannot plausibly be implemented. *Id.* at 35; *see All. for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 940 (D.C. Cir. 1991) ("Impossible requirements imposed by an agency are perforce unreasonable."). Plaintiffs note that the requirement mandates that states certify that their reported populations do not include anyone who have been removed "pursuant to the immigration laws of the United States," something that is impossible for states to do because they do not have records of people removed by the federal government. (ECF

No. 39 at 35.)  Plaintiffs also note the sheer impracticality of completing state population censuses due to a lack of resources for such an endeavor and the limited timeframe set forth by the requirement.  *Id.* at 35–37.  Plaintiffs further argue that the requirement is impermissibly vague because it lacks any explanation for what constitutes "removal"; for example, does federal immigration enforcement's moving of an arrestee from one state's facility to another state's facility constitute removal? *Id.* at 37–38.

Second, as with the Performance Period Decision, Plaintiffs allege that Defendants failed to offer any satisfactory explanation for the Population Certification Requirement.  *Id.* at 38–40.  According to Plaintiffs, FEMA has relied on federal population data—rather than state certifications of their own populations—since the EMPG program began.  *Id.* at 33, 39.  The 2025 EMPG NOFO reflected this norm, as it made no suggestion that states might have to certify their own population to receive EMPG funding.  Plaintiffs argue that Defendants departed from this norm by imposing the Population Certification Requirement without any substantive explanation, right before the lapse in funding for that program.  *Id.* at 39.  Plaintiffs suggest that Defendants thus failed to "show that there [we]re good reasons" for the requirement, let alone any "awareness" that they were "changing position."  *Id.* (quoting *Fox Television Stations*, 556 U.S. at 515).

Third, Plaintiffs argue that the Population Certification Requirement is arbitrary and capricious because Defendants failed to consider states' reasonable reliance on EMPG funds, and the consequences that would result from a sudden

freeze on those funds. *Id.* at 40–41. Plaintiffs note their reliance on consistent EMPG funding for emergency preparedness needs, which has included months-long processes of reviewing project proposals for subgrantees and corresponding monetary allocations. *Id.* at 40. Plaintiffs allege that Defendants failed to consider how costly and disruptive the Population Certification Requirement would be to states' abilities to access these funds to fulfill critical public safety functions. *Id.*

Apart from their arguments as to the reviewability of the Population Certification Requirement—which the Court has already rejected—Defendants supply limited substantive justification for their decision to impose that requirement. *See* ECF No. 47 at 33–34. Defendants defend the decision as being an attempt to ensure that EMPG funding allocations are "consistent with the true state populations as of September 30, 2025." *Id.* at 34. According to Defendants, this decision falls clearly within a "zone of reasonableness" to which, under the arbitrary and capricious standard, the Court must defer. *Id.*

Once again, however, Defendants identify no contemporaneous rationale for their last-minute change to the terms and conditions of their grant awards. Defendants' failure to provide a substantive explanation for the Population Certification Requirement is made even starker than their failure to explain the Performance Period Decision given the fact that the Population Certification Requirement was added *after* Defendants issued final awards for EMPG funding. Without any contemporaneous explanation for this sudden, last-minute change, the

Court can only conclude that the decision to impose the Performance Certification Requirement was arbitrary and capricious.[11]

### E.    Plaintiffs Are Entitled to Equitable Relief

Having found that all three challenged actions by Defendants violated the APA, the Court now turns to question of what equitable relief, if any, to award. Plaintiffs ask this Court to (1) declare unlawful and (2) vacate the challenged actions; and (3) grant permanent injunctive relief against those actions. (ECF No. 39 at 46–56.) More specifically with respect to a permanent injunction, Plaintiffs request that the Court direct Defendants to amend HSGP awards to Plaintiffs to reflect the August 1, 2025 HSGP NOFO, amend HSGP and EMPG awards to provide the performance period set forth in their respective 2025 NOFOs, amend EMPG awards to remove the Population Certification Requirement, enjoin Defendants from enforcing that or any materially similar requirement, and direct Defendants to disburse all allowable costs for which Plaintiffs seek payment from their awards. *Id.* at 55–56.

Plaintiffs' requests for declaratory relief and vacatur are "intrinsically linked." *Illinois v. FEMA*, 2025 WL 2716277, at *15. As *Illinois v. FEMA* explained,

> Declaratory judgment states the law; when a court makes a declaratory judgment in the administrative law context, it declares the agency action unlawful. But declaratory relief itself does not compel an affirmative action like an injunction does; instead, it establishes the legal rights and obligations at issue. Related, but different, when a court vacates agency action, it nullifies the action and removes its legal force.

---

[11] Having found the Performance Certification Requirement to be arbitrary and capricious in violation of the APA, the Court need not address Plaintiffs' other APA claims against the requirement: that it violates both federal statutes regarding the required use of U.S. Census Bureau reports and the procedural requirements of the Paperwork Reduction Act.

> This remedial act available under the APA ensures that the unlawful agency action cannot bind the parties to the instant case, as well as all other entities affected.  So, declaratory relief provides the legal determination, and vacatur is the logical consequence of that determination.  They are two sides of the same coin.

*Id.* at *15 (internal citation omitted).

As the Court has found the challenged actions to be unlawful, declaratory relief is clearly warranted.  *See* 28 U.S.C. § 2201(a) ("In a case of an actual controversy within its jurisdiction . . . any court of the United States, . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").  Defendants, however, propose that "the APA does not permit vacatur of agency action."  (ECF No. 47 at 38.)  Defendants otherwise argue that, even should vacatur be available, the Court should only grant it in a way that applies only to Plaintiffs.  *Id.* at 38–39.

Defendants' bold assertion that vacatur is unavailable under the APA, drawn from a single concurring Supreme Court opinion questioning the availability of vacatur under the APA, *see United States v. Texas*, 599 U.S. 670, 693–703 (2023) (Gorsuch, J., concurring), is clearly wrong.  While Defendants may *wish* to see the doubts raised by that concurrence to materialize into limits on vacatur as a remedy, existing Supreme Court and First Circuit precedent affirms vacatur to be appropriate under the remedy.  *See, e.g.*, *Regents*, 591 U.S. at 9 ("[W]e conclude that the [agency] did violate the APA, and that the [challenged action] must be vacated."); *Harrington v. Chao*, 280 F.3d 50, 61 (1st Cir. 2002) (vacating agency action challenged under the APA).  Both *United States v. Texas* and, more recently, *Trump v. CASA* refused to

disturb this precedent. *See Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the [APA] authorizes federal courts to vacate federal agency action."). And "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). The Court sees no reason why vacatur should be somehow limited in this case.

The Court thus turns to Plaintiffs' request for permanent injunctive relief. "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). But "[i]n the context of analyzing claims under the APA, some courts have held that 'once the court reache[s] the conclusion that the rule was indeed illegal . . . there [is] no separate need to show irreparable injury . . . .'" *Illinois v. FEMA*, 2025 WL 2716277, at *15 (alterations in original) (quoting *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)).

Plaintiffs allege that all three of Defendants' decisions pose the risk of irreparable harm. (ECF No. 39 at 48–54.) According to Plaintiffs, the Reallocation Decision's drastic HSGP cuts will severely curtail Plaintiffs' ability to support life-saving counterterrorism programming, including, *inter alia*, programs for school safety and active shooter trainings, planning for upcoming international sporting events like the 2028 Summer Olympics, bomb squads, border security operations, terrorism watch desks, and emergency management personnel and communication systems. *Id.* at 49–50. Likewise, Plaintiffs allege that the Population Certification Requirement would result in a complete freeze on EMPG programs that enable states to fund emergency management and infrastructure. *Id.* at 51–52. Plaintiffs argue that the Performance Period Decision has "thrown state budgeting and planning processes into disarray, imposing immense administrative costs on Plaintiff States," would likely result in lost EMPG and HSGP funds due to the difficulty in completing programs within one-year timeframes, and debilitate the ability of Plaintiffs to fund long-term emergency projects. *Id.* at 52–54.

Plaintiffs also argue that the balance of equities and public interest favor permanent injunctive relief because, simply put, there "is no public interest in allowing [Defendants'] gangsterism to continue." *Id.* at 54. Plaintiffs contend that the catastrophic risks posed to their residents by Defendants' actions weighs heavily in favor of injunctive relief. *Id.* at 54–55. And Plaintiffs argue that Defendants "would suffer no harm by simply maintaining the status quo, in which HSGP funds are not re-allocated, the EMPG program is not subject to an unworkable population

certification requirement, and neither grant is subject to a surprise truncated performance period." *Id.* at 55.

Defendants challenge Plaintiffs' requested relief by arguing that Plaintiffs have failed to establish either irreparable harm or that the balance of equities and public interest weigh in favor of a permanent injunction. (ECF No. 47 at 35–37.) First, according to Defendants, Plaintiffs cannot establish irreparable harm where the HSGP funds at issue were neither "obligated to them" nor "owed" to them. *Id.* at 35–36. Defendants challenge the irreparable harm posed to Plaintiffs by the Performance Period Decision and the Population Certification Requirement, both because such harm is speculative and because, "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Id.* at 36–37 (quoting *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)).

Second, Defendants argue that the balance of equities and public interest tip in their favor because, according to Defendants, granting Plaintiffs' requested injunction would inequitably punish non-Plaintiff States by taking funding away from them. *Id.* at 37. Further, Defendants contend that "any time [the Government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Id.* (quoting *CASA*, 606 U.S. at 861). And Defendants note that the Supreme Court has recently reiterated that the government suffers irreparable harm when it is forced to disburse funds that it may be unable to recover. *Id.* (citing *Nat'l. Institutes of Health v. Am. Pub. Health Ass'n.*, 145 S. Ct. 2658 (2025); *Dept. of Educ. v. California*, 604 U.S. 650, 651–52 (2025)).

44

The Court has no trouble in finding that Plaintiffs "stand to suffer irreparable harm" because "the effect of the loss of emergency and disaster funds cannot be recovered later, and the downstream effect on disaster response and public safety are real and not compensable." *Illinois v. FEMA*, 2025 WL 2716277, at *16. And as the Court has found Defendants' actions to be unlawful, the public interest favors injunctive relief because "there is generally no public interest in the perpetuation of unlawful agency action." *New York v. Kenney*, 155 F.4th 67, 77 (1st Cir. 2025) (quoting *Somerville Pub. Schools v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025)). Thus, because Plaintiffs have succeeded on the merits of their claims, because they face irreparable harm, and because the balance of equities and public interest weigh in their favor, the Court finds permanent injunctive relief to be warranted.[12]

The remaining question, then, is what form any permanent injunctive relief should take, particularly with respect to the Reallocation Decision. Under ideal circumstances, the appropriate remedy would perhaps be to simply instruct Defendants to recalculate HSGP funding allocations in a lawful manner, consistent with the declaratory relief to be ordered by the Court. But given the last-minute nature of Defendants' decisions, the enjoined lapse in the relevant statutory appropriations, the impending December 31 deadline for award acceptance, and

---

[12] Defendants also argue that the Court should stay any ordered relief pending appeal. (ECF No. 47 at 40.) But laying aside Plaintiffs' procedural objections to that request, *see* ECF No. 51 at 47 n.9, because of the "substantial overlap" between the factors governing stay requests and "the factors governing preliminary injunctions" (and, by extension, permanent injunctions), *Nken*, 556 U.S. at 434, the Court finds a stay of any ordered relief to be unwarranted.

Defendants' continued and preposterous position that sanctuary status "did not play any role in calculating grant funding for states," (ECF No. 46-2 ¶ 19), the Court finds that this would rely too much on Defendants' good faith. Under these circumstances, the most equitable solution is to grant the injunctive relief sought by Plaintiffs by directing Defendants to allocate HSGP awards according to what, from the administrative record, appears to have been the funding determinations made prior to the unlawful Reallocation Decision: the target allocations reflected by the 2025 HSGP NOFO.

## IV.    CONCLUSION

As have other courts before it, the Court "does not—and indeed cannot—make any determination here regarding the relative merits of the executive branch's and the States' approaches to civil immigration enforcement." *California v. U.S. Dept. of Transportation*, No. 25-CV-208-JJM-PAS, 2025 WL 3072541, at *13 (D.R.I. Nov. 4, 2025). Furthermore, it is entirely possible that Defendants could, through proper adherence to the APA and to both the text and intent of the existing statutory framework, make rational adjustments to the way in which HSGP and EMPG funds are awarded to reflect the current administration's counterterrorism objectives. But the profoundly arbitrary and capricious actions Defendants took here are precisely what Congress, through the APA, forbade.

Defendants' wanton abuse of their role in federal grant administration is particularly troublesome given the fact that they have been entrusted with a most solemn duty: safeguarding our Nation and its citizens. While the intricacies of

administrative law and the terms and conditions on federal grants may seem abstract to some, the funding at issue here supports vital counterterrorism and law enforcement programs. Some of these programs were likely involved in the response to the tragic mass shooting at Brown University that recently occurred within this Court's territorial jurisdiction. To hold hostage funding for programs like these based solely on what appear to be Defendants' political whims is unconscionable and, at least here, unlawful.

As such, for the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Summary Judgment (ECF No. 39) and DENIES Defendants' Cross-Motion for Summary Judgment (ECF No. 47). Consistent with its findings, the Court orders the following:

1. The Reallocation Decision, Performance Period Decision, and Population Certification Requirement are declared unlawful and are ordered set aside and vacated;

2. Defendants are directed to amend HSGP awards issued to Plaintiffs to reflect the awards provided by the August 1, 2025 HSGP NOFO;

3. Defendants are directed to amend HSGP awards issued to Plaintiffs to provide the period of performance set forth in the August 1, 2025 HSGP NOFO, namely September 1, 2025, to August 31, 2028;

4. Defendants are directed to amend EMPG awards to Plaintiffs to provide the period of performance set forth in the 2025 EMPG NOFO, namely October 1, 2024, to September 30, 2027;

5.  Defendants are directed to amend EMPG awards issued to Plaintiffs to remove the award terms titled "Verification of a State's Population";

6.  Defendants are enjoined from enforcing by any means against Plaintiffs and their instrumentalities and subdivisions the EMPG award terms titled "Verification of a State's Population" or any materially similar terms requiring certification of a state's population as a condition on the receipt of federal funds;

7.  Defendants are directed to disburse, in the ordinary course, all allowable costs for which Plaintiffs seek payment from their fiscal year 2025 HSGP and EMPG awards on behalf of themselves and their sub-grantees.


IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge

December 22, 2025